**2015-1139, -1142**

# United States Court of Appeals
# for the Federal Circuit

TAKEDA PHARMACEUTICALS U.S.A., INC.,

*Plaintiff – Appellant,*

*v.*

WEST-WARD PHARMACEUTICAL CORPORATION,
HIKMA AMERICAS INC., and HIKMA PHARMACEUTICALS PLC,

*Defendants – Cross-Appellants.*

*Appeal from the United States District Court for the District of Delaware
in Case No. 1:14-cv-01268-SLR, Hon. Sue L. Robinson.*

## BRIEF FOR THE PLAINTIFF-APPELLANT

JEFFREY I. WEINBERGER
TED G. DANE
ELIZABETH A. LAUGHTON
MUNGER, TOLLES & OLSON LLP
355 South Grand Ave., 35th Floor
Los Angeles, CA 90071
(213) 683-9100

MARY W. BOURKE
WOMBLE CARLYLE SANDRIDGE & RICE, LLP
222 Delaware Avenue, Suite 1501
Wilmington, DE 19899
(302) 252-4320

ERIC K. CHIU
AMY L. GREYWITT
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000

TRYN T. STIMART
WOMBLE CARLYLE SANDRIDGE & RICE, LLP
8065 Leesburg Pike, 4th Floor
Tysons Corner, VA 22182
(703) 790-3310

*Counsel for Plaintiff-Appellant*

November 24, 2014

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant Takeda Pharmaceuticals U.S.A., Inc. certifies the following:

1.    The full name of every party or amicus represented by me is:

**Takeda Pharmaceuticals U.S.A., Inc.**

2.    The name of the real party in interest (if the party named in the caption is not the party in interest) represented by me is:

**N/A**

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

**Takeda Pharmaceuticals U.S.A., Inc. is a wholly-owned subsidiary of Takeda America Holdings, Inc., which is a wholly-owned subsidiary of Takeda Pharmaceutical Company Limited.**

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

**MUNGER, TOLLES & OLSON LLP**
**Jeffrey I. Weinberger, Ted G. Dane, Eric K. Chiu, Elizabeth A. Laughton, Amy L. Greywitt**

**WOMBLE CARLYLE SANDRIDGE & RICE, LLP**
**Mary W. Bourke, Tryn T. Stimart, Daniel M. Attaway**

DATE:  November 24, 2014               _/s/ Jeffrey I. Weinberger_____
                                       JEFFREY I. WEINBERGER
                                       *Counsel for Plaintiff/Appellant*

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ................................................................i

TABLE OF CONTENTS........................................................... ii

TABLE OF AUTHORITIES ......................................................v

STATEMENT OF RELATED CASES ............................................... viii

STATEMENT REGARDING ORAL ARGUMENT .......................... viii

I.     JURISDICTIONAL STATEMENT ...............................................1

II.    STATEMENT OF THE ISSUES ...................................................1

III.   INTRODUCTION ........................................................................2

IV.    STATEMENT OF THE CASE ......................................................8

       A.     Scientific and Technical Background ...................................8

       B.     The Acute Gout Flare Patents ('938 and '647 Patents) ......................11

       C.     The DDI Patents ('655, '648, and '722 Patents)................................13

       D.     Hikma's Generic Colchicine Products ................................16

       E.     District Court Proceedings ..................................................24

V.     SUMMARY OF THE ARGUMENT.....................................28

VI.    STANDARD OF REVIEW.......................................................31

VII.   ARGUMENT.........................................................................32

       A.     Under The Correct Legal Standard, Takeda Demonstrated a
              Likelihood Of Success On The Merits................................32

              1.     The Law of Inducement and *AstraZeneca v. Apotex*................32

ii

2.      Acute Gout Flare Patents ........................................35

      (a)      The District Court Erred in Failing to Find Evidence That *Some* Consumers Would Infringe Takeda's Patents Sufficient to Establish Hikma's Inducement. ..................................35

      (b)      The District Court Erred by Failing to Consider Hikma's Decision to Launch Its Product in the Face of Recognized Infringement Problems. .................37

      (c)      The District Court's Analysis of Substantial Infringing and Noninfringing Uses Is Based on an Erroneous Reading of *Warner-Lambert*.......................38

3.      DDI Patents .............................................................42

      (a)      The District Court Erred in Finding a Lack of Evidence of Direct Infringement of the DDI Patents..........................................................42

      (b)      The District Court Erred in Finding That Takeda Had Not Demonstrated Hikma's Inducement of Infringement of the DDI Patents. ...................................45

      (c)      The District Court Again Misapplied *AstraZeneca* and Conducted an Incomplete Inducement Analysis. .......................................................48

4.      The District Court Committed Legal Error in Holding That the Doctrine of Willful Blindness Does Not Apply in the Context of a Preliminary Injunction. .............50

      (a)      The Doctrine of Willful Blindness Applies to Forward-Looking Claims in the Same Way It Applies to All Other Inducement Cases. .......................50

      (b)      Takeda Has Demonstrated That Hikma Was At Least Willfully Blind to the Fact That Its Conduct Would Cause Patients to Infringe Takeda's Patents..........................................................52

B.      The District Court Erred in Failing to Find Irreparable Harm. ........... 54

     1.      Takeda Satisfied the Standard For Irreparable Harm Articulated By This Court. ........................................................ 54

     2.      All of Takeda's Identified Harms Would Be the Result of Hikma's Infringing Conduct. ................................................... 56

C.      The District Court's Injunction Pending Appeal Should Be Modified. ........................................................................................... 59

VIII.   CONCLUSION .......................................................................................... 62

ADDENDUM ................................................................................................. A1

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Apple Inc. v. Samsung Electronics Co.*,
  735 F.3d 1352 (Fed. Cir. 2013)...................................................... 7, 28

*Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK,
  2014 WL 976898 (N.D. Cal. Mar. 6, 2014).........................................56

*Apple, Inc. v. Samsung Electronics Co.*,
  678 F.3d 1314 (Fed. Cir. 2012)...........................................................54

*AstraZeneca LP v. Apotex, Inc.*,
  623 F. Supp. 2d 579 (D.N.J. 2009) ...................................... 34, 45, 51

*AstraZeneca LP v. Apotex, Inc.*,
  633 F.3d 1042 (Fed. Cir. 2010)................................................ *passim*

*DSU Med. Corp. v. JMS Co.*,
  471 F.3d 1293 (Fed. Cir. 2006) (en banc) ..........................................32

*Endo Pharm. Inc. v. Actavis, Inc.*,
  746 F.3d 1371 (Fed. Cir. 2014)...........................................................31

*Genentech, Inc. v. Novo Nordisk A/S*,
  108 F.3d 1361 (Fed. Cir. 1997)...........................................................31

*Glaxo, Inc. v. Novopharm, Ltd.*,
  110 F.3d 1562 (Fed. Cir. 1997)...........................................................43

*Global-Tech Appliances, Inc. v. SEB S.A.*,
  131 S. Ct. 2060 (2011) ................................................................ 51, 53

*Google Inc. v. Beneficial Innovations, Inc.*,
  No. 2:11-cv-0229-JRG-RSP, 2014 WL 4215402 (E.D. Tex. Aug. 22, 2014) ....36

*Hoxworth v. Blinder, Robinson & Co., Inc.*,
  903 F.2d 186 (3d Cir. 1990)................................................................61

*Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*,
  302 F.3d 1352 (Fed. Cir. 2002)...........................................................31

*Kos Pharm. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004)..............................................................59

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
  134 S. Ct. 2111 (2014) ....................................................................32

*Litton Sys., Inc. v. Sunstrand Corp.*,
  750 F.2d 952 (Fed. Cir. 1984).........................................................60

*Olsen v. Correiro*,
  189 F.3d 52 (1st Cir. 1999) .............................................................56

*Sealant Sys. Int'l, Inc. v. TEK Global S.R.L.*, No. 5:11-CV-00774-PSG,
  2014 WL 1008183 (N.D. Cal. Mar. 7, 2014).....................................58

*Takeda Pharm. U.S.A., Inc. v. Burwell*, No.
  1:14-cv-01668 (KBJ) (D.D.C.) .......................................................23

*United Therapeutics Corp. v. Sandoz*, Nos. 12-cv-01617, 13-cv-316,
  2014 WL 4259153 (D.N.J. Aug. 29, 2014) ................................. 46, 47

*Warner-Lambert Co. v. Apotex Corp.*,
  316 F.3d 1348 (Fed. Cir. 2003)......................................... 38, 39, 40, 41

*Water Techs. Corp. v. Calco, Ltd.*,
  850 F.2d 660 (Fed. Cir. 1988).........................................................32

## Statutes

28 U.S.C. § 1292(c) ..............................................................................1

28 U.S.C. § 1331 ...................................................................................1

28 U.S.C. § 1338 ...................................................................................1

28 U.S.C. § 2201 ...................................................................................1

28 U.S.C. § 2202 ...................................................................................1

35 U.S.C. § 271 .....................................................................................1

35 U.S.C. § 271(b) ........................................................................... 1, 32

vi

35 U.S.C. § 271(e)(2)..............................................................................39

FDCA § 505(b)(2)........................................................ 17, 18, 19, 20, 23

**Rules**

Fed. R. Civ. P. 65(c)...............................................................................61

**Other Authorities**

5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
    § 30:50 (4th ed. 2003) ..........................................................................59

FDA News Release (June 8, 2006), *available at*
    http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/2006/
    ucm108665.htm....................................................................................17

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Plaintiff-Appellant provides as follows:

(a)    There have been no previous appeals in this case.

(b)    The following case will directly affect or will be directly affected by this Court's decision in the instant appeal:

(1)    *Takeda Pharmaceuticals U.S.A., Inc. v. Burwell*, No. 1:14-cv-01668 (KBJ) (D.D.C.).

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument.  The issues in this case, including the Court's precedent with respect to induced infringement and the irreparable harm element for preliminary injunctive relief, are of considerable importance.  Proper resolution of these issues depends on a detailed understanding of the applicable case law and facts, including the relevant drug products, physician practices, and regulatory approval process.  Oral argument will aid the Court in evaluating these complex issues.

# I.    JURISDICTIONAL STATEMENT

This is a patent infringement suit filed by Plaintiff-Appellant Takeda Pharmaceuticals U.S.A, Inc. ("Takeda") against Defendants-Appellees West-Ward Pharmaceutical Corp., Hikma Americas Inc., and Hikma Pharmaceuticals PLC (collectively, "Hikma").  The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338, 35 U.S.C. § 271, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  The district court issued an order denying Takeda's motion for a preliminary injunction on November 4, 2014.  Takeda timely noticed its appeal on November 5, 2014.  This Court has jurisdiction over the district court's interlocutory order under 28 U.S.C. § 1292(c).

# II.    STATEMENT OF THE ISSUES

1.    Whether the district court erred legally and factually in concluding that Takeda did not establish a reasonable likelihood of success in proving inducement of infringement under 35 U.S.C. § 271(b).

2.    Whether the district court erred legally and factually in concluding that Takeda did not establish irreparable harm absent an injunction.

3.    Whether, based on the foregoing errors, the district court abused its discretion in denying Takeda's motion for preliminary injunction.

1

4.    Whether the district court abused its discretion in requiring that Takeda provide 10-business-days' notice before launching an authorized generic of its patented drug, effectively enjoining Takeda and altering the status quo.

## III.  INTRODUCTION

Takeda appeals the denial of a preliminary injunction to prevent Hikma from inducing patent infringement with the launch of its colchicine drug product called Mitigare™.  Takeda has asserted five patents relating to the use of colchicine to treat and prevent gout flares.  Absent an injunction, Hikma will infringe each of those patents.  Two of the patents-in-suit recite methods for using low-dose colchicine to treat acute gout flares (collectively, the "Acute Gout Flare Patents").  The other three patents recite methods for administering colchicine to prevent gout flares in patients concomitantly taking drugs known as "CYP3A4" or "P-gp" inhibitors, including clarithromycin, ketoconazole, and verapamil (collectively, the "Drug-Drug Interaction" or "DDI Patents").

Before Takeda's patented inventions, the potentially toxic nature of colchicine posed safety risks for its use as a gout medication.  Takeda's patents on using colchicine to treat and prevent gout flares resulted from groundbreaking discoveries by Mutual Pharmaceutical Company ("Mutual"), a former Takeda affiliate.  Through a comprehensive research and development program, Mutual developed specific colchicine dosing regimens that allowed doctors and patients to

2

treat and prevent gout flares effectively while avoiding the harmful and sometimes fatal colchicine toxicity caused by traditional prescribing practices. As a result of this research, Mutual became the first drug manufacturer to receive approval from the Food and Drug Administration ("FDA") to market colchicine for both treatment and prophylaxis (prevention) of gout flares. The package insert for that product, sold under the brand name Colcrys®, includes the only FDA-approved instructions that teach doctors and patients how to safely and effectively treat and prevent gout flares with colchicine.

Immediately following its approval of Colcrys®, FDA issued a drug safety communication to healthcare professionals, recommending that they "prescribe the FDA-approved Colcrys dose for the treatment of acute gout flares" and "refer to Colcrys' approved prescribing information for specific dosing recommendations and additional drug interaction information." (A327.) The specific dosing instructions in the Colcrys® label have since become part of the standard of care set forth by the American College of Rheumatology ("ACR") for treating gout flares and for concomitantly administering colchicine with CYP3A4 and/or P-gp inhibitors.

In 2010, Hikma sought approval to sell a 0.6 mg colchicine tablet for prophylaxis of gout flares.[1]  In an effort to avoid Takeda's patents, Hikma did not ask FDA to approve its product for the treatment of acute gout flares.  FDA nevertheless ruled that the labeling for Hikma's duplicate product would need to include all pertinent dosing information from the Colcrys® label, including instructions for administering colchicine in accordance with Takeda's patented methods.  Hikma thereupon withdrew its application.

More than a year later, Hikma filed a second application, this time for a 0.6 mg colchicine capsule, again ostensibly directed only to prophylaxis of gout flares.  Despite FDA's observation that it "may be natural" for doctors prescribing Mitigare™ for prophylaxis to also use it for treatment (A2586), Hikma did not include instructions on how to safely and effectively treat acute gout flares using its product.  Instead, Hikma instructs patients experiencing flares to "tell your healthcare provider."  (A148.)  As Hikma knew, the only source for FDA-approved instructions on how to safely and effectively administer colchicine to treat flares is the Colcrys® label.  And because FDA and the ACR have recommended that prescribers follow those dosing instructions as part of the standard of care, the inevitable and intended consequence of Hikma's instruction to "tell your

---

[1] Administering colchicine for prophylaxis of gout flares is not covered by Takeda's asserted patents, except when it involves concomitant administration with certain other drugs.

healthcare provider" will be for prescribers to consult the Colcrys® label and follow Takeda's patented low-dose colchicine regimen.

Hikma also tried to avoid including Takeda's patented dose reductions for concomitant administration, asserting to FDA that such dose reduction instructions would be "inappropriate," and suggesting other dosing regimens for which it could offer no clinical support. (A1078.) When those requests were denied, Hikma included a non-specific instruction to "either reduc[e] the daily dose or reduc[e] the dose frequency" if concomitant administration of Mitigare™ and CYP3A4 inhibitors is necessary. (A140.) As with treatment of acute gout flares, the only source for FDA-approved instructions on how to concomitantly administer colchicine safely and effectively is the Colcrys® label, and those instructions have been adopted as part of the standard of care. Accordingly, Hikma's label again will have the inevitable effect of leading prescribers to consult that label and apply Takeda's patented dosing methods.

On September 26, 2014, FDA granted Hikma approval to market and sell its Mitigare™ capsule for prophylaxis of gout flares. If allowed to resume its launch of Mitigare™, Hikma will induce infringement of Takeda's asserted patents. As this Court held in *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1060-61 (Fed. Cir. 2010), inducement may be found where (1) a proposed label's instructions would inevitably lead some consumers to practice the claimed method; (2) the

5

defendant's statements and actions indicate knowledge that its label presents infringement problems; and (3) the defendant proceeds to launch its product despite such awareness.

As noted above, the instructions in Hikma's label would inevitably lead to infringement of Takeda's patented methods. Moreover, the evidence below shows that Hikma was aware of (or at least willfully blind to) the inevitability of such infringement, yet launched its product. Despite FDA's admonition that doctors would naturally use Mitigare™ to treat acute gout flares, Hikma moved forward with a label that contained no prohibition against such use. Hikma also did not include any prohibition against concomitant administration with CYP3A4 inhibitors. As a result, Hikma will induce infringement of both the Acute Gout Flare and DDI Patents.

In erroneously concluding that Takeda had not demonstrated a reasonable likelihood of success on the merits of its inducement claims, the district court departed from *AstraZeneca*. In particular, the district court erred by failing to consider (1) the inevitable effect of the statements in Hikma's label on prescribers; and (2) Hikma's actions evincing its knowledge (or willful blindness) that its label would lead to infringement.

The district court also abused its discretion in concluding that Takeda did not establish irreparable harm in the absence of an injunction. Although the

district court recognized that Takeda would suffer substantial harm, the district court erred in its application of this Court's "nexus" requirement, finding that Takeda must demonstrate that its patented methods are the sole reason that customers will buy Mitigare™. Under *Apple Inc. v. Samsung Electronics Co.*, 735 F.3d 1352, 1356 (Fed. Cir. 2013), however, Takeda needed only to show that its patented methods will drive *some* demand for Mitigare™. Takeda did so by introducing evidence that the ability to administer colchicine in safe and effective doses makes a colchicine product significantly more desirable, thus driving demand. The court also failed to consider that, because Hikma could not have obtained FDA approval to sell Mitigare™ without including the infringing instructions, Hikma's infringement is a "but-for" cause of its sales, thus satisfying even the most rigorous application of the nexus requirement.

Finally, the district court erred in requiring that Takeda provide Hikma with 10-business-days' notice before launching an authorized generic version of Colcrys®. The district court provided no legal basis for effectively enjoining Takeda from launching a generic version of its own patented product for ten days. By giving Hikma a 10-day head start in the market, the 10-day provision will impermissibly alter the status quo. And because the district court did not impose a bond requirement on Hikma, Takeda has no recourse for the significant harm it will suffer.

7

Takeda respectfully requests that the Court reverse the district court's denial of its request for a preliminary injunction and remove the 10-day notice requirement from the district court's order.

## IV.    STATEMENT OF THE CASE

### A.    Scientific and Technical Background

Gout is a form of severe arthritis caused by accumulation of uric acid in the joints. Patients with gout typically suffer from severe and sudden attacks of pain, redness, inflammation, and tenderness in the joints known as "flares."

Colchicine is a plant extract that helps decrease these inflammatory responses, and has been used as a gout medication for centuries. Colchicine can be used for gout in two ways: (1) to treat acute flares when they occur; and (2) prophylactically, to prevent gout flares from recurring. By the end of the last century, a standard dosing regimen had developed. For prophylaxis, colchicine was administered at doses of 0.6 mg or 1.2 mg per day. In the event of an acute flare, an additional 1.2 mg of colchicine was administered at the onset of the flare, followed by 0.6 mg colchicine every hour, with the belief that a total amount in the range of 4 mg to 8 mg would be needed to be effective. (A170 col.34 ll.16-19.)

These conventional treatment regimens, however, led to serious safety risks. Colchicine is a narrow therapeutic index drug, meaning that the concentrations at which it provides therapeutic benefit are very close to those at which the drug has

toxic effects. (A2028.) The conventional dosing regimens resulted in numerous side effects, including nausea, vomiting, and diarrhea. (A2028-29.)

In addition, various drugs known as "CYP3A4 inhibitors" and "P-gp inhibitors" interfere with the metabolic breakdown of colchicine. Concomitant administration of colchicine with such drugs may therefore lead to elevated colchicine drug concentrations resulting in serious, sometimes life-threatening, side effects. (A191 col.1 ll.47-61.) For example, clarithromycin is a "strong CYP3A4 inhibitor" that has been reported to cause fatal colchicine toxicity. (A210.) Verapamil is a "moderate CYP3A4 inhibitor" that has been reported to cause significant increases in colchicine concentration leading to neuromuscular toxicity. (*Id.*)

In the mid-2000s, Mutual undertook an extensive research and development program, including a clinical trial called "AGREE" to determine whether colchicine could be effectively administered to patients without causing toxic side effects. (A2028-29.) Mutual discovered the unexpected superiority of a regimen for treating acute gout flares that reduced the total dosage from as much as 8 mg over an extended period of time to 1.8 mg in one hour. This regimen consists of "2 tablets of 0.6 mg [colchicine] followed in 1 hour by 1 tablet." (A175 col.43 l.65-col.44 l.19.) Moreover, through its drug-drug interaction studies and analysis of the pharmacokinetics of colchicine, Mutual also determined specific dose

9

reductions for safely and effectively administering colchicine to patients concomitantly taking other drugs that could lead to elevated colchicine levels (e.g., clarithromycin, ketoconazole, and verapamil). (A2029.)

In 2009, as a result of its pioneering studies, Mutual (now Takeda) became the first entity to receive FDA approval to sell colchicine in the United States for the acute treatment of gout flares and for prophylaxis in patients receiving concomitant administration of certain CYP3A4 and/or P-gp inhibitors, such as clarithromycin, ketoconazole, and verapamil. (A2028.) Takeda's product labeling for Colcrys® contains the FDA-approved dosing regimen for treating acute gout flares and provides specific FDA-approved dose adjustments when taking Colcrys® concomitantly with other drugs, including "strong" and "moderate" CYP3A4 inhibitors. (A210.)

In conjunction with its approval of Colcrys®, FDA issued a drug safety communication ("FDA Alert") to healthcare professionals. FDA stated that "data submitted [by Mutual] supporting the safety and efficacy of Colcrys in acute gout flares demonstrated that a substantially lower dose of colchicine was as effective as the higher dose traditionally used" and that "patients receiving the lower dose experienced significantly fewer adverse events." (A327.) FDA recommended that "[h]ealthcare professionals prescribe the FDA-approved Colcrys dose for the treatment of acute gout flares: 1.2 mg followed by 0.6 mg in 1 hour (total 1.8mg)."

10

(*Id*.)  With respect to concomitant administration, FDA identified "cases of fatal colchicine toxicity reported in certain patients taking standard therapeutic doses of colchicine and concomitant medications that interact with colchicine, such as clarithromycin." (*Id*.)  FDA therefore recommended that "[h]ealthcare professionals refer to Colcrys' approved prescribing information for specific dosing recommendations and additional drug interaction information." (*Id*.) Underscoring the importance of Mutual's discoveries, the ACR described Mutual's dosing regimens as a "paradigm shift" for the treatment and prevention of gout flares and incorporated those regimens into its standard of care guidelines. (A394.) The ACR informed doctors that "acute gout can be treated with a loading dose of 1.2 mg of colchicine followed by 0.6 mg 1 hour later" and referred them to Colcrys®'s "labeling … [for] colchicine dose reduction (or avoidance of colchicine use) with drug interactions with moderate to high potency [CYP3A4 and P-gp] inhibitors." (A389.)

Takeda obtained several patents relating to the inventive methods of colchicine administration set forth in its product label, five of which are at issue here.

### B.     The Acute Gout Flare Patents ('938 and '647 Patents)

Two of Takeda's asserted patents are directed to methods of treating acute gout flares with colchicine (the "Acute Gout Flare Patents").  U.S. Patent No.

11

7,981,938 ("the '938 patent") is directed to a method of treating a gout flare in a patient already undergoing prophylactic treatment with colchicine. (A152-85.) Specifically, claim 1 of the '938 patent discloses administering 1.2 mg oral colchicine at the onset of the gout flare; followed by 0.6 mg colchicine about one hour later; and then waiting twelve hours before resuming prophylactic treatment. Claim 1 of the '938 patent provides as follows:

| Element No. | Claim 1 |
|---|---|
| Element 1 | A method of treating a gout flare with colchicine in a patient undergoing colchicine prophylactic treatment of gout flares, consisting of |
| Element 2 | administering to a patient having a gout flare while undergoing prophylactic treatment of gout flares |
| Element 3 | 1.2 mgA oral colchicine at the onset of the acute gout flare, |
| Element 4 | followed by 0.6 mgA oral colchicine about one hour later; |
| Element 5 | and after waiting 12 hrs, continuing prophylactic treatment consisting of 0.6 mgA or 1.2 mgA oral colchicine daily. |

(*See* A180.)

U.S. Patent No. 7,964,647 ("the '647 patent") is also directed to a method of treating a gout flare using a specific dosing regimen of colchicine. (A422-53.) Claim 1 of the '647 patent recites administering 1.2 mg oral colchicine at the onset of the gout flare, followed by 0.6 mg colchicine about one hour later. Claim 1 of the '647 patent provides as follows:

| Element No. | Claim 1 |
|---|---|
| Element 1 | A method of treating a patient having an acute gouty arthritis attack with colchicine consisting of |
| Element 2 | administering 1.2 mg oral colchicine to a human patient having an acute gouty arthritis attack at the onset of the acute gouty arthritis attack, |
| Element 3 | followed by 0.6 mg oral colchicine one hour later. |

(*See* A451.)

## C.    The DDI Patents ('655, '648, and '722 Patents)

Three of Takeda's asserted patents are directed to methods for administering reduced doses of colchicine for the prophylaxis of gout flares in patients who are concomitantly administering certain CYP3A4 and/or P-gp inhibitors (the "DDI Patents").  For example, representative claim 3 of U.S. Patent No. 8,097,655 ("the '655 patent") recites a 75% reduction of the typical colchicine dose (to 0.3 mg once per day) in patients who are also taking clarithromycin, an antibiotic.  (A187-204.)  The elements of claim 3 are summarized as follows:[2]

| Element No. | Representative Claim 3 |
|---|---|
| Element 1 (claim 1) | A method of using colchicine for prophylactic treatment of gout flares in an adult human gout patient |
| Element 2 (claim 1) | so as to reduce the occurrence of colchicine toxicity when said patient is receiving concomitant administration of clarithromycin, said method comprising: |

[2] Claim 3 of the '655 patent depends from claims 1 and 2, and therefore incorporates all of the elements of those claims.

| Element 3 (claim 1) | orally administering |
|---|---|
| Element 4 (claim 1) | a reduced colchicine daily dosage amount to the patient for prophylactic treatment of gout flares, |
| Element 5 (claim 1) | wherein the reduced colchicine daily dosage amount is a 75% reduction of a colchicine dosage amount adapted for oral administration to the gout patient for the prophylaxis of gout flares in the absence of concomitant administration of clarithromycin, |
| Element 6 (claim 1) | wherein concomitant administration of clarithromycin is administration within 1 to 2 days of orally administering the second colchicine dosage amount. |
| Element 7 (claim 2) | wherein the colchicine dosage amount adapted for oral administration to the gout patient for the prophylaxis of gout flares in the absence of concomitant administration of clarithromycin is 0.6 mg twice per day |
| Element 8 (claim 3) | wherein the reduced colchicine daily dosage amount is 0.3 mg once per day |

(*See* A201-02.)

Representative claim 5 of U.S. Patent No. 7,964,648 ("the '648 patent") recites an adjusted daily dose of colchicine that is 25% of a 0.6 mg twice daily dose (*i.e.*, 0.3 mg once daily) for patients concomitantly taking ketoconazole, an antifungal medication. (A337-64.) The elements of claim 5 are summarized as follows: [3]

---

[3] Claim 5 of the '648 patent depends from claims 1 and 2.

14

| Element No. | Representative Claim 5 |
|---|---|
| Element 1 (claims 1 and 2) | A method of treating a patient with colchicine, [wherein the treating is for the prophylaxis of gout flares,] comprising |
| Element 2 (claim 1) | orally administering |
| Element 3 (claim 1) | an adjusted daily dosage amount of colchicine to the patient who is receiving concomitant administration of ketoconazole, |
| Element 4 (claim 1) | wherein the adjusted daily dosage amount of colchicine is 25% to 50% of an intended daily dosage amount of colchicine, |
| Element 5 (claim 1) | and wherein the intended daily dosage amount of colchicine is a dosage amount suitable for the patient if the patient were not receiving concomitant ketoconazole. |
| Element 6 (claim 2) | wherein the intended daily dosage amount of colchicine suitable for the patient if the patient were not receiving concomitant ketoconazole is 0.6 mg twice daily or 0.6 mg once daily |
| Element 7 (claim 5) | wherein the adjusted daily dosage amount of colchicine is 25% of a 0.6 mg twice daily intended dose |

(*See* A358-59.)

Representative claim 1 of U.S. Patent No. 8,440,722 ("the '722 patent")

recites an adjusted daily dose of colchicine that is 50% to 75% of the usual

colchicine daily dose (*e.g.*, 0.6 mg once daily) for patients concomitantly taking

verapamil, a heart medication.  (A399-420.)  Claim 1 provides as follows:

| Element No. | Representative Claim 1 |
|---|---|
| Element 1 | A method of treating a patient in need of treatment for prophylaxis of gout flares with colchicine, comprising |
| Element 2 | orally administering |

| Element 3 | an adjusted daily dosage amount of colchicine to the patient who is receiving concomitant administration of verapamil, |
| Element 4 | wherein the adjusted daily dosage amount of colchicine is 50% to 75% of an intended daily dosage amount of colchicine, |
| Element 5 | wherein the intended daily dosage amount of colchicine is a dosage amount suitable for the patient if the patient were not receiving concomitant verapamil, |
| Element 6 | wherein the intended daily dosage amount of colchicine suitable for the patient if the patient were not receiving concomitant verapamil is 0.6 mg twice daily or 0.6 mg once daily, |
| Element 7 | and wherein the concomitantly administered dose of verapamil is 240 mg per day. |

(*See* A420.)

### D.    Hikma's Generic Colchicine Products

Hikma was a high-volume seller of unapproved oral single-ingredient colchicine drug products prior to the approval of Colcrys® and the issuance of Takeda's patents.  From around 1972 through 2010, Hikma described itself as "the leading supplier of colchicine tablets in the United States."  (A231 ¶ 5.)

In 2006, FDA undertook a comprehensive safety initiative to remove unapproved drugs, including unapproved oral single-ingredient colchicine products, from the market.  FDA found that such "unapproved drugs represent a public health threat because consumers wrongly assume that these widely marketed and available drugs are approved and have been found to be safe and

16

effective by the FDA," despite never having been subjected to any screening process.[4]

FDA required pharmaceutical companies to discontinue selling colchicine products. In disregard of the FDA's directive, Hikma continued to manufacture and sell colchicine tablets. On October 1, 2010, FDA announced its intent to take enforcement action against colchicine manufactures, citing the threat to public safety. (A2028.) Shortly thereafter, Hikma stopped selling colchicine tablets. Until Hikma's recent 505(b)(2) approval, Takeda and its predecessor Mutual have been the sole United States provider of FDA-approved oral single-ingredient colchicine products for the treatment and prevention of gout flares. (A103 ¶ 2; A107 ¶ 17.)

In 2010, Hikma sought FDA approval to sell a 0.6 mg oral single-ingredient colchicine tablet for prophylaxis of gout flares (carving out treatment from its label). (*See* A280; A301.) Hikma's proposed product had the same active pharmaceutical ingredient, route of administration, dosage form, and strength as Takeda's Colcrys® product. (A252 n.1; A255; A302.) In other words, Hikma sought approval to market a duplicate of Colcrys®.

---

[4] FDA News Release (June 8, 2006), *available at* http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/2006/ucm108665.htm.

The typical procedure by which a company seeks FDA approval to market its own version of a brand name drug is through the Abbreviated New Drug Application ("ANDA") procedures for generic drug products. Under the statutory provisions governing ANDAs, an ANDA filer does not have to submit its own safety and efficacy data. Instead, the generic applicant may rely on the data previously submitted to FDA by the brand company in connection with approval of the brand name drug. The only clinical data required from the generic applicant is data showing that its product is "bioequivalent" to the "Reference Listed Drug" ("RLD"), *i.e.*, the previously-approved drug relied on by the generic applicant for safety and efficacy data. In addition, the generic applicant must (1) include product labeling that substantially mirrors the labeling for the RLD; and (2) indicate whether it intends to honor, or challenge the applicability or validity of, the brand company's patents relating to the RLD.

Rather than submit an ANDA for its duplicate Colcrys® product, Hikma filed a New Drug Application ("NDA") pursuant to Section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act ("FDCA"). A section 505(b)(2) application is essentially a hybrid of a typical NDA for a novel drug compound and an ANDA for a generic version of a previously-approved product. It may be used for drug products that contain previously-approved active ingredients, but have been modified in some way from the brand name drug, such as dosage strength,

18

formulation, or route of administration.  Similar to an ANDA applicant, a section

505(b)(2) applicant must identify what is called a "Listed Drug," and may rely on

the FDA's safety and efficacy findings regarding that Listed Drug.  Unlike an

ANDA applicant, a section 505(b)(2) applicant need not copy the label of the

Listed Drug for its own product.

Because the product for which Hikma sought approval in 2010 was a

duplicate Colcrys® product, Hikma's submission of a section 505(b)(2) NDA for

its duplicate colchicine product, rather than an ANDA, was improper.  To avoid

referencing the Colcrys® label, Hikma did not identify Colcrys® as the Listed Drug

but instead cited an older colchicine combination drug, Col-Probenecid.  (*See*

A306.)  Takeda submitted a Citizen Petition to FDA objecting to Hikma's NDA,

and filed a lawsuit against Hikma alleging infringement of four patents covering

Colcrys®.  (A251-72.)

On May 25, 2011, FDA granted Takeda's Citizen Petition in part.  (A291-

317.)  Most significantly, FDA rejected Hikma's attempts to avoid using the

Colcrys® label for its duplicate product.  Because Hikma had not performed any

independent testing to establish the safety and effectiveness of its colchicine

product, FDA determined that Hikma needed to rely on the studies performed by

Mutual, as well as the labeling for Colcrys®.  (A293.)  With regard to treatment of

acute gout flares, FDA stated that "the labeling for a single-ingredient colchicine

product seeking approval for prophylaxis of gout flares *must inform healthcare providers that the lower dose colchicine regimen evaluated in [Mutual's] AGREE trial is adequate to treat an acute gout flare*." (*Id.*) (emphasis added.)[5]

Similarly, with regard to concomitant administration, FDA found that "product labeling for any single-ingredient oral colchicine product needs to include adequate information on drug-drug interactions, including *relevant dose adjustments needed to prevent unnecessary toxicity*." (A293.) FDA thus granted Mutual's request that any "marketing application for a duplicate of Colcrys … must be submitted as an ANDA that cites Colcrys as the RLD." (A316.) As noted, the consequence of FDA's ruling was that Hikma would have to copy the contents of the Colcrys® label for its duplicate product, including instructions to administer the drug in accordance with Takeda's patented methods. Rather than do so, Hikma withdrew its pending application.

On October 5, 2012, Hikma submitted a new section 505(b)(2) NDA, again seeking approval for an oral single-ingredient colchicine product for prophylaxis of gout flares (and carving out treatment of gout flares). (A132-35.) This time, Hikma made an insignificant change from its prior product by converting it from a tablet to a capsule while maintaining the same dosage strength and route of

---

[5] All emphases in quotations throughout the brief are added unless otherwise indicated.

administration (Colcrys® is sold as a tablet).  In all other respects, however, its

product remained identical to Colcrys®.  Hikma again failed to file its application

as an ANDA.

Moreover, instead of including the specific instructions contained in the

Colcrys® label, Hikma's proposed label included vague statements concerning the

use of its product.  The history of how Hikma's label was negotiated with FDA is

informative.  With respect to concomitant administration, Hikma initially argued to

FDA that "specific dose reduction scheme(s) would be inappropriate in colchicine

product labeling" and that "the solution to address a drug-drug interaction concern

with colchicine would be to refrain from using colchicine or the interacting drug."

(A1078.)  FDA, however, rejected this approach, concluding that "the labeling for

a single-ingredient colchicine product would need to include *specific recommended*

*dose modifications* in the event of a need for concomitant administration with

interacting drugs (moderate CYP3A4 inhibitors, strong CYP3A4 inhibitors, and P-

gp inhibitors)."  (A1080.)  Hikma then proposed an instruction that patients who

were concomitantly administering colchicine should follow a dosing regimen

*different from* the patented Colcrys® method:  "In the rare case that both the

colchicine and the CYP3A4 and/or P-gp inhibitor are truly necessary, decrease the

dose of colchicine to 0.6 mg *once or twice per week* . . . ."  (A1146.)  Again, FDA

denied Hikma's request, finding it "[un]clear how [Hikma] derived [this] dose

21

modification recommendation[]" and expressing "concern[] that disparate recommendations in the labeling for Colcrys (colchicine) and the proposed labeling for [Hikma's] product … may cause patient and prescriber confusion with respect to drug-drug interactions."  (A2576.)

On FDA's suggestion, Hikma then conducted its own drug-drug interaction studies, but unilaterally selected different CYP3A4/P-gp inhibitors than those studied by Mutual and discussed in the Colcrys® label "to avoid potential patent issues."  (A2577-78; A2537.)  FDA, however, found Hikma's results inconclusive, "mak[ing] it difficult to know how to label the product."  (A2557.)   In the end, departing from its initial safety concerns, FDA approved the Mitigare™ label with a general instruction to "*reduc[e] the daily dose or reduc[e] the dose frequency*" when concomitantly administered with CYP3A4 or P-gp inhibitors, which were expressly described as including clarithromycin, ketoconazole, and verapamil. (A139-40 at Sec. 7.1.)  Hikma's label thus left it to physicians to consult the ACR guidelines and FDA-approved Colcrys® label to determine the specific amount of dose reduction.

With respect to acute treatment, FDA similarly informed Hikma that "the labeling for a single-ingredient colchicine product should inform healthcare providers that a lower-dose regimen is adequate to treat an acute gout flare that may occur during chronic colchicine use, in the event of a need for acute-on-

chronic treatment with colchicine." (A1080.) In further correspondence with Hikma, FDA explained that "if Mitigare is being used for prophylaxis, *it may be natural for the provider to use it for acute treatment as well*." (A2586.)

Once again, Hikma chose a middle course between explicitly incorporating the dosing instructions from the Colcrys® label and advising prescribers that its product should not be used to treat acute gout flares. The final Mitigare™ label simply states that the "safety and effectiveness of MITIGARE™ for acute treatment of gout flares during prophylaxis has not been studied" and instructs patients: "If you have a gout flare while taking Mitigare™, tell your healthcare provider." (A138; A148.)

On September 26, 2014, FDA, in an unexplained reversal of its previous safety-based rulings regarding colchicine products, approved Hikma's section 505(b)(2) NDA.[6] (A132-35.) Hikma issued a press release on September 30, 2014, announcing that it had received FDA approval of its second NDA. (*See* A110 ¶ 32.) Takeda filed suit on October 3, 2014, and Hikma launched its Mitigare™ product that same day. (A126.) Hikma continued to take steps towards

---

[6] Takeda is separately challenging FDA's decision in a separate action under the Administrative Procedures Act ("APA"). *Takeda Pharm. U.S.A., Inc. v. Burwell*, No. 1:14-cv-01668 (KBJ) (D.D.C.). Takeda's patent rights, however, are independent of and in addition to any relief that Takeda receives in that action. If the court in the APA action orders FDA to withdraw its approval of Hikma's Mitigare™, the present appeal will be mooted.

launching an authorized generic version of Mitigare™ "as early as Friday, October 10, 2014" (A22), but was temporarily enjoined by the district court on October 9, 2014.

### E.    District Court Proceedings

After learning, on September 30, 2014, of FDA's approval of Hikma's NDA for Mitigare™ (colchicine), Takeda promptly filed a suit for patent infringement on October 3, 2014, in the United States District Court for the District of Delaware. On October 6, 2014, Takeda moved for a temporary restraining order ("TRO") and preliminary injunction to prevent the irreparable harm that would be caused by Hikma's launch of Mitigare™.

On October 9, 2014, the district court granted Takeda's request for a TRO preventing Hikma from selling its generic colchicine product. (A26-27.) The district court held that Takeda had demonstrated a likelihood of success on the merits that the instructions in Hikma's label would induce patients and prescribers to infringe Takeda's patented methods. (A25.) The district court also found that the remaining factors—irreparable harm, balance of the hardships, and the public interest—favored Takeda. (A26.)

On October 31, 2014, after further briefing, the district court issued a more detailed order, which extended the TRO until November 4, 2014. Over Takeda's objection, this expanded order also imposed various obligations on Takeda. In

addition to requiring Takeda to post a $13 million bond, it:  (1) restrained Takeda from launching an authorized generic version of Colcrys® during the term of the TRO; and (2) required that, in the event the TRO was dissolved, Takeda provide Hikma with 10-business-days' notice before launching an authorized generic version of Colcrys®.  (A18-20.)

On November 4, 2014, following additional briefing and a hearing, the district court denied Takeda's motion for a preliminary injunction.  Departing from its earlier TRO decision, the court found that Takeda had not carried its burden of demonstrating a likelihood of success or irreparable harm.  (A16.)

With regard to the Acute Gout Flare Patents, the district court found the evidence insufficient to establish that doctors and patients administering Mitigare™ would do so according to Takeda's patented dosing regimen, even though Takeda's regimen is both well-known and the only regimen approved by the FDA for treating acute flares.

The parties had submitted widely divergent evidence concerning the relative extent to which colchicine is administered for treatment versus prophylaxis.  (*See* A8.)  Based on a preliminary analysis of pharmacy data for over 170,000 patients,[7]

---

[7] As explained by Takeda's Senior Director of Gout Marketing, such pharmacy data analysis is considered "best practice in the industry" for obtaining information regarding how prescription drugs are used.  (A2506 ¶ 3.)  Takeda's preliminary analysis was based on a conservative definition of prophylaxis (i.e., erring on the (footnote continued)

Takeda contended that over 56% of the market involved infringing uses, *i.e.*, treatment of acute gout flares, and that approximately 43% related to use of colchicine for prophylaxis.  (A2508 ¶ 6.)  In contrast, Hikma, based solely on the personal experience of two practicing rheumatologists, contended that 95% of the colchicine market was for prophylaxis, with only 5% being used for treatment. (*See* A776.)  Hikma did not submit any studies or data analysis, and did not challenge Takeda's market analysis.  Rather than adopt either side's contentions, the court merely stated that it "suspect[ed that] the actual number lies somewhere in between" and made no further findings on the extent of the infringing vs. noninfringing uses.  (A8 n.8.)

With respect to the DDI Patents, the district court found "there is no evidence that any healthcare provider has actually practiced the methods of the DDI patents" (A14) even though, with regard to Hikma's Mitigare™, such proof was not available because Takeda's claim was based on threatened *future* infringement.  The district court also failed to consider the declaration of a practicing rheumatologist that he had, in fact, prescribed other colchicine products for concomitant administration in accordance with the methods recited in the DDI Patents.  (*See* A2502 ¶ 2.)

side of being *more* inclusive with respect to the prophylaxis category) to assess how patients are using Colcrys®, *i.e.*, for treatment or for prophylaxis of gout flares.  (*Id.*; A2508 ¶ 7.)

The district court also held that Takeda had not offered sufficient evidence that Hikma induced any infringement by physicians or patients because Hikma's label indicated that such concomitant administration "should be avoided." (A13-14.) The district court did not address the fact that Hikma's label nonetheless recognizes that concomitant administration of Mitigare™ and CYP3A4 inhibitors might sometimes be "necessary." (*See* A140.) The district court also failed to consider (1) the instruction in Hikma's label to "reduc[e] the daily dose or reduc[e] the dose frequency" when concomitantly administering Mitigare™ with CYP3A4 inhibitors; together with (2) ACR guidelines that specifically instruct physicians to follow Takeda's patented reduced dose regimens when administering colchicine with CYP3A4 inhibitors. (*See* A140; A394.)

With respect to the other preliminary injunction factors, the district court adhered to its earlier finding that Mitigare™ would likely capture the colchicine market based on "substitution from Takeda's Colcrys® product [that] will be immediate and significant." (A15; A26.) The district court reaffirmed its earlier findings that "[s]uch a market shift would also impact, e.g., key relationships with prescribers and other market participants, damage goodwill and reputation, effect formulary displacement, etc. (D.I. 18; 69)." (A15 n.15.)

However, the district court departed from its earlier finding of irreparable harm on the ground that Takeda's evidence did not sufficiently "link[] its harm to

27

the allegedly infringing conduct." (A15.) The district court found that Takeda's harm did not all derive from Hikma's alleged infringement because there were "substantial noninfringing uses for colchicine." (*Id.*) In so ruling, the court applied a nexus requirement for establishing harm narrower than that articulated by this Court in *Apple Inc. v. Samsung Electronics Co.*, 735 F.3d 1352, 1356 (Fed. Cir. 2013) ("*Apple III*"), and did not consider the fact that all of Takeda's harms are tied directly to Hikma's infringing label, because, without that label, FDA would not approve Hikma's products.

Recognizing the "significance of this dispute to both parties," the district court extended the TRO pending appeal, on the condition that Takeda seek an immediate and expedited appeal and post an increased bond. (A16.)

## V.    SUMMARY OF THE ARGUMENT

The district court committed legal and factual errors in finding that Takeda failed to demonstrate a likelihood of success or establish irreparable harm. Based on these errors, the district court improperly denied Takeda's motion for preliminary injunction.

*Likelihood of Success* With respect to Takeda's Acute Gout Flare Patents, Hikma did not contest that there would be some direct infringement by doctors and patients. However, the district court rejected Takeda's inducement claims on the ground that Hikma lacked the requisite specific intent to induce infringement. The

28

court applied an unduly narrow analysis, refusing to infer intent without explicit directions to infringe in the label.  In so finding, the court failed to consider the surrounding context for the vague statements in Hikma's label, including Hikma's awareness that such instructions would present infringement problems, and its decision nonetheless to launch Mitigare™.  As this Court recognized in *AstraZeneca*, such additional circumstantial evidence supports a finding of intent to induce infringement.

The district court also erred in holding that an intent to induce infringement cannot be inferred where the defendant's product is capable of substantial noninfringing uses.  Where, as here, the evidence indicates that *both* the infringing and noninfringing uses are substantial, a party who knowingly facilitates infringing uses cannot evade liability based on other uses that do not infringe.

With respect to Takeda's DDI Patents, the district court improperly criticized Takeda's evidence of infringement as based on a "predictive course of conduct," rather than actual instances of infringement.  Because Takeda's claims are for declaratory relief tied to future acts of infringement, Takeda's evidence necessarily looked to the type of behavior that reasonably could be expected to occur if Hikma launched its Mitigare™ product.  As so directed, Takeda presented adequate evidence to demonstrate a likelihood of such future infringement.

29

With regard to the intent element of Takeda's inducement claims for both sets of patents, the district court again adopted an overly narrow view of the evidence, focusing entirely on the absence of explicit instructions to infringe in the Mitigare™ label and disregarding the evidence that Hikma understood and intended that such language would lead to infringement.  Moreover, the court also erred in failing to consider whether Takeda satisfied the intent requirement through evidence indicating that Hikma was willfully blind to the infringing consequences of its intentionally vague label statements.

*Irreparable Harm*  Although the district court properly concluded that the launch of Mitigare™ would significantly harm Takeda, it clearly erred in finding that Takeda had not sufficiently "linked its harm to the allegedly infringing conduct."  Undisputed evidence established such a link by showing that Takeda's patented methods of safe low-dose colchicine treatment enhance the desirability of oral single-ingredient colchicine products such as Mitigare™ to prescribers and patients.  Moreover, the court failed to take into account that FDA approval of Hikma's label—with its instructions inducing infringement—was a prerequisite to Hikma's ability to sell Mitigare™ at all.  Accordingly, Hikma's infringement is the but-for cause of all of the harms that Takeda will suffer from the launch of Mitigare™.

*Form of Injunction*  Finally, the court erred in requiring Takeda to provide 10-business-days' notice to Hikma before launching an authorized generic version of Colcrys®. No precedent supports such a unilateral restraint against the moving party after expiration of the injunction itself.  In giving Hikma an unwarranted 10-day head start, the district court's order impermissibly alters the status quo between the parties, which has the potential to inflict substantial harm upon Takeda.

## VI.    STANDARD OF REVIEW

A trial court's denial of a preliminary injunction motion is subject to review under an abuse of discretion standard.  *Endo Pharm. Inc. v. Actavis, Inc.*, 746 F.3d 1371, 1373-74 (Fed. Cir. 2014).  "[A]n abuse of discretion may be established by showing that the trial court made a clear error of judgment in weighing relevant factors or exercised its discretion based upon an error of law or clearly erroneous factual findings."  *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997).  Legal issues underlying a court's denial of a preliminary injunction are reviewed *de novo.  Endo Pharm.*, 746 F.3d at 1373; *Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1356 (Fed. Cir. 2002).

31

## VII.  ARGUMENT

### A.  Under The Correct Legal Standard, Takeda Demonstrated a Likelihood Of Success On The Merits.

#### 1.  The Law of Inducement and *AstraZeneca v. Apotex*

Under section 271 (b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer."  35 U.S.C. § 271(b).  To establish liability under section 271(b), a patent holder must show (1) direct infringement and (2) specific intent to induce, *i.e.,* that the defendant "actively and knowingly aid[ed] and abett[ed] another's direct infringement."  *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (en banc); *see also Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 (2014).  Inducement therefore "requires evidence of culpable conduct, directed to encouraging another's infringement." *DSU*, 471 F.3d at 1306.  "Direct evidence [of intent] is not required; rather, circumstantial evidence may suffice."  *Id.* (quoting *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988)).

The key decision of this Court regarding a generic company's liability for inducing infringement based upon statements in its product label is *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042 (Fed. Cir. 2010).  In *AstraZeneca*, this Court held that, in such cases, courts must consider the totality of the evidence in analyzing inducement, including not only the language of the label but also evidence indicating the accused infringer's intent with regard to the infringing use.

32

*AstraZeneca* involved a patented method for treating respiratory diseases by administering the drug budesonide "not more than once per day." 633 F.3d at 1046. Although AstraZeneca's drug label indicated that the drug could be administered either once or twice per day, Apotex attempted to "carve out" the patented once-daily method of administration by only seeking FDA approval for twice-daily administration of either 0.25 mg or 0.5 mg budesonide, with no explicit mention of once-daily administration in its label. *Id.* at 1047. However, Apotex's label included a warning that patients should "titrate down" to the lowest effective dose to avoid adverse effects. *Id* Apotex's product packaging made it impossible to reduce the dosage amount below 0.25 mg. Thus, the district court reasoned, a physician or patient titrating down from the 0.25 mg twice daily recommended dose naturally would adjust to 0.25 mg *once daily*. *Id.* at 1057.

The district court concluded that, because the label's "downward-titration" language "would necessarily lead patients to use a 0.25 mg vial of the drug once-daily," the "label *implicitly instructed* users to [practice the claimed method]." *Id.* This Court further noted that, even if the downward-titration language could also lead some doctors and patients to adopt noninfringing dose regimens, it "would inevitably lead *some* consumers to practice the claimed method." *Id.* at 1060. The Court held that the existence of such noninfringing uses did not allow Apotex to

33

evade liability for inducing other, infringing uses.  *Id. at* 1060; *see also AstraZeneca LP v. Apotex, Inc.*, 623 F. Supp. 2d 579, 601 (D.N.J. 2009).

The Court further explained that, even when a product's noninfringing uses are substantial, "liability for active inducement may be found where evidence goes beyond a product's characteristics or the knowledge that it may be put to infringing uses, and *shows statements or actions directed to promoting infringement*." *AstraZeneca*, 633 F.3d at 1059 (citations and internal quotation marks omitted). The Court reviewed Apotex's correspondence with FDA and concluded that it reflected Apotex's awareness that its label may lead to infringement.

The evidence on which the Court relied to establish Apotex's knowledge of infringement is very similar to the evidence here.  In response to a Citizen Petition, the FDA "put Apotex on notice … that downward-titration may involve once-daily dosing." *Id.* at 1058.  The evidence reflected that Apotex "was aware of and certainly concerned about the potential infringement problem" its label posed. *Id.* at 1059 (citation and internal quotation marks omitted).  Nonetheless, like Hikma, here, Apotex "decided to proceed with the label," rather than await expiration of the patent or file a Paragraph IV certification to obtain clarity on patent issues. *Id.* at 1059-61.

34

### 2.    Acute Gout Flare Patents

#### (a)    The District Court Erred in Failing to Find Evidence That *Some* Consumers Would Infringe Takeda's Patents Sufficient to Establish Hikma's Inducement.

The district court erred in finding that Hikma's label did not evince an intent to induce infringement of the Acute Gout Flare Patents.  In *AstraZeneca*, this Court made clear that the key question is "whether [the] instructions teach an infringing use of the device such that we are willing to infer from those instructions an affirmative intent to infringe."  *Id.* at 1060.  Applying that principle, *AstraZeneca* concluded that even a label containing only a "general recommendation that is applicable to any dosing regimen" could provide evidence of an affirmative intent to induce if the language was nonetheless applicable to one of the recommended starting doses such that it "would inevitably lead *some* consumers to practice the claimed method."  *Id.*

Here, the district court correctly recognized that Hikma's label "necessarily leads" patients in need of acute gout flare treatment to consult a healthcare provider.  (A11.)  However, the court erred in failing to acknowledge the necessary result of such consultation:  patients would be told to take Mitigare™ according to Takeda's patented dosing regimen.

The record below reflects that Takeda's patented regimen is the only FDA-approved treatment regimen for acute gout flares, and has been recommended to

35

doctors by both FDA and the ACR.  FDA has advised healthcare providers to "refer to Colcrys' approved prescribing information for specific dosing recommendations" and "prescribe the FDA-approved Colcrys dose for the treatment of acute gout flares."  (A327.)  Additionally, the ACR guidelines, which establish the standard of care for treating gout with colchicine, inform doctors that "acute gout can be treated with a loading dose of 1.2 mg of colchicine followed by 0.6 mg 1 hour later," as recited in Takeda's patented methods.  (A389.)  Consistent with these recommendations, Takeda submitted a declaration from Dr. Chad Boomershine, a practicing rheumatologist, stating that he relies on the Colcrys® label and the ACR guidelines for treating acute gout flares.  (A98 ¶ 8.)  Takeda therefore established a likelihood that *some* prescribers would practice the claimed method, which is all that *AstraZeneca* requires to establish intent to induce infringement.  *See Google Inc. v. Beneficial Innovations, Inc.*, No. 2:11-cv-0229-JRG-RSP, 2014 WL 4215402, at *12 (E.D. Tex. Aug. 22, 2014) ("*AstraZeneca* demonstrates that, to prove intent to induce infringement, the Court need not find that the accused inducer's acts would cause infringement in every instance, so long as those acts 'would inevitably lead some consumers to practice the claimed method.'") (citation omitted).

**(b)** **The District Court Erred by Failing to Consider Hikma's Decision to Launch Its Product in the Face of Recognized Infringement Problems.**

Although Hikma's label does not explicitly instruct users to practice the claimed method, it nonetheless label instructs: "If you have a gout flare while taking Mitigare™, tell your healthcare provider." (A148.) The potential infringement problems presented by this instruction were known to Hikma. As FDA stated in correspondence with Hikma, "if Mitigare is being used for prophylaxis, *it may be natural for the provider to use it for acute treatment as well*." (A2586.) Moreover, Hikma knew that FDA has told healthcare providers to "prescribe the FDA-approved Colcrys dose for the treatment of acute gout flares" (A327), and knew that Takeda owned patents on that dosing method (*see* A306). Despite this knowledge, Hikma went ahead with its launch of Mitigare™.

In *AstraZeneca*, this Court found such evidence sufficient to establish inducement. The Court found the requisite intent based not only on the contents of the proposed label, "but also on Apotex's decision to proceed with its plan to distribute the drug despite being aware that the label presented infringement problems." *AstraZeneca*, 633 F.3d at 1060-61.

Here, Hikma instructed patients having an acute gout flare to "tell your healthcare provider," knowing (or being willfully blind to the fact) that, based on FDA's response to Mutual's Citizen Petition, the FDA Alert discussing Colcrys®,

its communications with FDA, and the ACR Guidelines, those healthcare providers would follow Takeda's patented dosing regimens.  Hikma therefore was aware that its label would lead some doctors and patients to infringe Takeda's Acute Gout Flare Patents, yet proceeded to launch its product anyway.  As this Court explained in *AstraZeneca*, such awareness and actions support a finding of specific intent to induce infringement.  *Cf. AstraZeneca*, 633 F.3d at 1060-61.

### (c) The District Court's Analysis of Substantial Infringing and Noninfringing Uses Is Based on an Erroneous Reading of *Warner-Lambert*.

The district court also erred by relying on an erroneous reading of *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348 (Fed. Cir. 2003), focusing solely on whether Hikma could identify a substantial noninfringing use for its product, rather than assessing the extent of the *infringing* uses of that product.  In *Warner-Lambert*, this Court refused to infer intent to induce infringement where infringing uses made up only 2.1% of the market.  316 F.3d at 1365.  The Court concluded that where "fewer than 1 in 46 sales of that product are for infringing uses, we are not in a position to infer or not infer intent on the part of Apotex."  *Id.  Warner-Lambert* therefore stands for the proposition that an intent to cause infringement cannot be predicated on the mere fact that there may be some *de minimis* infringing uses of a product overwhelmingly sold for noninfringing uses.

However, that proposition does not mean a defendant can avoid liability for knowingly causing *substantial* infringing uses. Yet that is how the district court applied *Warner-Lambert*. (A5.) According to the district court, so long as substantial noninfringing uses exist, it should not consider the "market realities … that a generic product may be used in infringing ways." (A8.) Despite observing that because this is not an ANDA case, the court could "consider the record in light of the realities of the marketplace in which the parties compete" (A23),[8] the district court focused almost exclusively on Hikma's approved label rather than consider the totality of the circumstances regarding the approval of Hikma's products and Hikma's intended market.

The flaw in this reasoning is readily apparent by imagining a generic company who files an application seeking approval to sell a drug product suitable for treating two highly-prevalent indications, such as high blood pressure and heart disease, only one of which is covered by a patent. The generic company might seek express approval to sell the drug only for the non-patented application, but, for the patented indication, include an instruction to "consult your doctor." If the court concluded that such language in the label served to promote a substantial use

---

[8] (*See also* A8 n.7 (finding that "'market realities' are not persuasive in the context of § 271(e)(2) litigation" but "are relevant to a non-§ 271(e)(2) analysis such as the one at bar.") (citing *AstraZeneca LP v. Apotex, Inc.*, 669 F.3d 1370 (Fed. Cir. 2012).)

of the product for the patented indication, the generic company could not reasonably defend its conduct solely on the ground that there was also a substantial non-infringing use for its product.  In other words, the relative extent of the infringing use necessarily must be considered in determining whether intent to infringe can be inferred.

Here, Takeda presented evidence that the infringing use of Mitigare™ would be extensive, but the district court did not consider that evidence in its analysis.  In contrast to the 2.1% in *Warner-Lambert*, here, Takeda showed that *greater than 56%* of colchicine sales are for an infringing use—treating acute gout flares.  (A2508 ¶ 6.)  Thus, the majority of Hikma's intended sales are for an infringing use.  Yet the district court erroneously concluded that the fact that approximately 44% of Hikma's sales would be noninfringing allowed it to avoid liability for inducement with regard to the other 56% .

Moreover, because of the district court's misapplication of *Warner-Lambert*, it never determined whether Takeda's 56% estimate of infringing uses, or Hikma's 5% estimate, was correct.  Instead, the court merely speculated that the correct figure might lie "somewhere in between" "43.75% (Takeda's number)" and "95% (Hikma's number)."  (A8 & n.8.)

In fact, the only estimate with proper evidentiary support in the record is Takeda's 43.75% based on Takeda's preliminary analysis.  Takeda submitted a

40

market study that analyzed pharmacy data of more than 170,000 patients to assess how patients are using Colcrys®, *i.e.*, for treatment or for prophylaxis of gout flares.  (A2506 ¶ 3.)  Such pharmacy data analysis is considered "best practice in the industry" for obtaining information regarding how prescription drugs are used. (*Id.*)  Takeda's study showed that more than 56% of the colchicine market uses it to treat acute gout flares—an infringing use.  (A2508 ¶ 6.)  This is also unlike a situation where the carved out indication is for a completely different patient population.  Here, the same population of gout patients use colchicine to treat acute gout flares and for prophylaxis.  *C.f. Warner-Lambert*, 316 F.3d at 1352-53 (where patented methods were directed to neurodegenerative disease, but defendant only sought approval for treatment of partial seizures).

Hikma did not challenge either the assumptions or the methodology employed in Takeda's analysis and did not offered any competing study.  In light of Hikma's claims that it has "spent years working with the FDA, and devoted millions in drug development, to launch its generic colchicine product" (A798), one would expect Hikma to have closely examined the colchicine market.  Yet, with respect to infringing and noninfringing uses, the only evidence Hikma presented to support its 5% estimate was anecdotal testimony from two rheumatologists about their personal prescribing practices.  (A805 ¶ 6; A1386

¶ 31.)  In addition to being unsupported by any documentation, such evidence falls far short of establishing colchicine prescribing practices generally.  Indeed, Hikma presented no evidence as to the prescribing practices of the healthcare providers responsible for the vast majority of Colcrys® prescriptions, namely, primary care physicians, podiatrists, and emergency room doctors.  (A2506 ¶ 4 (rheumatologists dispense only around 11% of total Colcrys® prescriptions in the United States).)

### 3.  DDI Patents

#### (a)  The District Court Erred in Finding a Lack of Evidence of Direct Infringement of the DDI Patents.

The district court rejected Takeda's inducement claim under the DDI Patents in part based on its findings that "Takeda's experts essentially hypothesize" that direct infringement would occur, and that "there is no evidence that any healthcare provider has actually practiced the methods of the DDI patents."  (A13.)  This finding is clearly erroneous.

Takeda's declaratory judgment claims are not based on past instances of infringement, but rather the threat of *future* infringement resulting from the sale of Mitigare™.  This Court has recognized that such claims are proper where:  (1) the defendant is "engaged in an activity directed toward . . . an infringement charge . . . [or] making meaningful preparation for such activity"; and (2) the defendant's conduct "indicate[s] a refusal to change the course of its actions in the face of acts by the patentee sufficient to create a reasonable apprehension that a suit will be

forthcoming." *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1571 (Fed. Cir. 1997).

The evidence below satisfied this standard. Dr. Boomershine, a rheumatologist, testified that he has concomitantly administered colchicine to patients in accordance with the patented methods:

> For a patient undergoing concomitant administration with a strong CYP3A4 inhibitor such as clarithromycin or ketoconazole, I would typically reduce the patient's Colcrys® dose for prophylaxis of gout flares based on the dose adjustment guidelines in the Colcrys® product label. [I]f the original intended dose for prophylaxis of gout flares is 0.6 mg twice a day, I would adjust the dose to 0.3 mg once a day.

(A100-01 ¶ 17.)

The district court disregarded Takeda's evidence. Moreover, with regard to the '655 and '648 patents, the district court erroneously concluded that doctors would not alter the frequency of a 0.6 mg dose to achieve a dose of 0.3 mg once a day because colchicine has a "narrow therapeutic index." (A12.) This finding ignored the express instruction in Hikma's label that, in the event of concomitant administration CYP3A4 inhibitors, the dose of Mitigare™ could be adjusted by "*reducing the dose frequency*." (A140 at Sec. 7.1.) Indeed, Hikma itself represented to FDA that 0.6 mg *could* "be administered half as frequently as the 0.3 mg dose recommended for Colcrys" and that "decreasing the frequency of administration should actually improve the safety of the drug." (A1158.)

43

Consistent with this representation, Dr. Boomershine averred that he would follow the patented dose reduction method. (A101 ¶ 18 ("Because Mitigare™ is a capsule, splitting the dose is not feasible. Instead, I would recommend altering the frequency of dosing to every other day to achieve an average 0.3 mg once a day. I would expect that some doctors prescribing Mitigare™ would follow similar prescribing practices.").)

The evidence below also demonstrated the likelihood that other physicians would follow Takeda's patented dose reductions when concomitantly administering Mitigare™ with the CYP3A4 inhibitors recited in the DDI patents. FDA issued a safety alert describing "cases of fatal colchicine toxicity reported in certain patients taking standard therapeutic doses of colchicine and concomitant medications that interact with colchicine, such as clarithromycin." (A327.) FDA accordingly recommended that "[h]ealthcare providers refer to Colcrys' approved prescribing information for specific dosing recommendations and additional drug interaction information." (*Id.*) Similarly, the ACR's dosing guidelines referred practitioners to Colcrys®'s "labeling … [for] colchicine dose reduction (or avoidance of colchicine use) with moderate to high potency [CYP3A4] inhibitors." (A389.)

The district court criticized Takeda for relying "on a predictive course of conduct to demonstrate that Hikma has induced infringement." (A13.) However, a

44

motion for a preliminary injunction based upon imminent threatened infringement

necessarily requires a court to consider acts that have not yet occurred. *See, e.g.*,

*AstraZeneca*, 623 F. Supp. 2d at 599 (D.N.J. 2009), *aff'd*, 633 F.3d 1042 (Fed. Cir.

2010) ("[T]he Court seeks to determine whether there is (*or would be*) direct

infringement by the consumers who use Apotex's generic [drug] according to the

instructions on the Apotex Label."). Here, the record evidence indicated a

likelihood that physicians and patients would infringe Takeda's DDI patents once

Mitigare™ became available for sale. That is all that Takeda needed to show to

establish the direct infringement prong of its inducement claim.

> **(b)**    **The District Court Erred in Finding That Takeda Had Not Demonstrated Hikma's Inducement of Infringement of the DDI Patents.**

The district court also committed clear error in finding that Takeda failed to

demonstrate acts of inducement by Hikma. The district court found that Hikma's

label would not encourage or promote third-party infringement of the DDI patents

because it "characterizes the concomitant use of Mitigare™ and CYP3A4

inhibitors as something that 'should be avoided' and therefore includes only a

warning, not an instruction." (A13.)

The court's analysis failed to consider the totality of the relevant statement

in Hikma's label. The full text is as follows:

> The concomitant use of MITIGARE™ and CYP3A4 inhibitors (e.g., clarithromycin, ketoconazole, grapefruit juice, erythromycin,

verapamil, etc.) ***should be avoided*** due to the potential for serious and life-threatening toxicity [See Warnings and Precautions (5.3) and Clinical Pharmacology (12.2)].

If co-administration of MITIGARE™ and a CYP3A4 inhibitor ***is necessary***, the ***dose of MITIGARE™ should be adjusted by either reducing the daily dose or reducing the dose frequency***, and the patient should be monitored carefully for colchicine toxicity [See Clinical Pharmacology (12.2)].

(A140 at Sec. 7.1.)

In other words, the label includes *both* a warning *and* an instruction.  More specifically, it includes a warning *followed by* an instruction of how to concomitantly administer Mitigare™ with CYP3A4 inhibitors notwithstanding that warning.  *Cf. United Therapeutics Corp. v. Sandoz*, Nos. 12-cv-01617, 13-cv-316, 2014 WL 4259153, at *18 (D.N.J. Aug. 29, 2014) ("A warning provides information regarding a potential risk. It does not prescribe a course of action. An instruction, on the other hand, is a statement directing one to take some action, such as how to avoid a potential adverse event.") (cited at A13)).  Takeda introduced evidence that those choosing to follow the Mitigare™ label's instruction to "reduc[e] the dose or reduc[e] the dose frequency"  when administering Mitigare™ with a CYP3A4 inhibitor would likely have followed its patented dosing methods, as they represent the only FDA-approved dosing regimens for concomitant administration of colchicine with such other drugs.  (*See* 2502 ¶ 2.)

46

The case upon which the district court relied, *United Therapeutics*, is therefore inapposite.  (*See* A13-14.)  There, the generic company's label included *only* a warning against the infringing use.  It did not, as here, instruct patients and physicians how to engage in the infringing use despite the warning.

Moreover, in *United Therapeutics*, the patentee argued that some physicians would engage in direct infringement of the method claims at issue because the label's warnings would cause them to research the scientific literature, where they might find certain articles recommending use of a specific diluting solution.  *See United Therapeutics*, 2014 WL 4259153, at *17.   The court understandably rejected this theory as speculative, because it was premised on the possibility of a "scholarly scavenger hunt," rather than actual prescribing practices.  *See id.* at *19.

In contrast, here, Takeda's patented dosing regimens are hardly speculative.  They are the standard of care recommended by FDA and the leading authority in gout treatment, the ACR.  (A389 ("Practitioners should consult the FDA-approved [Colcrys®] drug labeling … [for] colchicine dose reduction … with drug interactions …."); A327 ("FDA recommends:  Healthcare professionals refer to Colcrys' approved prescribing information for specific dosing recommendations and additional drug interaction information.").)  Thus, it is highly likely that doctors would consult Takeda's Colcrys® label to determine how to reduce the Mitigare™ dose for concomitant administration with CYP3A4 inhibitors.  (*See*

2502 ¶ 2 ("It is my understanding that the colchicine dose reductions detailed in the Colcrys® product insert are the only FDA-approved dosing reductions of colchicine during concomitant administration with CYP3A4 or P-gp inhibitors. I am not aware of any other unique source that provides evidence-based safe and effective reduced colchicine dosing instructions during concomitant administration with a CYP3A4 or P-gp inhibitor.").)

### (c)   The District Court Again Misapplied *AstraZeneca* and Conducted an Incomplete Inducement Analysis.

In addition to giving improper weight to the evidence of inducement contained in the Mitigare™ label, the district court again misapplied *AstraZeneca* by failing to consider the evidence outside of the label that demonstrates Hikma's intent to induce third-party infringement. *Cf. AstraZeneca*, 633 F.3d at 1060-61 ("specific intent finding was not based solely on the proposed label, *but also on Apotex's decision to proceed with its plan to distribute the drug despite being aware that the label presented infringement problems*")).

Hikma's repeated attempts to avoid including the instruction to "reduc[e] the daily dose or reduc[e] the dose frequency" when concomitantly administering Mitigare™ reflect its clear knowledge that such an instruction would cause others to infringe Takeda's DDI Patents. In July 2011, during preparations to file its second NDA, Hikma argued to FDA that "a specific dose reduction scheme(s) would be inappropriate in colchicine product labeling" and that "the solution to

address a drug-drug interaction concern with colchicine would be to *refrain from using colchicine or the interacting drug*." (A1078.) FDA, however, told Hikma that, due to safety concerns, Hikma could not totally omit instructions about reducing the daily dose or dose frequency. FDA insisted that the label "would need to include specific recommended dose modifications in the event of a need for concomitant administration with interacting drugs." (A1080.) In November 2011, Hikma tried a different tack, proposing an instruction that patients who were concomitantly administering colchicine should follow a dosing regimen *different from* the patented Colcrys® method: "In the rare case that both the colchicine and the CYP3A4 and/or P-gp inhibitor are truly necessary, decrease the dose of colchicine to 0.6 mg *once or twice per week*." (A1146.) FDA again denied Hikma's request, finding it "[un]clear how [H]ikma derived [this] dose modification recommendation[]"and expressing "concern[] that disparate recommendations in the labeling for Colcrys (colchicine) and the proposed labeling for your product … may cause patient and prescriber confusion with respect to drug-drug interactions." (A1956.)

Hikma's awareness that its label presented infringement problems is also demonstrated by its decision to conduct drug-drug interaction studies using completely different CYP3A4 inhibitors than those discussed in the study results in the Colcrys® label "to avoid patent issues." (A2577; A2537.) Moreover, because

49

FDA found those studies to be inconclusive (A2557), Hikma once again was not allowed to leave out an instruction to reduce the dose of Mitigare™ when concomitant administration is necessary.  FDA ultimately approved the Mitigare™ label with a general instruction to "reduc[e] the daily dose or reduc[e] the dose frequency" when concomitantly administered with CYP3A4or P-gp inhibitors, leaving it to physicians to consult the ACR guidelines and FDA-approved Colcrys® label for specific details on how to reduce the dose.

Hikma's repeated attempts to avoid including an instruction to reduce the colchicine dose demonstrate its awareness that its label would lead prescribers and patients to Takeda's patented dosing regimens.  As this Court concluded in *AstraZeneca*, Hikma's decision to proceed with launching Mitigare™, despite such knowledge, dictates a finding of specific intent.

> **4.     The District Court Committed Legal Error in Holding That the Doctrine of Willful Blindness Does Not Apply in the Context of a Preliminary Injunction.**
>
> **(a)     The Doctrine of Willful Blindness Applies to Forward-Looking Claims in the Same Way It Applies to All Other Inducement Cases.**

The district court also erred in "declin[ing] to invoke the doctrine of willful blindness" in determining whether Takeda had established intent to induce infringement.  (*See* A9.)  Without citation to any legal authority, the court declared that the doctrine does not apply when the infringing conduct has not yet occurred.

(*See* A9 ("The doctrine of willful blindness, if invoked at bar where the generic has not even launched and there are substantial noninfringing uses, would make this already predictive exercise one that borders on mere speculation.").)

The record here, however, supports a finding of willful blindness by Hikma due to the facially apparent impact of its label on the prescribing practices of doctors and pharmacists.  In *Global-Tech*, the Supreme Court held that the knowledge requirement for induced infringement could be satisfied by showing either actual knowledge *or willful blindness*.  *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011).  Willful blindness is satisfied where "(1) the defendant . . . subjectively believe[s] there is a high probability that [the accused conduct infringes a patent] and (2) the defendant . . . take[s] deliberate actions to avoid learning of that fact."  *Id.* at 2070.  Applied in the context of a declaratory relief claim based upon the threat of future infringement, a finding of willful blindness requires that the defendant subjectively believes that there is a high probability that is conduct *will result* in infringement, yet takes deliberate steps to avoid having knowledge of such future infringement.  *See, e.g.*, *AstraZeneca*, 623 F. Supp. 2d at 599 (D.N.J. 2009), *aff'd*, 633 F.3d 1042 (Fed. Cir. 2010).

**(b)    Takeda Has Demonstrated That Hikma Was At Least Willfully Blind to the Fact That Its Conduct Would Cause Patients to Infringe Takeda's Patents.**

The district court erred in failing to consider Hikma's willful blindness to the consequences of its label as evidence of intent to induce infringement. Although Hikma sought below to downplay the likely extent of infringing conduct by healthcare providers administering Mitigare™, it was undisputed that the *only* recognized dosing standards for acute gout flares and concomitant administration of colchicine with CYP3A4 inhibitors are Takeda's patented dosing methods. (A389 (ACR guidelines reciting the patented dosing regimen for treating acute gout flares and directing doctors to the Colcrys® label for concomitant administration with CYP3A4 inhibitors).) Indeed, FDA tells healthcare providers to "refer to Colcrys®' approved prescribing information" when administering colchicine. (A327.) Except for being a capsule as opposed to a tablet, Mitigare™ is a duplicate of Colcrys®. Accordingly, to the extent clear and explicit dosing guidance cannot be found in Hikma's label, doctors prescribing Mitigare™ will inevitably follow Takeda's patented dosing regimens in accordance with the standard of care. (A99-101 ¶¶ 14, 17; A2658-59 ¶¶ 22-23.) Hikma's suggestion that no physicians will follow the FDA- and ACR-approved dosing recommendations, and will instead devise their own, case-by-case colchicine dosing regimens, is not credible.

Indeed, the extensive discussions between Hikma and FDA concerning the wording of the Mitigare™ label with regard to concomitant administration evince Hikma's awareness that, absent a clear and unambiguous instruction not to prescribe Mitigare™ to patients taking CYP3A4 inhibitors, *or* inclusion of an explicit reduced dosing regimen, physicians would inevitably turn to the Colcrys® label for guidance, and thereby infringe the DDI Patents.

With regard to the Acute Gout Flare Patents, FDA informed Hikma that "if Mitigare™ is being used for prophylaxis, it may be natural for the provider to use it for acute treatment as well." (A2586.) Moreover, any such use would follow Takeda's patented methods, as they constitute the standard of care for treating gout with colchicine. Yet Hikma made no effort to determine how often patients using Mitigare™ for prophylaxis would use that same Mitigare™ to treat acute flares, thereby sticking its head in the sand as to the extent of infringement that would occur. In fact, as Takeda demonstrated below, patient prescription data indicate that the *majority* of patients use colchicine for treating gout flares. (A2508 ¶¶ 6-7.)

Thus, at a minimum, Hikma was aware that a "high probability" existed that doctors and patients would prescribe its drug in an infringing manner and deliberately avoided learning this fact. *See Global-Tech*, 131 S. Ct. at 2070-71. The district court therefore erred for failing to consider Hikma's willful blindness as sufficient evidence to establish an intent to induce infringement.

**B.    The District Court Erred in Failing to Find Irreparable Harm.**

The district court properly concluded that, if Hikma resumed its launch, the colchicine market would shift to Hikma, causing extensive harm to Takeda.  (A15 ("[S]ubstitution from Takeda's Colcrys® product will be immediate and significant.").)  Indeed, Hikma itself acknowledged that "substitution to [Hikma's authorized generic] product would likely be rapid and substantial."  (A592.) Despite these findings, the district court found that Takeda had not satisfied the irreparable harm factor for an award of injunctive relief, because in its view, Takeda had not sufficiently "linked its harm to the allegedly infringing conduct." (A15.)

The district court's conclusion that Takeda did not demonstrate irreparable harm rests on two errors of law.  First, the district court adopted an overly restrictive view of the nexus required between the defendants' infringement and the patentee's harm by requiring that the patented feature be the *exclusive* cause of that harm.  Second, the court erred in failing to recognize that Hikma's infringing conduct was a but-for cause of *all* of the harms to Takeda, and thus the entirety of those harms are attributable to Hikma's infringement.

**1.    Takeda Satisfied the Standard For Irreparable Harm Articulated By This Court.**

In *Apple, Inc. v. Samsung Electronics Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012) ("*Apple I*"), this Court explained that a party seeking an injunction against

patent infringement must show "some causal nexus" between the infringement and the alleged harm in order to demonstrate "irreparable harm." *Id.* In its subsequent opinion in *Apple III*, which was not addressed by the district court, the Court clarified that the patentee may establish such nexus by showing "some connection between the patented feature and demand for [the allegedly infringing] products." *Apple III*, 735 F.3d at 1364. In particular, the Court stated that a causal nexus could be shown with evidence "that the inclusion of a patented feature makes a product significantly more desirable." [9] *Id.*

Takeda submitted such evidence. For instance, rheumatologist Dr. Allan Morton testified that the ability to use a colchicine product for *both* prophylaxis and treatment of acute gout flares (as set forth in the Acute Gout Flare Patents) "makes … [the] product significantly [more] desirable." (A2658 ¶ 20.) Dr. Morton similarly explained that the dosing regimens claimed in the DDI Patents make it possible for patients to safely take colchicine concomitantly without fear of serious or even fatal toxicity, again making it significantly more desirable. [10]

---

[9] This Court's analysis of the causal nexus requirement was made in the context of product claims. *See, e.g.*, *Apple III*, 735 F.3d at 1362. The Court has not yet provided specific guidance on how the nexus requirement applies to claims for methods of use.

[10] This Court has made clear that patents can be viewed in the aggregate for the purposes of an irreparable harm analysis. *Apple III*, 735 F.3d at 1365 ("[I]t may make sense to view patents in the aggregate where they all relate to the same technology or where they combine to make a product significantly more

(footnote continued)

(A2662-63 ¶ 32.)  Such desirability is hardly surprising.  A physician's ability to prescribe a gout medication that can be safely administered to a patient across a wide range of therapeutic scenarios provides valuable peace of mind and security to doctors and patients.

Accordingly, the district court clearly erred in finding that Takeda had not established a nexus between the inventive features of its patents and the harm resulting from Hikma's Mitigare™ launch.

## 2.  All of Takeda's Identified Harms Would Be the Result of Hikma's Infringing Conduct.

As discussed above, the district court erroneously concluded that Takeda must show that Hikma's infringement was the exclusive cause of *all* of the harms it would suffer from the launch of Mitigare™.  Yet, even if such a direct link were required, Takeda made such a showing.

The nexus requirement "reflects general tort principles of causation." *Apple III*, 735 F.3d at 1361.  Of particular relevance here, those principles include the concept of but-for causation.  *See, e.g.*, *Olsen v. Correiro*, 189 F.3d 52, 66 (1st Cir. 1999) (observing that "traditional tort principles" include whether "the plaintiff's harm 'would not have occurred 'but for' the [defendants'] breach [of a legal

---

valuable.").  Here, aggregation of all of the asserted patents is appropriate when assessing the presence of irreparable harm because asserted patents together enable the safe and effective use of colchicine.  *See, e.g.*, *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2014 WL 976898, at *9 (N.D. Cal. Mar. 6, 2014).

duty]'") (brackets in original).  Because FDA would not have approved Mitigare™ without the infringing label instructions, Hikma's inducement is the but-for cause of the harms that would be suffered by Takeda.  Specifically, Hikma was able to gain FDA approval for Mitigare™ only because it was understood that doctors would follow Takeda's patented dosing regimens when treating acute gout flares or concomitantly administering Mitigare™.  *See* Section IV.D *supra*.

With respect to the Acute Gout Flare Patents, FDA originally stated that "the labeling for a single-ingredient colchicine product seeking approval for prophylaxis of gout flares should inform healthcare providers that the lower dose colchicine regimen evaluated in the AGREE trial is adequate to treat an acute gout flare that may occur during chronic colchicine use."  (A314.)  FDA also knew of its own guidance that doctors "refer to Colcrys' approved prescribing information for specific dosing recommendations" and "prescribe the FDA-approved Colcrys dose for the treatment of acute gout flares."  (A327.)  Thus, in approving Mitigare™ for prophylaxis, FDA required its label to include the instruction: "If you have a gout flare while taking Mitigare™, tell your healthcare provider," (A148), knowing that this instruction would lead healthcare providers to the FDA's recommendations and/or the ACR guidelines, which in turn would instruct them to use the patented dosing regimen set forth in the Colcrys® label.

57

Similarly, with respect to the DDI Patents, Hikma repeatedly tried to craft a label that did not include the specific instruction to reduce the daily dose or dose frequency in accordance with Takeda's patented methods. Yet FDA ultimately required Hikma to include a general instruction to "reduc[e] the daily dose or reduc[e] the dose frequency" when concomitant administration with CYP3A4 or P-gp inhibitors is necessary (A140), knowing that the standard of care, as articulated by FDA and the ACR, directed physicians to prescribe colchicine according to Takeda's patented dosing regimens.

Thus, the same label language that establishes Hikma's inducement liability was essential to Hikma's ability to obtain FDA approval and market its product at all. Accordingly, Hikma's infringement constitutes a but-for cause of all of the harms Takeda will suffer as a result of Hikma's launch of Mitigare™. (*See* A2496); *see, e.g.*, *Sealant Sys. Int'l, Inc. v. TEK Global S.R.L.*, No. 5:11-CV-00774-PSG, 2014 WL 1008183, at *23 (N.D. Cal. Mar. 7, 2014) ("Because TEK's kits rely on this feature of the '581 patent—and, indeed, *could not operate* without this feature—TEK's infringement is traceably tied to its products' success causing irreparable injury.").

The district court accordingly erred in finding that Takeda had not established the requisite nexus between Hikma's infringement and the harms Takeda will suffer absent an injunction.

## C.  The District Court's Injunction Pending Appeal Should Be Modified.

The district court's opinion and order denying Takeda's motion for a preliminary injunction extended the provisions of the TRO entered on October 31, 2014, and the conditions set forth in the TRO "continue to govern the conduct of the parties." (A16.)  According to the district court, the TRO was extended to "maintain the status quo pending appeal." (*Id.*)

Paragraphs 3 and 4 of the TRO provide that both parties are enjoined from launching an authorized generic version of their products during its pendency. (A18-20.)  Paragraph 6 additionally provides, however, that Takeda "shall provide notice to Hikma at least ten business days before the launch of any authorized generic" of Colcrys®. (A20.)  This language has the effect of enjoining Takeda from launching a generic version of its own patented product for ten business days *after* any injunction against Hikma may be vacated.  There is no precedent to support such a unilateral restraint against the moving party after expiration of the injunction itself.

Hikma argued below that this provision was necessary to preserve the status quo, because Hikma would have had a head start in selling its generic drug but for the entry of the TRO.  This argument is fundamentally flawed.  The "status quo [is] defined as 'the last, peaceable, noncontested status of the parties.'" *Kos Pharm. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citing 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:50 (4th ed. 2003)); *see*

59

*also Litton Sys., Inc. v. Sunstrand Corp.*, 750 F.2d 952, 961 (Fed. Cir. 1984) ("The status quo to be preserved is that state of affairs existing immediately *before* the filing of the litigation, the last uncontested status which preceded the pending controversy."). Accordingly, the status quo here was the state of affairs that existed *before* Takeda's infringement suit was filed. Thus, to maintain the status quo, the Court needed only to restore the parties to their respective states before Takeda filed suit on October 3, 2014.

At that time, Takeda, as the patentee, was free to launch an authorized generic at any time it chose. (A2508-09 ¶ 8.) As a brand manufacturer with an approved product already on the market, Takeda did not need to develop, manufacture or receive additional FDA approval. Rather, Takeda could simply re-label its existing product as a generic to its own brand Colcrys®. (*Id.*)

Moreover, Takeda learned of the anticipated launch of Hikma's Mitigare™ product on September 30, 2014, and Hikma has represented that it planned to launch its authorized generic of Mitigare™ ten days later, on October 10, 2014. (A22.) Thus, in the absence of any injunctive relief, Takeda would have been able to immediately inform its customers that it was launching an authorized generic, and launch shortly thereafter. (A2508-09 ¶ 8.) The 10-day notice requirement thus impermissibly alters, rather than restores, the status quo that existed before suit

was filed.  It thus unjustifiably provides Hikma with a significant and otherwise unavailable period of exclusivity without generic competition from Takeda.[11] Enjoining Takeda after expiration of the injunction against Hikma would be particularly extraordinary because Hikma has brought no affirmative claims upon which that injunction could be based.  Moreover, unlike Takeda, Hikma has not been required to post a bond in the event that Takeda prevails at trial.  *See* Fed. R. Civ. P. 65(c) (permitting the imposition of  "a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained"); *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 210 (3d Cir. 1990) ("Given the text and policies of rule 65(c), this court has interpreted the bond requirement very strictly.").  Accordingly, Takeda will have no recourse against Hikma for the substantial damage that would be caused if it is not permitted to immediately compete with Hikma in the generic market due to the district court's imposition of the 10-business-day notice requirement.

---

[11] Hikma told the district court in numerous filings, that such a 'head start' has enormous competitive value in the market.  (*See, e.g.*, A591-92; A2128-31 ¶¶ 20-23.)

## VIII.  CONCLUSION

For the foregoing reasons, the district court's denial of Takeda's motion for a preliminary injunction should be reversed and Hikma should be enjoined from making, using, importing, selling, or making any offers to sell any Mitigare™ colchicine product or authorized generic thereof pending trial on the merits.  At a minimum, the case should be remanded so that Takeda's request for a preliminary injunction can be evaluated under the correct legal standards.  In addition, Takeda requests that this Court modify the district court's injunction pending appeal to remove the provision requiring Takeda to provide notice to Hikma in advance of launching an authorized generic version of Colcrys®.

Respectfully submitted,

Dated:  November 24, 2014

_/s/Jeffrey I. Weinberger_

Jeffrey I. Weinberger
*Counsel for Plaintiff-Appellant*

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

| File Date | Docket No. | Description | Page No. |
|---|---|---|---|
| 11/04/2014 | 78 | Memorandum Opinion | A1-16 |
| 11/04/2014 | 79 | Order Denying Takeda's (D.I. 5) Motion for Preliminary Injunction. Further Ordered that the Status Quo will be Maintained Pending Appeal if: (1) Takeda takes an immediate appeal and requests expedited review of both the merits and this ruling by the Federal Circuit; and (2) the conditions included in the court's order issued on October 31, 2014 (D.I. 72 ) continue to govern the conduct of the parties, except that the bond shall increase $500,000 per day until further order of this court or the Federal Circuit. | A17 |
| 10/31/2014 | 72 | Temporary Restraining Order | A18-20 |
| 10/09/2014 | 21 | Memorandum Order [granting Takeda's Motion for a Temporary Restraining Order] | A21-27 |
| 10/06/2014 | 9.3 | U.S. Patent U.S. 7,981,938 | A152-185 |
| 10/06/2014 | 9.4 | U.S. Patent U.S. 8,097,655 | A187-204 |
| 10/06/2014 | 9.17 | U.S. Patent No. 7,964,648 | A337-364 |
| 10/06/2014 | 9.18 | U.S. Patent No. 8,440,722 B2 | A399-420 |
| 10/06/2014 | 9.19 | U.S. Patent No. 7,964,647 B2 | A422-453 |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TAKEDA PHARMACEUTICALS USA, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. No. 14-1268-SLR |
| WEST-WARD PHARMACEUTICAL CORPORATION, HIKMA AMERICAS INC., and HIKMA PHARMACEUTICALS PLC, | ) ) ) ) ) | |
| Defendants. | ) ) | |

---

Mary W. Bourke, Esquire and Daniel M. Attaway, Esquire of Womble Carlyle Sandridge & Rice, LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Tryn T. Stimart, Esquire of Womble Carlyle Sandridge & Rice, LLP, Jeffrey I. Weinberger, Esquire, Ted G. Dane, Esquire, Elizabeth Laughton, Esquire, Eric K. Chiu, Esquire and Amy L. Greywitt, Esquire of Munger, Tolles & Olson LLP.

Dominick T. Gattuso, Esquire of Proctor Heyman LLP, Wilmington, Delaware. Counsel for Defendants. Of Counsel: John T. Bennett, Esquire, Elaine H. Blais, Esquire, William G. James, Esquire and Elizabeth J. Holland, Esquire of Goodwin Procter LLP, and John K. Hsu, Esquire, James F. Hurst, Esquire, Steffen N. Johnson, Esquire, Charles B. Klein, Esquire and Samuel S. Park, Esquire of Winston & Strawn LLP.

---

**MEMORANDUM OPINION**

Dated:  November 4, 2014
Wilmington, Delaware

A1

ROBINSON, District Judge

## I. INTRODUCTION

On October 3, 2014, Takeda Pharmaceuticals U.S.A., Inc. ("Takeda") filed suit

against West-Ward Pharmaceutical Corporation, Hikma Americas Inc., and Hikma

Pharmaceuticals PLC (collectively, "Hikma"), asserting induced infringement of five

patents[1] under 35 U.S.C. § 271(b).[2] (D.I. 1) Takeda is the owner of the asserted

patents, all of which cover methods of administering colchicine products for the

treatment of acute gout flares, as well as for concomitant administration of colchicine

with other drugs for prophylaxis (prevention) of gout flares.

Hikma has launched the accused product, Mitigare™, an oral single-ingredient

colchicine product, "indicated for prophylaxis of gout flares in adults" (D.I. 1, ex. H at 1),

and intends to launch a generic version of such at a price significantly below that of

Takeda's pricing structure. Although Mitigare™ has the same active ingredient, route of

administration, and strength as Takeda's colchicine product (Colcrys®), Hikma did not

file its application with the Food and Drug Administration ("FDA") as an Abbreviated

New Drug Application ("ANDA"). Instead, Hikma sought approval through the New

---

[1]U.S. Patent Nos. 7,964,648 ("the '648 patent"); 7,981,938 ("the '938 patent"); 8,097,655 ("the '655 patent"); 8,440,722 ("the '722 patent"); and 7,964,647 ("the '647 patent") (collectively, "the asserted patents"). The '655, '648 and '722 patents are directed to methods for administering reduced doses of colchicine for the prophylaxis of gout flares in patients who are concomitantly taking clarithromycin ('655 patent), ketoconazole ('648 patent), or verapamil ('722 patent). The '938 patent is directed to a method of treating a gout flare using a specific low-dose regiment in patients already undergoing prophylactic treatment with colchicine. The '647 patent is directed to a method of treating a gout flare using a low-dose regiment of colchicine.

[2]For all of the asserted patents, Takeda alleges that Hikma "will intentionally encourage acts of direct infringement immediately by healthcare providers administering and/or patients using MITIGARE™." (D.I. 1 at ¶¶ 40, 47, 54 and 61)

A2

Drug Application ("NDA") pathway under § 505(b)(2) of the Hatch-Waxman Act. Moreover, in its proposed label, Hikma has omitted specific mention of uses for which Takeda has patent protection.

On October 5, 2014, Takeda requested a temporary restraining order ("TRO") to preserve the status quo while the parties more fully briefed (and the court considered) Takeda's motion for a preliminary injunction. (D.I. 5)  On October 9, 2014, the court issued a memorandum order granting Takeda's motion for a TRO. (D.I. 21)  The parties jointly stipulated to extend the period for which the TRO was in force through the end of November 4, 2014. (D.I. 54)  Presently before the court is Takeda's motion for a preliminary injunction. (D.I. 5)  The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).  For the reasons discussed more fully below, the court denies Takeda's motion for a preliminary injunction.

## II. STANDARD OF REVIEW

"The decision to grant or deny . . . injunctive relief is an act of equitable discretion by the district court." *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  The grant of such relief is considered an "extraordinary remedy" that should be granted only in "limited circumstances."  *See Kos Pharma, Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted).  A party seeking preliminary injunction relief must demonstrate:  (1) a reasonable likelihood of success on the merits; (2) the prospect of irreparable harm in the absence of an injunction; (3) that this harm would exceed harm to the opposing party; and (4) the public interest favors such relief.  *See, e.g., Sciele Pharma Inc. v. Lupin Ltd.*,  684 F.3d 1253, 1259 (Fed. Cir. 2011); *Antares Pharma, Inc.*

2

A3

*v. Medac Pharma, Inc.*, Civ. No. 14-270, 2014 WL 3374614, at *2 (D. Del. July 10,

2014). The burden lies with the movant to establish every element in its favor or the

grant of a preliminary injunction is inappropriate. *See P.C. Yonkers, Inc. v.*

*Celebrations, the Party and Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir.

2005). If either or both of the fundamental requirements—likelihood of success on the

merits and probability of irreparable harm if relief is not granted—are absent, an

injunction cannot issue. *See McKeesport Hosp. v. Accreditation Council for Graduate*

*Med. Educ.*, 24 F.3d 519, 523 (3d Cir. 1994).

## III. DISCUSSION

### A. Likelihood of Success

As noted, Takeda has asserted inducement of infringement under 35 U.S.C. §

271(b). Under § 271(b), "[w]hoever actively induces infringement of a patent shall be

liable as an infringer." It is a plaintiff's burden to demonstrate that the accused

infringer's "actions induced infringing acts and that [the accused infringer] knew or

should have known [its] actions would induce actual infringements." *Manville Sales*

*Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990). "[M]ere knowledge

of possible infringement by others does not amount to inducement; specific intent and

action to induce infringement must be proven." *Warner Lambert Co. v. Apotex Corp.*,

316 F.3d 1348, 1364 (Fed. Cir. 2003). Therefore, "if an entity offers a product with the

object of promoting its use to infringe, as shown by clear expression or other affirmative

steps taken to foster infringement, it is liable for the resulting acts of infringement by

third parties. . . . 'The inducement rule . . . premises liability on purposeful, culpable

expressions and conduct . . . .'" *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1305-1306 (Fed. Cir. 2006) (quoting *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 937 (2005)). "[W]here a product has substantial noninfringing uses, intent to induce infringement cannot be inferred even when [the accused infringer] has actual knowledge that some users of its product may be infringing the patent." *Warner Lambert*, 316 F.3d. at 1365.[3]

In addition to the above precedent, the parties addressed two subsequent Federal Circuit decisions, *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042 (Fed. Cir. 2010) ("*AZ 2010*"), and *AstraZeneca Pharmaceuticals LP v. Apotex Corp.*, 669 F.3d 1370 (Fed. Cir. 2012) ("*AZ 2012*"). In *AZ 2010*, the Federal Circuit affirmed the grant of a preliminary injunction barring defendant Apotex from launching a generic version of a budesonide drug made and distributed by plaintiff AstraZeneca and covered under method and kit claims disclosed in several of AstraZeneca's patents. It was AstraZeneca's contention, *inter alia*, that Apotex's proposed label would induce consumers to infringe the asserted method claims "because the label implicitly instructed users to administer the generic drug once daily" by advising that, "[i]n all patients, it is desirable to downward-titrate to the lowest effective dose" once "the desired clinical effect is achieved." *AZ 2010*, 633 F.3d at 1057. Given the available strengths (0.25 mg and 0.5 mg per 2 ml vial) and the recommended starting dose (0.5

---

[3]Under the facts of record in *Warner Lambert*, where there were many uses for the product at issue and the evidence demonstrated that "fewer than 1 in 46 sales of that product [were] for infringing uses," the Federal Circuit concluded that it was "not in a position to infer or not infer intent" on the part of the accused infringer "without any direct evidence" of intent. *Id.*

4

mg total daily dose administered twice daily in divided doses, i.e., 0.25 mg administered twice daily) of the generic, the district court reasoned that "the first step in titrating down from [the starting] dose would have to be 0.25 mg once daily." The district court concluded that the downward titration language included in the proposed label "**would necessarily lead patients" to infringe** the asserted method claims which disclosed once-daily administration. *Id.* (emphasis added). By my reading, the district court found more in the label than an "implicit" instruction.

The Federal Circuit, for its part, acknowledged that when evidence of substantial noninfringing uses exists, a court may not infer intent from the mere knowledge of possible infringing uses, but must find affirmative intent from "[e]vidence of active steps . . . taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use." *Id.* at 1059 (quoting *Grokster*, 545 U.S. at 935). In other words, the evidence of specific intent must go "'beyond a product's characteristics or the knowledge that it may be put to infringing uses, and [instead show] statements or actions directed to promoting infringement.'" *Id.* at 1059 (quoting *Grokster,* 545 U.S. 913 at 936). According to the Court, then, "[t]he pertinent question is whether the proposed label instructs users to perform the patented method." *Id.* at 1060. Based on the proposed label under review and Apotex's decision to proceed with its plan to distribute its generic "despite being aware that the label presented infringement problems,"[4] the Federal Circuit found that is was "not left with a definite and firm conviction that a mistake [had] been made," thus affirming the district court's

---

[4]The record contained correspondence with the FDA wherein AstraZeneca had argued that the downward titration language taught "once-daily dosing." *Id.* at 1057-58.

determination that AstraZeneca would likely prove induced infringement at trial. *Id.* at 1061. Not exactly a ringing endorsement of the decision to enjoin Apotex.

In *AZ 2012*, defendants - all generic drug manufacturers - only sought approval in their ANDAs for unpatented methods of using rosuvastatin calcium and, consequently, submitted section viii statements[5] regarding AstraZeneca's use patents. AstraZeneca filed a § 271(e)(2)(A) action[6] against defendants based on its belief that the FDA would require the defendants to make labeling amendments explicitly incorporating the indications covered by the use patents. The Federal Circuit affirmed dismissal of AstraZeneca's claims, based on the nature of the ANDA regime. More specifically, § 271(e)(2)(A) confines the scope of the infringement analysis in the context of ANDA litigation to the scope of approval sought in the ANDA. Because generic manufacturers are permitted to limit the scope of regulatory approval they seek, they also can forego a § 271(e)(2) infringement suit "by excluding patented indications from their ANDAs." *AZ 2012*, 669 F.3d at 1379. The fact that "market realities" suggested that some users may ignore the warnings in the proposed label and use the

---

[5]Pursuant to 21 U.S.C. § 355(j)(2)(A)(viii), an applicant seeking approval for a method of use not claimed in a "method of use patent" associated with the listed drug must submit a section viii statement declaring that the patent does not claim such a use. The applicant must also remove or "carve out" any mention of the patented method of use from the proposed label for the generic drug. *See AZ 2010*, 633 F.3d at 1046; 21 C.F.R. § 314.92(a)(1).

[6]35 U.S.C. § 271(e)(2)(A) provides that "[i]t shall be an act of infringement to submit" an ANDA "for a drug claimed in a patent or the use of which is claimed in a patent."

patented method[7] was deemed "unpersuasive" in the context of specific intent, with the

Federal Circuit rejecting AstraZeneca's "expansive view of § 271(e)(2)." *Id.* at 1380.

And, indeed, it is not surprising that "market realities" are not persuasive in the context

of § 271(e)(2) litigation, where the infringement analysis starts and ends with the scope

of the ANDA, defined by statute as constituting the artificial act of infringement.

Applying the principles gleaned from the above precedent to the record at bar, I

start my analysis with several facts that I consider beyond dispute.  First, colchicine had

been used for the treatment of gout flares long before Takeda's patents issued, as

evidenced by Hikma's colchicine product that was sold in the 1970s before the FDA

withdrew all such drugs from the market.  (D.I. 9, ex. F at ¶ 5)  Second, Hikma's

proposed label omits explicit directions for uses covered by Takeda's patent.  (D.I. 9,

ex. B at ¶ 4)  Finally, regardless of whether the right number is 43.75% (Takeda's

number, D.I. 67, ¶ 6) or 95% (Hikma's number, D.I. 38 at ¶ 6; D.I. 43 at ¶¶ 31, 38),[8] the

use of colchicine for the prophylactic treatment of gout flares - as opposed to its use for

the treatment of acute gout flares - is substantial, that is, considerable.  Therefore,

specific intent cannot be inferred from the knowledge (actual or based on "market

realities"[9]) that a generic product may be used in infringing ways.  There must instead

be affirmative evidence of specific intent and action to induce infringement.

---

[7]It was AstraZeneca's contention that, "even if a generic drug is formally approved only for unpatented uses, pharmacists and doctors will nonetheless substitute the generic for all indications once it becomes available."  *AZ 2012*, 669 F.3d at 1380.

[8]I suspect the actual number lies somewhere in between.

[9]I agree with Takeda that market realities are relevant to a non-§ 271(e)(2) analysis such as the one at bar.

7

A8

As an initial note, I decline to invoke the doctrine of willful blindness to establish Hikma's intent to induce infringement. The Supreme Court in *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011), was reviewing a record of already completed actions (copying and marketing a competitor's product) when it ruled.[10] The doctrine of willful blindness, if invoked at bar where the generic has not even launched and there are substantial noninfringing uses, would make this already predictive exercise one that borders on mere speculation.

I also need to explain that my focus in the TRO proceeding was on whether it was likely that patients who were taking colchicine for prophylaxis of gout flares would follow the patented methods of treating acute flares and when co-administering with other drugs. I found there to be sufficient evidence of record in this regard. On the expanded record submitted by the parties, I find reason to question my earlier conclusions. Most significantly, however, I have come to realize that the issue is not just whether some patients and/or healthcare providers may directly infringe. The issue is whether Hikma has actively encouraged them to do so, as demonstrated by Takeda through record evidence. I address that issue now.

### 1. Induced infringement of acute gout flare patents

The '938 and '647 patents disclose methods of treatment of acute gout attacks, including where the patient is already undergoing treatment for the prophylaxis of gout flares. The treatment consists of administering 1.2 mg oral colchicine followed by 0.6

---

[10]The Court found that the evidence "was more than sufficient for a jury to find that Pentalpha subjectively believed there was a high probability that SEB's fryer was patented, that Pentalpha took deliberate steps to avoid knowing that fact, and that it therefore willfully blinded itself to the infringing nature of Sunbeam's sales." *Id.* at 2072.

mg oral colchicine one hour later.

Hikma's proposed label includes the following information.  As to "indications and usage:" "Mitigare™ is indicated for prophylaxis of gout flares in adults."  As to "limitations of use:" "The safety and effectiveness of Mitigare™ for acute treatment of gout flares during prophylaxis has not been studied."  According to the Mitigare™ Medication Guide: "If you have a gout flare while taking Mitigare™, tell your healthcare provider."  The dosage and administration of Mitigare™ is described as: "0.6 mg (one capsule) once or twice daily.  Maximum dose 1.2 mg/day.  Mitigare™ is administered orally, without regard to meals."  (D.I. 46, ex. 7)

Hikma argues that its proposed label not only lacks any affirmative directions for the treatment of acute gout flares,[11] but it actually disclaims an indication for acute gout flares.  Takeda nonetheless contends that the record has sufficient evidence of induced infringement, based on a series of postulations: (1) oral colchicine is used for prophylaxis of gout flares (as proposed in Hikma's label); (2) oral colchicine is one of the appropriate primary modality options to treat acute gout flares (D.I. 9, ex. T); (3) Hikma in its label advises patients to consult with their healthcare providers if they suffer an acute gout flare; (4) sources available to healthcare providers, such as the FDA and the American College of Rheumatology ("ACR"), refer to Colcrys®' prescribing information for the treatment of acute gout flares (D.I. 9, ex. T at 1454, ex. N; D.I. 70, ex. D at 1); therefore (5) Hikma's proposed label inevitably leads doctors to the patented treatment regime of the Colcrys® label.

---

[11]As conceded by Takeda.  (D.I. 6 at 12-13)

Even if the above evidence were undisputed, which is not the case on this expanded record,[12] the question remains whether the proposed label is a sufficient catalyst to constitute "active steps taken to encourage direct infringement" of the '938 and '647 patents.  I conclude that Takeda has not carried its burden of persuasion in this regard.  Unlike the facts reviewed in *AZ 2010*, where the generic's label itself gave the information needed to infringe (the downward titration language), Hikma's label only "necessarily leads" to consultation with a healthcare provider who may, or may not, consult Colcrys®' prescribing information and who may, or may not, follow the patented method of use for treatment of the acute gout flare.  Especially with the heavy burden associated with injunctions, Takeda has not demonstrated that such a consultation will "inevitably" lead to infringing acts.

## 2. Induced infringement of drug-drug interaction ("DDI") patents

The three DDI patents disclose methods for prophylaxis of gout flares when colchicine is co-administered with:  (1) verapamil (the '722 patent, which claims a reduced colchicine dose of 50% of the usual dose); (2) clarithromycin (the '655 patent, which claims a reduced colchicine dose of 75% of the usual dose); and (3) ketoconazole (the '648 patent, which claims a reduced colchicine dose of 25% of the usual dose).  Hikma's proposed label provides the following with respect to co-administration:

---

[12]Hikma has produced evidence, e.g., that because colchicine can cause nausea, vomiting, diarrhea and other side effects, nonsteroidal anti-inflammatory drugs "have become the treatment choice for most acute attacks of gout."  (American College of Rheumatology, *Diseases & Conditions: Gout*, http://www.rheumatology.org/Practice/Clinical/Patients/Diseases_And_Conditions/Gout/ (last visited November 4, 2014).

10

> Co-administration of P-gp or CYP3A4 inhibitors or inhibitors of both
> P-gp and CYP3A4 (e.g., clarithromycin or cyclosporine) have been
> reported to lead to colchicine toxicity.  The potential for drug-drug
> interactions must be considered prior to and during therapy.
>
> Concomitant use of MITIGARE™ and inhibitors of CYP3A4 or P-gp
> should be avoided if possible.  If co-administration of MITIGARE™
> and an inhibitor of CYP3A4 or p-gp is necessary, the dose of
> MITIGARE™ should be reduced and the patient should be
> monitored carefully for colchicine toxicity.

(D.I. 46, ex 7)

In connection with the DDI drugs, Hikma argues that Takeda has failed to meet its burden of proving either direct or indirect infringement.  With respect to the former, direct infringement of the '655 and '648 patents requires a 0.3 mg dose of colchicine, which (according to Takeda's expert) is not feasible with Mitigare™ because it is a 0.6 mg capsule that cannot be split.  (D.I. 7 at ¶ 18)  Takeda responds that "a dose of 0.3 mg once a day may be accomplished by altering the frequency of a 0.6 mg dose."  (D.I. 65 at 3; D.I. 7 at ¶¶ 17-18)  Under the circumstances, however, where the DDI patents themselves describe colchicine as having a "narrow" or "low" therapeutic index,[13] Takeda's postulation (even if consistent with arguments made by Hikma to the FDA in other contexts, *see* D.I. 41, ex. E), is not persuasive evidence of direct (certainly not

_____

[13]*See, e.g.,* '648 patent, 1:38-47:

Colchicine has a narrow therapeutic index.  The margin between an effective dose and a toxic dose of colchicine is much narrower than that of many other widely used drugs.  Consequently, actions that result in increased colchicine levels in patients receiving colchicine therapy are particularly dangerous.  Co-administration of colchicine to patients along with certain other drugs can have the effect of increasing colchicine levels. Such drug-drug interactions with colchicine have been reported to result in serious morbid complications and, in some cases, death.

11

literal) infringement.

With respect to induced infringement, Takeda concedes that Hikma's label "fails to specify how to reduce the dose or dose frequency." (D.I. 6 at 12)  Indeed, unlike the label reviewed in *AZ 2010,* which characterized downward titration to the lowest effective dose as "desirable" "for all patients," Hikma's proposed label characterizes the concomitant use of Mitigare™ and CYP3A4 inhibitors as something that "should be avoided."  As explained by the court in *United Therapeutic Corp. v. Sandoz,* Civ. No. 12-01617, 2014 WL 4259153 (D.N.J. Aug. 29, 2014), "there is a rather significant difference between a warning and an instruction."  *Id.* at *18-19.

In response, once again Takeda relies on a predictive course of conduct to demonstrate that Hikma has induced infringement.  According to the logic that must be followed in this regard: (1) a patient undergoing prophylaxis of gout flares with a colchicine regime must also be prescribed one of the three drugs at issue; (2) the healthcare provider must then determine that avoidance of co-administration is not possible; and (3) the healthcare provider must follow the patented method claims.  For the '655 and '648 patents, that requires a 0.3 mg dose of colchicine to be administered, even though Mitigare™ is available only in 0.6 mg capsules.  Consistent with the expanded record, there is no evidence that any healthcare provider has actually practiced the methods of the DDI patents[14] and, indeed, there are declarations of record

---

[14]Notably, Takeda's experts essentially hypothesize that, if co-administration of colchicine and medications "such as" any of the named drugs were required, they "would . . . typically reduce the patient's Colcrys® dose based on the dose adjustment guidelines in the Colcrys® label" (D.I. 7 at ¶ 18) or, even more generally, have in the past "trusted guidance regarding dose reduction" (D.I. 70 at ¶ 32).

12

that include evidence that "avoidance" of co-adminstration is the normal practice, given the risks of toxicity and the many options for each of the DDI drugs. (D.I. 43 at ¶ 29, D.I. 38 ¶ 7, D.I. 42 ¶ 9)   In sum, even if Takeda's theory of infringement were supported by evidence in the record, I find more persuasive the court's analysis in *United Therapeutic Corp. v. Sandoz*, where it rejected the theory "that a scholarly scavenger hunt - which may be incited by [the label]" - can "constitute evidence of [defendant's] intent to induce physicians to engage in infringing conduct."  2014 WL 4259153 at *19.  Hikma's label, "taken in its entirety, fails to recommend or suggest to a physician" that the patented methods of co-administration should be followed.  *Bayer Schering Pharma AG v. Lupin, Ltd.,* 676 F.3d 1316, 1324 (Fed. Cir. 2012).

With respect to the remaining DDI patent, the '722 patent requires not only a reduced dosage of colchicine (50% to 75% of the usual dose), but is confined to those instances "wherein the concomitantly administered dose of verapamil is 240 mg per day." ('722 patent, col. 30:36-37)  Aside from the concerns raised above and equally applicable to the '722 patent, there is the added complication that there are multiple dosing options for using verapamil other than 240 mg (D.I. 49, ex. C; D.I. 43 ¶ 42) and, again, there is no evidence that any physician has ever followed the patented method of use.  Takeda has not submitted persuasive evidence of direct infringement.  For the reasons stated above, neither has Takeda offered sufficient evidence of induced infringement.

### 3.  Validity of patents-in-suit

I agree with Takeda that Hikma has failed to raise a substantial question

regarding the validity of the acute gout flare patents, as the prior art preferred in this

regard either does not disclose the low dose regimen of the acute gout flare patents

(D.I. 43, ex. S; D.I. 70 at ¶ 46) or does not corroborate the use of such a regimen.

Likewise, with respect to the DDI patents, although the prior art suggested that the

colchicine dose should be reduced or stopped if co-administered with, e.g.,  PGP

inhibitors, there is no disclosure of what the amount of reduction should be.  (D.I. 70 at

¶ 49, ex. R)

### B.  Irreparable Harm

In connection with granting Takeda's request for a preliminary restraining order, I

found that Takeda had demonstrated irreparable harm based on the prospect that

generic Mitigare™ will likely take over the colchicine market, that is, substitution from

Takeda's Colcrys® product will be immediate and significant.[15]  The expanded record

has drawn that conclusion into some doubt, not because the anticipated market shift

will not happen, but because of the principle that "[s]ales lost to an infringing product

cannot irreparably harm a patentee if consumers buy that product for reasons other

than the patented feature."  *Apple, Inc. v. Samsung Electronics Co.*, 678 F.3d 1314,

1324 (Fed. Cir. 2012).  Having found substantial noninfringing uses for colchicine, I

cannot say with confidence that Takeda has linked its harm to the allegedly infringing

conduct.  Even the Adheris Health study does not specifically relate Colcrys® use to the

patented method.  (D.I. 67 at ¶¶ 6-7)  Under these circumstances, I conclude that

---

[15]Such a market shift would also impact, e.g., key relationships with prescribers
and other market participants, damage goodwill and reputation, effect formulary
displacement, etc.  (D.I. 18; 69)

A15

Takeda has not carried its burden to prove irreparable harm.

### C. Remaining Factors

The expanded record has not given me cause to change my analysis of the remaining factors.

## IV. CONCLUSION

Because Takeda has failed to demonstrate that it will likely prove induced infringement at trial or suffer irreparable harm, the extraordinary relief sought is not warranted. However, given the significance of this dispute to both parties, I will maintain the status quo pending appeal if: (1) Takeda takes an immediate appeal[16] and requests expedited review of both the merits and this ruling by the Federal Circuit; and (2) the conditions included in my order of October 31, 2014 (D.I. 72) continue to govern the conduct of the parties, except that the bond shall increase $500,000 per day until further order of this court or the Federal Circuit.

An appropriate order shall issue.

---

[16]On or before Wednesday, November 5, 2014 at 4:30 p.m..

A16

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TAKEDA PHARMACEUTICALS USA, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 14-1268-SLR |
| | ) | |
| WEST-WARD PHARMACEUTICAL CORPORATION, HIKMA AMERICAS INC., and HIKMA PHARMACEUTICALS PLC, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R

At Wilmington this 4th day of November, 2014, consistent with the memorandum

opinion issued this same date;

IT IS ORDERED that Takeda's motion for a preliminary injunction (D.I. 5) is

denied.

IT IS FURTHER ORDERED that the status quo will be maintained pending

appeal if:  (1) Takeda takes an immediate appeal and requests expedited review of

both the merits and this ruling by the Federal Circuit; and (2) the conditions included in

the court's order issued on October 31, 2014 (D.I. 72) continue to govern the conduct of

the parties, except that the bond shall increase $500,000 per day until further order of

this court or the Federal Circuit.

_____

United States District Judge

A17

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TAKEDA PHARMACEUTICALS U.S.A., INC.,

     Plaintiff,

v.

WEST-WARD PHARMACEUTICAL
CORPORATION, HIKMA AMERICAS INC., and
HIKMA PHARMACEUTICALS PLC,

     Defendants.

Civil Action No. 14-cv-1268-SLR

## [PROPOSED] TEMPORARY RESTRAINING ORDER

The Court having considered the parties' submissions on Plaintiff Takeda

Pharmaceuticals U.S.A., Inc.'s ("Takeda") Motion for a Temporary Restraining Order against

Defendants West-Ward Pharmaceutical Corporation ("West-Ward"), Hikma Americas Inc.

("Hikma US"), and Hikma Pharmaceuticals PLC ("Hikma Pharmaceuticals") (collectively,

"Hikma"), and having concluded that Takeda has carried its burden to demonstrate the

prerequisites for a temporary restraining order;

IT IS HEREBY ORDERED this _3ht_ day of _October_ , 2014 that:

    1.    Hikma (and its officers, agents, servants, employees, and attorneys, and other

persons who are in active concert or participation with them) are temporarily restrained from *making, using,*

*importing,* selling, or making any offers to sell (from and after the date hereof) any Mitigare™ colchicine

product or authorized generic thereof; and

    2.    Hikma (and its officers, agents, servants, employees, and attorneys, and other

persons who are in active concert or participation with them) shall immediately take, or shall

have taken, all necessary steps to maintain the status quo, including:

24844171.1

A18

a.      sending to their customers for any Mitigare™ colchicine product or

authorized generic thereof (including but not limited to drug wholesalers, warehousing

chains, and mail-order pharmacies), by facsimile and email, a letter informing them of the

Court's Order and attaching a copy of this Order thereto;

b.      refraining from fulfilling any accepted offers for sale of any Mitigare™

colchicine product or authorized generic thereof made to any customers.

3.      Hikma (and its officers, agents, servants, employees, and attorneys, and other

persons who are in active concert or participation with them) shall not take any further steps to

list the Mitigare™ colchicine product or any authorized generic thereof in any drug compendia.

4.      Takeda (and its officers, agents, servants, employees, and attorneys, and other

persons who are in active concert or participation with them) shall also immediately take all

necessary steps to maintain the status quo, including refraining from the launch of any authorized

generic of products marketed under the trade name Colcrys® and shall not take any steps to list

any authorized generic of Colcrys® in any drug compendia.

5.      This ORDER shall remain in full force and effect through ~~October 31, 2014~~, *November 4, 2014,*   *SLR*  *10/31/14*

unless otherwise ordered by this Court.

6.      Takeda shall post a bond in the amount of ___*13 million*___   ~~($1 million per~~

~~day from October 9, 2014 until the date the temporary restraining order is dissolved)~~ or such

other amount as modified by this Court. The amount of the bond does not currently reflect any

harm that Hikma may suffer and demonstrate as a result of loss of a first-mover advantage in the

marketplace. The parties recognize, however, that the Court does not currently need to address

this issue and the issue will be addressed as a later time if necessary. Should Takeda launch an

authorized generic of Colcrys® within thirty days of the expiration of this order, the Court will

24844171.1

schedule a hearing to consider further evidence regarding the appropriate amount of any increased or supplemental bond, injunctive relief and/or additional damages in excess of the aforementioned bond amount.  Takeda shall provide notice to Hikma at least 10 business days before the launch of any authorized generic of Colcrys®.


_____
Honorable Sue L. Robinson

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

TAKEDA PHARMACEUTICALS )
USA, INC., )
 )
       Plaintiff, )
 )
   v. ) Civ. No. 14-1268-SLR
 )
WEST-WARD PHARMACEUTICAL )
CORPORATION, HIKMA AMERICAS )
INC., and HIKMA PHARMACEUTICALS )
PLC, )
 )
      Defendants. )

**MEMORANDUM ORDER**

At Wilmington this 9th day of October, 2014, having conferred with counsel and

having reviewed the papers filed in connection with plaintiff's motion for a temporary

restraining order ("TRO");

IT IS ORDERED  that said motion (D.I. 5) is granted, for the reasons that follow:

1. **Background.**  Plaintiff Takeda Pharmaceuticals U.S.A., Inc. ("Takeda") has

requested a TRO to preserve the status quo while the parties more fully brief (and the

court considers) Takeda's motion for a preliminary injunction. Takeda is the owner of

the asserted patents,[1] all of which cover methods of administering colchicine products

---

[1]U.S. Patent Nos. 7,964,648 ("the '648 patent"); 7,981,938 ("the '938 patent");
8,097,655 ("the '655 patent"); 8,440,722 ("the '722 patent"); and 7,964,647 ("the '647
patent") (collectively, "the asserted patents").  The '655, '648 and '722 patents are
directed to methods for administering reduced doses of colchicine for the prophylaxis of
gout flares in patients who are concomitantly taking clarithromycin ('655 patent),
ketoconazole ('648 patent), or verapamil ('722 patent).  The '938 patent is directed to a

for the treatment of acute gout flares, as well as for concomitant administration of colchicine with other drugs for prophylaxis (prevention) of gout flares.  Defendants West-Ward Pharmaceutical Corporation, Hikma Americas Inc., and Hikma Pharmaceuticals PLC (collectively referred to as "Hikma") have launched a branded product, Mitigare™, an oral single-ingredient colchicine product, "indicated for prophylaxis of gout flares in adults" (D.I. 1, ex. H at 1), and intends to launch a generic version of such as early as Friday, October 10, 2014 at a price significantly below that of Takeda's pricing structure.  Although Mitigare™ has the same active ingredient, route of administration, and strength as Takeda's colchicine product (Colcrys®), Hikma did not file its application with the FDA as an ANDA.  Moreover, in its proposed label, Hikma has omitted specific mention of uses for which Takeda has patent protection.

2.  **Standard of review.**  "The decision to grant or deny . . . injunctive relief is an act of equitable discretion by the district court." *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  The grant of such relief is considered an "extraordinary remedy" that should be granted only in "limited circumstances."  *See Kos Pharma, Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted).  A party seeking preliminary injunction relief must demonstrate:  (1) a reasonable likelihood of success on the merits; (2) the prospect of irreparable harm in the absence of an injunction; (3) that this harm would exceed harm to the opposing party; and (4) the public interest favors such relief.  *See, e.g., Sciele Pharma Inc. v. Lupin Ltd.,*  684 F.3d 1253, 1259 (Fed. Cir.

method of treating a gout flare using a specific low-dose regiment in patients already undergoing prophylactic treatment with colchicine.  The '647 patent is directed to a method of treating a gout flare using a low-dose regiment of colchicine.

2

A22

2011); *Antares Pharma, Inc. v. Medac Pharma, Inc.*, Civ. No. 14-270, 2014 WL 3374614, at *2 (D. Del. July 10, 2014). A request for a TRO is governed by the same general standards that govern the issuance of a preliminary injunction. *In re Cyclobenzaprine*, 2011 WL 1980610, at *1 (D. Del. May 20, 2011).

3. **Analysis.** I start with the recognition that this dispute did not proceed through the statutory regime established to vet patent infringement issues before drugs enter the stream of commerce.[2] This is so because defendants did not note the asserted patents as having any relevance to their product Mitigare™. Because the infringement analysis need not reflect the artificial construct of ANDA litigation,[3] I in turn am not confined to the principle that "section 271(e)(2)(A) lies only against a patented use that has been approved by the FDA." *Bayer Schering Parma AG v. Lupin, Ltd.*, 676 F.3d 1316, 1319 (Fed. Cir. 2012). To put the point differently, I can consider the record in light of the realities of the marketplace in which the parties compete.

4. In this regard, as I have noted before, "off-label prescribing - the prescription of a medication in a manner different from that approved by the FDA - is legal and common." Stafford, "Regulating Off-Label Drug Use - Rethinking the Role of the FDA," The New England Journal of Medicine (April 3, 2008) ("Stafford") at 1427. *See generally Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 350-351 and n.5

---

[2]35 U.S.C. § 271(e)(2).

[3]The court in *IGI Laboratories, Inc. v. Mallinckrodt LLC*, 2014 WL 1652790 (D. Del. April 22, 2014), in addressing counterclaims under 35 U.S.C. § 271(e)(2)(A), described this section "as creating a highly artificial act of infringement . . . so that courts could promptly resolve infringement and validity disputes before the ANDA applicant had engaged in the traditional statutorily defined act of infringement." *Id.* at *1 (citing *AstraZeneca Pharm. LP v. Apotex Corp.*, 669 F.3d 1370, 1377 (Fed. Cir. 2012)).

(2001).  Indeed, it has been suggested that the FDA itself has a "permissive attitude

toward the promotion of off-label uses of drugs."  *See* Stafford at 1428.  Therefore, the

fact that the Mitigare™ label does not **instruct** users to perform the patented method is

not dispositive.  And, indeed, the label does contain relevant information regarding use

of Mitigare™ with other drugs:

> Co-administration of P-gp or CYP3A4 inhibitors or inhibitors of both
> P-gp and CYP3A4 (e.g., clarithromycin or cyclosporine) have been
> reported to lead to colchicine toxicity.  The potential for drug-drug
> interactions must be considered prior to and during therapy.
>
> Concomitant use of MITIGARE™ and inhibitors of CYP3A4 or P-gp
> should be avoided if possible.  If co-administration of MITIGARE™
> and an inhibitor of CYP3A4 or P-gp is necessary, the dose of
> MITIGARE™ should be reduced and the patient should be monitored
> carefully for colchicine toxicity.

(D.I. 1, ex. H at 1)

　　　5.  To prove infringement, the patentee must show that the accused method

meets every claim limitation either literally or under the doctrine of equivalents.  *Pfizer,*

*Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1376 (Fed. Cir. 2005).  To establish

inducement, the patentee must show "direct infringement, and that the alleged infringer

'knowingly induced infringement and possessed specific intent to encourage another's

infringement.'"  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010).

　　　6.  Having reviewed the record, including the claim charts prepared by Takeda

(D.I. 9, exs. M, O, and P), I conclude that Takeda has carried its burden to prove a

likelihood of success on the merits with respect to direct and induced infringement.[4]

---

[4]Hikma has not taken any steps to challenge the validity of the asserted patents,
as would be contemplated in, e.g., a Paragraph IV notice under the ANDA regime.

4

A24

More specifically, prescribing and filling prescriptions (by doctors and pharmacists) and use (by patients) of Mitigare™ for prophylaxis of gout flares will directly infringe representative claims of the '655, '648, and '722 patents. Based on the listing of these patents in the FDA's Orange Book, the parties' previous litigation history related to other colchicine patents,[5] and Hikma's instructions in the product labeling for Mitigare™, I conclude that Hikma knew about the patents and that the prescription or use of Mitigare™ infringes those patents. *See AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir. 2010) (a finding of specific intent is justified when the language of the accused infringer's product labeling "would inevitably lead some customers to practice the claimed method.").

7. With respect to the '938 and '647 patents, the pharmacological properties of Takeda's branded drug Colcrys® and Mitigare™ are identical. (D.I. 7, ¶ 12) Although Mitigare™ is approved for a more limited use than is Colcrys® - the latter is approved for treatment and prophylaxis of gout flares, while the former is approved only for prophylaxis - the record indicates that it is likely that some patients may use the same medication they use for prophylaxis to treat an acute gout flare when it occurs, because the dosing is similar (administration of "0.6 mg (one capsule) once or twice daily"). (D.I. 1, ex. H at 1; *see* D.I. 7, ¶¶ 10-14) Consistent with the claim chart provided by Takeda (D.I. 9, ex. S), I conclude that Takeda has carried its burden of proof to demonstrate direct infringement. Furthermore, by providing patients using colchicine for prophylaxis

---

[5]Takeda previously asserted several patents against Hikma relating to the concomitant administration of colchicine with other drugs for the prophylaxis of gout flares. (D.I. 9, ex. I)

of gout flares with the same 0.6 mg colchicine that is used to treat acute gout flares, with knowledge of the patents and the dosing recommendations specified by the FDA in the Orange Book, there is sufficient evidence of a specific intent on Hikma's part to induce infringement. By selling Mitigare™, Hikma is providing a 0.6 mg colchicine product to gout patients who will likely need to treat acute gout attacks and can readily do so by taking Mitigare™ consistent with the use of colchicine as recommended by the FDA and disclosed by the '983 and '647 patents. Indeed, the limited market for Mitigare™'s approved use - prophylaxis only - further demonstrates a specific intent to induce infringement, as the vast majority of gout patients using colchicine for prophylaxis also suffer acute gout flares. (D.I. 7, ¶ 13)

8. I also conclude that Takeda has carried its burden to demonstrate the remaining prerequisites for preliminary relief. There is sufficient record evidence to demonstrate that the generic launch will significantly impact Takeda's market share of colchicine products, as well as impair goodwill, pricing, and research and development efforts. (D.I. 8) Further, it is my impression that Hikma has effectively side-stepped the ANDA regime in an effort to get its generic product to market without appropriate legal underpinnings. For these reasons, the balance of hardships (maintaining the status quo for 14 days) and the public interest weigh in Takeda's favor.

9. **Conclusion.** For the reasons stated above, Takeda's motion for a temporary restraining order is granted.

IT IS FURTHER ORDERED that defendants shall maintain the status quo with

A26

respect to the launch of their generic colchicine product as of the date of this order,[6]

and may be sanctioned if they have moved forward with their launch in bad faith despite

the pendency of these proceedings.  A telephonic status conference shall be conducted

on Tuesday, October 14 at 1:00 p.m., with counsel for Takeda initiating the call.

Takeda shall take the laboring oar in preparing a more detailed form of order for review

by defendants and the court.

United States District Judge

---

[6]In other words, if defendants have launched so that their generic product is in
the stream of commerce and, ostensibly, out of their custody or control, defendants
must demonstrate that they have reached out to their customers and presented this
order to them in order to stay any further distribution of the generic.

7

A27

US007981938B2

(12) **United States Patent**           (10) **Patent No.:**     **US 7,981,938 B2**
Davis                                    (45) **Date of Patent:**     **\*Jul. 19, 2011**

(54) **COLCHICINE COMPOSITIONS AND METHODS**

(75) Inventor: **Matthew W. Davis**, Erwinna, PA (US)

(73) Assignee: **Mutual Pharmaceutical Company, Inc.**, Philadelphia, PA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/687,406**

(22) Filed: **Jan. 14, 2010**

(65) **Prior Publication Data**

US 2010/0105780 A1     Apr. 29, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 12/545,377, filed on Aug. 21, 2009, which is a continuation of application No. 12/465,210, filed on May 13, 2009, and a continuation of application No. 12/407,980, filed on Mar. 20, 2009, which is a continuation of application No. 12/246,034, filed on Oct. 6, 2008.

(60) Provisional application No. 60/977,796, filed on Oct. 5, 2007, provisional application No. 61/090,965, filed on Aug. 22, 2008.

(51) **Int. Cl.**
        *A01N 37/18*     (2006.01)
        *A61K 31/16*     (2006.01)
        *C07C 233/00*     (2006.01)
        *C07C 235/00*     (2006.01)
        *C07C 237/00*     (2006.01)
        *C07C 239/00*     (2006.01)
        *C07C 211/00*     (2006.01)
        *C07C 205/00*     (2006.01)
        *C07C 207/00*     (2006.01)

(52) **U.S. Cl.** ........ 514/629; 564/123; 564/308; 564/427; 568/306

(58) **Field of Classification Search** .................. 514/629; 564/123, 308, 427; 568/306
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

7,601,758 B1 \*   10/2009  Davis ........................... 514/629
7,619,004 B1 \*   11/2009  Davis ........................... 514/629

OTHER PUBLICATIONS

Wang et al. 2001, HMG-CoA reductase inhibitors (Statins) characterized as direct inhibitors of P-glycoprotein. Pharmaceutical Research, vol. 18, No. 6, pp. 800-806.\*
Horn et al. 2006, Life-threatening colchicine drug interactions. Pharmacy Times, p. 111.\*
U.S. Appl. No. 12/372,046, filed Feb. 2009, Davis, Matthew W.\*

U.S. Appl. No. 12/407,980, filed Mar. 2009, Davis, Matthew W.\*
U.S. Appl. No. 12/465,210, filed May 2009, Davis, Matthew W.\*
U.S. Appl. No. 12/688,038, filed Jan. 2010, Davis, Matthew W.\*
U.S. Appl. No. 12/576,355, filed Oct. 2009, Davis, Matthew W.\*
U.S. Appl. No. 12/545,120, filed Aug. 2009, Davis, Matthew W.\*
U.S. Appl. No. 12/489,750, filed Jun. 2009, Davis, Matthew W.\*
U.S. Appl. No. 12/545,377, filed Aug. 2009, Davis, Matthew W.\*
U.S. Appl. No. 12/246,034, filed Oct. 2008, Davis, Matthew W.\*
Jordan, K.M. et al. "British Society for Rheumatology and British Health Professionals in Rheumatology Guideline for the Management of Gout (Full Guidelines)", Rheumatology, 2007, pp. 1-17, Online Supplement to Jordan et al. 2007 "British Society for Rheumatology and British Health Professionals in Rheumatology Guideline for the Management of Gout (Executive Summary)", Rheumatology (Oxford). Aug. 2007;46(8):1372-4. Epub May 23, 2007.
Zhang, W. et al., "EULAR evidence based recommendations for gout. Part II: Management. Report of a task force of the EULAR Standing Committee for International Clinical Studies Including Therapeutics (ESCISIT)", Ann Rheum Dis 2006, 65: 1312-1324.
Ahern, M.J. et al., "Does Colchicine Work? The results of the first controlled study in acute gout" Aust NZ J Med 1987; 17: 301-304.
Borstad, G.C. et al., "Colchicine for prophylaxis of acute flares when initiating allopurinol for chronic gouty arthritis" J Rheumatol 2004; 31: 2429-32.
Terkeltaub, R.A. "Gout", N.E. J Med 2003; 349: 1647-55.
Paulus, H.E. et al. "Prophylactic colchicine therapy of intercritical gout. A placebo-controlled study of probenecid-treated patients" Arthritis Rheum 1974, 17(5): 609-14.
Probenecid and Colchicine Tablets USP, Mar. 2006, Watson Laboratories product label.
Colchicine Tablets USP, 0.6 mg, Vision Pharma LLC product label, Oct. 2006.
Leikin, J.B. and Paloucek, F.P., eds.; Poisoning and Toxicology Handbook, 4th Ed., CRC Press, Taylor & Francis Group, Informa Healthcare, Aug. 2007, pp. 216-217.
Yu, T.F. & Gutman, A.B., "Efficacy of Colchicine Prophylaxis in Gout: Prevention of Recurrent Gouty Arthritis Over a Mean Period of Five Years in 208 Gouty Subjects", Ann. Int. Med., Aug. 1961, 55(2): pp. 179-192.
"Abate" entry, Merriam-Webster Online Dictionary, downloaded from http://www.merriam-webster.com/dictionary/abate on Nov. 18, 2010.
Ben-Chetrit, E. et al., Colchicine: 1998 Update, Semin Arthritis Rheum. 1998; 28: 48-59
FDA Alert issued Jul. 30, 2009, "Information for Healthcare Professionals: New Safety Information for Colchicine (marketed as Colcrys)", downloaded from the FDA internet website (http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/DrugSafetyInformationforHeathcareProfessionals/ucm174315.htm) on Sep. 8, 2010.

\* cited by examiner

*Primary Examiner* — Sreeni Padmanabhan
*Assistant Examiner* — Kara R McMillian
(74) *Attorney, Agent, or Firm* — Cantor Colburn LLP

(57)     **ABSTRACT**

Stable ultrapure colchicine compositions comprising ultra-pure colchicine and a pharmaceutically acceptable excipient are described. The compositions can be tablets. Methods for preparing such compositions and methods of use are also disclosed. Methods of treating gout flares with colchicine compositions are also disclosed.

**1 Claim, 1 Drawing Sheet**

U.S. Patent          Jul. 19, 2011          US 7,981,938 B2

FIGURE 1



US 7,981,938 B2

1

# COLCHICINE COMPOSITIONS AND METHODS

## CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. application Ser. No. 12/545,377, filed Aug. 21, 2009; which is a continuation of U.S. application Ser. No. 12/465,210, filed May 13, 2009, and a continuation of U.S. application Ser. No. 12/407,980, filed Mar. 20, 2009, which is a continuation of U.S. application Ser. No. 12/246,034, filed Oct. 6, 2008, which claims the benefit of U.S. Provisional Application Ser. No. 60/977,796 filed Oct. 5, 2007 and U.S. Provisional Application Ser. No. 61/090,965 filed Aug. 22, 2008; each of the above-named applications is hereby incorporated by reference in its entirety.

## BACKGROUND

This application relates to colchicine compositions for therapeutic purposes, specifically ultrapure colchicine, and methods of making and using the colchicine compositions.

Colchicine, chemical name (–)-N-[7S,12aS)-1,2,3,10-tetramethoxy-9-oxo-5,6,7,9-tetrahydrobenzo[a]heptalen-7-yl]-acetamide, is a pale yellow powder soluble in water in 1:25 dilution.

Colchicine is an alkaloid found in extracts of certain plants such as *Colchicum autumnale* and *Gloriosa superba*. Colchicine arrests cell division in animals and plants. It has adversely affected spermatogenesis in humans and in some animal species under certain conditions.

Gout (or gouty arthritis) is a disease caused by a build up of uric acid due to an overproduction of uric acid or a reduced ability of the kidney to get rid of uric acid. It is more common in males, postmenopausal women, and people with high blood pressure. Heavy alcohol use, diabetes, obesity, sickle cell anemia, and kidney disease also increase the risk. The condition may also develop in people who take drugs that interfere with uric acid excretion.

In gout, monosodium urate or uric acid crystals are deposited on the articular cartilage of joints, tendons, and surrounding tissues due to elevated concentrations of uric acid in the blood stream. This provokes an inflammatory reaction of these tissues. Gout is characterized by excruciating, sudden, unexpected, burning pain, as well as swelling, redness, warmness, and stiffness in the affected joint. Low-grade fever may also be present. The patient usually suffers from two sources of pain. The crystals inside the joint cause intense pain whenever the affected area is moved. The inflammation of the tissues around the joint also causes the skin to be swollen, tender and sore if it is even slightly touched. For example, a blanket or even the lightest sheet draping over the affected area could cause extreme pain.

Acute gouty arthritis (alternatively referred to as a gout flare or a gout attack) is a sudden attack of pain in attacked joints, especially in the feet and legs. Chronic gout involves repeated attacks of joint pain.

In acute gouty arthritis, symptoms develop suddenly and usually involve only one or a few joints. The big toe, foot, or ankle joints are most often affected. The pain frequently starts during the night and is often described as throbbing, crushing, or excruciating. The joint appears infected with signs of warmth, redness, and tenderness. The attacks of painful joints may go away in several days, but may return from time to time. Subsequent attacks usually last longer. Some people

2

may progress to chronic gout (chronic gouty arthritis), while others may have no further attacks.

If several attacks of gout occur each year, it can lead to joint deformity and limited motion in joints. Uric acid deposits, called tophi, develop in cartilage tissue, tendons, and soft tissues. These tophi usually develop only after a patient has suffered from the disease for many years. Deposits also can occur in the kidneys, leading to chronic kidney failure.

Colchicine can be used for treating adults with acute gouty arthritis and pain in attacks of acute gouty arthritis, and also can be used beneficially for treating adults with chronic gout for prophylaxis of acute gout flares. Although its exact mode of action in the relief of gout is not completely understood, colchicine is known to decrease the inflammatory response to urate crystal deposition by inhibiting migration of leukocytes, to interfere with urate deposition by decreasing lactic acid production by leukocytes, to interfere with kinin formation and to diminish phagocytosis and the subsequent anti-inflammatory response. The anti-inflammatory effect of colchicine is relatively selective for acute gouty arthritis. However, other types of arthritis occasionally respond. It is neither an analgesic nor a uricosuric and will not prevent progression to chronic gouty arthritis. It does have a prophylactic, suppressive effect that helps to reduce the incidence of acute attacks and to relieve the residual pain and mild discomfort that patients with gout occasionally experience. In some instances, non-steroidal anti-inflammatory drugs (NSAIDs) may also be prescribed to relieve pain and inflammation in acute gouty arthritis attacks. Strong painkillers, such as codeine, or corticosteroids may also be prescribed to relieve the pain.

Colchicine is rapidly absorbed from the gastrointestinal tract. Peak concentrations occur in 0.5 to 2 hours. The drug and its metabolites are distributed in leukocytes, kidneys, liver, spleen and the intestinal tract. Colchicine is metabolized in the liver and excreted primarily in the feces with 10 to 20% eliminated unchanged in the urine.

There remains a need for pure forms of colchicine having low levels of impurities for pharmaceutical use to minimize the potential for side effects in patients taking colchicine pharmaceutical products and to minimize the need for costly toxicity testing required for approval of pharmaceutical products comprising conventional colchicine having high levels of individual or total impurities. In particular, there is a need for stable compositions comprising ultrapure colchicine.

## SUMMARY

Disclosed herein are colchicine compositions.

In one embodiment, the colchicine composition comprises ultrapure colchicine, wherein the ultrapure colchicine comprises no more than about 3.0% total impurities, specifically no more than about 2.0% total impurities, and a pharmaceutically acceptable excipient.

In another embodiment, the colchicine composition comprises ultrapure colchicine, wherein the ultrapure colchicine comprises no more than 3.0% total impurities, specifically no more than 2.0% total impurities, a filler, a binder, and a disintegrant.

In yet another embodiment, the colchicine composition comprises about 0.6 mg colchicine, about 12 to about 16 mg pregelatinized starch, about 20 to about 24 mg microcrystalline cellulose, about 3.9 to about 4.7 mg sodium starch glycolate, about 0.5 to about 0.7 mg magnesium stearate, and an amount of lactose monohydrate such that the colchicine dosage form has a total weight of about 100 mg.

US 7,981,938 B2

3

In an embodiment, the colchicine composition comprises colchicine; and a pharmaceutically acceptable excipient; wherein the colchicine composition comprises no more than about 3.5% total impurities and no more than 0.42% N-deacetyl-N-formyl colchicine.

In an embodiment, the colchicine composition comprises colchicine; and a pharmaceutically acceptable excipient, wherein the colchicine composition has 0.6 mgA colchicine, wherein a single dose of the 0.6 mgA colchicine composition has enhanced bioavailability as compared to a single dose of a pharmaceutical product comprising 0.5 mg colchicine after potency correction for colchicine.

In an embodiment, the colchicine composition comprises colchicine; and a pharmaceutically acceptable excipient, wherein the colchicine composition has equivalent bioavailability when administered in a fed or a fasted state.

In an embodiment, the colchicine composition comprises colchicine; and a pharmaceutically acceptable excipient, wherein administration of a single dose of the colchicine composition to a human provides a Cmax between about 1.3 ng/mL and about 4.0 ng/mL, an $AUC_{0-t}$ between about 4.4 ng-hr/mL and about 30.8 ng-hr/mL, or an $AUC_{0-INF}$ between about 6.7 ng-hr/mL and about 27.8 ng-hr/mL.

Methods of making the colchicine compositions are also disclosed herein.

In an embodiment, the method comprises wet granulating ultrapure colchicine, wherein the ultrapure colchicine comprises no more than about 3.0% of total impurities, with a pharmaceutically acceptable excipient to obtain wet granules, and mixing the granules with a disintegrant to obtain the composition.

In yet another embodiment, the method comprises wet granulating colchicine with a pharmaceutically acceptable excipient to obtain wet granules; drying the wet granules to obtain dried granules; milling the dried granules to obtain milled granules; mixing the milled granules with a disintegrant to obtain the composition; mixing the composition with a lubricant to obtain a tableting blend; and compressing the tableting blend to obtain a colchicine tablet.

Also disclosed herein are methods of making ultrapure colchicine.

In an embodiment, the method comprises subjecting colchicine comprising more than about 3.0% total impurities to column chromatography to obtain a colchicine concentrate, distilling the colchicine concentrate to obtain a colchicine distillate, and crystallizing ultrapure colchicine from the colchicine distillate; wherein the ultrapure colchicine comprises no more than about 3.0% total impurities.

In another embodiment, the method comprises subjecting colchicine comprising more than about 3.0% total impurities to neutral alumina column chromatography to obtain a colchicine concentrate; distilling the colchicine concentrate with ethyl acetate to obtain a colchicine distillate; and crystallizing ultrapure colchicine from the colchicine distillate in ethyl acetate; wherein the ultrapure colchicine comprises no more than about 3.0% total impurities.

In still another embodiment, the method comprises subjecting colchicine comprising more than about 3.0% total impurities to neutral alumina column chromatography to obtain a colchicine concentrate; distilling the colchicine concentrate with ethyl acetate to obtain a colchicine distillate; crystallizing a purified colchicine from the colchicine distillate in ethyl acetate; washing the purified colchicine with ethyl acetate to obtain a washed purified colchicine; and drying the washed purified colchicine to obtain ultrapure colchicine, wherein the ultrapure colchicine comprises no more than about 3.0% total impurities.

4

Also disclosed are methods of treating a patient with the colchicine compositions.

In an embodiment, the method comprises administering a dosing regimen to a patient having an acute gouty arthritis attack, wherein the dosing regimen consists of two colchicine dosage forms at the onset of the acute gouty arthritis attack, followed by one colchicine dosage form in about one hour, wherein a colchicine dosage form comprises about 0.6 mgA colchicine.

In an embodiment, the method comprises administering less than about 2 mg of colchicine to a patient over a period of about one hour, wherein the patient is experiencing an acute gouty arthritis attack.

In an embodiment, the method comprises administering to a human experiencing an acute gouty arthritis attack a colchicine composition, wherein the composition is effective to provide a colchicine plasma concentration profile having an area under the plasma colchicine concentration curve from time 0 to infinity ($AUC_{0-INF}$) of about 34.2 ng-hr/mL to about 74.1 ng-hr/mL, an area under the plasma colchicine concentration curve from time 0 to time t ($AUC_{0-t}$) of about 28.8 ng-hr/mL to about 58.9 ng-hr/mL, or a maximum plasma colchicine concentration (Cmax) of about 3.2 ng/mL to about 11.4 ng/mL for a maximum total dose of about 1.8 mg colchicine.

In an embodiment, the method comprises administering a dosing regimen to a patient having an acute gouty arthritis attack, wherein the dosing regimen consists of two colchicine dosage forms at the onset of the acute gouty arthritis attack, followed by one colchicine dosage form in about one hour, wherein a colchicine dosage form comprises about 0.6 mgA colchicine, wherein the dosing regimen is effective to provide an area under the plasma colchicine concentration curve from time 0 to infinity ($AUC_{0-INF}$) of about 34.2 ng-hr/mL to about 74.1 ng-hr/mL, an area under the plasma colchicine concentration curve from time 0 to time t ($AUC_{0-t}$) of about 28.8 ng-hr/mL to about 58.9 ng-hr/mL, or a maximum plasma colchicine concentration (Cmax) of about 3.2 ng/mL to about 11.4 ng/mL.

In an embodiment, the method comprises administering a dosing regimen to a patient having an acute gouty arthritis attack, wherein the dosing regimen consists of two colchicine dosage forms at the onset of the acute gouty arthritis attack, followed by one colchicine dosage form in about one hour, wherein a colchicine dosage form comprises about 0.6 mgA colchicine, wherein the dosing regimen is effective to provide a colchicine plasma concentration profile which has a maximum plasma colchicine concentration (Cmax) which is at least 80% of plasma Cmax provided by a dosing regimen of two dosage forms, followed by one dosage form about every hour later for 6 hours.

In an embodiment, the method comprises administering a dosing regimen to a patient having an acute gouty arthritis attack, wherein the dosing regimen consists of two colchicine dosage forms at the onset of the acute gouty arthritis attack, followed by one colchicine dosage form in about one hour, wherein a colchicine dosage form comprises about 0.6 mgA colchicine, wherein the odds of a patient being a responder to the dosing regimen are not statistically different from the odds of being a responder to a second dosing regimen consisting of two colchicine dosage forms at the onset of the acute gouty arthritis attack, followed by one colchicine dosage form every hour for 6 hours, wherein a responder is a patient obtaining a $\geq$50% improvement in pain at 24 hours after the first dose, without taking an additional active agent for reducing pain of the acute gouty arthritis attack.

A155

US 7,981,938 B2

5

6

In an embodiment, the method comprises administering a dosing regimen to a patient having an acute gouty arthritis attack, wherein the dosing regimen consists of two colchicine dosage forms at the onset of the acute gouty arthritis attack, followed by one colchicine dosage form in about one hour, wherein a colchicine dosage form comprises about 0.6 mg A colchicine, wherein in a randomized, placebo-controlled study of the dosing regimen in patients with an acute gouty arthritis attack, the fraction of patients that experienced a given % improvement in pain at 24 hrs after first dose is shown in FIG. 1.

These and other embodiments, advantages and features of the present invention become clear when detailed description and examples are provided in subsequent sections.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows the fraction of all patients improved at 24 hrs post-first dose of colchicine, regardless of pain rescue, as a function of the percent improvement in pain determined in the study of Example 3.

DETAILED DESCRIPTION

Disclosed herein are compositions comprising ultrapure colchicine and a pharmaceutically acceptable excipient. Herein, "ultrapure colchicine" means colchicine comprising no more than about 3.0% of total impurities, measured chromatographically as described below, specifically the ultra pure colchicine comprises no more than about 2.0% of total impurities. more specifically no more than about 1.0% of total impurities, or even more specifically no more than about 0.5% of total impurities. In some embodiments, the ultrapure colchicine comprises no more than about 0.10% of N-deacetyl-N-formyl colchicine, measured chromatographically. In some embodiments, the ultrapure colchicine is purified from a botanical source. Methods of making ultrapure colchicine and the compositions comprising the ultrapure colchicine, methods of treating various conditions using the compositions. Dosing regimens are also disclosed.

Not wishing to be bound by theory, it is postulated that the properties of colchicine as an antimitotic agent (e.g. its tubulin binding properties) or its effects on Pgp transporter properties provide the therapeutic effects of colchicine described herein. The methods described herein therefore also contemplate the use of an antimitotic agent with at least one pharmaceutically acceptable excipient. An antimitotic agent can be a drug that prevents or inhibits mitotis, or cell division.

In the specification and claims that follow, references will be made to a number of terms which shall be defined to have the following meaning.

The terms "a" and "an" do not denote a limitation of quantity, but rather denote the presence of at least one of the referenced item. The term "or" means "and/or". The terms "comprising", "having", "including", and "containing" are to be construed as open-ended terms (i.e., meaning "including, but not limited to") unless otherwise noted.

An "active agent" means a compound (including, for example, colchicine), element, or mixture that when administered to a patient, alone or in combination with another compound, element, or mixture, confers, directly or indirectly, a physiological effect on the patient. The indirect physiological effect may occur via a metabolite or other indirect mechanism. When the active agent is a compound, then salts, solvates (including hydrates), and co-crystals of the free compound or salt, crystalline forms, non-crystalline forms, and any polymorphs of the compound are contemplated

herein. Compounds may contain one or more asymmetric elements such as stereogenic centers, stereogenic axes and the like, e.g., asymmetric carbon atoms, so that the compounds can exist in different stereoisomeric forms. These compounds can be, for example, racemates or optically active forms. For compounds with two or more asymmetric elements, these compounds can additionally be mixtures of diastereomers. For compounds having asymmetric centers, all optical isomers in pure form and mixtures thereof are encompassed. In addition, compounds with carbon-carbon double bonds may occur in Z- and E-forms, with all isomeric forms of the compounds. In these situations, the single enantiomers, i.e., optically active forms can be obtained by asymmetric synthesis, synthesis from optically pure precursors, or by resolution of the racemates. Resolution of the racemates can also be accomplished, for example, by conventional methods such as crystallization in the presence of a resolving agent, or chromatography, using, for example, a chiral HPLC column. All forms are contemplated herein regardless of the methods used to obtain them.

"Bioavailability" means the extent or rate at which an active agent is absorbed into a living system or is made available at the site of physiological activity. For active agents that are intended to be absorbed into the bloodstream, bioavailability data for a given formulation may provide an estimate of the relative fraction of the administered dose that is absorbed into the systemic circulation. "Bioavailability" can be characterized by one or more pharmacokinetic parameters.

"Bioequivalence" or "equivalent bioavailability" means the absence of a significant difference in the rate or extent to which the active agent in pharmaceutical equivalents or pharmaceutical alternatives is absorbed into a living system or is made available at the site of physiological activity or the absence of a significant difference in the rate or extent to which the active agent in a pharmaceutical composition is absorbed into a living system or is made available at the site of physiological activity when administered by two different methods (e.g., dosing under fed non-fasted versus fasted conditions). Bioequivalence can be determined by comparing in vitro dissolution testing data for two dosage forms or two dosing conditions or by comparing pharmacokinetic parameters for two dosage forms or two dosing conditions.

In some embodiments, two products (e.g. an inventive composition and COL-PROBENECID®) or two methods (e.g., dosing under fed (non-fasted) versus fasted conditions) are bioequivalent if the ratio of the geometric mean of logarithmic transformed $AUC_{0-\infty}$, $AUC_{0-t}$, or $C_{max}$ for the two products or two methods is about 0.80 to about 1.25; specifically if the 90% Confidence Interval (CI) limit for the ratio of the geometric mean of logarithmic transformed $AUC_{0-\infty}$, $AUC_{0-t}$ or $C_{max}$ for the two products or two methods is about 0.80 to about 1.25; more specifically if the ratios of the geometric mean of logarithmic transformed $AUC_{0-\infty}$, $AUC_{0-t}$, and $C_{max}$ for the two products or two methods are about 0.80 to about 1.25; yet more specifically if the 90% Confidence Interval (CI) limits for the ratios of the geometric mean of logarithmic transformed $AUC_{0-\infty}$, $AUC_{0-t}$ and $C_{max}$ for the two products or two methods are about 0.80 to about 1.25.

"Colchicine therapy" refers to medical treatment of a symptom, disorder, or condition by administration of colchicine. Colchicine therapy can be considered optimal when effective plasma levels are reached when required. In addition, peak plasma values ($C_{max}$) should be as low as possible so as to reduce the incidence and severity of possible side effects.

"Conventional colchicine" means colchicine comprising more than 3% but no more than about 5.0% total impurities,

7

measured chromatographically as described below, and comprising more than about 0.10% of N-deacetyl-N-formyl colchicine.

A "dosage form" means a unit of administration of an active agent. Examples of dosage forms include tablets, capsules, injections, suspensions, liquids, emulsions, creams, ointments, suppositories, inhalable forms, transdermal forms, and the like.

"Dosing regimen" means the dose of an active agent taken at a first time by a patient and the interval (time or symptomatic) at which any subsequent doses of the active agent are taken by the patient. The additional doses of the active agent can be different from the dose taken at the first time.

A "dose" means the measured quantity of an active agent to be taken at one time by a patient.

"Efficacy" means the ability of an active agent administered to a patient to produce a therapeutic effect in the patient.

As used herein, the term "mgA" refers to milligrams of the active colchicine, or the free base of colchicine, after compensating for the potency of the batch of colchicine (i.e., after compensating for impurities, including solvents, and salts in the colchicine). For example, 0.612 mg of an ultrapure colchicine free base having a total impurity of 2 wt % (thus a purity of 98 wt %) contains 0.6 mgA (0.612 mg×0.98=0.6 mgA) of colchicine.

An "oral dosage form" means a unit dosage form for oral administration.

A "patient" means a human or non-human animal in need of medical treatment. Medical treatment can include treatment of an existing condition, such as a disease or disorder, prophylactic or preventative treatment, or diagnostic treatment. In some embodiments the patient is a human patient.

"Pharmaceutically acceptable" means that which is generally safe, non-toxic and neither biologically nor otherwise undesirable and includes that which is acceptable for veterinary use as well as human pharmaceutical use.

"Pharmaceutically acceptable salts" includes derivatives of colchicine, wherein the colchicine is modified by making acid or base addition salts thereof, and further refers to pharmaceutically acceptable solvates, including hydrates, and co-crystals of such compounds and such salts. Examples of pharmaceutically acceptable salts include, but are not limited to, mineral or organic acid addition salts of basic residues such as amines; alkali or organic addition salts of acidic residues; and the like, and combinations comprising one or more of the foregoing salts. The pharmaceutically acceptable salts include non-toxic salts and the quaternary ammonium salts of the colchicine. For example, non-toxic acid salts include those derived from inorganic acids such as hydrochloric, hydrobromic, sulfuric, sulfamic, phosphoric, nitric and the like; other acceptable inorganic salts include metal salts such as sodium salt, potassium salt, cesium salt, and the like; and alkaline earth metal salts, such as calcium salt, magnesium salt, and the like, and combinations comprising one or more of the foregoing salts. Pharmaceutically acceptable organic salts includes salts prepared from organic acids such as acetic, propionic, succinic, glycolic, stearic, lactic, malic, tartaric, citric, ascorbic, pamoic, maleic, hydroxymaleic, phenylacetic, glutamic, benzoic, salicylic, mesylic, esylic, besylic, sulfanilic, 2-acetoxybenzoic, fumaric, toluenesulfonic, methanesulfonic, ethane disulfonic, oxalic, isethionic, HOOC—$(CH_2)_n$—COOH where n is 0-4, and the like; organic amine salts such as triethylamine salt, pyridine salt, picoline salt, ethanolamine salt, triethanolamine salt, dicyclohexylamine salt, N,N'-dibenzylethylenediamine salt, and the like; and amino acid salts such as arginate, asparaginate, glutamate, and the like; and combinations comprising

8

one or more of the foregoing salts; organic amine salts such as triethylamine salt, pyridine salt, picoline salt, ethanolamine salt, triethanolamine salt, dicyclohexylamine salt, N,N'-dibenzylethylenediamine salt, and the like; and amino acid salts such as arginate, asparaginate, glutamate, and the like; and combinations comprising one or more of the foregoing salts. All forms of such derivatives of colchicine are contemplated herein, including all crystalline, amorphous, and polymorph forms. Specific colchicine salts include colchicine hydrochloride, colchicine dihydrochloride, and co-crystals, hydrates or solvates thereof.

"Pharmacokinetic parameters" describe the in vivo characteristics of an active agent (or a metabolite or a surrogate marker for the active agent) over time, such as plasma concentration (C), $C_{max}$, $C_n$, $C_{24}$, $T_{max}$, and AUC. "$C_{max}$" is the measured plasma concentration of the active agent at the point of maximum, or peak, concentration. "$C_{min}$" is the measured plasma concentration of the active agent at the point of minimum concentration. "$C_n$" is the measured plasma concentration of the active agent at about n hours after administration. "$C_{24}$" is the measured plasma concentration of the active agent at about 24 hours after administration. The term "$T_{max}$" refers to the time at which the measured plasma concentration of the active agent is the highest after administration of the active agent. "AUC" is the area under the curve of a graph of the measured plasma concentration of an active agent vs. time, measured from one time point to another time point. For example $AUC_{0-t}$ is the area under the curve of plasma concentration versus time from time 0 to time t, where t can be the last time point with measurable plasma concentration for an individual formulation. The $AUC_{0-\infty}$ or $AUC_{0-INF}$ is the calculated area under the curve of plasma concentration versus time from time 0 to time infinity. In steady-state studies, $AUC_{0-\tau}$ is the area under the curve of plasma concentration over the dosing interval (i.e., from time 0 to time τ (tau), where tau is the length of the dosing interval. Other pharmacokinetic parameters are the parameter $K_e$ or $K_{el}$, the terminal elimination rate constant calculated from a semi-log plot of the plasma concentration versus time curve; $t_{1/2}$ the terminal elimination half-life, calculated as $0.693/K_{el}$; CL/F denotes the apparent total body clearance after administration, calculated as Total Dose/Total $AUC_\infty$; and $V_{area}$/F denotes the apparent total volume of distribution after administration, calculated as Total Dose/(Total $AUC_\infty \times K_{el}$).

"Adverse event" means any untoward medical occurrence in a patient administered an active agent and which does not necessarily have to have a causal relationship with this treatment. An adverse event (AE) can therefore be any unfavorable and unintended sign (including an abnormal laboratory finding, for example), symptom, or disease temporally associated with the use of the active agent, whether or not considered related to the active agent.

"Side effect" means a secondary effect resulting from taking an active agent. The secondary effect can be a negative (unfavorable) effect (i.e., an adverse side effect) or a positive (favorable) effect.

The most frequently reported adverse side effects to colchicine therapy are gastrointestinal, specifically diarrhea; abdominal pain with cramps; nausea; and vomiting. Less frequently or rarely reported adverse side effects associated with colchicine therapy include anorexia, agranulocytosis, allergic dermatitis, allergic reactions, alopecia, angioedema, aplastic anemia, bone marrow depression, myopathy, neuropathy, skin rash, thrombocytopenic disorder, and urticaria.

Determining that a patient experiences an adverse side effect can be performed by obtaining information from the patient regarding onset of certain symptoms which may be

US 7,981,938 B2

9

indicative of the adverse side effect, results of diagnostic tests indicative of the adverse side effect, and the like.

Ultrapure colchicine comprising low levels of individual impurities or total impurities is highly desirable as compared to conventionally available forms of colchicine. Currently, commercially available forms of colchicine often comprise high levels of impurities. Depending on the source or the preparation process, colchicine may comprise some or all of the common impurities shown in Table 1.

10

The ultrapure colchicine disclosed herein comprises no more than (NMT) about 3.0%; specifically NMT about 2.0%, or more specifically, NMT about 1.0%, or even more specifically NMT about 0.5% of total impurities. In one embodiment, "total impurities" includes the common impurities, Impurities A through F, as well as all structurally unidentified impurities eluting within 1.5 times the retention time of colchicine using an HPLC method as described in more detail below. In another embodiment, other HPLC and HPLC meth-

TABLE 1

| Common Impurities | Chemical Name | Other common name |
|---|---|---|
| Impurity A | N-[(7S,12aS)1,2,3,10-tetramethoxy-9-oxo-5,6,7,9-tetrahydrobenzo[a]heptalen-7-yl]formamide | N-deacetyl-N-formyl colchicine |
| Impurity B | (−)-N-[(7S,12aR)-1,2,3,10-tetramethoxy-9-oxo-5,6,7,9-tetrahydrobenzo[a]heptalen-7-yl]-acetamide | Conformational isomer |
| Impurity C | N-[(7S,7bR,10aS)-1,2,3,9-tetramethoxy-8-oxo-5,6,7,7b,8,10a-hexahydrobenzo[a]cyclopenta[3,4]cyclobuta[1,2-c]cyclohepten-7-yl]-acetamide | β-Lumicolchicine |
| Impurity D | N-[(7S,12aS)-3-(β-D-glucopyranosyloxy)-1,2,10-trimethoxy-9-oxo-5,6,7,9-tetrahydrobenzo[a]heptalen-7-yl]-acetamide | Colchicoside |
| Impurity E | N-[(7S,12aS)-3-hydroxy-1,2,10-trimethoxy-9-oxo-5,6,7,9-tetrahydrobenzo[a]heptalen-7-yl]-acetamide | 3-O-demethyl colchicine |
| Impurity F | N-[(7S,12aS)-10-hydroxy-1,2,3-trimethoxy-9-oxo-5,6,7,9-tetrahydrobenzo[a]heptalen-7-yl]acetamide | Colchiceine |

In addition to the common impurities listed above, colchicine may also comprise N-[(7S,12aS)-2-hydroxy-1,3,10-trimethoxy-9-oxo-5,6,7,9-tetrahydrobenzo[a]heptalen-7-yl]-acetamide ("2-O-demethyl colchicine") impurity. Some analytical methods cannot differentiate 2-O-demethyl colchicine from 3-O-demethyl colchicine.

In addition to the common impurities listed above, colchicine may also comprise other structurally unidentified impurities. In fact, conventional forms of colchicine may comprise as much as 5% of total impurities, determined chromatographically as described below. Such high levels of impurities in conventional colchicine pose several problems. The impurities may cause side effects in patients taking dosage forms comprising conventional colchicine. For example, N-deacetyl-N-formyl-colchicine (Impurity A, also known as Gloriosine) is tumorigenic and has been studied as an anti-cancer agent. Therefore reduction in the level of N-deacetyl-N-formyl colchicine found in convention colchicine is highly desirable. Additionally, high levels of impurities can also pose a regulatory challenge for pharmaceutical companies using conventional colchicine in products. For a pharmaceutical product comprising an active agent, the United States Food and Drug Administration (FDA) requires "qualification" or toxicity information for any impurity that is greater than the International Conference on Harmonization (ICH) qualification threshold of 0.15% per individual impurity in the active agent substance or 1.0% in the dosage form. Thus, there is a regulatory benefit for a pharmaceutical company to market pharmaceutical products comprising active agents comprising low levels of individual impurities or total impurities in the active agent substance as well as in the dosage form. As a result, for a pharmaceutical composition comprising colchicine, it is in the best interest of both the pharmaceutical company and the patient that impurities be minimized, if possible, in the colchicine and in colchicine compositions or dosage forms.

ods, for example, as described in more detail below, can be used to quantify the level of total impurities.

The ultrapure colchicine may also comprise low levels of individual impurities. In one embodiment, the ultrapure colchicine comprises NMT about 2.0%, specifically NMT about 1.5%; more specifically NMT about 1.0%; or yet more specifically, NMT about 0.5%, or even more specifically, NMT about 0.15%, or still more specifically, NMT about 0.10%, of any individual impurity. The impurity can be Impurity A, Impurity B, Impurity C, Impurity D, Impurity E, Impurity F, or an unidentified impurity.

In an embodiment, the ultrapure colchicine comprises no more than (NMT) about 3.0% total impurities and NMT about 0.10% N-deacetyl-N-formyl colchicine.

In another embodiment, the ultrapure colchicine comprises NMT about 3.0% total impurities; NMT about 0.1% per individual impurity of Impurity A, Impurity C, Impurity D, and Impurity E; NMT about 0.15% Impurity F; and NMT about 2.0% of Impurity B.

Not wishing to be bound by theory, it is postulated that the conformational isomer, Impurity B, is in equilibrium with the active colchicine such that even after purification of the colchicine to about 0.5% Impurity B, the purified colchicine re-equilibrates to a level of Impurity B around about 1% to about 1.3%.

The level of an individual impurity or of total impurities in colchicine may be determined by any suitable analytical method known in the art. In one embodiment, the impurity levels are determined using a high performance liquid chromatography (HPLC) assay, for example, the HPLC method described in the Colchicine Official Monograph USP30/NF25, herein fully incorporated by reference.

Exemplary conditions for HPLC or ultra performance liquid chromatography (HPLC) assays that can be used for the impurity analysis of colchicine or of a colchicine pharmaceutical product are listed in Table 2.

A158

US 7,981,938 B2

<table>
<tr><td>11</td><td>12</td></tr>
</table>

TABLE 2

| Exemplary HPLC Conditions For Colchicine Purity Analysis | | | |
|---|---|---|---|
| | USP30/NF25 Colchicine Official Monograph Method | HPLC Method | UPLC Method |
| Mobile phase | 0.5 Molar $KH_2PO_4$ in Methanol:Water (65:45, v:v), pH adjusted to 5.5 with $H_3PO_4$ | pH 7.2 10 mM Phosphate Buffer:methanol (MeOH) Gradient | pH 4.5 Ammonium Acetate Buffer:MeOH Gradient |
| Column | Octylsilyl silica gel, 4.6 mm × 25 cm, 5 micron | Zorbax SBC(18) 4.6 × 250 mm | Acquity GEH C18 2.1 × 100 mm, 1.7 um particle size |
| Flow rate | 1.0 mL/min | 1.0 mL/min | 0.25 mL/min |
| Column Temp | Ambient | Ambient | 30 C. +/− 2 C. |
| Detection | 254 nanometers (nm) | 246 nm | 246 nm |
| Injection volume | 20 microliters (uL) | 75 uL | 7 uL |
| Sample Conc. | 0.006 mg/mL | 0.120 mg/ml | 0.012 mg/ml |
| Run time | 15 minutes (min) | 46 min | 25 min |

When using one of the above HPLC conditions in Table 2 for colchicine purity analysis, the relative retention time (RRT) of an impurity can be calculated by the following formula:

RRT of an impurity=RT of the impurity/RT of colchicine,

where RT stands for retention time of the impurity or the colchicine at the particular conditions used in the assay.

In one embodiment, using the HPLC method in Table 2, the retention time (RT) of colchicine is about 7 minutes and the relative retention times (RRTs) of the common impurities eluting within 1.5 times the retention time for colchicine are listed in Table 2A:

TABLE 2A

| Relative Retention Times (RRTs) of the Common Impurities | |
|---|---|
| Impurity ID | RRT |
| N-deacetyl-N-formyl colchicine - Impurity A | 0.94 |
| Conformational isomer - Impurity B | 0.8 |
| β-Lumicolchicine - Impurity C | 1.2 |
| Colchicoside - Impurity D | 0.4 |
| 3-O-demethyl colchicine - Impurity E | 0.7 |

In one embodiment, the percent of a particular impurity is calculated by dividing the response (peak area) of the impurity peak by the sum of all responses (total peak area of all peaks, including the colchicine peak and all common and unidentified impurity peaks) eluting within 1.5 times the retention time for colchicine in the HPLC assay and multiplying the result by 100%.

In one embodiment, the level (%) of total impurities is calculated by dividing the sum of responses of any peaks other than that due to colchicine eluting within 1.5 times the retention time for colchicine by the sum of all responses eluting in the HPLC assay and multiplying the result by 100%.

An additional HPLC method for determining the level of impurities other than Impurity F in colchicine or in colchicine pharmaceutical products has been developed and validated for use as an alternative to the methods in Table 2 above. The method is shown in Table 3A below.

TABLE 3A

| Quantitative HPLC Method for determining all impurities other than impurity F in colchicine and colchicine pharmaceutical products. | |
|---|---|
| | Quantitative HPLC Method for colchicine and colchicine products. |
| Mobile phase | pH 4.5 Ammonium Acetate Buffer:methanol Gradient |
| Column | Waters XBridge C18, 250 mm × 4.6 mm, 5 μm particle size |
| Flow rate | 0.9 mL/min |
| Column Temp | 10 ± 3.5 C. (for column)/10 ± 2 C. (for sample) |
| Detection | 246 nm |
| Injection volume | 75 μL |
| Sample Conc. | 0.16 mg/ml |
| Run time | 60 min |

In the quantitative HPLC method of Table 3A, the retention time (RT) of colchicine is about 24 minutes and the relative retention times (RRTs) of the common impurities for colchicine are listed in Table 3B:

TABLE 3B

| Relative Retention Times (RRTs) of the Common Impurities | |
|---|---|
| Impurity ID | RRT |
| N-deacetyl-N-formyl colchicine - Impurity A | 0.93 |
| Conformational isomer - Impurity B | 0.82 |
| β-Lumicolchicine - Impurity C | 1.76 |
| Colchicoside - Impurity D | 0.18 |
| 3-O-demethyl colchicine - Impurity E | 0.52 |
| 2-O-demethyl colchicine | 0.54 |
| Gamma-Lumicolchicine | 1.37 |

The percentage of individual impurities in the sample solution is calculated as follows:

$$\% \text{ Impurity} = \frac{r_i}{r_s} \times \frac{W_s(\text{mg})}{100 \text{ mL}} \times \frac{6.0 \text{ mL}}{100 \text{ mL}} \times \frac{2.0 \text{ mL}}{100 \text{ mL}} \times P \times$$

$$\left(\frac{100 - \% \ RS_s - \% \ W_s}{100}\right) \times \frac{200 \text{ mL}}{SW(\text{mg}) \times \left(\frac{100 - \% \ RS_a - \% \ W_a}{100}\right)} \times \frac{100 \ \%}{RRF}$$

Where:

$r_s$=The area response of the Colchicine peak in the Working Standard Solution.

US 7,981,938 B2

13

$r_i$=The area response of the impurity peak in the Sample Solution

P–% Purity of the Colchicine Reference Standard divided by 100%.

SW–Weight of Sample taken for Sample Preparation

$W_s$=Weight of Colchicine in the Stock Standard Solution

RRF=Relative Response Factor for specified and unspecified impurities, 1.0

% $RS_{s/u}$=Percent of Residual Solvents in the Colchicine Standard/Sample

% $W_{s/u}$=% Water in the Colchicine Standard/Sample

To date, the impurity colchiceine (Impurity F or 10-O-Demethyl Colchicine "10-DMC") has been typically analyzed by a qualitative colorimetric test described in the Colchicine Official Monograph USP30/NF25 using ferric chloride solution, rather than chromatographically. The standard for acceptable levels of Impurity F has been absence of production of a definite green color in a solution of colchicine.

However, a chromatographic method has been developed for the determination of Impurity F (Colchiceine or 10-O-Demethyl Colchicine "10-DMC"). The chromatographic conditions are as follows:

TABLE 3C

| HPLC parameters for Colchicine determination | |
| --- | --- |
| HPLC System: | HPLC equipped with a pump, auto sampler, variable wavelength detector and a suitable data acquisition system. |
| Column: | Phenomenex Gemini C18 150 mm × 4.6 mm 5 µm, 110 Å |
| Detection: | 245 nm |
| Flow Rate: | About 1.5 mL/min |
| Injection Volume: | 50 µL |
| Temperature: | Column: 10° C. ± 3.5° C. Sample: 5° C. ± 2° C. |
| Needle Rinse Setting: | Double |
| Needle Wash: | Water:Acetonitrile (50:50) |
| Digital Filter Response: | 1.0 |
| Sampling Rate: | 5.0 |
| Resolution: | 1.2 |
| Mobile Phase: | pH 4.5 Buffer Solution:Acetonitrile (75:25) |
| Run Time: | About 7 minutes for Standard About 20 minutes for first Blank and Samples |

The LQL level for 10-DMC in this method is 0.776304 µg/mL. The amount of 10-DMC expressed in percent of Colchicine is calculated as follows:

$$\% \text{ Purity} = \frac{r_t}{r_s} \times \frac{W_s(\text{mg}) \times P}{4000 \text{ mL}} \times \left( \frac{100 - \% RS_s - \% W_s}{100} \right) \times$$
$$\frac{3.0 \text{ mL}}{100 \text{ mL}} \times \frac{50 \text{ mL}}{W_u(\text{mg}) \times \left( \frac{100 - \% RS_u - \% W_u}{100} \right)} \times \frac{100\%}{RRF}$$

Where:

$r_t$=The peak area response of 10-DMC in the Sample Solution

$r_s$=The peak area response of Colchicine in the Working Standard Solution

$W_s$=The weight of Colchicine in the Stock Standard Preparation

$W_u$=The weight of Colchicine in the Sample Preparation

P=Standard purity factor expressed as labeled (% Purity/100)

% $RS_{s/u}$=Percent of Residual Solvents in the Colchicine Standard/Sample

% $W_{s/u}$=% Water in the Colchicine Standard/Sample

RRF=Relative response factor for 10-DMC–0.88

14

Ultrapure colchicine may be obtained by various purification methods starting from colchicine-containing botanical extracts, conventional colchicine, or other partially-purified forms of colchicine. In some embodiments, the colchicine is purified from a botanical source. The botanical source can be any capable of providing colchicine, conventional or ultrapure, in quantities suitable for commercial pharmaceutical product manufacture

The literature from 1884-1997 on methods of isolation and purification of colchicine from various botanic sources, including for example C. autumnale corms or leaves and species of Gloriosa has been reviewed. (Kiselev & Yavich, 1991, "METHODS OF ISOLATING ALKALOIDS OF THE COLCHICINE SERIES"; Plenum Publishing Co., English translation of article from Khimiya Prirodnykh Soedinenii, No. 5, pp. 592-600, September-October, 1990). Kiseleve & Yavich also review reports in the literature of impurities detected in colchicine stored for various times, as follows. In an article published in 1944 it was reported that chromatography of colchicine corresponding to the requirements of the USP of that time showed the presence of 5% of impurities and various amount of individual impurities. An article published in 1952 reported that colchicine meeting the requirements of the USP contained about 4% of 3-demethylcolchicine. A 1953 article reported 1.5% of N-formyldeacetylcolchicine isolated and the presence of other accompanying alkaloids in a pharmacopeial sample of colchicine. An investigation of a commercial sample by high-resolution liquid chromatography, published in 1986, reported finding 93.4% of colchicine, 2.9% of N-formyldeacetylcholchicine, 1.8% of 17-hydroxy-colchicine, and 0.84% of an unknown substance.

Walaszik et al. describes a process of incorporating carbon 14 into C. autumnale plants and isolating radioactive colchicine from the radioactive plants (See Walaszik et al., Science (1952) 116:225-227). However, the level of impurities in the isolated radioactive colchicine is not disclosed.

The purification methods disclosed herein produce ultrapure colchicine comprising very low levels of total impurities or individual impurities. In one embodiment, ultrapure colchicine may be obtained from conventional colchicine obtained commercially or produced using solvent extraction of appropriate botanic material as described in more detail below.

In one embodiment, conventional colchicine may be obtained by isolating colchicine from a colchicine chloroform extract. The extract is washed with a mixture of purified water, sodium hydroxide solution, sodium chloride solution and acetic acid. The washed extract is filtered and the resulting concentrate is distilled in two steps, first using methanol, and second using ethyl acetate. The resulting distillate is crystallized. Ethyl acetate can be used to isolate and wash the crystallized colchicine, which is then dried to yield conventional colchicine. The conventional colchicine comprises more than about 3.0% but no more than 5% total impurities.

The conventional colchicine may be used directly in a colchicine composition comprising a pharmaceutically acceptable excipient. It may also be used for further purification to obtain ultrapure forms of colchicine.

In one embodiment of a method of making ultrapure colchicine, the conventional colchicine may be subjected to column chromatography to obtain a purified colchicine concentrate, distilling the purified colchicine concentrate to obtain a colchicine distillate, and crystallizing ultrapure colchicine from the colchicine distillate. The method can further comprise washing the crystallized ultrapure colchicine with a solvent and drying. The ultrapure colchicine comprises no more than about 3.0% of total impurities.

US 7,981,938 B2

15                                      16

In one embodiment, the column chromatography is carried out using methylene chloride as solvent on a column of neutral alumina. Other solvents or chromatographic media may be used, provided that impurities are removed from the conventional colchicine to the desired level. In another embodiment, distillation of the purified colchicine concentrate is carried out using ethyl acetate. Other organic solvents can be used, provided that impurities are removed from the purified colchicine concentrate. In yet another embodiment, the solvent used to wash the crystallized ultrapure colchicine is ethyl acetate.

In another embodiment, a method of making ultrapure colchicine comprises subjecting colchicine comprising more than about 3.0% total impurities to neutral alumina column chromatography to obtain a colchicine concentrate; distilling the colchicine concentrate with ethyl acetate to obtain a colchicine distillate; crystallizing a purified colchicine from the colchicine distillate in ethyl acetate; washing the purified colchicine with ethyl acetate to obtain a washed purified colchicine; and drying the washed purified colchicine to obtain ultrapure colchicine, wherein the ultrapure colchicine comprises no more than about 3.0% total impurities.

In one embodiment, the ultrapure colchicine obtained in any of the above methods comprises no more than about 2.0% total impurities. In another embodiment, the ultrapure colchicine comprises no more than about 1.5% total impurities. In another embodiment, the ultrapure colchicine comprises no more than about 1.0% total impurities. In another embodiment, the ultrapure colchicine comprises no more than about 0.5% total impurities. In yet another embodiment, the ultrapure colchicine comprises no more than about 0.5% per individual impurity of Impurity A, Impurity B, Impurity C, Impurity D, Impurity E, or Impurity F. In still another embodiment, the ultrapure colchicine comprises no more than about 0.15% per individual impurity of Impurity A, Impurity C, Impurity D, Impurity E, or Impurity F. In another embodiment, the ultrapure colchicine comprises no more than about 1.0% of total unidentified impurities. In yet another embodiment, the ultrapure colchicine comprises no more than about 0.5% of total unidentified impurities. In yet another embodiment, the ultrapure colchicine comprises no more than about 1.0% of Impurity B, and no more than 0.1% per individual impurity of any of Impurity A, Impurity C, Impurity D, Impurity E, and Impurity F.

The above methods of making ultrapure colchicine are only examples of suitable methods for its preparation.

The colchicine compositions disclosed herein comprise colchicine and a pharmaceutically acceptable excipient. In one embodiment, the colchicine composition comprises 0.1 wt % to 10 wt % colchicine, specifically 0.1 wt % to 5 wt % colchicine. In one embodiment, the colchicine in the colchicine compositions is ultrapure colchicine. The compositions comprising ultrapure colchicine are stable and provide enhanced safety to patients taking the compositions because the patients are ingesting fewer impurities. In particular, the colchicine compositions contain substantially lower levels of the tumorigenic compound N-deacetyl-N-formyl colchicine.

The pharmaceutically acceptable excipient in the colchicine composition may be a filler (or diluent), a binder, a disintegrant, a lubricant, or a combination comprising two or more of the foregoing excipients.

In one embodiment, the pharmaceutically acceptable excipient comprises a filler. Exemplary fillers may be one or more compounds which are capable of providing compactability and good flow. Exemplary fillers include microcrystalline cellulose, starch, lactose, sucrose, glucose, mannitol, maltodextrin, sorbitol, dextrose, silicic acid, dibasic

calcium phosphate, or a combination comprising at least one of the foregoing fillers. Exemplary lactose forms include lactose monohydrate, NF (Fast Flo), lactose spray-dried monohydrate, and lactose anhydrous. Exemplary microcrystalline cellulose (MCC) include, for example, AVICEL® PH101 and AVICEL® PH102, which are commercially available from FMC Biopolymer, Philadelphia, Pa. Exemplary dibasic calcium phosphates include dihydrated and anhydrous dibasic calcium phosphates. In one embodiment, the filler is a combination of microcrystalline cellulose and lactose monohydrate, NF (fast flo).

When present, the amount of the filler in the composition may be about 10 wt % to about 99 wt %, or more specifically, about 30 wt % to about 90 wt %, or even more specifically, about 50 wt % to about 90 wt %, or still more specifically, about 70 wt % to about 85 wt %, based on the total weight of the composition. In one embodiment, the total amount of the filler is about 82 wt %, based on the total weight of the composition

In one embodiment, the pharmaceutically acceptable excipient comprises a binder. Binders may be used to impart cohesive qualities to a formulation, for example, a tablet formulation, and thus ensure that the tablet remains intact after compaction. Exemplary binders include starches (for example, Starch 1500® or pregelatinized starch), alginates, gelatin, carboxymethylcellulose, sugars (for example, sucrose, glucose, dextrose, and maltodextrin), polyethylene glycol, waxes, natural and synthetic gums, polyvinylpyrrolidone, and cellulosic polymers (for example, microcrystalline cellulose, hydroxypropyl cellulose, hydroxypropyl methylcellulose, methyl cellulose, and hydroxyethyl cellulose) and combinations comprising one or more of the foregoing binders. In one embodiment, the binder is starch, or more specifically, pregelatinized starch.

When present, the amount of the binder may be about 10 wt % to about 99 wt %, or more specifically, about 10 wt % to about 50 wt %, or even more specifically, about 10 wt % to about 20 wt %, based on the total weight of the composition. In one embodiment, the amount of the binder is about 14 wt %, based on the total weight of the composition.

In another embodiment, the pharmaceutically acceptable excipient comprises a disintegrant. Disintegrants are used to facilitate disintegration or "breakup" of a composition, for example, a tablet, after administration. Exemplary disintegrants include sodium starch glycolate, sodium crosscarmelose (cross-linked carboxy methyl cellulose), crosslinked polyvinylpyrrolidone (PVP-XL), anhydrous calcium hydrogen phosphate, agar-agar, potato or tapioca starch, alginic acid, or a combination comprising one or more of the foregoing disintegrants.

When present, the disintegrant may be present in an amount of about 0.1 to 30 wt %, or more specifically, about 1 to 20 wt %, or even more specifically, about 1 to 10 wt %, based on the total weight of the composition. In one embodiment, the amount of the disintegrant is about 4.5 wt %, based on the total weight of the composition.

In another embodiment, the pharmaceutically acceptable excipient comprises a lubricant. Generally, a lubricant is added just before tableting, and is mixed with the rest of the composition for a minimum period of time to obtain good dispersal. Exemplary lubricants include magnesium stearate, calcium stearate, zinc stearate, stearic acid, talc, glyceryl behenate, polyethylene glycol, polyethylene glycol, polyethylene oxide, sodium lauryl sulfate, magnesium lauryl sulfate, sodium oleate, sodium stearyl fumarate, DL-leucine, colloidal silica, or a combination comprising one or more of the

A161

US 7,981,938 B2

17

foregoing lubricants. In one embodiment, the lubricant is magnesium stearate, calcium stearate, or zinc stearate.

When present, the lubricant may be present in an amount of about 0.01 wt % to about 10 wt %, or more specifically, about 0.1 wt % to about 5 wt %, or even more specifically, about 0.1 wt % to about 1 wt %, based on the total weight of the composition. In one embodiment, the amount of the lubricant is about 0.6 wt %, based on the total weight of the composition.

If desired, the composition may optionally comprise small amounts of nontoxic auxiliary substances such as wetting or emulsifying agents, or pH buffering agents, for example, sodium acetate, sorbitan monolaurate, triethanolamine sodium acetate, triethanolamine oleate, sodium lauryl sulfate, dioctyl sodium sulfosuccinate, and polyoxyethylene sorbitan fatty acid esters.

In one embodiment, a composition comprises an ultrapure colchicine, wherein the ultrapure colchicine comprises no more than 3.0% of total impurities, a filler, a binder, and a disintegrant.

In another embodiment, a colchicine composition comprises about 0.6 mgA colchicine; about 14 mg pregelatinized starch; about 22 mg microcrystalline cellulose; about 4.3 mg sodium starch glycolate; about 0.6 mg magnesium stearate; and an amount of lactose monohydrate such that the colchicine composition has a total weight of about 100 mg. In one embodiment, the colchicine in the colchicine composition is ultrapure colchicine.

In an embodiment, a colchicine composition comprises colchicine; and a pharmaceutically acceptable excipient; wherein the colchicine composition comprises no more than about 3.5% total impurities, specifically no more than about 3.0% total impurities, more specifically no more than about 2.0% total impurities, or yet more specifically no more than about 1.0% total impurities. In some of these embodiments, specific limitations on the levels of individual impurities are also met by the colchicine composition. In addition to containing no more than a particular maximum level of total impurities, the colchicine composition can comprise not more than about 0.42% Impurity A, Impurity C, Impurity D, Impurity E, or Impurity F, and not more than about 2.0% Impurity B; specifically not more than about 0.2% Impurity A, Impurity C, Impurity D, Impurity E, or Impurity F, and not more than about 1.5% Impurity B; and more specifically not more than about 0.15% Impurity A, Impurity C, Impurity D, Impurity E, or Impurity F, and not more than about 1.1% Impurity B. In one embodiment the colchicine composition comprises no more than 3.5% total impurities, no more than 0.42% Impurity A, and no more than 2.0% Impurity B. The pharmaceutically acceptable excipient can be one or more discussed previously herein.

In one embodiment, a colchicine composition comprises colchicine and a pharmaceutically acceptable excipient; wherein the colchicine composition comprises no more than about 3.5% total impurities. In some embodiments, the colchicine composition comprises ultrapure colchicine and total impurities in the ultrapure colchicine comprise no more than about 3.0%, or specifically no more than about 2.0%, or more specifically no more than about 1.5%, or yet more specifically, no more than about 1.0%. In addition to containing no more than a particular maximum level of total impurities, the ultrapure colchicine in the colchicine composition can comprise not more than about 0.15% Impurity A, Impurity C, Impurity D, Impurity E, or Impurity F, and not more than about 2.0% Impurity B; specifically not more than about 0.10% Impurity A, Impurity C, Impurity D, or Impurity E; not more than about 0.15% Impurity F, and not more than about

18

1.5% Impurity B. In one embodiment the colchicine composition comprises ultrapure colchicine comprising no more than 0.10% Impurity A, no more than about 0.15% Impurity F, and no more than 2.0% Impurity B. The pharmaceutically acceptable excipient can be one or more discussed previously herein.

In one embodiment, a colchicine composition comprises colchicine; a filler; a binder; and a disintegrant; wherein the colchicine composition comprises no more than about 3.5% total impurities. In some embodiments, the colchicine composition comprises ultrapure colchicine and total impurities in the composition comprise no more than about 3.5%, or specifically no more than about 3.0%, more specifically no more than about 2.0%, or yet more specifically, no more than about 1.0%; with individual impurity levels of not more than about 0.42% for Impurity A, Impurity C, Impurity D, Impurity E, or Impurity F, and not more than about 2.0% for Impurity B; or specifically with individual impurity levels of not more than about 0.10% for Impurity A, Impurity C, Impurity D, Impurity E, or Impurity F, and not more than about 2.0% for Impurity B.

In one embodiment, the percent total impurities in the composition is determined in an HPLC assay as described in Colchicine Official Monograph USP30/NF25 as 100% times a sum of responses of any peaks other than that due to colchicine, eluting within 1.5 times the retention time for colchicine, relative to a sum of responses of all peaks eluting within 1.5 times the retention time for colchicine and the percent of an individual impurity in the composition is determined in an HPLC assay as described in Colchicine Official Monograph USP30/NF25 as 100% times the responses of the impurity peak relative to a sum of responses of all peaks eluting within 1.5 times the retention time for colchicine.

In yet another embodiment, the percent total and/or individual impurities in the composition is determined in an HPLC assay or HPLC assay in accordance with the methods described in Table 2 or Table 3A or 3C.

In one embodiment, any of the colchicine compositions described above is in the form of a tablet. As used herein, the term "tablet" means a compressed pharmaceutical dosage form of any shape or size. The tablets described herein may be obtained from the compositions comprising colchicine and a pharmaceutically acceptable excipient. Any of the colchicine compositions can be in the form of any other dosage form known in the art, specifically, any oral dosage form, for example a capsule.

Either wet or dry granulation of a colchicine composition may be used prior to compressing the composition into tablets, or direct compression can be used.

In one embodiment, wet granulation is used to prepare wet granules comprising colchicine. A granulating liquid is used in wet granulation process. Both aqueous and non-aqueous liquids may be used as the granulating liquid. In one embodiment, the granulating liquid is an aqueous liquid, or more specifically, de-ionized water. In an embodiment, the colchicine is ultrapure colchicine.

The amount of the granulating liquid used may depend on many factors, for example, the type of the granulating liquid, the amount of the granulating liquid used, whether a hygroscopic excipient is used, the nature of the active agent, and the active agent loading. In one embodiment, the amount of the granulating liquid is in the range of about 5 wt % to about 50 wt %, or more specifically, about 10 wt % to about 40 wt %, based on the dry weight of the granulating particles prior to wet granulation.

Wet granulation time is generally about 5 to 60 minutes. In one embodiment, the colchicine particles and suitable excipi-

US 7,981,938 B2

19

ents are mixed with the granulating liquid for a period of about 5 to about 45 minutes, or more specifically, about 5 to about 35 minutes. For a small scale, the mixing time is about 1 to about 20 minutes, or more specifically, 3 to 10 minutes. Wet granulation is generally performed at temperatures between about $20°$ C. to about $35°$ C., or more specifically, at room temperature (about $25°$ C.).

Any equipment may be used to contact the granulating liquid with the colchicine and the excipients as long as uniform distribution of the granulating liquid is achieved. For example, small-scale production can be achieved by mixing and wetting the ultrapure colchicine and the excipients in mortars or stainless steel bowls, while for larger quantities, V-blenders with intensifier bars, planetary mixers, rotary granulators, high shear granulators, and fluid-bed granulation equipment may be used. In one embodiment, the granulator is a high shear granulator.

In one embodiment, a method of making a colchicine composition comprises wet granulating colchicine with a pharmaceutically acceptable excipient to obtain wet granules, and mixing the granules with a second excipient to obtain a colchicine composition. In one embodiment, the pharmaceutically acceptable excipient comprises a mixture of a filler and a binder. In another embodiment, the mixture of the filler and the binder comprises pregelatinized starch, lactose monohydrate, and microcrystalline cellulose. In another embodiment, de-ionized water is used as the granulating liquid. In some embodiments, the colchicine is ultrapure colchicine. In an embodiment, the second excipient mixed with the granules is a disintegrant. The colchicine compositions can contain about 0.1 wt % to about 10 wt %, or more specifically, about 0.1 wt % to about 1 wt %, of colchicine, based on the total weight of the colchicine composition.

In an embodiment, the method of making a composition comprises wet granulating colchicine with a pharmaceutically acceptable excipient to obtain wet granules, and mixing the granules with a disintegrant to obtain a colchicine composition. In some embodiments, the method further comprises drying the mixture. In another embodiment, the wet granules are dried to obtain dried granules; and then the dried granules are mixed with a disintegrant to obtain the composition. In another embodiment, the dried granules can be milled to obtain milled granules before mixing the milled dried granules with the disintegrant. In one embodiment, greater than 50% of the milled granules pass through a 45 micron sieve or mesh screen. The method can further comprise mixing the colchicine composition with a lubricant to obtain a tableting blend or compressing the tableting blend to obtain a tablet. The method can further comprise coating the tablet.

In one embodiment, a method of making a colchicine composition comprises wet granulating ultrapure colchicine with a pharmaceutically acceptable excipient to obtain wet granules; drying the wet granules to obtain dried granules; milling the dried granules to obtain milled granules; and mixing the milled granules with a disintegrant to obtain the composition. The ultrapure colchicine can comprise no more than about 3.0% total impurities, with no more than about 0.10% Impurity A, no more than about 0.15% Impurity F, and no more than about 2.0% Impurity B.

In another embodiment, a method of making a colchicine tablet comprises wet granulating colchicine with a pharmaceutically acceptable excipient to obtain wet granules; drying the wet granules to obtain dried granules; milling the dried granules to obtain milled granules; mixing the milled granules with a disintegrant to obtain the composition; mixing the

20

composition with a lubricant to obtain a tableting blend; and compressing the tableting blend to obtain a colchicine tablet.

In some embodiments, the wet granules are dried to obtain dried granules before mixing with a second excipient, for example a disintegrant. Wet granules can be dried by any suitable means to remove the granulating liquid and to form dried granules containing colchicine and the pharmaceutically acceptable excipient. The conditions and duration of drying depend on factors such as the liquid used and the weight of the granulating particles. Examples of suitable drying methods include, but are not limited to, tray drying, forced air drying, microwave drying, vacuum drying and fluid bed drying.

The extent of drying may be determined by visual observation and manual manipulation, as is common in the art. The extent of drying may also be determined by sieve analysis, moisture measurements, such as loss on drying (LOD) or other suitable methods. In one embodiment, wet granules are dried until the granules lose less than 5 weight percent (wt %), or more specifically, 3 wt % upon drying at $105°$ C. based on the total weight of the dried granules prior to drying (or LOD of less than 3 wt %).

After drying, dried granules may be mixed directly with an excipient, for example, a filler, a binder, a disintegrant, or a lubricant, for further processing. Alternatively, dried granules may optionally be subjected to additional processing steps prior to mixing with the excipient. For example, dried granules may be sized to reduce particle size prior to mixing with an excipient. Exemplary sizing operations include milling or sieving. Any suitable equipment for reducing the particle size may be used in the present invention. In one embodiment, the dried granules are milled to obtain milled granules so that at least 50% of the milled granules pass through a 45 micron mesh screen.

Suitable excipients may be added extragranularly and mixed with the granules to form colchicine compositions. As used herein, the term "extragranular" or "extragranularly" means that the referenced material, for example, a suitable excipient, is added or has been added as a dry component after wet granulation. In one embodiment, a disintegrant and a lubricant, in that sequence, are added extragranularly to the granules and mixed to form a blend. The blend may be encapsulated directly into capsule shells, for example, hard gelatin shells, to form capsule formulations. Alternatively, the blend may be compressed into tablets. In some embodiments, the granules are dried granules or milled, dried granules. In some embodiments, the colchicine is ultrapure colchicine.

Mixing can be carried out for a sufficient time to produce homogeneous mixtures or blends. Mixing may be accomplished by blending, stirring, shaking, tumbling, rolling, or by any other method to achieve a homogeneous blend. In some embodiments, the components to be mixed are combined under low shear conditions in a suitable apparatus, such as a V-blender, tote blender, double cone blender or any other apparatus capable of functioning under low shear conditions.

The homogenous mixtures or blends are then compressed using any method suitable in the industry.

The colchicine tablets prepared from the above described methods exhibit acceptable physical characteristics including good friability and hardness. The colchicine tablets disclosed herein have friability in the range of about 0% to 3%, specifically about 0 to 1%, more specifically 0% to 0.5%

The colchicine tablet can be coated. Coating the tablet may be performed by any known process. A coating for the colchicine tablet disclosed herein can be any suitable coating, such as, for example, a functional or a non-functional coating, or multiple functional or non-functional coatings. By "func-

US 7,981,938 B2

21

tional coating" is meant to include a coating that modifies the release properties of the total formulation, for example, a sustained-release coating. By "non-functional coating" is meant to include a coating that is not a functional coating, for example, a cosmetic coating. A non-functional coating can have some impact on the release of the active agent due to the initial dissolution, hydration, perforation of the coating, etc., but would not be considered to be a significant deviation from the non-coated composition.

In one embodiment, the tablet is coated with a non-functional coating. The coating can be a white or colored OPADRY® or OPADRY® II (both available from Colorcon, West Point, Pa.), optionally with additional ingredients such as carnauba wax, plasticizers, opacifiers, colorants, and antioxidants. In one embodiment, the coating comprises OPADRY® II and carnauba wax.

In an embodiment, a colchicine composition comprises about 0.6 mgA colchicine; about 12 to about 16 mg pregelatinized starch; about 20 to about 24 mg microcrystalline cellulose; about 3.9 to about 4.7 mg sodium starch glycolate; about 0.5 to about 0.7 mg magnesium stearate; and an amount of lactose monohydrate such that the colchicine dosage form has a total weight of about 100 mg. In some embodiments the colchicine composition comprises about 0.6 mgA colchicine, about 14 mg pregelatinized starch, about 22 mg microcrystalline cellulose, about 4.3 mg sodium starch glycolate, about 0.6 mg magnesium stearate, and an amount of lactose monohydrate such that the colchicine dosage form has a total weight of about 100 mg. The colchicine composition can be in the form of a tablet. In some embodiments the tableted composition further comprises a coating comprising Opadry® II and carnauba wax. In an embodiment, the colchicine is ultrapure colchicine.

In one embodiment, a colchicine composition comprising ultrapure colchicine is formulated into an immediate-release formulation. By "immediate-release" is meant a conventional or non-modified release in which greater than or equal to about 75% of the active agent is released within two hours of administration, specifically within one hour of administration.

Active agent release from a pharmaceutical formulation can be analyzed in various ways. One exemplary test is in vitro dissolution. A dissolution profile is a plot of the cumulative amount of active agent released from a formulation as a function of time. A dissolution profile can be measured utilizing the Drug Release Test <724>, which incorporates standard test USP 26 (Test <711>). A profile is characterized by the test conditions selected such as, for example, apparatus type, shaft speed, temperature, volume, and pH of the dissolution medium. More than one dissolution profile may be measured. For example, a first dissolution profile can be measured at a pH level approximating that of the stomach, and a second dissolution profile can be measured at a pH level approximating that of one point in the intestine or several pH levels approximating multiple points in the intestine.

In one embodiment, the immediate-release colchicine composition exhibits a dissolution profile such that at ten minutes after combining the composition with 500 ml of purified water at 37° C.±0.5° C. according to USP 28 <711> Apparatus 1 (basket), 100 rpm speed, about 90 to about 100 wt. % of the total amount of active agent is released; specifically at 30 minutes after combining the composition with the dissolution medium, about 95 to about 100 wt. % of the total amount of colchicine is released; and more specifically at one hour after combining the composition with the dissolution medium, about 98 to about 100 wt. % of the total amount of colchicine is released.

22

Potency, or the amount of active colchicine present in a batch of colchicine, can be determined as described in Colchicine Official Monograph USP 30/NF 25 by comparing an assay sample to a colchicine reference standard (e.g., USP Colchicine RS) sample in the chromatographic assay described in Colchicine Official Monograph USP30/NF25 The quantity of active colchicine in the assay sample, in mg, of $C_{22}H_{25}NO_6$ is calculated by the formula: $10C(r_U/r_S)$, in which C is the concentration, in µg per mL, of the colchicine reference standard sample; and $r_U$ and $r_S$ are the colchicine peak responses obtained from the assay sample and the colchicine reference standard sample, respectively.

In another embodiment, potency of a batch of colchicine can be determined using the HPLC Potency assay described in the table below by comparing an assay sample to a colchicine reference standard.

| HPLC Potency Assay B | |
| --- | --- |
| Mobile phase | 50 mM Potassium Phosphate Buffer:methanl (45:55), pH 5.5 ± 0.05 |
| Column | Phenomenex Luna C8(2), 4.6 mm × 25 cm, 5 µm |
| Flow rate | 1.0 mL/min |
| Column Temperature | Ambient |
| Detection | 254 nm |
| Injection volume | 20 uL |
| Sample Conc. | 0.120 mg/ml |
| Run time | 15 min |

The quantity, in percentage, of $C_{22}H_{25}NO_6$ (active colchicine), on an anhydrous, solvent free basis, in the colchicine assay sample is calculated by the formula:

$$\% \text{ Purity} = \frac{r_u}{r_s} \times \frac{W_s(\text{mg}) \times P \times \left(\frac{100 - M_s - S_s}{100}\right)}{500 \text{ ml}} \times$$

$$\frac{PV(\text{ml})}{VF(\text{ml})} \times \frac{VF_1(\text{ml})}{SW(\text{mg}) \times \left(\frac{100 - M_u - S_u}{100}\right)} \times \frac{VF_2(\text{ml})}{PV_1(\text{ml})} \times 100$$

Where:

$r_u$=The peak area of colchicine in the working sample solution

$r_s$=The peak area of colchicine in the working standard solution

$W_s$=The weight of colchicine in the standard preparation

P=Standard purity factor expressed as labeled % Purity

$M_s$=Moisture factor in standard expressed as % Moisture

$S_s$=Solvent factor in standard expressed as % Solvent

PV=Pipet volume used for the working standard solution

VF=Volumetric flask used for the working standard solution

SW=Sample weight in the stock sample solution

$VF_1$=Volumentric flask used for the stock sample solution

$M_u$=Moisture factor in sample expressed as % Moisture

$S_u$=Solvent factor in sample expressed as % Solvent

$VF_2$=Volumentric flask used for the working sample solution

$PV_1$=Pipet volume used for the working sample solution.

Alternatively, potency of a batch of colchicine can be determined by comparing an assay sample to a colchicine reference standard in yet another HPLC assay as follows:

A164

US 7,981,938 B2

23

| | HPLC Potency Assay C |
|---|---|
| HPLC System: | HPLC equipped with a pump, autosampler, variable wavelength detector and a suitable data acquisition system |
| Column Information: | Phenomenex Gemini C18 150 × 4.6 mm 5 μm 110 Å |
| Detection: | 245 nm |
| Flow Rate: | 1.5 mL/minute |
| Injection Volume: | 20 μL |
| Column Temperature: | 30° C. ± 3° C. |
| Needle Rinse Setting: | Double |
| Sampling Rate: | 2.0 |
| Resolution: | 1.2 |
| Filter Response: | 1 |
| Digital Filter: | Enabled |
| Needle Wash/Seal Wash: | Methanol:Water (50:50) |
| Run Time: | About 15 minutes |
| Mobile Phase: | pH 6.0 Buffer Solution (50 mM of Potassium phosphate and 4 mM of EDTA):Methanol (60:40) |
| Diluent: | Water:Methanol (75:25) |

The percent purity of Colchicine ($C_{22}H_{25}NO_6$), on an anhydrous, solvent-free basis, is calculated as follows:

$$\% \text{ Assay} = \frac{r_u}{r_s} \times \frac{W_s(\text{mg}) \times P}{50 \text{ mL}} \times \left(\frac{100 - \% RS_s - \% W_s}{100}\right) \times$$

$$\frac{5.0 \text{ mL}}{100 \text{ mL}} \times \frac{500 \text{ mL}}{W_u(\text{mg}) \times \left(\frac{100 - \% RS_u - \% W_u}{100}\right)} \times 100\%$$

Where:

$r_u$=The peak area response of Colchicine in the Sample Solution.

$r_s$=The peak area response of Colchicine in the Working Standard Solution.

$W_s$=The weight of Colchicine in the Stock Standard Preparation.

$W_u$=The weight of Colchicine in the Sample Preparation.

P=Standard purity factor expressed as labeled (% Purity/100).

$\% RS_{s/u}$=Percent of Residual Solvents in the Colchicine Standard/Sample.

$\% W_{s/u}$=% Water in the Colchicine Standard/Sample.

Disclosed herein are also methods of treatment and dosing regimens.

The compositions comprising ultrapure colchicine disclosed herein may be used to treat or prevent a patient's condition such as acute gouty arthritis, chronic gouty arthritis, acute pericarditis, asthma, Behçet's disease, cancer, chronic gout (prophylaxis), pseudogout cystic disease comprising polycystic kidney disease or cystic fibrosis, demyelinating disease of central or peripheral origin, Dupuytren's contracture, Familial Mediterranean fever, glaucoma, idiopathic pulmonary fibrosis, idiopathic thrombocytopenic purpura, inflammatory disorder comprising rheumatoid arthritis, lentiviral infection, multiple sclerosis, postpericardiotomy syndrome, primary amyloidosis, primary biliary cirrhosis, proliferative vitreoretinopathy, pyoderma gangrenosum, recurrent pericarditis, or a condition in need of enhanced bone formation or bone mineral density.

The traditional dose of colchicine used to treat or prevent an attack of acute gouty arthritis has been about 1.0 to about 1.2 mgA of colchicine, for example, two tablets each comprising about 0.6 mgA colchicine. This dose may be followed by one unit of the composition every hour, or two units every

24

two hours, until pain is relieved or until diarrhea ensues ("diarrheal dose"). After the initial dose, it is sometimes sufficient to take about 0.6 mgA colchicine every two or three hours. The dosing should be stopped if there is gastrointestinal discomfort or diarrhea. (Opiates may be needed to control diarrhea.) In subsequent attacks, the patient should be able to judge his medication requirement accurately enough to stop short of his diarrheal dose. The total amount of colchicine needed to control pain and inflammation during an attack has been believed to be in the range from about 4 mgA to about 8 mgA. An interval of three days between colchicine courses is advised in order to minimize the possibility of cumulative toxicity.

In one embodiment, a method of treating acute gouty arthritis comprises administering two colchicine dosage forms each comprising about 0.6 mgA colchicine at the onset of the acute gout attack, followed by one dosage form every hour for m hours, wherein the value of m is 1 to 8. In one embodiment, the value of m is 1 to 6. In another embodiment, the value of m is 1 (total of 3 tablets). In yet another embodiment, the value of m is 6 (total of 8 tablets). The colchicine in the dosage form can be ultrapure colchicine. The dosage form can be any oral dosage form, specifically a tablet.

In another embodiment, a method of treating Familial Mediterranean Fever comprises administering ½ dosage form to four dosage forms daily, each dosage form comprising about 0.6 mgA colchicine (total of about 0.3 to about 2.4 mgA colchicine daily). In another embodiment, a method of prophylactically treating chronic gout comprises administering one-half dosage form, one dosage form, two dosage forms, or three dosage forms, each dosage form comprising about 0.6 mgA of colchicine, daily. In another embodiment, a method of treating Behçet's disease comprises administering one dosage form comprising about 0.6 mgA of colchicine twice daily (total of 2 dosage forms). The colchicine in the dosage form can be ultrapure colchicine. The dosage form can be any oral dosage form, specifically a tablet.

In one embodiment, a method of treating patients with some but not all of the symptoms of acute gout, chronic gout (prophylaxis), or pseudogout, where the patients are not clinically or informally diagnosed with one of these diseases, comprises administering one or more of the dosage forms comprising about 0.6 mgA of colchicine. The colchicine in the dosage form can be ultrapure colchicine.

The invention should not be considered limited to these particular conditions for combining the components and it will be understood, based on this disclosure that the advantageous properties can be achieved through other conditions provided the components retain their basic properties and substantial homogeneity of the blended formulation components of the formulation is otherwise achieved without any significant segregation.

The following examples further illustrate the invention but should not be construed as in any way limiting its scope. In particular, the processing conditions are merely exemplary and can be readily varied by one of ordinary skill in the art.

EXAMPLES

Example 1

Exemplary Ultrapure Colchicine

As discussed above, ultrapure colchicine with reduced levels of individual and total impurities was desired by the inventors for formulation into a new dosage form in order to minimize potential adverse reactions from the impurities in

US 7,981,938 B2

25 26

patients taking the dosage form and to reduce the expense of qualification testing during the approval process for marketing the new dosage form. Batches of conventional colchicine were previously obtained from Sanmar Specialty Chemicals Limited (Berigari, India). Conventional colchicine can be further purified to form ultrapure colchicine meeting the following impurity specifications:

TABLE 4

Purity Specifications for an exemplary
batch of Ultrapure Colchicine

| Impurity, Common name | Impurity | NMT % |
|---|---|---|
| N-deacetyl-N-formyl colchicine | A | 0.10 |
| Conformational isomer | B | 1.0 |
| β-Lumicolchicine | C | 0.10 |
| Colchicoside | D | 0.10 |
| 3-O-demethyl colchicine | E | 0.10 |
| Total Impurities | | 2.0 |

Ultrapure colchicine was prepared to meet the purity specifications in Table 4 as described below.

First, conventional colchicine was obtained from a colchicine chloroform extract. The extract was washed with a mixture of purified water, sodium hydroxide solution, sodium chloride solution and acetic acid. The washed extract was filtered and the resulting concentrate was distilled in two steps, first using methanol, and second using ethyl acetate. The resulting distillate was crystallized. Ethyl acetate was used to isolate and wash the crystallized colchicine, which was then dried, resulting in the conventional colchicine. This process is also referred to herein as the "old process".

Second, the conventional colchicine was then subjected to column chromatography on neutral alumina using methylene chloride as solvent. The resulting concentrate was distilled using ethyl acetate, crystallized, isolated and washed using ethyl acetate, and dried, resulting in ultrapure colchicine. This method of generating conventional colchicine, followed by the additional chromatography purification step is also referred to herein as the "new process".

The impurity levels of the lot of ultrapure colchicine and two lots of conventional colchicine were analyzed using the USP30/NF25 Colchicine Official Monograph HPLC method ("USP method") described in Table 2 above. The impurity levels are shown in Table 5.

TABLE 5

| | Impurity Level, % | | | |
|---|---|---|---|---|
| Colchicine Lot | N-Deacetyl-N-formyl colchicine - Impurity A | Conformational Isomer - Impurity B | Total Unidentified Impurities | Total Impurities |
| Ultrapure (RD0600164) | ND* | 0.5 | ND* | 0.5 |
| Conventional-1 (RD060075) | 2.1 | 0.6 | ND* | 2.7 |
| Conventional 2 (RD060055) | 2.2 | 0.6 | ND* | 2.8 |

*ND—None detected.

Table 5 shows that ultrapure colchicine has fewer impurities than each of the conventional colchicine lots. Total impurities of the Ultrapure Lot using the USP method were about 0.5%. On the other hand, total impurities of conventional Lots #1 and 2 were about 2.7% and 2.6%, respectively.

Determined impurity levels may differ depending on the test method used. Table 5B contrasts the determined levels of the conformational isomer, Impurity A (N-deacetyl-N-formyl colchicine), and total impurities for the three colchicine lots using the three methods described in Table 2. The three methods show a maximum absolute variability in the percent determined of 0.8% for N-deacetyl-N-formyl colchicine, of 0.5% for conformational isomer, and 0.7% for total impurities.

TABLE 5B

Levels of impurities in colchicine lots determined using methods of Table 2.

| | | Conformational Isomer | | | N-deacetyl-N-formyl colchicine | | | Total Impurities | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Lot name (Lot #) | Purification Process | UPLC Method | HPLC Method | USP Method | UPLC Method | HPLC Method | USP Method | UPLC Method | HPLC Method | USP Method |
| Conventional-1 (RD060055) | Old | 0.9 | 0.8 | 0.6 | 3.0 | 2.5 | 2.2 | | 3.5 | 2.8 |
| Conventional 2 (RD060075) | Old | 0.9 | 0.8 | 0.6 | 2.7 | 2.3 | 2.1 | | 3.2 | 2.7 |
| Ultrapure (RD0600164) | New | 0.9 | 1.0 | 0.5 | ND* | ND | ND | | 1.1 | 0.5 |

*ND, none detected.

US 7,981,938 B2

| 27 | 28 |

Regardless of the testing method used for measuring these impurity levels, the impurity levels for ultrapure colchicine manufactured using the new process remains below the specifications set forth in Table 4.

The ultrapure colchicine of the present invention was prepared to meet the organic volatile impurity specifications ("residual solvents") in Table 6 as described below. The residual solvents are determined using USP <467> test method. In addition to the known and existing solvents, specifications were also set for residual solvent peaks that were seen in HPLC assay testing as described in Tables 2, 3A, or 3C, which solvents are not expected or previously existing for the residual solvent test methods for colchicine or were not identifiable.

TABLE 6

| Specifications for Organic Volatile Impurities | |
| --- | --- |
| Organic volatile | NMT |
| Chloroform | 100  ppm |
| Methanol | 3000  ppm |
| Methylene Chloride | 600  ppm |
| Ethanol | 5000  ppm |
| Ethyl Acetate | 6.0% |
| Ethyl Propionate | 5000  ppm |
| Propyl Acetate | 5000  ppm |
| Others | 500  ppm each |

**Example 2**

**Stable Tablets Comprising Ultrapure Colchicine**

Stable colchicine compositions comprising the ultrapure colchicine described in Example 1 were manufactured using the following process. Ultrapure colchicine as described in Example 1 was dissolved in purified water. Pregelatinized starch (Starch® 1500), lactose monohydrate, NF (Fast Flo), and microcrystalline cellulose, NF (Avicel PH101) were placed in a 150-liter high shear granulator and mixed. The aqueous ultrapure colchicine solution was added to the granulator while mixing. The wet granules were dried in an oven at 50º C. until the loss on drying of the material was less than 3 wt %. The dried granules were milled through a Fitzmill equipped with a 1βscreen.

The milled granules were charged into a 5 cubic foot Gemco Double Cone Blender and blended with screened sodium starch glycolate, NF (GLYCOLYS®). Then, screened magnesium stearate, NF was added to the blender. Blending was continued and a final tableting blend was made.

This final tableting blend was compressed into core tablets. These core tablets were film-coated with OPADRY® II purple and carnauba wax. The composition of the ultrapure colchicine tablets is shown in Table 7.

TABLE 7

| Ingredient | Amount Per Tablet, mg |
| --- | --- |
| Ultrapure Colchicine | 0.6[1] |
| Pregelatinized starch, NF (Starch 1500) | 14.0 |
| Lactose Monohydrate, NF (Fast Flo) | Varies[2] |
| Microcrystalline Cellulose, NF (Avicel PH101) | 21.6 |
| Sodium Starch Glycolate, NF (GLYCOLYS) | 4.5 |
| Magnesium Stearate, NF | 0.6 |
| Total core tablet | 100 |
| OPADRY II Purple (#40L10039) | 4.0 |
| Carnauba Wax | 0.01 |

[1]Colchicine amount is shown in units of mgA, adjusted for purity of the lot of colchicine.
[2]Amount adjusted, depending on the actual amount of the colchicine lot added, to maintain an overall core tablet weight of 100 mg.

As a comparison, the lot of conventional colchicine designated in Example 1 as "conventional-2" was substituted in place of ultrapure colchicine in the same tablet formulation shown in Table 7. The same process of making the tablets as described above was used.

The impurities in the tablet comprising the ultrapure colchicine and that comprising the conventional colchicine were analyzed using the HPLC method described in Table 2 above. The impurity levels of both colchicine tablets are shown in Table 8.

TABLE 8

| Colchicine Product Lot | Colchicine Lot | Process | Impurity Content, % | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | N-Deacetyl-N-formyl colchicine (Impurity A) | Conformation Isomer (Impurity B) | Total Unknown Impurities | Total Impurities |
| A | Ultrapure | New | ND* | 1.1 | 0.1 | 1.2 |
| B | Conventional-2 | Old | 2.3 | 1.2 | ND* | 3.6 |

*ND—None detected.

It can be seen from Table 8 that the tablet comprising the ultrapure colchicine has less total impurities than that comprising the conventional colchicine.

The colchicine composition comprising ultrapure colchicine at 6 month stability time points under conditions of 25º C./60% relative humidity and 40º C./60% relative humidity exhibits impurity content ranges of Not Detected to about 0.1% for Impurity A, less than about 1.0% for total unknown impurities compared to a colchicine composition comprising conventional colchicine which exhibits impurity content of greater than about 1.5 for Impurity A and greater than about 2.0% for total unknown impurities when tested under the same conditions.

Table 9 below provides data on impurity levels and stability of impurity levels of colchicine composition batches manufactured using ultrapure and conventional colchicine, and impurity levels for two lots of commercially available COL-PROBENECID® tablets (Watson Laboratories), an FDA-approved combination dosage form comprising colchicine and probenicid.

US 7,981,938 B2

| 29 | | | | | | | | 30 |

TABLE 9

| Material | Lot | Colchicine purification Process | Conditions of Stability Study | Conformational Isomer | | N-Deacetyl peak | |
|---|---|---|---|---|---|---|---|
| | | | | UPLC Method | HPLC Method | UPLC Method | HPLC Method |
| COL-PROBENECID ® (Probenecid/ Colchicine) Tablets† | L6C0395 | N/A | N/A | 0.8 | — | 2.2 | — |
| | L6M1440 | N/A | N/A | 0.8 | — | 2.5 | — |
| Colchicine Product Lot | B | Old process | room temp, at release | 0.9 | 1.2 | 2.8 | 2.3 |
| | | | 12 mo 25 C./60% RH | 0.9 | 0.9 | 2.7 | 2.6 |
| | A | New process | room temp, at release | 1.0 | 1.2 | ND | ND |
| | | | 6 mo 25 C./60% RH | 1.0 | 0.8 | ND | ND |
| | | | 6 mo 40 C./75% RH | 1.0 | 1.1 | ND | ND |
| | C | New process | room temp, at release | 1.0 | 1.1 | ND | ND |
| | | | 6 mo 25 C./60% RH | 0.9 | 0.9 | ND | ND |
| | | | 6 mo 40 C./75% RH | 1.0 | 1.1 | ND | ND |
| | D | New process | room temp, at release | 1.0 | 1.1 | ND | ND |
| | | | 6 mo 25 C./60% RH | 1.0 | 1.0 | ND | ND |
| | | | 6 mo 40 C./75% RH | 0.9 | 1.1 | ND | ND |

—, not analyzed;
†Commercially available;
N/A, not applicable;
ND, none detected.

For comparison, several lots of an FDA-approved colchicine-probenecid combination dosage form and various unapproved commercial colchicine dosage forms were tested for levels of impurities using the HPLC method of Table 2. Results are shown in the tables below.

| Impurities in FDA-Approved Colchicine/Probenecid Combination Product | | | | |
|---|---|---|---|---|
| | Watson Laboratories Colchicine/Probenecid Tablets | | | |
| Impurity | L7G1085 | L7G1085 | L7G1087 | L7E0808 |
| Conformational Isomer | 1.0% | 1.0% | 0.8% | 1.0% |

-continued

| Impurities in FDA-Approved Colchicine/Probenecid Combination Product | | | | |
|---|---|---|---|---|
| | Watson Laboratories Colchicine/Probenecid Tablets | | | |
| Impurity | L7G1085 | L7G1085 | L7G1087 | L7E0808 |
| N-deacetyl-N-formyl colchicine | 2.0% | 2.0% | 1.5% | 2.0% |
| Largest Unknown | 0.1% | 0.1% | 0.1% | 0.1% |
| Total Impurities | 3.1% | 3.1% | 2.4% | 3.2% |

| Impurities in Unapproved Colchicine Products | | | | | | |
|---|---|---|---|---|---|---|
| | West-Ward | | | Vision | | |
| Impurity | 62303A* | 63842A | 63843A | C07003 | C07049 | C07058 |
| Exp Date | Jan-2009 | May-2011 | May-2011 | Jan-2009 | Aug-2009 | Sep-2009 |
| Conformational Isomer | 1.1/0.9% | 0.9% | 0.9% | 1.1/0.8% | 0.9% | 0.9% |
| N-deacetyl-N-formyl colchicine | 2.5/2.6% | 2.0% | 1.8% | 1.3/1.3% | 2.7% | 2.6% |
| Largest Unknown | 1.7/1.6% | 0.5% | 0.3% | 0.1/0.1% | 0.1% | 0.3% |
| Total Impurities | 5.3/5.3% | 3.5% | 3.1% | 2.5/2.3% | 3.8% | 4.0% |

| | Qualitest | | | Akyma |
|---|---|---|---|---|
| Impurity | T105G07A | T107G07A | T108G07A | 3A5246004* |
| Exp Date | Jul-2010 | Jul-2010 | Aug-2010 | Jan-2008 |
| Conformational Isomer | 1.0% | 0.9% | 0.9% | 1.1/0.9% |
| N-deacetyl-N-formyl colchicine | %1.4 | 1.3% | 1.3% | 1.4/1.5% |
| Largest Unknown | 0.3% | 0.2% | 0.2% | 0.2/0.1% |
| Total Impurities | 2.7% | 2.7% | 2.6% | 2.9/2.5% |

*Values from two separate analyses reported

A168

US 7,981,938 B2

31

32

| Summary of Impurities in Marketed Colchicine Products with Batches of colchicine tablets using ultrapure colchicine | | | |
|---|---|---|---|
| | Marketed Colchicine Products | | Product Lots with Ultrapure Colchicine |
| Impurity | Minimum | Maximum | Maximum |
| Conformational Isomer | 0.8% | 1.1% | 1.1% |
| N-deacetyl-N-formyl colchicine | 1.3% | 2.7% | ND |
| Largest Unknown | 0.1% | 1.7% | 0.3% |
| Total Impurities | 2.4% | 5.3% | 1.4% |

ND = none detected

The total impurities found in ultrapure colchicine and colchicine products comprising ultrapure colchicine are significantly lower compared to the approved and unapproved, marketed colchicine products. In addition, the maximum total impurities value observed by testing 14 approved or unapproved marketed products was 5.3%; while the maximum value seen to date in inventive ultrapure colchicine product batches was 1.4%. This represents a 75% reduction in total impurities.

Of particular significance, the level of the known impurity, N-deacetyl-N-formyl-colchicine (Impurity A, also known as Gloriosine) has been reduced from levels exceeding 2% to levels to undetectable levels that comply with the ICH Q3A (R2) qualification threshold of 0.15% for an active agent. Gloriosine is tumorigenic and has been studied as an anti-cancer agent. Purification of conventional colchicine to obtain ultrapure colchicine has effectively reduced all individual impurity levels in the colchicine to substantially reduce exposure of patients to this tumorigenic impurity.

Example 3

Therapeutic Effects of Ultrapure Colchicine Formulation

The therapeutic effect of the ultrapure colchicine formulation containing 0.6 mg A of colchicine obtained in Example 2 is evaluated in a clinical study that is a multicenter, randomized, double-blind, placebo-controlled, parallel group, 1-week, dose comparison study designed to evaluate the efficacy of ultrapure colchicine in treating an acute gout attack (acute gouty arthritic attack) in patients with acute gout. A sufficient number of patients are screened to enroll and randomize 300 patients (100 patients per treatment group) who meet the criteria of the American College of Rheumatology (ACR) for acute arthritis of gout. The primary objective of the study is to demonstrate the efficacy of colchicine in an acute gout attack (gouty flare) based on pain reduction after 24 hours as a measure of response. Secondary objectives of the study are to compare low-dose and standard-dose dosing regimens of colchicine with respect to pain, time to response and complete pain relief, interference with sleep, and signs and symptoms of inflammation and to determine the effect of colchicine when administered in the two different dosing regimens.

Description of Study

The study will consist of three distinct phases and the number of visits to the study clinic will vary depending on conditions pertaining to an individual patient's acute gout flare experienced in the study as described below. The Pre-Flare Phase will consist of up to two visits to the study clinic (with additional interim visits for clinical laboratory testing every 3 months until acute gout flare onset): Visit 1 (Screening) and Visit 2 (Randomization). The Flare Phase will not include a visit to the study clinic. The Post-Flare Phase will consist of up to three visits to the study clinic: Visit 3 (as soon as possible [ASAP] up to 48 hours post-flare onset; if a patient cannot complete Visit 3 in the first 48 hours post-flare onset, Visit 3 will be waived and the patient should return to the clinic for Visit 4), Visit 4 (>48 to 96 hours post-flare onset in patients who took at least one dose of study drug and in patients who did not qualify for treatment with study drug during the Flare Phase but did not complete Visit 3), and Visit 5 (7 days post-flare onset to be conducted in patients who took at least one dose of study drug and whose acute gout flare was still ongoing at Visit 4). For those patients in whom the acute gout flare is not resolved at Visit 5 (based on the judgment of the Investigator) or in whom there is an unresolved AE or clinically significant treatment-emergent laboratory abnormality, there will be one additional follow-up visit 14 days post-flare onset (Visit 6).

When a patient develops an acute gout flare, the patient will call the trained personnel at the Gout Flare Call Center (available 24 hours/day throughout the duration of the study). The patient will be queried regarding any changes in his/her medical health and concomitant medication use since the time of randomization. In order to establish if the patient's acute gout flare will be eligible for treatment with study drug, a standardized questionnaire will be used to document that the patient has all of the following signs/symptoms of the affected joint(s): swelling, erythema, marked tenderness, and pain. In addition, a patient must have at least one of the following: rapid onset of maximum pain within the prior 4 to 12 hours, decreased range of motion in the joint, warmth, or other symptom similar to a prior gout flare. Patients will be asked to rate the pain severity for each joint affected by the acute gout flare by using a study diary. Patients must have at least one joint affected by an acute gout flare with a pain assessment of ≧4 on the PI-NRS at the onset of the acute gout flare during the Flare Phase prior to taking study drug. If signs and symptoms of an acute gout flare are confirmed and the gout flare is considered eligible for treatment with study drug, the patient will also be instructed to begin taking study drug and to continue completing the patient diary. Patients will be instructed to stop taking study drug and to call the investigational site if at any time they experience a severe gastrointestinal event while taking study drug. The Gout Flare Call Center will call the patient in 24 hours from the onset of the acute gout flare to ensure that the patient has completed the patient diary, including assessments for pain at 24 hours.

In the event that the Gout Flare Call Center determines that the patient does not qualify for treatment with study drug, the patient may be asked to call back in 1 hour for re-assessment. Patients who do not qualify for treatment with study drug may seek alternative therapy without prejudice to further study participation should another acute gout flare occur.

The Gout Flare Call Center will contact patients on a monthly basis beginning 1 month after randomization to study drug. These contacts will continue until the patient has an acute gout flare or study completion, whichever occurs first. The purpose of these contacts is to re-educate patients about study participation.

Post-Flare Phase:

Visit 3: After developing an acute gout flare, whether eligible for treatment with study drug or not, all patients will return to the clinic as soon as possible after acute gout flare onset for clinical assessments. If a patient cannot complete Visit 3 in the first 48 hours post-flare onset, Visit 3 will be

US 7,981,938 B2

**33**

waived and the patient should return to the clinic for Visit 4. For patients whose acute gout flare was deemed eligible for treatment with study drug and at least one dose of study drug was taken, Investigators will examine the patient and complete clinical assessments, patient diaries will be collected, the patient will be queried for concomitant medication use and Adverse Events (AEs), and the study drug blister pack will be collected. For patients whose acute gout flare was deemed not eligible for treatment with study drug by the Gout Flare Call Center, continued eligibility for the study will be confirmed by the Investigator based on review of the inclusion and exclusion criteria as well as the responses to the standardized questionnaire and examination of the patient. Patient diaries will be collected and patients will be queried for concomitant medication use and AEs.

Visit 4: The second Post-Flare Phase visit is to be conducted >48 to 96 hours following acute gout flare onset. It will take place in patients who took at least one dose of study drug and also in those patients who did not qualify for treatment with study drug during the Flare Phase but did not complete Visit 3. For patients whose acute gout flare was deemed eligible for treatment with study drug and at least one dose of study drug was taken, Investigators will examine the patient and complete clinical assessments, patient diaries will be collected, patients will be queried for concomitant medication use and AEs, and the study drug blister pack will be collected (if not previously collected). Patients who took at least one dose of study drug and whose acute gout flare is still ongoing at Visit 4 will return to the clinic for a final visit (Visit 5) 7 days post-flare onset; however, if their acute gout flare is resolved at Visit 4, final study assessments, including collection of samples for laboratory safety and a complete physical examination, will be performed at Visit 4. For patients whose acute gout flare was deemed not eligible for treatment with study drug by the Gout Flare Call Center who did not have a Visit 3, continued eligibility for the study will be confirmed by the Investigator based on review of the inclusion and exclusion criteria as well as the responses to the standardized questionnaire and examination of the patient. Patient diaries will be collected and patients will be queried for concomitant medication use and AEs.

Visit 5/Early Termination: The final visit for the study will take place 7 days after the acute gout flare onset in patients who took at least one dose of study drug and whose acute gout flare was still ongoing at Visit 4. Patients will be examined and clinical assessments will be made. A complete physical examination will be conducted. Samples for clinical laboratory testing will be collected. Patient diaries will be collected and patients will be queried for concomitant medication use and AEs. The study drug blister pack will be collected (if not previously collected).

Visit 6/Follow-up: For those patients in whom the acute gout flare is not resolved at Visit 5 (based on the judgment of the Investigator) or in whom there is an unresolved AE or clinically significant treatment-emergent laboratory abnormality, there will be one additional follow-up visit 14 days post-flare onset (Visit 6).

For inclusion in the study, a patient must be 18 years of age or older, must present with a confirmed diagnosis of gout consistent with the criteria of the ACR, and must have experienced ≧2 acute gouty arthritic attacks in the 12 months prior to randomization. Patients on urate-lowering therapy must be on a stable dose and schedule with no changes in therapy for 4 weeks prior to randomization and expected to remain on a stable regimen during study participation.

Patients with acute polyarticular gout (>4 joints); taking colchicine routinely; with a known hypersensitivity to colchi-

**34**

cine; with a history of myocardial infarction, unstable angina, cerebrovascular events, or coronary artery bypass grafting; with active myeloid leukemia, obstructive gastrointestinal cancer, or metastatic cancer; with chronic renal dysfunction, with chronic hepatic dysfunction are excluded from the study. Patients using systemic corticosteroid, cyclosporine, adalimumab, etanercept, infliximab, anakinra, abatacept, mycophenolate, azathioprine, or chronic use of non-steroidal anti-inflammatory drugs (NSAIDs), acetaminophen, tramadol, and other analgesics such as opiates at screening are also be excluded.

The three treatment groups in this study are two ultrapure colchicine tablets (1.2 mgA) administered at the onset of an acute gout attack followed by one tablet (0.6 mgA) after one hour and one placebo tablet every hour thereafter for 5 hours (the "low" dose regimen); two ultrapure colchicine tablets (1.2 mgA) administered at the onset of an acute gout attack followed by one tablet (0.6 mgA) every hour for six (6) hours (the "standard" dose regimen); or two placebo tablets at the onset of an acute gout attack followed by one placebo capsule every hour thereafter for 6 hours (the "placebo" regimen).

Efficacy assessment will be made based on patient and Investigator inputs. Patients will record pain severity and sleep interference on a study diary. The severity of pain for each joint affected by the acute gouty arthritic attack will be rated on an 11-point pain intensity numerical rating scale (PI-NRS) that ranges from 0 ("no pain") to 10 ("worst possible pain"). Recordings are to be made prior to each dose of study drug, i.e., pre-treatment with study drug and for the first 8 hours following start of treatment, and every 8 hours thereafter (while awake) until symptoms disappear or 72 hours have passed since the first dose of study drug was taken, whichever occurs first. The patient's pain assessment of each affected joint as reported by the patient at pre-treatment with study drug and at 24 hours post-start of study drug will be documented by a central Study Center to be used in the event the patient fails to provide data on his/her study diary for either of these two key time points. In the morning upon awakening, the patient is to rate sleep interference due to the acute gout flare in the study diary on an 11-point scale that ranges from 0 ("pain did not interfere with sleep") to 10 ("pain completely interfered; patient was unable to sleep"). Investigators will provide clinical assessments in the clinic at all Post-Flare Phase study visits, and at medically necessary intervening visits. For these assessments, each of the patient's joints affected by the acute gouty arthritic attack will be examined and signs and symptoms of inflammation will be rated (erythema [absent, present, or not assessable], swelling [0, "none" to 3, "severe"], and tenderness to touch [0, "none" to 3, "severe"]). At the final clinic visit, the Investigator will also provide a global assessment of response to treatment ranging from 0 ("excellent") to 4 ("none").

The primary efficacy variable is response to treatment in the target joint, based on patient self-assessment of pain at 24 hours post-dose. The target joint is identified during data analysis as that joint affected by the acute gout flare with the highest baseline pain score on the patient diary. Ties among maximum joint scores for an individual are resolved by random selection. A responder is one who provides both a pre-treatment and valid 24-hour pain score and achieves a ≧50% reduction in pain score at the 24-hour post-dose assessment relative to the pre-treatment score and does not use rescue medication. Patients who use rescue medication, discontinue prior to the 24-hour post-dose assessment, or do not achieve a ≧50% reduction in pain score at the 24 hour post-dose assessment relative to the pre-treatment score are deemed non-responders.

US 7,981,938 B2

35

The secondary efficacy variables are assessments of magnitude of pain reduction, time to response, time to complete pain relief, and interference with sleep as recorded on patient diaries by the patient. Signs and symptoms of inflammation per Investigator's clinical assessments of the target joint are evaluated. Time to drop out (use of rescue medications) is also evaluated. Investigator global assessment of response to treatment is assessed.

The primary efficacy analysis will be based on an Intent-to-Treat (ITT) population, defined as all patients who were randomized, contacted the Gout Flare Call Center, took at least one dose of study drug, and had one subsequent contact. The Per Protocol (PP) population is defined as the subset of the ITT population confirmed by the Investigator as continuing to meet all major inclusion and exclusion criteria and initiating treatment within hours of the onset of the acute gout flare. Analyses will also be made on an Evaluable patient population with an Evaluable patient defined as one who, in addition to being included in the PP population, completed the randomized treatment course. The ITT population will be used for the evaluation of safety.

Statistical tests for efficacy analysis are two-tailed with an alpha significance level of 0.05.

For primary efficacy analysis, the number of responders in the standard-dose colchicine group and the placebo group, as defined for the primary efficacy variable, will be compared using the Mantel-Haenszel chi-square test stratified on study site. The comparison of the standard-dose colchicine and placebo groups of the ITT population is the primary comparison of interest. The sensitivity to alternate definitions of response (based both on magnitude of reduction from baseline as well as time point) will be evaluated as secondary endpoints. As additional sensitivity analyses, these tests will also be repeated for the PP and Evaluable populations if the sample sizes differ from the overall ITT population by more than 10%.

For secondary efficacy analysis, the number of responders in the low-dose colchicine group will be compared to placebo and also to standard-dose colchicine using the Mantel-Haenszel chi-square test stratified on study site. Change in pain intensity, interference with sleep, time to 50% reduction in pain, and time to complete pain relief will be analyzed as continuous variables using analysis of covariance with study site, treatment group, and site by treatment interaction as independent variables for change in pain intensity and interference with sleep, with baseline score as a covariate. For the Investigator's clinical assessment of inflammation (erythema, swelling, and tenderness to touch) and Investigator's global assessment of response to treatment, the treat-

36

ment groups will be compared using the Mantel-Haenszel chi-square test stratified on study site.

Safety assessments will be made based on patient and Investigator inputs. Patients will be initially screened in the clinic for inclusion by review of medical history and concomitant medication use, physical examination, measurement of vital signs (oral temperature, sitting radial or brachial pulse rate, respiratory rate, and sitting blood pressure), body weight, and clinical laboratory testing (serum biochemistry, complete blood count, and urinalysis). After randomization, clinical laboratory tests, concomitant medication use, medical history and current complaints (AE) will be reviewed every 3 months until an acute gout flare occurs in order to ensure continued eligibility. Compliance with key inclusion/exclusion criteria (based on intervening medical history and concomitant medication use) will be re confirmed by the Gout Flare Call Center prior to authorizing the start of study drug. Following the start of study drug, patients will record any severe gastrointestinal AEs on their diaries and these will be recorded in the Case Report Form (CRF) at each clinic visit. Full physical examinations and clinical laboratory testing will be conducted at the final clinic visit (Visit 4 or Visit 5). Vital signs and body weight will be measured at each Post Flare visit (Visit 3 and 4 or 5). For those patients in whom there is an unresolved AE or clinically significant treatment emergent laboratory abnormality, there will be one additional follow up visit 14 days post flare onset (Visit 6).

Safety analysis will be performed by coding adverse events using a standardized medical dictionary and the incidence summarized by treatment group; tabulations will be prepared of all AEs as well as by relationship and by severity. Adverse events resulting in termination and events meeting regulatory criteria for seriousness will also be tabulated separately. Descriptive statistics (mean, median, standard deviation, and range) of clinical laboratory testing results and vital sign measurements will be generated for each treatment group and change from the most recent value prior to onset of the acute gout flare calculated; no inferential testing will be performed. Treatment emergent abnormalities on physical examination will be tabulated and listed by treatment group. By patient listings of all safety data and concomitant medication use will be generated.

Study Results

The following data were obtained in general accordance with the above protocol.

Out of 813 patients screened, 575 were randomized to treatment with 185 patients having a gouty flare and receiving study drug. The intent-to-treat population consisted of 184 patients (52 received standard dose, 74 received low dose and 58 received placebo).

| Number of Responders Based on Target Joint Pain Score at 24 Hours Post First Dose | | | | | |
|---|---|---|---|---|---|
| Colchicine Dose | | Placebo | Odds Ratio | | |
| Low (N = 74) | High (N = 52) | (N = 58) | (95% Confidence Intervals) | | |
| N (%) | N (%) | N (%) | Low vs. Placebo | High vs. Placebo | High vs. Low |
| 28 (37.8) | 17 (32.7) | 9 (15.5) | 3.31 (1.41, 7.77) P = 0.0046 | 2.64 (1.06, 6.62) P = 0.0343 | 0.80 (0.38, 1.68) P = 0.5529 |

US 7,981,938 B2

| 37 | 38 |
|---|---|
| | -continued |

Cumulative Distribution of Degree of Percent Improvement
for Target Joint Pain Score at 24 Hours Post First Dose
Colchicine Dose

| % Improvement | High (N = 52) | Low (N = 74) | Placebo (N = 58) |
|---|---|---|---|
| >=0% | 52 (100.0%) | 74 (100.0%) | 58 (100.0%) |
| >=10% | 32 (61.5%) | 47 (63.5%) | 24 (41.4%) |
| >=20% | 29 (55.8%) | 45 (60.8%) | 21 (36.2%) |
| >=30% | 21 (40.4%) | 39 (52.7%) | 17 (29.3%) |
| >=40% | 21 (40.4%) | 36 (48.6%) | 14 (24.1%) |
| >=50% | 19 (36.5%) | 30 (40.5%) | 10 (17.2%) |

Cumulative Distribution of Degree of Percent Improvement
for Target Joint Pain Score at 24 Hours Post First Dose
Colchicine Dose

| % Improvement | High (N = 52) | Low (N = 74) | Placebo (N = 58) |
|---|---|---|---|
| >=60% | 15 (28.8%) | 24 (32.4%) | 7 (12.1%) |
| >=70% | 10 (19.2%) | 20 (27.0%) | 4 (6.9%) |
| >=80% | 9 (17.3%) | 15 (20.3%) | 3 (5.2%) |
| >=90% | 6 (11.5%) | 9 (12.2%) | 2 (3.4%) |
| >=100% | 6 (11.5%) | 8 (10.8%) | 2 (3.4%) |

Treatment Response Based on at Least a 2-Unit Reduction in Target Joint Pain Score at
24 Hours and 32 Hours Post First Dose

| | Number (%) of Responders | | | Treatment Comparisons | | |
|---|---|---|---|---|---|---|
| | Colchicine Dose | | | (Odds Ratio and 95% CI)[1] | | |
| Hours Post First Dose | High (N = 52) | Low (N = 74) | Placebo (N = 58) | High vs. Placebo | Low vs. Placebo | High vs. Low |
| 24 | 18 (34.6) | 32 (43.2) | 10 (17.2) | 2.54 (1.04, 6.18) p = 0.0368 | 3.66 (1.61, 8.32) p = 0.0015 | 0.69 (0.33, 1.45) p = 0.3298 |
| 32 | 20 (38.5) | 34 (45.9) | 10 (17.2) | 3.00 (1.24, 7.24) p = 0.0126 | 4.08 (1.80, 9.27) p = 0.0005 | 0.74 (0.36, 1.51) p = 0.4033 |

[1]The p-value is from the unstratified Pearson chi-square test.

Target Joint Pain at Baseline, 24 Hours and 32 Hours Post First Dose, and Change from
Baseline (LOCF) - ITT Population

| | | Colchicine Dose | | | Treatment Comparisons[1] | | |
|---|---|---|---|---|---|---|---|
| Time Point | Statistic | High (N = 52) | Low (N = 74) | Placebo (N = 58) | High vs. Placebo | Low vs. Placebo | High vs. Low |
| | | 24 Hours Post First Dose | | | | | |
| Baseline | Mean (SD) Median (Mix, Max) | 6.9 (1.59) 7.0 (4, 10) | 6.9 (1.72) 7.0 (4, 10) | 6.8 (1.44) 7.0 (4, 10) | −1.3 p = 0.0145 | −1.5 p = 0.0055 | 0.2 p = 0.7540 |
| Change | Mean (SD) Median (Mix, Max) | −2.0 (2.93) −2.0 (−9, 4) | −2.2 (3.46) −2.0 (−9, 5) | −0.7 (2.77) 0.0 (−8, 4) | | | |
| | | 32 Hours Post First Dose | | | | | |
| Baseline | Mean (SD) Median (Mix, Max) | 6.9 (1.59) 7.0 (4, 10) | 6.9 (1.72) 7.0 (4, 10) | 6.8 (1.44) 7.0 (4, 10) | −1.6 p = 0.0057 | −1.6 p = 0.0038 | 0.1 p = 0.9238 |
| Change | Mean (SD) Median (Mix, Max) | −2.3 (3.05) −2.0 (−9, 3) | −2.4 (3.59) −2.5 (−9, 5) | −0.7 (2.95) 0.0 (−8, 4) | | | |

[2]Tabled values are the difference between treatment groups mean change from baseline and p-value from ANCOVA with treatment geup as the independent variable and baseline score as the covariate.

Total Pain Relief (TOTPAR) Based on All Target Joint Pain Scores

| | | Colchicine Dose | | |
|---|---|---|---|---|
| Time Point | Statistic | High (N = 52) | Low (N = 74) | Placebo (N = 58) |
| Hour 24 | n Mean (SD) Median(Mix, Max) | 51[1] 20.9 (48.42) 11.5 (−102, 135) | 74 30.5 (61.44) 23.0 (−112, 185) | 58 9.5 (45.87) 7.3 (−90, 142) |

US 7,981,938 B2

<table>
<tr><td>39</td><td>40</td></tr>
</table>

-continued

Total Pain Relief (TOTPAR) Based on All Target Joint Pain Scores

| | | Colchicine Dose | | |
| | | High (N = 52) | Low (N = 74) | Placebo (N = 58) |
|---|---|---|---|---|
| Time Point | Statistic | | | |
| Hour 32 | n | 51 | 74 | 58 |
| | Mean (SD) | 31.9 (63.83) | 45.5 (82.05) | 12.2 (59.88) |
| | Median(Mix, Max) | 27.5 (−102, 185) | 34.1 (−128, 257) | 7.3 (−114, 142) |

[1]Patient 1026-1005 did not have a diary and the 24-hour call to the Call Center was 27 hours after the initial call. As indicated in the SAP, the Call Center pain score was not eligible for substitution for the missing diary. This patient has been excluded from the TOTPAR summary.

Number (%) of Patients Using Rescue Medication Up to and Including the 24-Hour Post First Dose Assessment

| Colchicine Dose | | | Treatment Comparison (Odds Ratio and 95% CI) | | |
|---|---|---|---|---|---|
| High (N = 52) | Low (N = 74) | Placebo (N = 58) | | | |
| n (%) | n (%) | n (%) | High vs. Placebo | Low vs. Placebo | High vs. Low |
| 18 (34.6) | 23 (31.1) | 29 (50.0%) | 0.53 (0.25, 1.14) p = 0.1034 | 0.45 (0.22, 0.92) p = 0.0273 | 1.17 (0.55, 2.50) p = 0.6768 |

Change from Baseline in Target Joint Pain Scores at 24 Hours Post First Dose with Interval of Time of Dose Relative to Flare Onset as Covariate (LOCF) - ITT Population

| | | Colchicine Dose | | | Treatment Comparisons[1] | | |
|---|---|---|---|---|---|---|---|
| | Statistic | High (N = 52) | Low (N = 74) | Placebo (N = 58) | High vs. Placebo | Low vs. Placebo | High vs. Low |
| | | Early Treatment Start (within 4 hours) | | | | | |
| Baseline | Mean (SD) | 6.9 (1.59) | 6.9 (1.72) | 6.8 (1.44) | −1.3 p = 0.0145 | −1.5 p = 0.0055 | 0.2 p = 0.7540 |
| | Median (Mix, Max) | 7.0 (4, 10) | 7.0 (4, 10) | 7.0 (4, 10) | | | |
| Change | Mean (SD) | −2.0 (2.93) | −2.2 (3.46) | −0.7 (2.77) | | | |
| | Median (Mix, Max) | −2.0 (−9, 4) | −2.0 (−9, 5) | −0.0 (−8, 4) | | | |
| | | Late Treatment Start (after 4 hours) | | | | | |
| Baseline | Mean (SD) | 6.9 (1.59) | 6.9 (1.72) | 6.8 (1.44) | −1.6 p = 0.0057 | −1.6 p = 0.0038 | 0.1 p = 0.9238 |
| | Median (Mix, Max) | 7.0 (4, 10) | 7.0 (4, 10) | 7.0 (4, 10) | | | |
| Change | Mean (SD) | −2.3 (3.05) | −2.4 (3.59) | −0.7 (2.95) | | | |
| | Median (Mix, Max) | −2.0 (−9, 3) | −2.5 (−9, 5) | 0.0 (−8, 4) | | | |

[1]Patient 1016-1013 was missing a flare onset time and Patients 1002-1007, 1018-1008, 1006-1013, 1009-1011, 1010-1005, 1010-1010, 1026-1002, 1026-1007, 1064-1007, and 1068-1022 appear to have taken the first dose of study medication prior to flare onset.
[2]Tabled values are the difference between treatment groups mean change from baseline and p-value from ANCOVA with treatment group as the independent variable and baseline score as the covariate.

Overall Summary of Treatment Emergent Adverse Events - Safety Population

| | Colchicine Dose | | |
|---|---|---|---|
| | High (N = 52) n (%) | Low (N = 74) n (%) | Placebo (N = 59) n (%) |
| Total Number of TEAEs[1] | 85 | 34 | 27 |
| Number (%) of Patients with at Least One TEAE | 40 (76.9) | 27 (36.5) | 16 (27.1) |
| Number (%) of Patients with at Least One Mild TEAE | 15 (28.8) | 19 (25.7) | 9 (15.3) |
| Number (%) of Patients with at Least One Moderate TEAE | 15 (28.8) | 8 (10.8) | 6 (10.2) |
| Number (%) of Patients with at Least One Severe TEAE | 10 (19.2) | 0 | 1 (1.7) |

US 7,981,938 B2

**41**                                    **42**

-continued

Overall Summary of Treatment Emergent Adverse Events - Safety Population

| | Colchicine Dose | | |
|---|---|---|---|
| | High (N = 52) n (%) | Low (N = 74) n (%) | Placebo (N = 59) n (%) |
| Number (%) of Patients with a TEAE Discontinuing Study | 0 | 0 | 0 |
| Number (%) of Patients with a Treatment Emergent SAE | 0 | 0 | 0 |

[1]Patients reporting more than one adverse event are only counted once for a given event.

Number (%) of Patients with at Least One Treatment-Emergent Gastrointestinal Adverse Event Recorded on the Diary or the CRF- Safety Population

| | Colchicine Dose | | | | | |
|---|---|---|---|---|---|---|
| | Standard (N = 52) | | Low (N = 74) | | Placebo (N = 59) | |
| Method of Capture | All | Severe | All | Severe | All | Severe |
| Captured on Adverse Event CRF[1] | 40 (76.9)[2] | 10 (19.2) | 19 (25.7) | 0 | 12 (20.3) | 0 |
| Captured on Patient Diary | 48 (92.3)[2] | 13 (25.0) | 32 (43.2)[3] | 3 (4.1) | 15 (25.4) | 2 (3.4) |
| Captured on Patient Diary or Adverse Event CRF | 49 (94.2)[2] | 18 (34.6) | 33 (44.6) | 3 (4.1) | 16 (27.1) | 2 (3.4) |

[1]Gastrointestinal adverse events captured on the AE CRF include the MedDRA preferred terms of "diarrhoea", "nausea", "vomiting", "abdominal pain", or "abdominal pain lower", "abdominal pain upper", "abdominal discomfort", or "dyspepsia".
[2]Statistically significantly different from placebo and from Low-dose colchicine (95% CI of odds ratio does not include "1").
[3]Statistically significantly different from placebo (95% CI of odds ratio does not include "1").

Number (%) of Patients with at Least One Severe TEAE in Any Treatment Group- Safety Population

| | Colchicine Dose | | | Placebo | Odds Ratio (95% Confidence | | |
|---|---|---|---|---|---|---|---|
| MedDRA System Organ Class MedDRA Preferred Term | High (N = 52) n (%) | Low (N = 74) n (%) | All Colchicine (N = 126) n (%) | (N = 59) n (%) | High vs. Placebo | Low vs. Placebo | High vs. Low |
| Number of Patients with at Least One Severe TEAE | 10 (19.2) | 0 | 10 (7.9) | 1 (1.7) | 13.8 (1.7, 112) | — | — |
| Gastrointestinal Disorders | 10 (19.2) | 0 | 10 (7.9) | 0 | — | — | — |
| Diarrhea | 10 (19.2) | 0 | 10 (7.9) | 0 | — | — | — |
| Melena | 1 (1.9) | 0 | 1 (0.8) | 0 | — | — | — |
| Nausea | 1 (1.9) | 0 | 1 (0.8) | 0 | — | — | — |
| Metabolism and Nutrition Disorders | 0 | 0 | 0 | 1 (1.7) | — | — | — |
| Gout | 0 | 0 | 0 | 1 (1.7) | | | |
| Musculoskeletal and Connective Tissue Disorders | 1 (1.9) | 0 | 1 (0.8) | 0 | — | — | — |
| Pain in Extremity | 1 (1.9) | 0 | 1 (0.8) | 0 | — | — | — |

US 7,981,938 B2

43    44

| | Colchicine Dose | | Placebo | Odds Ratio (95% Confidence Intervals) | | |
|---|---|---|---|---|---|---|
| MedDRA System Organ Class MedDRA Preferred Term | High (N = 52) n (%) | Low (N = 74) n (%) | (N = 59) n (%) | High vs. Placebo | Low vs. Placebo | High vs. Low |
| Number of Patients with at Least One Drug-Related TEAE | 38 (73.1) | 21 (28.4) | 14 (23.7) | 8.7 (3.7, 20.6) | 1.3 (0.6, 2.8) | 6.9 (3.1, 15.2) |
| Gastro-intestinal Disorders | 38 (73.1) | 18 (24.3) | 11 (18.6) | 11.8 (4.8, 29.0) | 1.4 (0.6, 3.3) | 8.4 (3.8, 19.0) |
| Diarrhea | 38 (73.1) | 16 (21.6) | 8 (13.6) | 17.3 (6.6, 45.4) | 1.8 (0.7, 4.4) | 9.8 (4.3, 22.5) |
| Nausea | 7 (13.5) | 3 (4.1) | 3 (5.1) | 2.9 (0.7, 11.9) | 0.8 (0.2, 4.1) | 3.7 (0.9, 15.0) |
| Vomiting | 8 (15.4) | 0 | 0 | — | — | — |

Number (%) of Patients with at Least One Drug-Related Treatment Emergent Adverse Events with an Incidence of ≧2% of Patients in Any Treatment Group

As shown in the above tables, standard dose colchicine produced ≧50% pain reduction at 24 hrs without pain rescue in a greater proportion of patients than did placebo (32.7% vs. 15.5%, p=0.0343; odds ratio 2.64 (95% CI, 1.06, 6.62), and more gastrointestinal side effects than placebo (73.1% vs. 18.6%, odds ratio 11.8 {95% CI, 4.8, 29.0}), in particular more diarrhea than placebo (73.1% vs. 13.6%, odds ratio 17.3 {95% CI, 6.6, 45.4}). Low dose colchicine also produced ≧50% pain reduction at 24 hrs without pain rescue in a greater proportion of patients than did placebo (37.8% vs. 15.5%, p=0.0046; odds ratio 3.31 (95% CI, 1.41, 7.77)), and more gastrointestinal side effects than placebo (24.3% vs. 18.6%, odds ratio 1.4 {95% CI, 0.7 to 11.9}), but did not significantly differ from placebo with respect to diarrhea (21.6% vs. 13.6%, odds ratio 1.8 {95% CI, 0.7 to 4.4}). Severe diarrhea occurred in 19.2% of patients taking high-dose colchicine while not occurring in the low-dose colchicine group. Vomiting occurred in 15.4% of patients taking high-dose colchicine while not occurring in the low-dose colchicine group.

Based on the primary efficacy variable of ≧50% pain reduction at 24 hrs without pain rescue, the proportion of responders to the standard dose and the low dose colchicine regimens was not significantly different (p=0.5529). The odds ratio for being a responder to standard dose colchicine vs. being a responder to low dose colchicine was 0.80 (95% CI, 0.38, 1.68). The proportion of patients rescued prior to 24 hours for the standard dose, low dose and placebo were 34.6%, 28.4% and 48.3%, respectively.

FIG. 1 summarizes efficacy data from the trial. FIG. 1 shows the fraction of all patients improved at 24 hrs post-first dose, regardless of pain rescue, as a function of the percent improvement in pain for each of the three treatment methods (standard dose, low dose, placebo). For example, 49% of patients taking the low dose achieved at least 40% relief compared to 24% of the patients on placebo.

Standard dose oral colchicine was established to be effective, but burdened by significant diarrhea. In contrast, although low dose colchicine was not significantly different from standard dose colchicine in efficacy, low dose colchicine was not significantly different from placebo with respect to diarrhea. This trial provides a new evidence basis for acute gout treatment, specifically supporting the unexpected superiority of a low dose colchicine dosing regimen of 2 tablets of 0.6 mg followed in 1 hour by 1 tablet. The higher standard dose colchicine dosing regimen did not improve patient outcome, but did increase adverse events.

Example 4

Pharmacokinetic Study in Healthy Adults of Single vs. Multiple Oral Doses of Colchicine Tablets

This study was a single-center, open-label, single-sequence, two-period study to evaluate the pharmacokinetic profile of colchicine following single and multiple oral doses of colchicine tablets, 0.6 mg, in healthy volunteers.

In Period 1, study subjects received a 0.6-mg dose of colchicine after an overnight fast of at least 10 hours. In Period 2, subjects received a 0.6-mg dose of colchicine in the morning and the evening (approximately 12 hours later) for 10 days (steady state regimen). Subjects received a light breakfast served 60 minutes following dose administration in the morning and the evening dose was administered 90 minutes after an evening meal on Days 15 through 24 only. On Day 25, the colchicine dose was administered after an overnight fast of at least 10 hours and lunch was served 4 hours post-dose. Study periods were separated by a 14-day washout. Following the single dose and the last dose of the multiple dose regimen (beginning on the mornings of Day 1 and Day 25, respectively), blood samples were collected (6 mL each) from each subject within 1 hour prior to dosing and after dose administration at study hours 0.5, 1, 1.5, 2, 3, 4, 6, 8, 10, 12, and 24 (while confined) and 36, 48, 72, and 96 (on an outpatient basis). Plasma concentrations of colchicine and its metabolites were determined using validated LC/MS-MS methods.

Thirteen healthy, non-smoking subjects with a mean age of 25.5 years (range 19 to 38 years) and within 15% of ideal body weight were enrolled in this study. All subjects completed both dosing periods according to protocol.

After a single dose, plasma concentrations are no longer quantifiable 24 hours post-dose in all but 1 subject. After the last dose of the steady state regimen, concentrations remained quantifiable for 48 to 72 hours. Review of individual subject data shows that no subject experienced a secondary colchicine peak, either following a single dose or upon multiple dosing.

US 7,981,938 B2

45

All 2-O-demethylcolchicine (2-DMC) concentrations were below the level of quantitation (LOQ, 0.2 ng/mL) and only one sample from 1 subject (of 13 subjects) had a detectable 3-O-demethylcolchicine (3-DMC) concentration which was near the level of quantitation. Therefore, metabolites are not discussed further.

In healthy adults, colchicine appears to be readily absorbed when given orally, reaching a mean maximum plasma concentration of 2.5 ng/mL in 1.5 hours after a single dose. The drug is distributed widely, with an apparent volume of distribution of 540 L. greatly exceeding total body water. The elimination half-life as calculated following a single oral dose is approximately 5 hours. Levels were not detectable by 24 hours post-dose and this is therefore not an accurate estimate. Pharmacokinetic parameter values are summarized in the table below.

Review of trough plasma concentrations indicates that steady state was attained by approximately the eighth day of dosing for most subjects. Colchicine may have a diurnal variation reflected in the observed Cmin concentrations at steady state. Cmin concentrations prior to the morning dose are approximately 12% higher than the Cmin concentrations prior to the evening dose (Day 23 and Day 24). The mean Cmin concentration observed on Day 25 was 0.907 ng/mL.

Colchicine accumulated following administration of multiple doses to an extent greater than expected. Exposure was nearly two-fold higher (approximately 1.7 based on AUC [Day 25 $AUC_{0-\tau}$/Day 1 $AUC_{0-\infty}$] and approximately 1.5 based on Cmax [Day 25 $C_{max}$/Day 1 $C_{max}$]). This observation could be attributable to an underestimation of $AUC\infty$ following a single dose. With the higher plasma levels that occur with repeated dosing, a longer terminal elimination half life is apparent, 26.6 hours. Pharmacokinetic parameter values are summarized in the tables below.

TABLE 10

Colchicine Pharmacokinetic Parameter Values Following Administration of A Single Oral Dose of Colchicine 0.6 mg in Healthy Adults

| | $AUC_{0-t}$ (pg-hr/mL) | $AUC_{0-inf}$ (pg-hr/mL) | $C_{max}$ (pg/mL) | $T_{max}$ (hr) | $Kel$ (1/hr) | $T_{1/2}$ (hr) |
|---|---|---|---|---|---|---|
| N | 13 | 13 | 13 | 13 | 13 | 13 |
| MEAN | 10508.54 | 12281.90 | 2470.77 | 1.50 | 0.1829 | 4.95 |
| STDEV | 3544.82 | 4423.34 | 706.98 | 0.54 | 0.0592 | 4.43 |
| % CV | 33.73 | 36.02 | 28.61 | 36.00 | 32.39 | 89.54 |
| MEDIAN | 10560.90 | 11451.45 | 2714.00 | 1.50 | 0.1992 | 3.48 |
| MIN | 4812.88 | 7252.66 | 1584.00 | 1.00 | 0.0359 | 2.84 |
| MAX | 18128.65 | 23838.48 | 3977.00 | 3.00 | 0.2643 | 19.29 |

TABLE 11

Colchicine Pharmacokinetic Parameter Values Following Administration of Multiple (b.i.d.) Oral Doses of Colchicine 0.6 mg in Healthy Adults

| | $AUC_{0-t}$ (pg-hr/mL) | $AUC_{0-\infty}$ (pg-hr/mL) | $AUC_{0-inf}$ (pg-hr/mL) | $C_{max}$ (pg/mL) | $C_{min}$ (pg/mL) | $C_{avg}$ (pg/mL) | $T_{max}$ (hr) | $Kel$ (1/hr) | $T_{1/2}$ (hr) |
|---|---|---|---|---|---|---|---|---|---|
| N | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 |
| MEAN | 43576.96 | 29056.23 | 54198.77 | 3553.15 | 906.51 | 1210.68 | 1.31 | 0.03 | 26.60 |
| STDEV | 9333.26 | 4531.30 | 9214.54 | 843.45 | 152.19 | 188.80 | 0.50 | 0.00 | 4.33 |
| % CV | 21.42 | 15.59 | 17.00 | 23.74 | 16.79 | 15.59 | 45.61 | 16.34 | 16.26 |
| MEDIAN | 41925.10 | 28452.15 | 54113.43 | 3734.00 | 903.50 | 1185.51 | 1.00 | 0.03 | 26.51 |
| MIN | 29328.78 | 20791.98 | 37599.76 | 1977.00 | 636.23 | 866.33 | 0.50 | 0.02 | 20.82 |
| MAX | 58265.35 | 36083.95 | 67944.65 | 4957.00 | 1149.67 | 1503.50 | 3.00 | 0.03 | 33.65 |

46

TABLE 12

Mean (% CV) Colchicine Pharmacokinetic Parameter Values Following Administration of Single and Multiple (b.i.d.) Oral Doses of Colchicine 0.6 mg in Healthy Adults

| | Vd/F(L) | CL/F (L/hr) |
|---|---|---|
| Colchicine 0.6-mg Single Dose (N = 13) | | |
| Day 1 | 341 (54.4) | 54.1 (31.0) |
| Colchicine 0.6 mg b.i.d. × 10 days | | |
| Day 25 | 1150 (18.73) | 30.3 (19.0) |

CL = Dose/$AUC_0$ (Calculated from mean values)
Vd = CL/Ke (Calculated from mean values)

In the above table, the parameter CL/F denotes the apparent total body clearance after administration, calculated as Total Dose/Total $AUC0-\tau_{inf}$; and $V_d$/F denotes the apparent total volume of distribution after administration, calculated as Total Dose/(Total $AUC_\infty \times K_{el}$).

Example 5

Pharmacokinetic Study in Healthy Adults of Low Dose Acute Gout Regimen: 1.8 mg Over 2 Hours

This study was a single-center, single-period, open-label pharmacokinetic study conducted in healthy subjects under fasting conditions. It was designed to characterize the pharmacokinetic profile of a low-dose regimen of colchicine (1.8 mg over 2 hours) used as one of the treatment arms in the randomized, controlled trial in patients with an acute gout flare discussed above.

Thirteen healthy, non-smoking subjects with a mean age of 29.3 years (range 20 to 49 years) and within 15% of ideal body weight were enrolled in this study. Subjects received 2×0.6 mg tablets initially followed by 1×0.6 mg tablet 1 hour later. Blood samples for measurement of colchicine plasma concentrations and metabolites were collected (relative to the first dose of study drug) at pre-dose; 0.5 and 1 hour post-dose (prior to second dose); and 1.5, 2, 2.5, 3, 4, 6, 8, 12, 18, 24, 36, and 48 hours post-dose. Subjects were confined until 48 hours post-dose and then returned 72 and 96 hours after the first dose for additional blood sampling on an outpatient basis. Plasma concentrations of colchicine and its metabolites were determined using validated LC/MS-MS methods.

2-DMC concentrations were below the LOQ for all subjects. Eight of 13 subjects had at least one measurable 3-DMC concentration (29 total 3-DMC measurable concentrations). 3-DMC concentrations ranged from 0.20 ng/mL (near the LOQ) to 0.45 ng/mL and were observed 1 to 4 hours post-dose. Given these low levels, metabolites are not discussed further herein.

US 7,981,938 B2

47

When colchicine was administered in this low-dose regimen, concentrations increased to a maximum of 6.2 ng/mL, occurring 1.81 hours after the initial dose (0.81 hours after the second dose). Most of the subjects (10 of 13 subjects or 77%) experienced a secondary peak within 6 hours after the first of the two doses, attributed to intestinal secretion and re-absorption and/or biliary recirculation.

The terminal elimination half-life was 23.6 hours. A summary of the pharmacokinetic parameter values is provided in the table below.

TABLE 12

COLCHICINE PHARMACOKINETIC PARAMETER VALUES AFTER LOW-DOSE COLCHICINE (1.8 MG OVER 2 HOURS) ADMINISTRATION IN HEALTHY ADULTS

|  | $C_{max}$ (pg/mL) | $T_{max}$ (hr) | Total $AUC_{0-t}$ (pg-hr/mL) | Total $AUC_\infty$ (pg-hr/mL) | $K_{el}$ (1/hr) | CL/F (mL/hr) | $V_{area}/F$ (L) | $t_{1/2}$ (hr) |
|---|---|---|---|---|---|---|---|---|
| N | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 |
| MEAN | 6192.77 | 1.81 | 43787.55 | 52070.06 | 0.0326 | 39650.93 | 1188.72 | 23.63 |
| STDEV | 2433.70 | 0.38 | 11437.48 | 13689.27 | 0.0100 | 9993.17 | 319.56 | 9.24 |
| % CV | 39.30 | 21.24 | 26.12 | 26.29 | 30.80 | 27.04 | 26.88 | 39.10 |
| MEDIAN | 5684.00 | 2.00 | 43942.15 | 50783.77 | 0.0322 | 35444.40 | 1149.35 | 21.56 |
| MIN | 3160.00 | 1.00 | 28821.45 | 34171.00 | 0.0141 | 24295.73 | 774.19 | 13.80 |
| MAX | 11370.00 | 2.50 | 58931.99 | 74087.08 | 0.0502 | 52676.24 | 1724.36 | 49.20 |

Example 6

Pharmacokinetic Study in Healthy Adults of a Standard-Dose Acute Gout Regimen: 4.8 mg Colchicine over 6 Hours

This study was a single center, randomized, double-blind, double-dummy pharmacokinetic and exploratory ECG safety study.

With respect to the pharmacokinetic aspect of the study, on Day 1, following a minimum of 10 hours overnight fast, subjects received the appropriate randomized study drug (combination of over-encapsulated active drug or placebo capsules such that the blind was preserved). Those randomized to colchicine received 4.8 mg over 6 hours (initially 2×0.6 mg tablets followed by 1×0.6 mg tablet every hour for six additional doses). Those randomized to moxifloxacin received 1×400 mg tablet. Both dosing regimens were followed by a 4-hour post-dose fast (post-dose fast for colchicine arm started after the first dose of colchicine administered). Blood samples were obtained on Day 1 at the following time points (relative to the first dose of study drug): pre-dose and 1 (prior to second dose), 3 (prior to fourth dose), 6 (prior to final dose), 6.17, 6.33, 6.5, 6.75, 7, 7.25, 7.5, 7.75,

48

8, 10, 12, 23, 36, 48, 72 and 96 hours post-dose. Subjects were confined until 48 hours post-dose and then returned 72 and 96 hours after the first dose for additional blood sampling on an outpatient basis. Plasma concentrations of colchicine and its metabolites were determined using validated LC/MS-MS methods.

Eighteen healthy, non-smoking subjects with a mean age of 28.7 years (range 18 to 50 years) and within 15% of ideal body weight were enrolled in this study. Fifteen subjects were randomized to receive colchicine and 3 subjects were randomized to receive moxifloxacin as a positive control for QTc prolongation. All subjects completed the study according to protocol.

When colchicine was administered as the standard-dose regimen used in the treatment of patients experiencing an acute gout flare, colchicine concentrations increased to a maximum of 6.8 ng/mL (similar to the reported Cmax in the low-dose regimen) and absorbed approximately 4.5 hours after the initial dose (3.5 hours after the second dose). Most of the subjects (13 of 15 subjects receiving colchicine or 87%) experienced a secondary peak within 6 hours after a single oral dose, attributed to intestinal secretion and re-absorption and/or biliary recirculation. The terminal elimination half-life was 31.38 hours. A summary of the pharmacokinetic parameter values is provided in the table below.

TABLE 13

MEAN (% CV) COLCHICINE PHARMACOKINETIC PARAMETER VALUES AFTER STANDARD-DOSE COLCHICINE (4.8 MG OVER 6 HOURS) ADMINISTRATION IN HEALTHY ADULTS

|  | $C_{max}$ (ng/mL) | $T_{max}$ (hr) | Total $AUC_{0-t}$ (ng-hr/mL) | Total $AUC_\infty$ (ng-hr/mL) | $K_{el}$ (h$^{-1}$) | CL/F (mL/hr) | $V_{area}/F$ (L) | $t_{1/2}$ (hr) |
|---|---|---|---|---|---|---|---|---|
| N | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 |
| MEAN | 6.84 | 4.47 | 104.95 | 118.20 | 0.0242 | 43168.87 | 1876.09 | 31.38 |
| STDEV | 1.30 | 1.99 | 24.61 | 26.01 | 0.0088 | 12862.03 | 456.19 | 8.36 |
| % CV | 18.94 | 44.65 | 23.45 | 22.01 | 36.59 | 29.79 | 24.32 | 26.65 |
| MEDIAN | 6.69 | 3.12 | 113.12 | 126.47 | 0.0212 | 37954.71 | 1902.14 | 32.76 |
| MIN | 4.95 | 3.12 | 53.74 | 61.31 | 0.0147 | 31386.01 | 805.92 | 15.03 |
| MAX | 8.60 | 7.50 | 138.24 | 152.93 | 0.0461 | 78287.41 | 2639.21 | 47.22 |

2-DMC concentrations were below LOQ for all subjects. Fourteen of 15 subjects had at least one measurable 3-DMC concentration; the 3-DMC concentrations ranged from 0.25 ng/mL (near the LOQ) to 0.42 ng/mL and were observed 1.12 to 12.12 hours post-dose. Summary mean 3-DMC pharmacokinetic parameter values can be found in the table below. The observed mean 3-DMC Cmax, AUC0-t, and AUC∞ concentrations were approximately 4.7%, 2%, and 4.1% of the observed mean colchicine Cmax, AUC0-t, AUC∞ concentrations, respectively.

US 7,981,938 B2

**49**                                                                     **50**

TABLE 14

Mean (% CV) 3-DMC Pharmacokinetic Parameter Values after Standard-Dose
Colchicine (4.8 mg over 6 hours) Administration in Healthy Adults

| | $C_{max}$ (ng/mL) N = 15 | $T_{max}$ [1] (h) N = 14 | $AUC_{0-t}$ (ng · h/mL) N = 13 | $AUC_{\infty}$ (ng · h/mL) N = 8 | Ke (h [1]) N = 8 | $t_{1/2}$ (h) N = 8 |
|---|---|---|---|---|---|---|
| Standard Dose N = 15 | 0.32 (16.35) | 5.06 (3.12-8.12) | 2.09 (40.29) | 4.84 (42.73) | 0.1418 (60.15) | 6.93 (64.35) |

[1] $T_{max}$ reported mean (range)

### Example 7

Food Effect Study Single Dose vs.
COL-PROBENECID® (0.5 mg Colchicine/500 mg
Probenecid)

The clinical study of this example was a randomized, single-dose, three-way crossover study testing the bioequivalence of two formulations of colchicine administered under standard fasting conditions, one the 0.6 mgA colchicine formulation of Example 2 (test product) and one a marketed combination product, 0.5 mg colchicine/500 mg probenecid tablets (COL-PROBENECID®, Watson Laboratories, Inc.) (reference product), and the effect of food on the test product by dosing following a high-fat breakfast.

Twenty-eight healthy non-smoking adult volunteers (male and female) and no alternates initiated the study. Subjects received three single doses, in a randomized sequence of three treatment periods. On each occasion, subjects received either one colchicine tablet USP, 0.6 mg (test product) given either with food or in a standard fasting condition or one colchicine 0.5 mg/probenecid 500 mg tablet (reference product) given in a standard fasting condition. Each treatment period was separated by a 14-day washout.

The two dosing conditions were (1) Standard Fasting Conditions (either colchicine tablets USP, 0.6 mg (test A) or reference product, COL-PROBENECID®): 1 tablet of test product (Test A) or reference product with 240 mL of room temperature water after an overnight fast of at least 10 hours; subjects will continue to fast for 4 hours post-dose; and (2) High-fat Breakfast (colchicine tablets USP, 0.6 mg): 1 tablet of test product (Test B) with 240 mL of room temperature water 30 minutes after initiation of a standardized, high-fat and high-calorie breakfast (FDA standard meal) preceded by an overnight fast.

Subjects were confined for at least 15 hours prior to and until at least 24 hours after dosing each period. During each period, subjects returned on four separate occasions for outpatient blood sampling.

No fluid, except that given with drug administration and the standardized high-fat and high-calorie breakfast (FDA standard meal) depending on the randomization, was allowed from 1 hour prior to dose administration until 2 hours after dosing. When fluids were restricted, they will be allowed ad libitum but will generally be controlled.

Dinner was served approximately 13.5 hours prior to dose administration. At 30 minutes before dose administration, those subjects to be dosed after eating (depending on randomization) were served the standardized, high-fat and high-calorie breakfast (FDA standard meal). All subjects fasted for at least 4 hours after dosing. Clear fluids, such as water, were allowed during fasting.

Subjects were served standardized meals and beverages, controlled by the clinic during periods of confinement. Meals were the same in content and quantity during each confinement period. No grapefruit and/or grapefruit containing products or caffeine and/or xanthine containing products were allowed during the confinement portions of the study.

During confinement, only non-strenuous activity was permitted. Following dose administration, subjects remained in a seated or upright position for at least 4 hours to ensure proper gastric emptying and subject safety.

Blood (6 mL) was collected in K2 EDTA vacutainers with samples taken within 1 hour prior to dosing (0 hour) and after dose administration at 0.5, 1, 1.5, 2, 3, 4, 6, 8, 12, and 24 hours (while confined) and 36, 48, 72, and 96 hours (on an outpatient basis). 1. Colchicine and metabolite plasma concentrations (colchicine, 2-DMC, 3-DMC, and 10 demethylcolchicine) were measured using a validated bioanalytical method.

Pharmacokinetic results comparing the test product under fed and fasting conditions are shown below.

TABLE 15

Pharmacokinetic results of colchicine test product under fed and fasting

| | Ln-Transformed Data | | | | | |
|---|---|---|---|---|---|---|
| | Least Squares Mean | | Geometric Mean | | | 90% Confidence Interval (Lower Limit, |
| PK Variable | Test B | Test A | Test B | Test A | % Ratio | Upper Limit) |
| $C_{max}$ (ng/mL) | 7.784 | 7.781 | 2402.55 | 2395.60 | 100.37 | (89.84, 112.14) |
| $AUC_{0-t}$ (ng/mL-hr) | 9.201 | 9.334 | 9906.40 | 11310.90 | 87.58 | (78.07, 98.26) |
| $AUC_{0-\infty}$ (ng/mL-hr) | 9.300 | 9.468 | 10939.73 | 12939.64 | 84.54 | (76.73, 93.15) |

Geometric means are based on least squares means of ln-transformed values.

US 7,981,938 B2

51

52

TABLE 15-continued

| | Non-Transformed Data | | | | |
|---|---|---|---|---|---|
| | | Least Squares Mean | | | 90% Confidence Interval |
| PK Variable | Test B | Test A | % Ratio | | (Lower Limit, Upper Limit) |
| $C_{max}$ (pg/mL) | 2486.99 | 2493.15 | 99.75 | | (90.43, 109.07) |
| $AUC_{0-t}$ (pg/mL·hr) | 10438.89 | 12536.56 | 83.27 | | (72.79, 93.74) |
| $AUC_{0-inf}$ (pg/mL·hr) | 11345.62 | 13907.83 | 81.58 | | (71.53, 91.63) |
| $T_{max}$ (hr) | 1.85 | 1.35 | 137.14 | | (111.11, 163.17) |
| Kel (hr$^{-1}$) | 0.1902 | 0.1520 | 125.13 | | (107.67, 142.58) |
| $T_{1/2}$ (hr) | 4.34 | 6.27 | 69.17 | | (45.2, 93.14) |

TABLE 16

Descriptive statistics for Pharmacokinetic Parameters
for Test Product A (0.6 mg) - Fasting conditions

| | AUC0-t (pg-hr/mL) | AUC0-inf (pg-hr/mL) | Cmax (pg/mL) |
|---|---|---|---|
| N | 25 | 24 | 25 |
| Arithmetic Mean | 12589 | 14113 | 2503 |
| STDev | 6210.729 | 5595.398 | 722.049 |
| % CV | 48.621 | 39.648 | 28.847 |
| Median | 11412.80 | 12756.02 | 2473.00 |
| Min | 4430.73 | 6674.96 | 1291.00 |
| Max | 30787.30 | 27789.51 | 3989.00 |

TABLE 17

Descriptive statistics for Pharmacokinetic Parameters
for Test Product A (0.6 mg) - Fed conditions

| | AUC0-t (pg-hr/mL) | AUC0-inf (pg-hr/mL) | Cmax (pg/mL) |
|---|---|---|---|
| N | 25 | 24 | 25 |
| Arithmetic Mean | 10491 | 11404 | 2497 |
| STDev | 4024.804 | 2895.681 | 695.091 |

TABLE 17-continued

Descriptive statistics for Pharmacokinetic Parameters
for Test Product A (0.6 mg) - Fed conditions

| | AUC0-t (pg-hr/mL) | AUC0-inf (pg-hr/mL) | Cmax (pg/mL) |
|---|---|---|---|
| % CV | 38.374 | 25.392 | 27.838 |
| Median | 9556.25 | 10964.17 | 2293.00 |
| Min | 6168.53 | 7128.50 | 1256.00 |
| Max | 26031.15 | 20101.33 | 3930.00 |

Food was observed to have negligible effect on rate of absorption, as indicated by the percent ratio of ln-transformed Cmax data of 100.37, but decreased the extent of absorption by about 15%, as indicated by the percent ratio of ln-transformed AUC0-t and AUC0-inf values of 87.56 and 84.54, respectively. Under fasted and fed conditions, the mean Cmax was 2.5 ng/mL. Tmax was 1.35 hrs under fasted conditions and 1.85 hrs under fed conditions.

Pharmacokinetic results comparing the test product to the reference product are shown in the tables below. The difference in colchicine potency of the test and reference products was corrected by calculating dose-normalized values in the pharmacokinetic parameters.

TABLE 18

Summary of Statistical Analysis Colchicine Test Product A (0.6 mg) - Fasting vs
Reference Product C (0.5 mg) - Fasting (Dose Normalized to 0.5 mg) N = 25

| | Ln-Transformed Data | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Least Squares Mean | | Geometric Mean | | | 90% Confidence Interval (Lower Limit, |
| PK Variable | Test A | Reference C | | Test A | Reference C | % Ratio | Upper Limit) |
| $C_{max}$ (pg/mL) | 7.598 | 7.374 | | 1994.67 | 1594.51 | 125.10 | (111.97, 139.76) |
| $AUC_{0-t}$ (pg/mL·hr) | 9.151 | 8.833 | | 9425.75 | 6858.61 | 137.43 | (122.5, 154.18) |
| $AUC_{0-inf}$ (pg/mL·hr) | 9.286 | 8.970 | | 10783.03 | 7863.34 | 137.13 | (124.46, 151.09) |

Geometric means are based on least squares means of ln-transformed values.

| | Non-Transformed Data | | | | |
|---|---|---|---|---|---|
| | | Least Squares Mean | | | 90% Confidence Interval |
| PK Variable | Test A | Reference C | % Ratio | | (Lower Limit, Upper Limit) |
| $C_{max}$ (pg/mL) | 2076.08 | 1688.54 | 122.95 | | (110.07, 135.83) |
| $AUC_{0-t}$ (pg/mL·hr) | 10435.91 | 8016.44 | 130.18 | | (115.25, 145.11) |
| $AUC_{0-inf}$ (pg/mL·hr) | 11565.28 | 8230.68 | 140.51 | | (126.04, 154.99) |
| $T_{max}$ (hr) | 1.35 | 1.34 | 100.11 | | (74.05, 126.17) |
| Kel (hr$^{-1}$) | 0.1520 | 0.1970 | 77.16 | | (63.69, 90.63) |
| $T_{1/2}$ (hr) | 6.27 | 3.78 | 165.89 | | (126.13, 205.65) |

US 7,981,938 B2

53

54

The 0.6 mgA colchicine tablet, formulated as in Example 2, showed enhanced bioavailability over COL-PROBENECID®. The formulation disclosed herein showed a greater rate and extent of absorption than did the COL-PROBENECID®.

Recitation of ranges of values herein are merely intended to serve as a shorthand method of referring individually to each separate value falling within the range, unless otherwise indicated herein, and each separate value is incorporated into the specification as if it were individually recited herein. The endpoints of all ranges directed to the same component or property are inclusive and independently combinable.

All methods described herein can be performed in a suitable order unless otherwise indicated herein or otherwise clearly contradicted by context. The use of any and all examples, or exemplary language (e.g., "such as") provided herein, is intended merely to better illuminate the invention and does not pose a limitation on the scope of the invention unless otherwise claimed. No language in the specification should be construed as indicating any non-claimed element as essential to the practice of the invention as used herein. Unless defined otherwise, technical and scientific terms used herein have the same meaning as is commonly understood by one of skill in the art to which this invention belongs. The terms wt %, weight percent, percent by weight, etc. are equivalent and interchangeable.

Embodiments of this invention are described herein, including the best mode known to the inventors for carrying out the invention. Variations of those preferred embodiments may become apparent to those of ordinary skill in the art upon reading the foregoing description. The inventors expect skilled artisans to employ such variations as appropriate, and the inventors intend for the invention to be practiced otherwise than as specifically described herein. Accordingly, this invention includes all modifications and equivalents of the subject matter recited in the claims appended hereto as permitted by applicable law. Moreover, any combination of the above-described elements in all possible variations thereof is encompassed by the invention unless otherwise indicated herein or otherwise clearly contradicted by context.

I claim:

1. A method of treating a gout flare with colchicine in a patient undergoing colchicine prophylactic treatment of gout flares, consisting of

administering to a patient having a gout flare while undergoing prophylactic treatment of gout flares

1.2 mgA oral colchicine at the onset of the acute gout flare, followed by 0.6 mgA oral colchicine about one hour later; and

after waiting 12 hrs, continuing prophylactic treatment consisting of 0.6 mgA or 1.2 mgA oral colchicine daily.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,981,938 B2                                                    Page 1 of 2
APPLICATION NO.     : 12/687406
DATED               : July 19, 2011
INVENTOR(S)         : Matthew W. Davis

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In column 1, line 25, delete "N-[7S," and insert -- N-[(7S, --, therefor.

In column 5, line 48, delete "mitotis," and insert -- mitosis, --, therefor.

In column 10, line 9, delete "HPLC" and insert -- UPLC --, therefor.

In column 10, line 65, "(HPLC)" and insert -- (UPLC) --, therefor.

In column 14, line 8, delete "manufacture" and insert -- manufacture. --, therefor.

In column 14, line 30, delete "N-formyldeactylcholchicine," and insert
-- N-formyldeacetylcolchicine, --, therefor.

In column 16, line 20, delete "composition" and insert -- composition. --, therefor.

In column 16, line 26, delete "alignates," and insert -- alginates --, therefor.

In column 16, line 46-47, delete "crosscarmelose" and insert -- croscarmellose --, therefor.

In column 18, line 36, delete "HPLC" and insert -- UPLC --, therefor.

In column 20, line 62, delete "0.5%" and insert -- 0.5%. --, therefor.

In column 22, line 22, delete "Buffer:methanl" and insert -- Buffer:methanol --, therefor.

In column 22, line 58, delete "Volumentric" and insert -- Volumetric --, therefor.

In column 22, line 62, delete "Volumentric" and insert -- Volumetric --, therefor.

Signed and Sealed this
Twenty-second Day of November, 2011

David J. Kappos

David J. Kappos
*Director of the United States Patent and Trademark Office*

**CERTIFICATE OF CORRECTION (continued)**                    Page 2 of 2
**U.S. Pat. No. 7,981,938 B2**

In column 27, line 61, delete "1βscreen" and insert -- 1A screen --, therefor.

In column 28, line 67, delete "probenicid." and insert -- probenecid. --, therefor.

In column 35, line 17, before "hours" insert -- 12 --.

In column 37-38, line 39, delete "goup" and insert -- group --, therefor.

In column 45, line 4, delete "3-O-demethylcolchcine" and insert -- 3-O-demethylcolchicine --, therefor.

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,981,938 B2                                                  Page 1 of 3
APPLICATION NO.   : 12/687406
DATED             : July 19, 2011
INVENTOR(S)       : Matthew W. Davis

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In column 3, line 20, delete "Cmax" and insert -- $C_{max}$ --, therefor.

In column 4, line 24, delete "Cmax" and insert -- $C_{max}$ --, therefor.

In column 4, line 39, delete "Cmax" and insert -- $C_{max}$ --, therefor.

In column 4, line 49, delete "Cmax" and insert -- $C_{max}$ --, therefor.

In column 4, line 50, delete "Cmax" and insert -- $C_{max}$ --, therefor.

In column 13, line 49, delete "4000 mL" and insert -- 400 mL --, therefor.

In column 18, line 18, delete "Impurity B." and insert -- Impurity B, --, therefor.

In column 22, line 6, after "USP/30NF25" insert -- . --.

In column 29, line 8, delete "(Probenecid" and insert -- (Probenicid --, therefor.

In column 31, line 29, delete "levels to undetectable" and insert -- undetectable --, therefor.

In column 34, line 10, delete "also be," and insert -- also --, therefor.

In column 37, line 54, delete "[2]Tabled" and insert -- [1]Tabled --, therefor.

In column 39, line 51, delete "[1]Patient" and insert -- Patient --, therefor.

In column 39, line 53, delete "[2]Tabled" and insert -- [1]Tabled --, therefor.

In column 45, line 22, delete "Cmin" and insert -- $C_{min}$ --, therefor.

Signed and Sealed this
Third Day of July, 2012

David J. Kappos

David J. Kappos
*Director of the United States Patent and Trademark Office*

In column 45, line 23, delete "Cmin" and insert -- $C_{min}$ --, therefor.

In column 45, line 24, delete "Cmin" and insert -- $C_{min}$ --, therefor.

In column 45, line 26, delete "Cmin" and insert -- $C_{min}$ --, therefor.

In column 45, line 33, delete "AUC∞" and insert -- $AUC_{\infty}$ --, therefor.

In column 45, line 43, delete "Kel" and insert -- $K_{el}$ --, therefor.

In column 46, line 1, after "Table 12" insert -- A --.

In column 46, line 6, delete "Vd" and insert -- $V_d$ --, therefor.

In column 46, line 14, delete "Vd = CL/Ke" and insert -- $V_d = CL/K_e$ --, therefor.

In column 46, line 17, delete "AUC0-tau" and insert -- $AUC_{0\text{-}tau}$ --, therefor.

In column 46, line 59, delete "Kel" and insert -- $K_{el}$ --, therefor.

In column 47, line 12, after "Table 12" insert -- B --.

In column 48, line 33, delete "Cmax" and insert -- $C_{max}$ --, therefor.

In column 48, line 64, delete "Cmax" and insert -- $C_{max}$ --, therefor.

In column 48, line 64, delete "AUC0-t" and insert -- $AUC_{0\text{-}t}$ --, therefor.

In column 48, line 64, delete "AUC∞" and insert -- $AUC_{\infty}$ --, therefor.

In column 48, line 66, delete "Cmax" and insert -- $C_{max}$ --, therefor.

In column 48, line 66, delete "AUC0-t" and insert -- $AUC_{0\text{-}t}$ --, therefor.

In column 48, line 66, delete "AUC∞" and insert -- $AUC_{\infty}$ --, therefor.

In column 49, line 5, delete "Ke" and insert -- $K_e$ --, therefor.

In column 49, line 63, delete "ng" and insert -- pg --, therefor.

In column 49, line 64, delete "ng" and insert -- pg --, therefor.

In column 49, line 65, delete "ng" and insert -- pg --, therefor.

**CERTIFICATE OF CORRECTION (continued)**                                    Page 3 of 3
**U.S. Pat. No. 7,981,938 B2**

In column 50, line 66, delete "ln-transformed" and insert -- ln-transformed --, therefor.

In column 51, line 11, delete "Kel" and insert -- $K_{el}$ --, therefor.

In column 51, line 19, delete "AUC0-t" and insert -- $AUC_{0-t}$ --, therefor.

In column 51, line 19, delete "AUC0-inf" and insert -- $AUC_{0-inf}$ --, therefor.

In column 51, line 20, delete "Cmax" and insert -- $C_{max}$ --, therefor.

In column 51, line 34, delete "AUC0-t" and insert -- $AUC_{0-t}$ --, therefor.

In column 51, line 34, delete "AUC0-inf" and insert -- $AUC_{0-inf}$ --, therefor.

In column 51, line 35, delete "Cmax" and insert -- $C_{max}$ --, therefor.

In column 51, line 64, delete "Kel" and insert -- $K_{el}$ --, therefor.

In column 52, line 19, delete "AUC0-t" and insert -- $AUC_{0-t}$ --, therefor.

In column 52, line 19, delete "AUC0-inf" and insert -- $AUC_{0-inf}$ --, therefor.

In column 52, line 20, delete "Cmax" and insert -- $C_{max}$ --, therefor.

In column 52, line 28, delete "Cmax" and insert -- $C_{max}$ --, therefor.

In column 52, line 30, delete "AUC0-t" and insert -- $AUC_{0-t}$ --, therefor.

In column 52, line 30, delete "AUC0-inf" and insert -- $AUC_{0-inf}$ --, therefor.

In column 52, line 31, delete "Cmax" and insert -- $C_{max}$ --, therefor.

In column 52, line 32, delete "Tmax" and insert -- $T_{max}$ --, therefor.



US008097655B2

(12) **United States Patent**
Davis

(10) Patent No.: **US 8,097,655 B2**
(45) Date of Patent: ***Jan. 17, 2012**

(54) **METHODS FOR CONCOMITANT ADMINISTRATION OF COLCHICINE AND MACROLIDE ANTIBIOTICS**

(75) Inventor: **Matthew W. Davis**, Erwinna, PA (US)

(73) Assignee: **Mutual Pharmaceutical Company, Inc.**, Philadelphia, PA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/109,034**

(22) Filed: **May 17, 2011**

(65) **Prior Publication Data**

US 2011/0207825 A1    Aug. 25, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 12/576,355, filed on Oct. 9, 2009, which is a continuation-in-part of application No. 12/327,258, filed on Dec. 3, 2008, now Pat. No. 7,619,004, and a continuation-in-part of application No. 12/368,700, filed on Feb. 10, 2009, now Pat. No. 7,601,758.

(60) Provisional application No. 61/190,053, filed on Oct. 15, 2008.

(51) Int. Cl.
| | |
|---|---|
| *A01N 37/18* | (2006.01) |
| *A61K 31/16* | (2006.01) |
| *C07C 233/00* | (2006.01) |
| *C07C 235/00* | (2006.01) |
| *C07C 237/00* | (2006.01) |
| *C07C 239/00* | (2006.01) |
| *C07C 211/00* | (2006.01) |
| *C07C 205/00* | (2006.01) |
| *C07C 207/00* | (2006.01) |

(52) **U.S. Cl.** ........ 514/629; 564/123; 564/308; 564/427; 568/306

(58) **Field of Classification Search** .................. 514/629; 564/123, 308, 427; 568/306
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,758,095 | A | 5/1998 | Albaum et al. | |
| 5,833,599 | A | 11/1998 | Schrier et al. | |
| 5,845,255 | A | 12/1998 | Mayaud | |
| 6,014,631 | A | 1/2000 | Teagarden et al. | |
| 6,037,157 | A | 3/2000 | Norbeck et al. | |
| 6,067,524 | A | 5/2000 | Byerly et al. | |
| 6,112,182 | A | 8/2000 | Akers et al. | |
| 6,317,719 | B1 | 11/2001 | Schrier et al. | |
| 6,356,873 | B1 | 3/2002 | Teagarden et al. | |
| 7,072,840 | B1 | 7/2006 | Mayaud | |
| 7,964,647 | B2 * | 3/2009 | Davis | 514/263.31 |
| 7,601,758 | B1 | 10/2009 | Davis | |
| 7,619,004 | B1 | 11/2009 | Davis | |

| | | | | |
|---|---|---|---|---|
| 7,964,648 | B2 * | 1/2010 | Davis | 514/263.31 |
| 7,820,681 | B1 * | 10/2010 | Davis | 514/263.31 |
| 7,906,519 | B2 * | 3/2011 | Davis | 514/263.31 |
| 7,915,269 | B2 * | 3/2011 | Davis | 514/263.31 |
| 7,935,731 | B2 | 5/2011 | Davis | |

OTHER PUBLICATIONS

U.S. Appl. No. 12/687,406, filed Jan. 2010, Davis, Matthew W.*
U.S. Appl. No. 13/090,697, filed Apr. 2011, Davis, Matthew W.*
U.S. Appl. No. 12/545,120, filed Aug. 2009, Davis, Matthew W.*
U.S. Appl. No. 13/092,459, filed Apr. 2011, Davis, Matthew W.*
U.S. Appl. No. 12/909,171, filed Oct. 2010, Davis, Matthew W.*
U.S. Appl. No. 13/110,087, filed May 2011, Davis, Matthew W.*
U.S. Appl. No. 12/576,355, filed Oct. 2009, Davis, Matthew W.*
Wang et al. 2001, Pharmaceutical Research, vol. 18, No. 6, pp. 800-806.*
Cheng, et al.; "Two Probable Cases of Serious Drug Interaction Between Clarithromycin and Colchicine"; Southern Medical Journal; 98. No. 8; pp. 811-813; (2005).
Horn, et al.; "Life-threatening Colchicine Drug Interactions"; Pharmacy Times; p. 111; (2006).
Waknine, Yael; "FDA Safety Changes: Dexedrine and Biaxin CME/CE"; Medscape Medical News; http://bcbsma.medscape.com/viewarticle/54411; 5 pages; (2006).
Hung et al.; "Fatal Interaction Between Clarithromycin and Colchicine in Patients with Renal Insufficiency: A Retrospective Study"; Clinical Infectious Diseases; 41; pp. 291-300; (2005).
Leikin et al.; "Colchicine"; Poisoning and Toxicology Handbook, Fourth Edition; p. 216; (2007).
Perez-Ruiz, et al.; "Optimisation of the Treatment of Acute Gout"; BioDrugs; 13; pp. 415-423; (2000).
Rollot, et al.; "Acute Colchicine Intoxication During Clarithromycin Administration"; The Annals of Pharmacotherapy; 38; pp. 2074-2077; (2004).
Terkeltaub, Robert A.; "Gout"; The New England Journal of Medicine; 349; pp. 1647-1655; (2003).
Terkeltaub, et al.; "Comparison of Low-Dose vs High-Dose Oral Colchicine Regimens in Patients with Gout Flares"; Presentation at the American College of Rheumatology Scientific Meeting; San Francisco, CA; Oct. 24-29, 2008.
Terkeltaub, et al.; "The Clinical Relevance of P-gp and CYP 3A4 on Colchicine Metabolism and Elimination"; Presentation at the American College of Rheumatology Scientific Meeting; San Francisco, CA; Oct. 24-29, 2008b.
Van Der Velden, et al.; "Colchicine-Induced Neuromyopathy in a Patient with Chronic Renal Failure: The Role of Clarithromycin"; Netherlands Journal of Medicine; 66; pp. 204-206; (2008).
Akdag et al.; "Acute Colchicine Intoxication During Clarithromycin Administration in Patients With Chronic Renal Failure"; J. Nephrol; 19; pp. 515-517; (2006).
Caraco, et al.; Acute Colchicine Intoxication—Possible Role of Erythromycin Administration; Journal of Rheumatology; 19:3; pp. 494-496; (1992).
Clarithromycin Tablets, USP; Clarithromycin for Oral Suspension, USP, BIAXIN XL Filmtab; Abbott Laboratories; 07E-010-U780-4 MASTER; 26 pages; Reference 03-5569-R3 Revised Mar. 2007.

(Continued)

*Primary Examiner* — Sreeni Padmanabhan
*Assistant Examiner* — Kara R McMillion
(74) *Attorney, Agent, or Firm* — Cantor Colburn LLP

(57) **ABSTRACT**

Methods for concomitant administration of colchicine together with one or more macrolide antibiotics, e.g., clarithromycin, are disclosed. Such methods reduce the dangers commonly associated with such concomitant administration and provide additional benefits.

**5 Claims, 2 Drawing Sheets**

**US 8,097,655 B2**

Page 2

### OTHER PUBLICATIONS

"Colchicine: Serious Interactions"; prepared by editorial staff; Translated from Rev. Prescrire; 28(294); pp. 267-270); (2008).

Concomitant Drugs (Wikidpedia document) http://en.wikipedia.org/wiki/Concomitant__drugs; printed May 28, 2009, 2 pages.

Dogukan, et al.; "Acute Fatal Colchicine Intoxication in a Patient on Continuous Ambulatory Peritoneal Dialysis (CAPD). Possible Role of Clarithromycin Administration"; Clinical Nephrology; 55(2); pp. 181-182; (2001).

Drugs.com; "Colchicine Dosage" (available on line http://www.drugs.com/dosage/colchicine.html), 6 pages, accessed Sep. 20, 2010.

Krishnan et al.; "Gout in Ambulatory Care Settings in the United States"; Journal of Rheumatology; 35; pp. 498-501; (2008).

Lacy et al.; Lexi-Comp's Clinical Reference Library, Drug Information Handbook, 7th Ed., pp. 108-109 and 292-293; (1999-2000).

Morris, et al.; "Lesson of the Week—Colchicine in Acute Gout"; BMJ; 327; pp. 1275-1276; (2003).

U.S. Appl. No. 12/327,258 Final Office Action dated Apr. 16, 2009, 24 pages.

U.S. Appl. No. 12/327,258 Non-final Office Action dated Feb. 13, 2009, 20 pages.

U.S. Appl. No. 12/327,258 Final Office Action dated Jul. 24, 2009, 22 pages.

U.S. Appl. No. 12/327,258 Non-final Office Action dated Jun. 4, 2009, 33 pages.

U.S. Appl. No. 12/368,700 Non-final Office Action dated Apr. 27, 2009, 77 pages.

Ogbru, Omudhome (www.medicinenet.com/colchicine/article.htm; 2 pages; (2008).

Rango, "Management of Goup with Colchicine", http://www.theberries.ca/Archives/colchicine.html; 4 pages; available on line as of Jul. 5, 2003).

Rx-s.net/weblog/more/colchicine-indications-and-dosage/;

"Colchicine Indications and Dosage"; 5 pages; last revised Aug. 2, 2005.

Achert et al.; "Pharmacokinetics/bioavailability of colchicine in healthy male volunteers"; European Journal of Drug Metabolism and Pharmacokinetics; 14(4); pp. 317-322; (1989).

Ahern et al., "Does Colchicine Work? The results of the first controlled study in acute gout!"; Aust NZ J Med 1987, 17: 301-304.

Borstad, et al.; "Colchicine for Prophylasix of Acute Flares When Initiating Allopurinol for Chronic Gouty Arthritis"; J. Rheumatol; 31; pp. 2429-2432; (2004).

Brooks; "Rheumatic Disorders" Chapter 25 of Avery's Drug Therapy, Pub. 1997 by Adis International, pp. 1113-1161.

Dahan et al., "Grapefruit Juice and its Constituents Augment Colchicine Intestinal Absorption: Potential Hazardous Interaction and the Role of P-Glycoprotein", Pharm Res. 2009; 26(4); 883-92; Epub Dec. 2, 2008.

Goldbart, et al.; Near Fatal Acute Colchicine Intoxication in a Child. A Case Report; Eur J Pediatr; 159; pp. 895-897; (2000).

"Guidance for Industry—In Vivo Drug Metabolism/Drug Interaction Studies—Study Design, Data Analysis, and Recommendations for Dosing and Labeling"; 19 pages; USDA; Nov. 1999.

"Risk of Drug Interactions Involving Herbval and Citrus Products"; Health Canada International Symposium on Drug, Food and Natural Health Product Interactions; Gatineau, Quebec, 61 pages; powerpoint presentation; Feb. 9, 2006.

Sabouraud, et al.; "Pharmacokinetics of Colchicine: A Review of Experimental and Clinical Data"; 2 Gastroenterol (Suppl. 1); 30; pp. 35-39p (1992).

Terkeltaub, Robert A.; "Colchicine Update: 2008"; Seminars in Arthritis and Rheumatism; VA Medical Center, University of California San Diego; (2009), 38(6), 411-419.

* cited by examiner



*Fig. 1*



*Fig. 2*

A190

US 8,097,655 B2

# METHODS FOR CONCOMITANT ADMINISTRATION OF COLCHICINE AND MACROLIDE ANTIBIOTICS

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 12/576,355 filed Oct. 9, 2009, which is a continuation-in-part of U.S. patent application Ser. No. 12/327,258 filed on Dec. 3, 2008, now U.S. Pat. No. 7,619,004, issued Nov. 17, 2009, and a continuation of part of U.S. application Ser. No. 12/368,700 filed on Feb. 10, 2009, now U.S. Pat. No. 7,601, 758, issued Oct. 13, 2009, all of which claim the benefit of Provisional Patent Application Ser. No. 61/190,053, filed Oct. 15, 2008, and all of which are incorporated herein in their entirety.

## BACKGROUND

This application relates to methods allowing for the co-administration of colchicine together with one or more macrolide antibiotics for therapeutic purposes with less danger than is associated with prior methods of administration.

Colchicine:

Colchicine, chemical name (−)-N-[(7S,12aS)-1,2,3,10-tetramethoxy-9-oxo-5,6,7,9-tetrahydrobenzo[a]heptalen-7-yl]-acetamide, is a pale yellow powder soluble in water in 1:25 dilution.

Colchicine is an alkaloid found in extracts of *Colchicum autumnale, Gloriosa superba*, and other plants. Among its many biological activities, colchicine blocks microtubule polymerization and arrests cell division. It has adversely affected spermatogenesis in humans and in some animal species under certain conditions.

Colchicine is a microtubule-disrupting agent used in the treatment of gout and other conditions that may be treated, relieved or prevented with anti-inflammatory treatment. Colchicine impairs the motility of granulocytes and can prevent the inflammatory phenomena that initiate an attack (or flare) of gout. Colchicine also inhibits mitosis, thus affecting cells with high turnover such as those in the gastrointestinal tract and bone marrow; therefore, the primary adverse side effects include gastrointestinal upset such as diarrhea and nausea. More serious side effects include morbid complications such as myopathy, neuropathy, bone marrow suppression and drug-induced cytopenia. Particular expressions of these morbid complications may include neuromuscular toxicity with paresthesias, pancytopenia, and seizures.

Colchicine has a low therapeutic index. The margin between an effective dose and a toxic dose of colchicine is much narrower than that of most other widely used drugs. Consequently, actions that result in increased colchicine levels in patients receiving colchicine therapy are particularly dangerous. Co-administration of colchicine to patients along with certain other drugs can have the effect of increasing colchicine levels. Such drug-drug interactions of colchicine have been reported to result in serious morbid complications and, in some cases, death.

Colchicine is rapidly absorbed from the gastrointestinal tract. Peak concentrations occur in 0.5 to 2 hours. The drug and its metabolites are distributed in leukocytes, kidneys, liver, spleen and the intestinal tract. Colchicine is metabolized in the liver and excreted primarily in the feces with 10 to 20% eliminated unchanged in the urine.

Gout:

Gout (or gouty arthritis) is a disease caused by a build up of uric acid. Such a build up is typically due to an overproduction of uric acid or to a reduced ability of the kidney to excrete uric acid. Gout is more common in certain groups of patients, including adult males, postmenopausal women, and hypertensives. Heavy alcohol use, diabetes, obesity, sickle cell anemia, and kidney disease also increase the risk of developing gout. The condition may also develop in people who take drugs that interfere with uric acid excretion.

In gout, crystals of monosodium urate (a salt of uric acid) are deposited in joints, e.g., on articular cartilage, as well as in and on tendons and surrounding tissues. These deposits correlate with elevated concentrations of uric acid in the blood stream and are believed to provoke the painful inflammatory reaction that occurs in affected tissues. Gout is characterized by excruciating, sudden, unexpected, burning pain, as well as by swelling, redness, warmness, and stiffness in the affected joint. Low-grade fever may also be present. The patient usually suffers from two sources of pain. The patient experiences intense pain whenever an affected joint is flexed. The inflammation of the tissues around the joint also causes the skin to be swollen, tender and sore if it is even slightly touched. For example, a blanket or even the lightest sheet draping over the affected area could cause extreme pain.

A gout flare is a sudden attack of pain in affected joints, especially in the lower extremities, and most commonly in the big toe. In afflicted individuals, the frequency of gout flares typically increases over time. In this fashion, gout progresses from acute gout to chronic gout, which involves repeated episodes of joint pain.

In acute gout flares, symptoms develop suddenly and usually involve only one or a few joints. The big toe, knee, or ankle joints are most often affected. The pain frequently starts during the night and is often described as throbbing, crushing, or excruciating. The joint appears infected, with signs of warmth, redness, and tenderness. Gout flares appear substantially more frequently with more intensive urate-lowering regimens and are a common consequence of therapy with allopurinol. Two randomized clinical trials assessed the efficacy of colchicine 0.6 mg twice a day for the prophylaxis of gout flares in patients with gout initiating treatment with urate lowering therapy. In both trials, treatment with colchicine decreased the frequency of gout flares. Flares of painful joints may go away in several days, but may return from time to time. Subsequent flares usually last longer. Acute gout may progress to chronic gout flares, or may resolve without further attacks.

The chronic appearance of several attacks of gout yearly can lead to joint deformity and limited joint motion. Nodular uric acid deposits, called tophi, may eventually develop in cartilage tissue, tendons, and soft tissues. These tophi are a hallmark of chronic gout, which usually develop only after a patient has suffered from the disease for many years. Deposits of monosodium urate can also occur in the kidneys of gout sufferers, potentially leading to chronic kidney failure.

Use of Colchicine to Treat Gout:

Colchicine can reduce pain in attacks of acute gout flares and also can be used beneficially for treating adults for prophylaxis of gout flares. Although its exact mode of action in the relief of gout is not completely understood, colchicine is known to decrease the inflammatory response to urate crystal deposition by inhibiting migration of leukocytes, to interfere with urate deposition by decreasing lactic acid production by leukocytes, to interfere with kinin formation and to diminish phagocytosis and subsequent inflammatory responses.

**3**

The anti-inflammatory effect of colchicine is relatively selective for gouty arthritis. However, other types of arthritis occasionally respond. It is neither an analgesic nor a uricosuric and will not prevent progression of acute gout to chronic gout. It does have a prophylactic, suppressive effect that helps to reduce the incidence of acute attacks as well as to relieve the residual pain and mild discomfort that patients with gout occasionally experience between attacks.

Macrolide Antibiotics:

Macrolide compounds are natural products and natural product derivatives characterized by the presence of a macrocyclic (large) lactone ring known as a macrolide ring. The macrolide antibiotics are important therapeutic agents. Commercially available macrolide antibiotics include azithromycin, clarithromycin, dirithromycin, erythromycin, and roxithromycin.

Clarithromycin is a semi-synthetic macrolide antibiotic with in vitro activity against a variety of aerobic and anaerobic gram-positive and gram-negative microorganisms, as well as *Mycobacterium avium* complex (MAC) microorganisms. The drug is believed to exert its antibacterial action by binding to 50S ribosomal subunits in susceptible microorganisms, resulting in inhibition of protein synthesis.

Clarithromycin is indicated in the treatment of mild to moderate infections in adults and children caused by susceptible strains of microorganisms, such as *Legionella pneumophila, Haemophilus influenzae, Streptococcus pneumoniae* and *Neisseria gonorrhoeae.* Clarithromycin is also used to treat pharyngitis (tonsillitis), sinusitis, bronchitis, community-acquired pneumonia, uncomplicated skin infections, and disseminated mycobacterial infections. The usual adult dose is 250 or 500 mg every 12 hours (500 or 100 mg per day) for 7 to 14 days, taken without regard to food.

Clarithromycin is rapidly absorbed from the gastrointestinal tract following oral administration, with an absolute bioavailability of approximately 50%. Peak plasma concentrations with single doses are reached within 2 to 3 hours and steady-state plasma concentrations are reached within 3 to 4 days. Food slightly delays the onset of absorption and time to peak concentration and increases the peak concentration by about 24%, but does not affect the extent of exposure. Clarithromycin distributes readily into body tissues and fluids and is not highly bound to plasma proteins (65 to 75%).

Cytochrome p450 (CYP) Enzymes:

CYP enzymes are agents of drug metabolism that are found in the liver, the gastrointestinal tract and other locations in the body. CYP enzymes occur in a variety of closely related proteins referred to as isozymes. Some of these that have been identified as important in drug metabolism are CYP1A2, CYP2A6, CYP2B6, CYP2C8, CYP2C9, CYP2C19, CYP2D6, CYP2E1, CYP3A4, and CYP3A5. Different CYP isozymes may preferentially metabolize different drugs. For example, phenytoin and fosphenytoin have been reported to be preferentially metabolized by CYP2C9, CYP2C19, and CYP3A4, while CYP2D6 has been reported to be responsible for the metabolism of many psychotherapeutic agents, such as thioridazine.

CYP Isozymes and Drug-Drug Interactions:

Examples of CYP-mediated drug-drug interactions include those involving CYP1A2 and CYP2E1 isozymes, which have been reported to be involved in drug-drug interactions involving theophylline, and those involving CYP2C9, CYP1A2, and CYP2C19, which have been reported to be involved in drug-drug interactions involving warfarin.

The 3A family of CYP isozymes, particularly CYP3A4, is also known to be involved in many clinically significant drug-drug interactions, including those involving colchicine and

**4**

macrolide antibiotics, as well as those involving non-sedating antihistamines and cisapride. CYP3A5 shares very similar protein structure, function and substrate specificity with CYP3A4. The CYP3A5*3 allele is a gene variant that does not express CYP3A5 enzyme. As a result of this genetic variation, about half of African-American subjects and 70-90% of Caucasian subjects do not express CYP3A5, while expression is more common in other ethnic groups.

While drugs are often targets of CYP-mediated metabolism, some may also alter the expression and activity of such enzymes, thus impacting the metabolism of other drugs.

Colchicine is both a target of and a modulator of CYP isozymes. The biotransformation of colchicine in human liver microsomes involves formation of 3-demethylchochicine and 2-demethylcolchicine. As shown by experiments using antibodies against CYP3A4 and experiments using chemical inhibition of CYP3A4, this transformation is correlated with (and thus apparently mediated by) CYP3A4 activity. CYP2A6, CYP2C9, CYP2C19, CYP2D6, and CYP2E1 do not appear to catalyze this biotransformation.

Studies on the effect of colchicine on expression of selected CYP isozymes in primary cultures of human hepatocytes have been reported. Dvorak et al. (Acta Univ. Palacki. Olomuc., Fac. Med. (2000) 143:47-50) provided preliminary data on the effect of colchicine and several of its derivatives on protein levels of CYP1A2, CYP2A6, CYP2C9/19, CYP2E1, and CYP3A4 as assessed by immunoblotting. Colchicine caused an increase in CYP2E1 protein levels and appeared to decrease protein levels of CYP1A2, CYP2C9/19, and CYP3A4, with 10 μM colchicine causing a greater reduction in each isozyme than 1 μM colchicine. The 3-demethylchochicine metabolite was reported to cause a decrease in protein for CYP1A2, CYP2C9/19, CYP2E1, and CYP3A4. The levels of CYP2A6 appeared unaffected by colchicine or any of the tested metabolites. In a more complete report on expression of CYP1A2, CYP2A6, CYP2C9, CYP2C19, CYP2E1, and CYP3A4. Dvorak et al. (Toxicology in Vitro (2002) 16:219-227) concluded that CYP1A2 protein content in 1 μM colchicine treated cells was not different from that in control cells, while the inducer TCDD increased the level of CYP1A2 protein by an average of three-fold. The levels of CYP2A6 protein were apparently unaffected by colchicine, while enzyme activities of CYP3A4 and CYP2C9 were significantly decreased by colchicine and activity of CYP2E1 was not affected. Northern blots showed that colchicine suppressed CYP2C9 mRNA levels by about 20% and did not alter CYP3A4 mRNA levels as compared to control cells. A subsequent study by Dvorak et al. (Mol. Pharmacol. (2003) 64:160-169) showed that colchicine decreased both basal and rifampicin-inducible and phenobarbital-inducible expression of CYP2B6, CYP2C8/9, and CYP3A4.

Like colchicine, clarithromycin is a target of metabolism by CYP3A isozymes. In non-fasting healthy human subjects, the elimination half-life of clarithromycin is about 3 to 4 hours with 250 mg administered every 12 hours, but increases to 5 to 7 hours with 500 mg administered every 8 to 12 hours. Approximately 20% and 30% of the dose, respectively, is excreted as unchanged drug in urine following oral administration of 250 and 500 mg clarithromycin given every 12 hours. Approximately 10 to 15% of the dose is excreted in urine as 14-hydroxyclarithromycin, an active metabolite of clarithromycin with substantial antibacterial activity. About 40% of an oral clarithromycin dose is excreted in feces.

Clarithromycin is also a potent inhibitor of CYP3A isozymes, as are other macrolide antibiotics. This inhibition is not rapidly reversible. Due to the limited reversibility of the inhibition of CYP3A isozymes by clarithromycin, CYP3A

US 8,097,655 B2

5

activity may not return to normal after a course of treatment with clarithromycin until the body produces adequate amounts of CYP3A isozymes to replace those irreversibly inhibited by the clarithromycin. Thus, it may take one to two weeks for CYP3A metabolic activity to return to normal following treatment with clarithromycin or other macrolide antibiotics.

P-glycoprotein (Pgp) is an ATP-dependent cell surface transporter molecule. Pgp actively pumps certain compounds, notably including drugs such as colchicine, out of cells. Pgp is encoded by the Adenosine triphosphate-binding cassette subfamily B member 1 (ABCB 1) gene, also referred to as the multiple drug resistance 1 gene (MDR1).

Clarithromycin is an inhibitor of Pgp, as are other macrolide antibiotics. In vitro, agents that inhibit CYP 3A4 typically also inhibit Pgp, and the magnitude of Pgp inhibition in vitro generally trends proportionally with magnitude of CYP 3A4 inhibition. However, equipotent CYP 3A4 inhibitors can exhibit different degrees of Pgp inhibition.

Thus clarithromycin and other macrolide antibiotics, in addition to inhibiting the metabolic breakdown of colchicine by inhibiting CYP 3A4 isozymes, can block a mechanism by which colchicine is pumped out of cells. Both the inhibition of colchicine breakdown by CYP 3A4 and the inhibition of the pumping of colchicine out of cells by Pgp have the effect of increasing the intracellular levels of colchicine.

Since colchicine acts intracellularly, the combined effects of CYP 3A4 inhibition and Pgp inhibition by clarithromycin (and related macrolide antibiotics) can cause colchicine toxicity in patients taking what would be a safe dose of colchicine in the absence of concomitant macrolide antibiotic administration.

Drug-drug interactions, such as the enhancement of colchicine toxicity by macrolide antibiotics, present a health risk to patients and a medical challenge for all medical care workers. Various studies of adverse reactions from exposure to multiple drugs have found that 6.5-23% of the adverse reactions result from drug-drug interactions. Unfortunately, each year a number of deaths occur as the direct result of patients adding a concomitant prescription pharmaceutical product to their existing medication regimen.

With regard to co-administration of colchicine with clarithromycin and other macrolide antibiotics, warnings have recently been published urging caution, or arguing that the two drugs should not be co-administered. For example, on Jul. 5, 2006 the US Food and Drug Administration (the FDA) approved safety labeling changes for clarithromycin tablets, extended-release tablets, and oral suspension to warn of the risk for increased exposure to colchicine in patients receiving both drugs. The Warnings section of the prescribing information for clarithromycin now includes the following statement: "There have been post-marketing reports of colchicine toxicity with concomitant use of clarithromycin and colchicine, especially in the elderly, some of which occurred in patients with renal insufficiency. Deaths have been reported in some such patients." In addition, the following was added to the Precautions section of the prescribing information: "[c]olchicine is a substrate for both CYP3A and the efflux transporter, P-glycoprotein (Pgp). Clarithromycin and other macrolides are known to inhibit CYP3A and Pgp. When clarithromycin and colchicine are administered together, inhibition of Pgp and/or CYP3A by clarithromycin may lead to increased exposure to colchicine. Patients should be monitored for clinical symptoms of colchicine toxicity."

A 2006 report entitled "Life-threatening Colchicine Drug Interactions" cautioned that "[c]olchicine should not be used with clarithromycin or erythromycin, and given the potential

6

for fatal outcomes, it would be prudent to avoid all PGP inhibitors with colchicine" (Horn, J. R. and Hansen, P. D., Pharmacy Times, May 2006, p. 111).

More recently, a publication in May, 2008 ended with the conclusion that "[t]he combined prescription of clarithromycin or other CYP3A4 inhibitors and colchicine should be avoided." Van der Velden, et al., (Neth. J. Med. 2008 May; 66(5):204-6).

There accordingly remains a need in the art for improved methods for administering colchicine to patients who are concomitantly being treated with macrolide antibiotics so as to reduce the occurrence of dangerous colchicine toxicity. The present disclosure addresses this need and provides further advantages.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows mean colchicine plasma concentrations following administration of single and multiple oral doses of colchicine 0.6 mg in healthy adults, N=13, Y axis=colchicine concentration, ng/mL. X axis=time in hours, ◆=day 1, □=day 25. See Example 1.

FIG. 2 shows a pharmacokinetic profile comparison of single-dose colchicine (0.6 mg, alone) and single-dose colchicine (0.6 mg) co-administered with steady-state clarithromycin in healthy adults, Y axis=colchicine concentration, ng/mL, X axis=time in hours, N=23, ○=day 1, ◆=day 29. See Example 2.

SUMMARY

Disclosed herein are methods for more safely administering colchicine concomitantly with administration of macrolide antibiotics such as clarithromycin or erythromycin. It has now been discovered that certain reduced or limited colchicine dosages, when administered with concomitantly administered recommended dosage amounts of macrolide antibiotics, certain "colchicine plus macrolide" dosing regimens, achieve plasma colchicine levels that are therapeutically effective, but are not significantly higher, and therefore not significantly more toxic, than plasma levels achieved by administration of manufacturers' recommended colchicine dosage amounts in the absence of concomitant macrolide antibiotic administration. Thus, in spite of recent published warnings that the two should not be concomitantly administered, colchicine and macrolide antibiotics can be administered concomitantly without undue hazard when colchicine is administered as disclosed herein.

In one embodiment, colchicine treatment is administered to a patient in suffering from a condition treatable with colchicine, and the patient is concomitantly receiving administration of a macrolide antibiotic to treat an infection. The colchicine therapy may involve either palliative or prophylactic treatment, or both.

In one embodiment, colchicine is employed in the prophylaxis of gout flares in a human individual, that is, to prevent gout flares. Such treatment can also be referred to as chronic treatment, meaning long-term treatment to reduce the occurrence of gout flares. In one embodiment, the method comprises determining a first colchicine dosage amount adapted for daily oral administration to the gout patient to prevent gout flares in the absence of concomitant administration of clarithromycin or erythromycin, determining a second colchicine dosage amount that is a 50% to 75% reduction of the first colchicine dosage amount, and orally administering the second colchicine dosage amount to the gout patient who is concomitantly receiving administration of clarithromycin

7

8

or erythromycin. The second colchicine dosage amount is administered to the patient in one or more doses one or more times per day every day, or double the second colchicine dosage amount is administered to the patient in one or more doses per day every other day.

In certain embodiments, in this method, the 50% to 75% reduction comprises one or more of 1) reducing the number of doses of colchicine administered per day, 2) reducing the amount of colchicine administered per dose, and 3) reducing the administration of colchicine from administration every day to administration every other day. For example, in this method, the 50% to 75% reduction may comprise reducing both the number of doses of colchicine administered per day and the amount of colchicine administered per dose.

In other aspects of these embodiments, one or more (where not mutually exclusive) of the following applies: 1) the patient is administered each dose of colchicine as one 0.6 mg colchicine tablet or as one half of a 0.6 mg colchicine tablet, 2) the patient is an adult, 3) the adult patient is less than 70 years old, 4) the patient is receiving concomitant administration of clarithromycin, 6) the second colchicine dosage amount is a one-half reduction of the first colchicine dosage amount, 7) the second colchicine dosage amount is a two-thirds reduction of the first colchicine dosage amount, 8) the second colchicine dosage amount is a three-quarters reduction of the first colchicine dosage amount, 9) the first colchicine dosage amount is about 1.2 mg per day and the second colchicine dosage amount is about 0.3 mg per day, 10) the first colchicine dosage amount is about 0.6 mg per day and the second colchicine dosage amount is about 0.15 mg per day.

In aspects of these embodiments, the second colchicine dosage amount of about 0.3 mg per day is administered as one half of a 0.6 mg colchicine tablet once a day every day, and the second colchicine dosage amount of about 0.15 mg per day is administered as one half of a 0.6 mg colchicine tablet once a day every other day.

In one embodiment, a method of using colchicine for prophylactic treatment of gout flares in a human gout patient so as to reduce the occurrence of colchicine toxicity when said patient is receiving concomitant administration of clarithromycin or erythromycin, comprises: orally administering a second colchicine daily dosage amount for prophylactic treatment of gout flares to the human gout patient who is concomitantly receiving administration of clarithromycin or erythromycin, wherein the second colchicine daily dosage amount is a 50 to 75% reduction of a first colchicine daily dosage amount suitable for daily oral administration for the prophylactic treatment of gout flares in the absence of concomitant administration of clarithromycin or erythromycin, wherein concomitant administration of clarithromycin or erythromycin is administration within 1 to 2 days of orally administering the second colchicine dosage amount, and wherein the first colchicine daily dosage amount is 1.2 mg administered as two 0.6 mg doses per day, or the first colchicine daily dosage amount is 0.6 mg per day.

In another embodiment, a method of using colchicine for prophylactic treatment of gout flares in a human gout patient so as to reduce the occurrence of colchicine toxicity when said patient is receiving concomitant administration of clarithromycin or erythromycin, comprises: orally administering a second colchicine daily dosage amount for prophylactic treatment of gout flares to the human gout patient who is concomitantly receiving administration of clarithromycin or erythromycin, wherein the second colchicine daily dosage amount is a 75% reduction of a first colchicine daily dosage amount suitable for daily oral administration for the prophylactic treatment of gout flares in the absence of concomitant

administration of clarithromycin or erythromycin, wherein concomitant administration of clarithromycin or erythromycin is administration within 1 to 2 days of orally administering the second colchicine dosage amount. In certain embodiments, the first colchicine daily dosage amount is 1.2 mg administered as two 0.6 mg doses per day, or the first colchicine daily dosage amount is 0.6 mg per day.

In another embodiment, a method of using colchicine for prophylactic treatment of gout flares in an adult human gout patient so as to reduce the occurrence of colchicine toxicity when said patient is receiving concomitant administration of clarithromycin or erythromycin comprises administering a reduced colchicine daily dosage amount to the patient for prophylactic treatment of gout flares, wherein the reduced colchicine daily dosage amount is 50-75% of a manufacturers' recommended colchicine daily dosage amount for the prophylactic treatment of gout flares in the absence of concomitant clarithromycin or erythromycin administration, wherein concomitant administration of clarithromycin or erythromycin is administration within 1 to 2 days of orally administering the second colchicine dosage amount. In certain embodiments, the manufacturers' recommended colchicine daily dosage amount for the prophylactic treatment of gout flares in the absence of concomitant clarithromycin or erythromycin administration is 1.2 mg/day or 0.6 mg/day.

In another embodiment, a method of using colchicine for prophylactic treatment of gout flares in an adult human gout patient so as to reduce the occurrence of colchicine toxicity when said patient is receiving concomitant administration of clarithromycin or erythromycin comprises administering a reduced colchicine daily dosage amount to the patient for prophylactic treatment of gout flares, wherein the reduced colchicine daily dosage amount is 75% of a manufacturers' recommended colchicine daily dosage amount for the prophylactic treatment of gout flares in the absence of concomitant clarithromycin or erythromycin administration, wherein concomitant administration of clarithromycin or erythromycin is administration within 1 to 2 days of orally administering the second colchicine dosage amount.

In one embodiment, the daily colchicine is coadministered with a urate-lowering drug such as febuxostat or allopurinol. Daily dosage amounts of febuxostat are typically 40 mg or 80 mg once daily. Daily dosage amounts of allopurinol are 200 to 300 mg per day for patients with mild gout and 400 to 600 mg per day for those with moderately severe tophaceous gout. The appropriate dosage amount may be administered in divided doses or as a single equivalent dose with the 300 mg tablet. Dosage requirements in excess of 300 mg should be administered in divided doses. The minimal effective dosage amount is 100 to 200 mg daily and the maximal recommended dosage amount is 800 mg daily. To reduce the possibility of flare-up of acute gouty attacks, it is recommended that the patient start with a low dosage amount of allopurinol (100 mg daily) and increase at weekly intervals by 100 mg until a serum uric acid level of 6 mg/dL or less is attained but without exceeding the maximal recommended dosage amount.

In yet another embodiment, a method of using colchicine for prophylactic treatment of gout flares in a human gout patient that is also receiving treatment with urate-lowering therapy so as to reduce the occurrence of colchicine toxicity when said patient is receiving concomitant administration of clarithromycin or erythromycin, comprises: orally administering a second colchicine daily dosage amount for prophylactic treatment of gout flares to the human gout patient who is concomitantly receiving administration of clarithromycin or erythromycin, wherein the second colchicine daily dosage

US 8,097,655 B2

9

amount is a 75% reduction of a first colchicine daily dosage amount suitable for daily oral administration for the prophylactic treatment of gout flares in the absence of concomitant administration of clarithromycin or erythromycin, wherein concomitant administration of clarithromycin or erythromycin is administration within 1 to 2 days of orally administering the second colchicine dosage amount. In certain embodiments, the first colchicine daily dosage amount is 1.2 mg administered as two 0.6 mg doses per day, or the first colchicine daily dosage amount is 0.6 mg per day. In certain embodiments, the urate lowering therapy is allopurinol or febuxostat.

In another embodiment, colchicine is used for the treatment of acute gout, that is, treatment of gout flares. In one embodiment, the method comprises determining a first colchicine dosage amount adapted for oral administration to the gout patient to treat gout flares in the absence of concomitant administration of clarithromycin or erythromycin, determining a second colchicine dosage amount that is a 50% to 75% reduction, preferably a two-thirds or three quarters reduction, of the first colchicine dosage amount, and orally administering the second colchicine dosage amount to the gout patient who is concomitantly receiving administration of clarithromycin or erythromycin. In one embodiment, the colchicine administration is not repeated for at least three days.

In certain embodiments, the 50% to 75% reduction comprises one or more of 1) reducing the number of doses of colchicine administered (e.g., per day), 2) reducing the amount of colchicine administered per dose (i.e., reducing the size of at least one colchicine dose), and 3) reducing the administration of colchicine from administration every day to administration every other day. For example, in this method, the 50% to 75% reduction may comprise reducing both the number of doses of colchicine administered per day and the amount of colchicine administered per dose. In one embodiment, the colchicine administration is not repeated for at least three days.

In other aspects of these embodiments, one or more (where not mutually exclusive) of the following apply: 1) the patient is administered each dose of colchicine as one 0.6 mg colchicine tablet or as one half of a 0.6 mg colchicine tablet (e.g. one half a scored 0.6 mg colchicine tablet), 2) the patient is an adult, 3) the adult patient is less than 70 years old, 4) the patient is receiving concomitant administration of clarithromycin, 5) the second colchicine dosage amount is about a one-half reduction of the first colchicine dosage amount, 6) the second colchicine dosage amount is about a two-thirds reduction of the first colchicine dosage amount, 7) the second colchicine dosage amount is about a three-quarters reduction of the first colchicine dosage amount, 8) the first colchicine dosage amount is about 1.8 mg per day and the second colchicine dosage amount is about 0.6 mg per day, 9) the second colchicine dosage amount is a single dose of about 0.6 mg, and after administration of the single dose ingestion of colchicine is stopped until a subsequent gout flare occurs, 10) the second colchicine dosage amount is a single dose of about 0.6 mg of colchicine, and after administration of the single dose ingestion of colchicine is not repeated within a 3-day period.

In an additional embodiment, the first colchicine dosage amount is about 1.8 mg per day and the second colchicine dosage amount is a single 0.6 mg dose, and preferably ingestion of colchicine is not repeated for at least three days after the single dose is administered.

In another embodiment, a method of using colchicine to treat a gout flare in a human patient who is receiving concomitant administration of clarithromycin or erythromycin

10

comprises determining a first colchicine dosage amount adapted for oral administration to the patient to treat a gout flare in the absence of concomitant administration of clarithromycin or erythromycin, determining a second colchicine dosage amount that is a 50-75% reduction of the first colchicine dosage amount, and orally administering the second colchicine dosage amount to the patient who is experiencing a gout flare and is concomitantly receiving administration of clarithromycin or erythromycin, wherein concomitant administration of clarithromycin or erythromycin is administration within 1 to 2 days of orally administering the second colchicine dosage amount, and not repeating colchicine administration for at least three days.

In another embodiment, a method of using colchicine to treat a gout flare in a human patient who is receiving concomitant administration of clarithromycin or erythromycin comprises determining a first colchicine dosage amount adapted for oral administration to the patient to treat a gout flare in the absence of concomitant administration of clarithromycin or erythromycin, determining a second colchicine dosage amount that is about a two thirds reduction of the first colchicine dosage amount, and orally administering the second colchicine dosage amount to the patient who is experiencing a gout flare and is concomitantly receiving administration of clarithromycin or erythromycin, wherein concomitant administration of clarithromycin or erythromycin is administration within 1 to 2 days of orally administering the second colchicine dosage amount, and not repeating colchicine administration for at least three days.

In another embodiment, a method of using colchicine to treat a gout flare in an adult human gout patient so as to reduce the occurrence of colchicine toxicity when said patient is receiving concomitant administration of clarithromycin or erythromycin comprises administering a reduced colchicine dosage amount to the patient to treat gout flares, wherein the reduced colchicine dosage amount is about 50% to about 75% of a manufacturer's recommended colchicine dosage amount in the absence of concomitant clarithromycin or erythromycin administration, and not repeating colchicine administration for at least three days, wherein concomitant administration of clarithromycin or erythromycin is administration within 1 to 2 days of orally administering the second colchicine dosage amount.

In a one embodiment, the patient is administered the colchicine according to a colchicine dosing regimen of a single starting colchicine dose of no more than about 0.6 mg colchicine, followed by either no additional colchicine doses within about 12, 24, 48, or 72 hours, or followed by at least one additional colchicine dose within 12 hours and no more frequently than once every hour (e.g., every 3, 4, 6, 8, or 12 hours). In this embodiment, each additional colchicine dose is no greater than about 0.3 mg and the patient may be an adult patient or a pediatric patient. In one embodiment, the starting colchicine dose is about 0.6 mg or about 0.3 mg, and each additional colchicine dose is about 0.3 mg. When additional doses are administered, it is preferred that only two, three, or four additional colchicine doses are administered within about 24 hours. In another embodiment, the patient is an adult patient and the starting colchicine dose is about 0.6 mg and each additional colchicine dose, if any, is about 0.3 mg. In one embodiment only three additional colchicine doses are administered within about 24 hours.

In another embodiment, colchicine is administered to a patient suffering from a condition treatable with colchicine, and the concomitant macrolide antibiotic is administered concurrently, or the patient has recently completed a dosing regimen of a macrolide antibiotic to treat an infection, and the

US 8,097,655 B2

11

patient is (immediately or within a period of two weeks, preferably three days, more preferably within 48 hours or 24 hours after completion of the macrolide antibiotic dosing regimen) administered a single dose of no more than about 0.6 mg of colchicine, preferably 0.3 mg or 0.6 mg of colchicine. For example, the starting colchicine dose is about 0.6 mg and only one additional colchicine dose is administered within about 24 hours and the additional colchicine dose is about 0.6 mg.

A preferred antibiotic for use in the disclosed methods is one that is an inhibitor of either or both of CYP3A and P-glycoprotein, preferably both. In certain embodiments, the antibiotic is dirithromycin, erythromycin, roxithromycin, or more preferably, clarithromycin or erythromycin. The clarithromycin may be administered to the patient at a dosage amount of about 500 mg daily and the colchicine dosing regimen is one about 0.6 mg colchicine dose to start, followed by 0, 1, 2, 3, or 4 additional colchicine doses of about 0.6 mg every 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, or 12 hours (e.g., every 2, 3, 4, 5, or 6 hours) after the preceding colchicine dose. Alternately, the clarithromycin may be administered to the patient at a dosage amount of about 1000 mg daily and the colchicine dosing regimen is one about 0.3 mg colchicine dose to start, followed by 0, 1, 2, 3, or 4 additional colchicine doses of about 0.3 mg each every 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, or 12 hours (e.g., every 3, 4, 5, or 6 hours) after the preceding colchicine dose. In a preferred regimen for treatment of acute gout flares, ingestion of colchicine is continued until a total of no more than about 1.2, 1.4, 1.6, 1.8, 2, or 2.4 mg of colchicine has been ingested, after which ingestion of colchicine is stopped until a subsequent acute gout flare occurs. In still another preferred regimen, clarithromycin may be administered to a patient, e.g., at a dosage amount of about 250 mg B.I.D. for a period of about 7 to 10 days, and the colchicine dosing regimen is administered to the patient upon completion of the clarithromycin dosing regimen, wherein the colchicine dosing regimen consists of the administration of no more than one dose of no more than 0.6 mg of colchicine. In one embodiment, the colchicine is administered as a dosage form of 0.6 mg (e.g., one 0.6 mg colchicine tablet), or 0.3 mg (e.g., one half of a 0.6 mg tablet) of colchicine and administration of the dosage form is not repeated within a period of at least about two days, preferably at least about three days.

In these and other embodiments, the colchicine-responsive condition is gout (e.g. a gout flare in a chronic gout sufferer), familial Mediterranean fever (FMF), thrombocytopenic purpura, pericarditis, scleroderma, or Behcet's disease. The gout may be an acute gout flare or chronic gout. For gout, the dosing regimen is generally continued until a total of no more than 2.4 mg of colchicine has been ingested, after which ingestion of colchicine is stopped until a subsequent gout flare occurs.

Another embodiment comprises administering colchicine to a patient also taking clarithromycin, or having completed treatment with clarithromycin within the prior 14 days, the patient being administered a single dosage amount of about 0.6 mg or about 0.3 mg of colchicine to treat a gout flare, which administration is not repeated within any 3-day period.

In another aspect, herein disclosed is a method for increasing the blood plasma levels of colchicine in a patient to whom colchicine is being administered to treat or prevent a colchicine-responsive condition. This method comprises the concomitant dosing of the patient with a sufficient amount of a macrolide antibiotic to increase the $C_{max}$ of colchicine by about 167% to 200%, or to increase the AUC of colchicine in the patient by about 240% to 250%, or to increase the plasma half-life of colchicine by about 233%, or to decrease the

12

clearance of colchicine by about 75%, compared to the $C_{max}$, AUC, plasma half-life, or clearance in the same or a matched patient when not being administered a concomitant macrolide antibiotic. In a one embodiment, the patient is being administered no more than three hourly doses of about 0.6 mg of colchicine or less, the macrolide antibiotic is clarithromycin, and the amount of macrolide antibiotic is from about 500 mg to about 1000 mg, with about 500 mg being preferred.

In another aspect, herein disclosed are methods for using colchicine which methods involve the use of pharmacy management systems.

In one aspect one such method comprises a pharmacy receiving a prescription for colchicine for a patient who is suffering from gout (e.g., acute gout flares or chronic gout) and who is concomitantly being treated with a macrolide antibiotic that is an inhibitor of CYP3A and P-glycoprotein, followed by the pharmacy dispensing colchicine in response to receipt of the prescription, wherein the dispensing is preceded by entry into a first computer readable storage medium, in functional communication with a computer, of a unique patient identifier for said patient and at least one drug identifier for colchicine linked to the patient identifier so as to indicate that colchicine is to be administered to the patient. The computer is programmed to issue a drug-drug interaction alert when the at least one drug identifier for colchicine is entered linked to the patient identifier so as to indicate that colchicine is to be administered to the patient and when the patient identifier is also linked to an identifier indicating that a macrolide antibiotic that is an inhibitor of CYP3A or P-glycoprotein is being concomitantly administered to the patient. Upon entry of the at least one drug identifier for colchicine linked to the patient identifier, a drug-drug interaction alert is issued to one or more of a pharmacy technician, a pharmacist, or a pharmacy customer obtaining the colchicine, said alert indicating that a macrolide antibiotic is being concomitantly administered to the patient and that prior to the colchicine being dispensed, the colchicine dosing regimen must be reviewed and, if necessary adjusted, so that when the colchicine is delivered to the pharmacy customer obtaining the colchicine it is delivered along with instructions for the colchicine to be taken in accordance with a dosing regimen of no more than one about 0.6 mg colchicine dose to start (e.g., following the onset of the acute gout attack or the first sign of a gout flare) followed by either: no additional colchicine doses within about 12, 24, 48, or 72 hours, or at least one additional colchicine dose within about 12 hours and no more frequently than once every hour and wherein each additional colchicine dose is no greater than about 0.6 mg, and wherein the patient ingests the colchicine as instructed.

The drug-drug interaction alert may be issued as one or both of a written warning on a display screen of the pharmacy management computer system, and a printed warning. The printed warning may be attached to or packaged with the dispensed prescription.

In one aspect, the identifier indicating that a macrolide antibiotic is being concomitantly administered to the patient is an identifier indicating that the macrolide antibiotic is clarithromycin and is linked to at least one further identifier indicating that the clarithromycin is prescribed so that 500 mg of clarithromycin is to be ingested by the patient daily, in which case the dosing regimen for colchicine is preferably one about 0.6 mg colchicine dose to start, optionally followed by additional colchicine doses, e.g., 0, 1, 2, 3, or 4 additional colchicine doses within 24 hours of about 0.3 mg ingested every 1, 2, 3, 4, 5, 6, 7, 8, 9 10, 11, or 12 hours (e.g., every 2, 3, 4, 5, or 6 hours) after the preceding colchicine dose. In another embodiment, the identifier indicating that a mac-

US 8,097,655 B2

13

rolide antibiotic is being concomitantly administered to the patient is an identifier indicating that the macrolide antibiotic is clarithromycin is linked to at least one further identifier, entered into a second computer readable storage medium in functional communication with a computer, the second storage medium being the same as or different from the first storage medium, and the further identifier indicating that the clarithromycin is prescribed so that about 500 mg of clarithromycin is to be ingested by the patient daily, in which case the colchicine dosing regimen is (preferably) one about 0.6 mg colchicine dose to start, followed by an about 0.3 mg colchicine dose ingested every 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, or 12 hours (e.g., every six to eight hours) after the preceding colchicine dose.

In yet another aspect, the identifier indicating that a macrolide antibiotic is being concomitantly administered to the patient is an identifier indicating that the macrolide antibiotic is clarithromycin and is linked to at least one further identifier, entered into a second computer readable storage medium in functional communication with a computer, the second storage medium being the same as or different from the first storage medium, and the further identifier indicating that the clarithromycin is prescribed so that about 1000 mg of clarithromycin is to be ingested by the patient daily and the dosing regimen is one about 0.3 mg colchicine dose to start, followed by an about 0.3 mg colchicine dose ingested every 2, 3, 4, 5, 6, 7, or 8 hours (e.g., every eight to twelve hours) after the preceding colchicine dose.

One dosing regimen calls for ingestion of colchicine to be continued until a total of no more than 1.2 mg or 2.4 mg of colchicine has been ingested, after which ingestion of colchicine is to be stopped, e.g., for at least 2, 3, 4, 5, 6, or 7 days, or until a subsequent acute gout flare, or the first sign of a subsequent gout flare, occurs.

Also disclosed herein is a dosage amount adjustment method for administering colchicine to a patient to treat a medical condition, the patient concomitantly suffering from an infection amenable to treatment with a macrolide antibiotic. The method comprises determining a first, a second, and a subsequent monotherapy colchicine dosage amount and a colchicine treatment schedule; and determining an antibiotic dosage amount and an antibiotic treatment schedule; and administering the macrolide antibiotic to the patient at the antibiotic dosage amount according to the antibiotic treatment schedule while concomitantly administering colchicine to the patient according to the colchicine treatment schedule at a first, a second, and a subsequent polytherapy colchicine dosage amount, each of which is a fraction of each of the corresponding first, second, and subsequent monotherapy colchicine dosage amounts, the fraction being less than or equal to about ⅔.

An alternate embodiment of this method comprises determining a monotherapy colchicine dosage amount and a colchicine treatment schedule, each adapted so that, when colchicine is administered to the patient in the absence of concomitant administration of the antibiotic at the monotherapy colchicine dosage amount according to the colchicine treatment schedule, a therapeutic circulating plasma level of colchicine is predicted to be achieved in the patient that is safe and effective to treat the condition in the patient while posing an acceptable adverse effect risk; and determining an antibiotic dose and an antibiotic treatment schedule, each adapted so that when the antibiotic is administered to the patient at the antibiotic dosage amount according to the antibiotic treatment schedule, a circulating level of the antibiotic is predicted to be achieved in the patient that is safe and therapeutically effective to treat the infection in the patient and administering

14

the antibiotic to the patient at the antibiotic dosage amount according to the antibiotic treatment schedule while concomitantly administering colchicine to the patient at a polytherapy colchicine dosage amount that is a fraction less than or equal to ½ of the monotherapy colchicine dosage amount to the patient according to the colchicine treatment schedule.

According to this embodiment, upon the administering of the antibiotic to the patient at the antibiotic dosage amount according to the antibiotic treatment schedule while concomitantly administering colchicine to the patient at the polytherapy colchicine dose according to the colchicine treatment schedule, the therapeutic circulating level of colchicine is achieved in the patient. Preferably, the fraction is selected from ¹⁄₁₂, ⅙, ¼, ⅓, ⁵⁄₁₂, and ½, more preferably, the fraction is ⅓ or ½. Preferably the antibiotic is selected from clarithromycin, dirithromycin, erythromycin and roxithromycin. Exemplary conditions are selected from gout, FMF, thrombocytopenic purpura, and Behçet's disease. In a preferred embodiment, the gout is an acute gout flare and the colchicine treatment schedule is an acute treatment schedule adapted for treatment of acute gout flares, or the gout is chronic gout, and the colchicine treatment schedule is a chronic treatment schedule adapted for prophylaxis of flares. In another embodiment, the fraction is ⅓ or ½ and treatment with colchicine is initiated subsequent to initiation of treatment with clarithromycin.

In one embodiment, each of the monotherapy colchicine doses and the colchicine treatment schedule are each adapted so that, when colchicine is administered to the patient at the monotherapy colchicine dose according to the colchicine treatment schedule in the absence of concomitant administration of the antibiotic, a therapeutic circulating level of colchicine is predicted to be achieved in the patient that is predicted to be safe and effective to treat the condition in the patient while posing an acceptable adverse effect risk.

Alternately, the antibiotic dose and the antibiotic treatment schedule are each adapted so that, when the antibiotic is administered to the patient at the antibiotic dose according to the antibiotic treatment schedule a circulating level of the antibiotic is predicted to be achieved in the patient that is therapeutically effective to treat the infection in the patient.

In one embodiment, upon the administration of the antibiotic to the patient at the antibiotic dose according to the antibiotic treatment schedule while concomitantly administering colchicine to the patient according to the colchicine treatment schedule at the polytherapy colchicine dose, a therapeutic circulating level of colchicine is predicted to be achieved in the patient that is predicted to be safe and effective to treat the condition in the patient while posing an acceptable adverse effect risk. In one embodiment, each subsequent colchicine dose is the same as the second colchicine dose. In another embodiment, each of the second and subsequent colchicine doses are the same as the first colchicine dosage amounts. In another, the fraction is selected from about ¹⁄₁₂, about ⅙, about ¼, about ⅓, about ⁵⁄₁₂, about ½, and about ⁷⁄₁₂, e.g., about ⅓ or about ⅔. In certain embodiments, the colchicine treatment schedule is once-a-day, twice-a-day, three-times-a-day or four-times-a-day.

Acute Gout

Acute gout, or gout flares, can be treated according to the following treatment schedule. This table indicates the original, or intended, dosage amount, i.e., the dosage amount of colchicine recommended absent concomitant administration of the drugs listed below. This table also presents the dosage amount adjustment, or the recommended colchicine dosage amount to be administered when strong and moderate

A197

US 8,097,655 B2

**15**

CYP3A4 and P-gp inhibitors are administered concomitantly with colchicine when the patient is being treated for a gout flare.

| Colchicine Dose Recommendation | | |
| --- | --- | --- |
| Drug | Original Intended Dose (Total Dose) | Dose Adjustment |
| Strong CYP3A4 Inhibitors | Regimen Reduced by Two Thirds | |
| Clarithromycin | 1.2 mg (2 tablets) at the first sign of the flare followed by 0.6 mg (1 tablet) one hour later. | 0.6 mg (1 tablet) × 1 dose. Dose to be repeated no earlier than 3 days. |
| Erythromycin | Dose to be repeated no earlier than 3 days. | |

Chronic Gout

For chronic gout (prophylaxis of gout flares), an original intended daily dosage amount is 1.2 mg or 6 mg. Alternatively, an intended daily dosage amount of chronic gout can be as much as 2.4 mg per day. The daily dosage amount for chronic gout can be administered at one time or dosed at intervals throughout the day, e.g. twice daily, three times daily, or four times daily.

Chronic gout, with and without a concomitant dose of another drug, can be treated according to the following treatment schedule:

Colchicine Dose Adjustment for Co-administration with Interacting Drugs if No Alternative Available

| Colchicine Dose Recommendation | | |
| --- | --- | --- |
| Drug | Original Intended Dose | Dose Adjustment |
| Clarithromycin | 0.6 mg twice daily | 0.3 mg once daily |
| | 0.6 mg once daily | 0.3 mg once every other day |
| Erythromycin | 0.6 mg twice daily | 0.3 mg once daily |
| | 0.6 mg once daily | 0.3 mg once every other day |

The dosage amount of 0.3 mg once every other day is administered either as 0.3 mg once every other day or 0.15 mg once a day.

Familial Mediterranean Fever

Familial Mediterranean Fever (FMF) can be treated according to the following intended daily dosing schedule:

| | Daily dosage amount | |
| --- | --- | --- |
| Age | Usual | Maximum |
| Adults and children >12 years | 1.2 mg | 2.4 mg |
| Children >6 to 12 years | 0.9 mg | 1.8 mg |
| Children 4 to 6 years | 0.6 mg | 1.8 mg |

When colchicine is given to patients with FMF concomitantly with other drugs, the adjusted (reduced) dosage amount of colchicine, according to this embodiment, is provided in the table below:

| Concomitant Drug Class or Food | Noted or Anticipated Outcome | Clinical Comment |
| --- | --- | --- |
| Strong CYP3A4 Inhibitors: | Significant increase in colchicine plasma | Use colchicine with caution at reduced |

**16**

-continued

| Concomitant Drug Class or Food | Noted or Anticipated Outcome | Clinical Comment |
| --- | --- | --- |
| clarithromycin | levels[1]; fatal colchicine toxicity has been reported with clarithromycin, a strong CYP3A4 inhibitor. Similarly, significant increase in colchicine plasma levels is anticipated with other strong CYP3A4 inhibitors. | maximum dose of 0.3 mg twice daily with increased monitoring for adverse effects. In patients with renal or hepatic impairment, use of colchicine in conjunction with these drugs is contraindicated. |
| Moderate CYP3A4 inhibitors: erythromycin | Significant increase in colchicine plasma concentration is anticipated. Neuromuscular toxicity has been reported with diltiazem and verapamil interactions. | Use colchicine with caution at reduced maximum dose of 0.6 mg twice daily with increased monitoring for adverse effects. In patients with renal or hepatic impairment, use a maximum dose of 0.3 mg twice daily. |

Colchicine is one of the most widely used drugs for treating familial Mediterranean fever (FMF). It has been reported that 5-10% of FMF patients do not show a beneficial response to colchicine administration. A polymorphism in the ABCB1 gene, the "ABCB1 3435 C to T polymorphism" has been reported to correlate with this lack of response to colchicine treatment, with patients with the homozygous TT genotype exhibiting the most pronounced "non-responder" phenotypes.

Accordingly, in another aspect, provided herein is a method for treating a patient suffering from FMF, which patient is a colchicine non-responder. In one embodiment, the patient is homozygous for the TT genotype of the ABCB1 3435 C to T polymorphism. The method entails the concomitant administration of a Pgp inhibitor and colchicine to the patient. A preferred Pgp inhibitor for use in this method is verapamil or cyclosporine-A, more preferably a macrolide antibiotic, preferably dirithromycin, erythromycin or roxithromycin, or, more preferably clarithromycin. Dosage amounts of the Pgp inhibitor for this purpose correspond to those called for in the prescribing information for the drug in question. For clarithromycin, the dosage amounts are 500 to 1000 mg per day and duration of clarithromycin dosing is preferably one, two, or three days, repeated weekly or bi-weekly. Preferred colchicine dosing regimens for this purpose are the same as used for treatment of FMF in responders, though the doses of colchicine administered may be increased as tolerated, e.g., up to two to three times the typical doses.

These and other embodiments, advantages and features of the present invention are further elaborated herein below.

DETAILED DESCRIPTION

Following multiple oral doses (0.6 mg twice daily), the mean elimination half-life of colchicine in young healthy volunteers (mean age 25 to 28 years of age) is 26.6 to 31.2 hours.

Pharmacy management systems are computer-based systems that are widely used by commercial pharmacies to manage prescriptions and to provide pharmacy and medical personnel with warnings and guidance regarding drugs being administered to patients. Such systems typically provide alerts warning either or both of health care providers and patients when a drug that may be harmful to the particular

US 8,097,655 B2

17

patient is prescribed. For example, such systems can provide alerts warning that a patient has an allergy to a prescribed drug, or is receiving concomitant administration of a drug that can have a dangerous interaction with a prescribed drug. U.S. Pat. Nos. 5,758,095, 5,833,599, 5,845,255, 6,014,631, 6,067, 524, 6,112,182, 6,317,719, 6,356,873, and 7,072,840, each of which is incorporated herein by reference, disclose various pharmacy management systems and aspects thereof. Many pharmacy management systems are now commercially available, e.g., CENTRICITY Pharmacy from BDM Information Systems Ltd., General Electric Healthcare, Waukesha, Wis., Rx30 Pharmacy Systems from Transaction Data Systems, Inc., Ocoee, Fla., SPEED SCRIPT from Digital Simplistics, Inc., Lenexa, Kans., and various pharmacy management systems from OPUS-ISM, Hauppauge, N.Y.

In the specification and claims that follow, references will be made to a number of terms which shall be defined to have the following meaning.

The terms "a" and "an" do not denote a limitation of quantity, but rather denote the presence of at least one of the referenced item. The term "or" means "and/or". The terms "comprising", "having", "including", and "containing" are to be construed as open-ended terms (i.e., meaning "including, but not limited to").

"Concomitant" and "concomitantly" as used herein refer to the administration of at least two drugs to a patient either simultaneously or within a time period during which the effects of the first administered drug are still operative in the patient. Thus, if the first drug is, e.g., clarithromycin and the second drug is colchicine, the concomitant administration of the second drug can occur as much as one to two weeks, preferably within one to seven days, after the administration of the first drug. This is because clarithromycin can exert a long-lasting inhibition of CYP3A isozymes so that CYP3A activity in the patient may not return to pre-clarithromycin-administration levels for as much as two weeks after the cessation of clarithromycin administration. If colchicine is the first drug, administration of a second drug would be concomitant if done within 1 to 2 days, preferably 12 to 24 hours.

"Dosage amount" means an amount of a drug suitable to be taken during a fixed period, usually during one day (i.e., daily).

"Dosage amount adapted for oral administration" means a dosage amount that is of an amount deemed safe and effective for the particular patient under the conditions specified. As used herein and in the claims, this dosage amount is determined by following the recommendations of the drug manufacturer's Prescribing Information as approved by the US Food and Drug Administration.

"Dosing regimen" means the dose of a drug taken at a first time by a patient and the interval (time or symptomatic) and dosage amounts at which any subsequent doses of the drug are taken by a patient. Each dose may be of the same or a different dosage amount.

A "dose" means the measured quantity of a drug to be taken at one time by a patient.

A "patient" means a human or non-human animal in need of medical treatment. Medical treatment can include treatment of an existing condition, such as a disease or disorder, prophylactic or preventative treatment, or diagnostic treatment. In preferred embodiments the patient is human.

"Providing" means giving, administering, selling, distributing, transferring (for profit or not), manufacturing, compounding, or dispensing.

"Risk" means the probability or chance of adverse reaction, injury, or other undesirable outcome arising from a

18

medical treatment. An "acceptable risk" means a measure of the risk of harm, injury, or disease arising from a medical treatment that will be tolerated by an individual or group. Whether a risk is "acceptable" will depend upon the advantages that the individual or group perceives to be obtainable in return for taking the risk, whether they accept whatever scientific and other advice is offered about the magnitude of the risk, and numerous other factors, both political and social. An "acceptable risk" of an adverse reaction means that an individual or a group in society is willing to take or be subjected to the risk that the adverse reaction might occur since the adverse reaction is one whose probability of occurrence is small, or whose consequences are so slight, or the benefits (perceived or real) of the active agent are so great. An "unacceptable risk" of an adverse reaction means that an individual or a group in society is unwilling to take or be subjected to the risk that the adverse reaction might occur upon weighing the probability of occurrence of the adverse reaction, the consequences of the adverse reaction, and the benefits (perceived or real) of the active agent. "At risk" means in a state or condition marked by a high level of risk or susceptibility.

Pharmacokinetic parameters referred to herein describe the in vivo characteristics of drug (or a metabolite or a surrogate marker for the drug) over time. These include plasma concentration (C), as well as $C_{max}$, $C_n$, $C_{24}$, $T_{max}$, and AUC. "$C_{max}$" is the measured plasma concentration of the active agent at the point of maximum, or peak, concentration. "$C_{min}$" is the measured plasma concentration of the active agent at the point of minimum concentration. "$C_n$" is the measured plasma concentration of the active agent at about n hours after administration. "$C_{24}$" is the measured plasma concentration of the active agent at about 24 hours after administration. The term "$T_{max}$" refers to the time from drug administration until $C_{max}$ is reached. "AUC" is the area under the curve of a graph of the measured plasma concentration of an active agent vs. time, measured from one time point to another time point. For example $AUC_{0-t}$ is the area under the curve of plasma concentration versus time from time 0 to time t, where time 0 is the time of initial administration of the drug. Time t can be the last time point with measurable plasma concentration for an individual formulation. The $AUC_{0-\infty}$ or $AUC_{0-INF}$ is the calculated area under the curve of plasma concentration versus time from time 0 to time infinity. In steady-state studies, $AUC_{0-\tau}$ is the area under the curve of plasma concentration over the dosing interval (i.e., from time 0 to time τ (tau), where tau is the length of the dosing interval. Other pharmacokinetic parameters are the parameter $K_e$ or $K_{el}$, the terminal elimination rate constant calculated from a semi-log plot of the plasma concentration versus time curve; $t_{1/2}$ the terminal elimination half-life, calculated as $0.693/K_{el}$. CL/F denotes the apparent total body clearance after administration, calculated as Total Dose/Total $AUC_\infty$; and $V_{area}$/F denotes the apparent total volume of distribution after administration, calculated as Total Dose/(Total $AUC_\infty \times K_{el}$).

"Side effect" means a secondary effect resulting from taking a drug. The secondary effect can be a negative (unfavorable) effect (i.e., an adverse side effect) or a positive (favorable) effect.

The most frequently reported adverse side effects to colchicine therapy are gastrointestinal, specifically abdominal pain with cramps, diarrhea, nausea, and vomiting. Less frequently or rarely reported adverse side effects associated with colchicine therapy include anorexia, agranulocytosis, allergic dermatitis, allergic reactions, alopecia, angioedema, aplastic anemia, bone marrow depression, myopathy, neuropathy, skin rash, thrombocytopenic disorder, and urticaria.

A199

US 8,097,655 B2

19                                           20

Whether a patient experiences an adverse side effect can be determined by obtaining information from the patient regarding onset of certain symptoms which may be indicative of the adverse side effect, results of diagnostic tests indicative of the adverse side effect, and the like.

The following examples further illustrate aspects of this disclosure but should not be construed as in any way limiting its scope. In particular, the conditions are merely exemplary and can be readily varied by one of ordinary skill in the art.

EXAMPLES

Example 1

Pharmacokinetic Study in Healthy Adults of Single Vs. Multiple Oral Doses of Colchicine Tablets

This study was a single-center, open-label, single-sequence, two-period study to evaluate the pharmacokinetic profile of colchicine following single and multiple oral doses of colchicine tablets, 0.6 mg, in healthy volunteers.

In Period 1, study subjects received a 0.6-mg dose of colchicine after an overnight fast of at least 10 hours. In Period 2, subjects received a 0.6-mg dose of colchicine in the morning and the evening (approximately 12 hours later) for 10 days (steady state regimen). Subjects received a light breakfast served 60 minutes following dose administration in the morning and the evening was administered 90 minutes after an evening meal on Days 15 through 24 only. On Day 25, the colchicine dose was administered after an overnight fast of at least 10 hours and lunch was served 4 hours post-dose. Study periods were separated by a 14-day washout. Following the single dose and the last dose of the multiple dose regimen (beginning on the mornings of Day 1 and Day 25, respectively), blood samples were collected (6 mL each) from each subject within 1 hour prior to dosing and after dose administration at study hours 0.5, 1, 1.5, 2, 3, 4, 6, 8, 10, 12, and 24 (while confined) and 36, 48, 72, and 96 (on an outpatient basis). Plasma concentrations of colchicine and its metabolites were determined using validated LC/MS-MS methods.

Thirteen healthy, non-smoking subjects with a mean age of 25.5 years (range 19 to 38 years) and within 15% of ideal body weight were enrolled in this study. All subjects completed both dosing periods according to protocol.

After a single dose, plasma concentrations are no longer quantifiable 24 hours post-dose in all but 1 subject. After the last dose of the steady state regimen, concentrations remained quantifiable for 48 to 72 hours. Review of individual subject data shows that no subject experienced a secondary colchicine peak, either following a single dose or upon multiple dosing.

All 2-O-demethylcolchicine (2-DMC) concentrations were below the level of quantitation (LOQ, 0.2 ng/mL) and only one sample from 1 subject (of 13 subjects) had a detectable 3-O-demethylcolchiine (3-DMC) concentration, which was near the level of quantitation. Therefore, metabolites are not discussed further.

In healthy adults, colchicine appears to be readily absorbed when given orally, reaching a mean maximum plasma concentration of 2.5 ng/mL in 1.5 hours after a single dose. The drug is distributed widely, with an apparent volume of distribution of 540 L, greatly exceeding total body water. The elimination half-life as calculated following a single oral dose is approximately 5 hours. Levels were not detectable by 24 hours post-dose and this is therefore not an accurate estimate. Pharmacokinetic parameter values are summarized in the table below.

Review of trough plasma concentrations indicates that steady state was attained by approximately the eighth day of dosing for most subjects. Colchicine may have a diurnal variation reflected in the observed Cmin concentrations at steady state. Cmin concentrations prior to the morning dose are approximately 12% higher than the Cmin concentrations prior to the evening dose (Day 23 and Day 24). The mean Cmin concentration observed on Day 25 was 0.907 ng/mL.

Colchicine accumulated following administration of multiple doses to an extent greater than expected. Exposure was nearly two-fold higher (approximately 1.7 based on AUC [Day 25 $AUC_{0-\tau}$/Day 1 $AUC_{0-\infty}$] and approximately 1.5 based on Cmax [Day 25 $C_{max}$/Day 1 $C_{max}$]). This observation could be attributable to an underestimation of AUG∞ following a single dose. With the higher plasma levels that occur with repeated dosing, a longer terminal elimination half life is apparent, 26.6 hours. Pharmacokinetic parameter values are summarized in the tables below.

TABLE 1

Colchicine Pharmacokinetic Parameter Values Following Administration of A Single Oral Dose of Colchicine 0.6 mg in Healthy Adults (N = 13)

|        | $AUC_{0-t}$ (pg-hr/mL) | $AUC_{0-inf}$ (pg-hr/mL) | $C_{max}$ (pg/mL) | $T_{max}$ (hr) | $K_{el}$ (1/hr) | $T_{1/2}$ (hr) |
|--------|-----------|-----------|---------|---------|--------|-------|
| MEAN   | 10508.54  | 12281.90  | 2470.77 | 1.50    | 0.1829 | 4.95  |
| STDEV  | 3544.82   | 4423.34   | 706.98  | 0.54    | 0.0592 | 4.43  |
| % CV   | 33.73     | 36.02     | 28.61   | 36.00   | 32.39  | 89.54 |
| MEDIAN | 10560.90  | 11451.45  | 2714.00 | 1.50    | 0.1992 | 3.48  |
| MIN    | 4812.88   | 7252.66   | 1584.00 | 1.00    | 0.0359 | 2.84  |
| MAX    | 18128.65  | 23838.48  | 3977.00 | 3.00    | 0.2443 | 19.29 |

TABLE 2

Colchicine Pharmacokinetic Parameter Values Following Administration of Multiple (b.i.d.) Oral Doses of Colchicine 0.6 mg in Healthy Adults (N = 13)

|        | $AUC_{0-t}$ (pg-hr/mL) | $AUC_{0-\tau}$ (pg-hr/mL) | $AUC_{0-inf}$ (pg-hr/mL) | $C_{max}$ (pg/mL) | $C_{min}$ (pg/mL) | $C_{ave}$ (pg/mL) | $T_{max}$ (hr) | $K_{el}$ (1/hr) | $T_{1/2}$ (hr) |
|--------|-----------|-----------|-----------|---------|---------|---------|--------|------|-------|
| MEAN   | 43576.96  | 29056.23  | 54198.77  | 3553.15 | 906.51  | 1210.68 | 1.31   | 0.03 | 26.60 |
| STDEV  | 9333.26   | 4531.30   | 9214.54   | 843.45  | 152.19  | 188.80  | 0.60   | 0.00 | 4.33  |
| % CV   | 21.42     | 15.59     | 17.00     | 23.74   | 16.79   | 15.59   | 45.61  | 16.34| 16.26 |
| MEDIAN | 41925.10  | 28452.15  | 54113.43  | 3734.00 | 903.50  | 1185.51 | 1.00   | 0.03 | 26.51 |
| MIN    | 29328.78  | 20791.98  | 37599.76  | 1977.00 | 636.23  | 866.33  | 0.50   | 0.02 | 20.82 |
| MAX    | 58265.35  | 36083.95  | 67944.65  | 4957.00 | 1149.67 | 1503.50 | 3.00   | 0.03 | 33.65 |

A200

US 8,097,655 B2

**21**

TABLE 3

| | Mean (% CV) Pharmacokinetic Parameter Values Following Administration of Single and Multiple (b.i.d.) Oral Doses of Colchicine 0.6 mg in Healthy Adults | |
| --- | --- | --- |
| | Vd/F (L) | CL/F (L/hr) |
| | Colchicine 0.6 mg Single Dose (N = 13) | |
| Day 1 | 540.5 (31.0) | 341.5 (54.4) |
| | Colchicine 0.6 mg b.i.d. × 10 days | |
| Day 25 | 1150 (18.73) | 30.3 (19.0) |

CL = Dose/AUC$_{0-t}$ (Calculated from mean values)
Vd = CL/Ke (Calculated from mean values)

In the above table, the parameter CL/F denotes the apparent total body clearance after administration, calculated as Total Dose/Total AUC0-$_{tau}$; and V$_d$/F denotes the apparent total volume of distribution after administration, calculated as Total Dose/(Total AUC$_\infty$×K$_{el}$).

Example 2

Clinical Drug-Drug Interaction Study of Colchicine and Clarithromycin

A single-center, open-label, one sequence, two-period study was carried out in 23 healthy subjects. On Day 1, a single 0.6-mg dose of colchicine was administered. After completing a 21-day washout period, all subjects received 250 mg of clarithromycin administered twice daily for 7 days (Days 22 through 29), a sufficient dose and duration to inhibit CYP3A4 and Pgp. On the final day (Day 29), a single dose of colchicine was co-administered with the clarithromycin dose.

When combined with steady-state clarithromycin, there is a significant increase in exposure to colchicine as compared to when colchicine is given alone: the mean C$_{max}$ and AUC$_{0-\tau}$ concentrations increased 167% and 250%, respectively. In addition, co-administration of clarithromycin and colchicine resulted in an increase of 233% in the plasma elimination half-life (t$_{1/2}$) of colchicine and a 75% decrease in apparent clearance (CL/F). A summary of the mean (% CV) colchicine pharmacokinetic parameters for Day 1 (colchicine administered alone) and Day 29 (colchicine co-administered with steady-state clarithromycin) are given in the table below and illustrated in the figure that follows.

**22**

Recitation of ranges of values herein are merely intended to serve as a shorthand method of referring individually to each separate value falling within the range, unless otherwise indicated herein, and each separate value is incorporated into the specification as if it were individually recited herein. The endpoints of all ranges directed to the same component or property are inclusive and independently combinable.

All methods described herein can be performed in a suitable order unless otherwise indicated or clearly contradicted by context. The use of any and all examples, or exemplary language (e.g., "such as") herein is intended to better illuminate the disclosure and is non-limiting unless otherwise specified. No language in the specification should be construed as indicating that any non-claimed element as essential to the practice of the claimed embodiments. Unless defined otherwise, technical and scientific terms used herein have the same meaning as is commonly understood by one of skill in the art to which this disclosure belongs. The terms wt %, weight percent, percent by weight, etc. are equivalent and interchangeable

Embodiments are described herein, including the best modes known to the inventors. Variations of such embodiments will become apparent to those of ordinary skill in the art upon reading the foregoing description. The skilled artisan is expected to employ such variations as appropriate, and the disclosed methods are expected to be practiced otherwise than as specifically described herein. Accordingly, all modifications and equivalents of the subject matter recited in the claims appended hereto are included to the extent permitted by applicable law. Moreover, any combination of the above-described elements in all possible variations thereof is encompassed unless otherwise indicated herein or otherwise clearly contradicted by context.

What is claimed is:

**1.** A method of using colchicine for prophylactic treatment of gout flares in an adult human gout patient so as to reduce the occurrence of colchicine toxicity when said patient is receiving concomitant administration of clarithromycin, said method comprising:

orally administering a reduced colchicine daily dosage amount to the patient for prophylactic treatment of gout flares, wherein the reduced colchicine daily dosage amount is a 75% reduction of a colchicine dosage amount adapted for oral administration to the gout patient for the prophylaxis of gout flares in the absence of concomitant administration of clarithromycin,

TABLE 4

| | | | | Comparison of Single-Dose Colchicine (0.6 mg, Alone) and Single-Dose Colchicine (0.6 mg) Co-Administered with Steady-State Clarithromycin in Healthy Adults | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| DAY | C$_{max}$ (ng/mL) | T$_{max}$[1] (h) | AUC$_{0-t}$ (ng · h/mL) | AUC$_\infty$ (ng · h/mL) | Ke (h$^{-1}$) | Vd/F (L) | CL/F (L/hr) | t$_{1/2}$ (h) |
| | | | | Colchicine Alone (n = 23) | | | | |
| 1 | 3 (30.97) | 1.00 (0.5-2.0) | 12 (37.6) | 16 (49.6) | 0.132 (46.87) | 432 (56.1) | 46.8 (43.7) | 9 (126.4) |
| | | | | Colchicine + Clarithromycin (n = 23) | | | | |
| 29 | 8 (23.74) | 1.0 (1.0-5.0) | 42 (23.3) | 53 (22.8) p value | 0.0298 (90.82) | 493 (33.69) | 12 (23.8) | 30 (41.37) |
| | <0.0001 | 0.08061 | <0.0001 | <0.0001 | <0.0001 | <0.0001 | <0.0001 | 0.0001 |

[1]T$_{max}$ mean (range)

US 8,097,655 B2

23

wherein concomitant administration of clarithromycin is administration within 1 to 2 days of orally administering the second colchicine dosage amount.

**2.** The method of claim **1**, wherein the colchicine dosage amount adapted for oral administration to the gout patient for the prophylaxis of gout flares in the absence of concomitant administration of clarithromycin is 0.6 mg twice per day.

**3.** The method of claim **2**, wherein the reduced colchicine dosage amount is 0.3 mg once per day.

24

**4.** The method of claim **1**, wherein the colchicine dosage amount adapted for oral administration to the gout patient for the prophylaxis of gout flares in the absence of concomitant administration of clarithromycin is 0.6 mg once per day.

**5.** The method of claim **4**, wherein the reduced colchicine dosage amount is 0.3 mg once every other day.

*    *    *    *    *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.         : 8,097,655 B2                                          Page 1 of 2
APPLICATION NO.  : 13/109034
DATED                 : January 17, 2012
INVENTOR(S)       : Matthew W. Davis

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On Title page 2, Item (56), under "OTHER PUBLICATIONS", line 3, delete "Wikidpedia" and insert -- Wikipedia --, therefor.

On Title page 2, Item (56), under "OTHER PUBLICATIONS", line 4, delete "Achert;" and insert -- Achtert; --, therefor.

In column 1, line 12, delete "continuation of part" and insert -- continuation-in-part --, therefor.

In column 3, line 27, delete "*phila.*" and insert -- *phila*, --, therefor.

In column 3, line 32, delete "100" and insert -- 1000 --, therefor.

In column 4, line 14, delete "3-demethylchochicine" and insert -- 3-demethylcolchicine --, therefor.

In column 4, lines 31-32, delete "3-demethylchochicine" and insert -- 3-demethylcolchicine --, therefor.

In column 6, line 22, delete "□" and insert -- ■ --, therefor.

In column 6, line 50, delete "in suffering" and insert -- suffering --, therefor.

In column 7, line 21, delete "6" and insert -- 5 --, therefor.

In column 7, line 23, delete "7" and insert -- 6 --, therefor.

In column 7, line 24, delete "8" and insert -- 7 --, therefor.

In column 7, line 26, delete "9" and insert -- 8 --, therefor.

Signed and Sealed this
Twenty-third Day of October, 2012

*David J. Kappos*

David J. Kappos
*Director of the United States Patent and Trademark Office*

In column 7, line 28, delete "10" and insert -- 9 --, therefor.

In column 10, line 44, delete "a one" and insert -- one --, therefor.

In column 12, line 4, delete "a one" and insert -- one --, therefor.

In column 13, line 3, after "clarithromycin" insert -- and --.

In column 15, line 21, delete "6" and insert -- 0.6 --, therefor.

In column 15, line 22, delete "of" and insert -- for --, therefor.

In column 16, line 5, delete "levels$^1$" and insert -- levels --, therefor.

In column 20, line 4, delete "3-O-demethylcolchciine" and insert -- 3-O-demethylcolchicine --, therefor.

In column 21, line 6, delete "Vd/F" and insert -- $V_d/F$ --, therefor.

In column 21, line 9, delete "540.5 (31.0)" and insert -- 341 (54.4) --, therefor.

In column 21, line 9, delete "341.5 (54.4)" and insert -- 54.1 (31.0) --, therefor.

In column 21, line 14, delete "Vd=CL/Ke" and insert -- $V_d = CL/K_e$ --, therefor.

In column 21, line 18, delete "AUC0-$_{\tau au}$" and insert -- $AUC_{0-\tau au}$ --, therefor.

In column 21, line 43, delete "t1/2" and insert -- $t_{1/2}$ --, therefor.

In column 21, lines 47-48, delete "table below and illustrated in the table that follows." and insert -- table below. --, therefor.

In column 21, line 54, delete "Ke" and insert -- $K_e$ --, therefor.

In column 21, line 54, delete "Vd/F" and insert -- $V_d/F$ --, therefor.

In column 22, line 21, after "interchangeable" insert -- . --.



US007964648B2

(12) **United States Patent**

Davis

(10) Patent No.: **US 7,964,648 B2**

(45) Date of Patent: **\*Jun. 21, 2011**

(54) **METHODS FOR CONCOMITANT ADMINISTRATION OF COLCHICINE AND A SECOND ACTIVE AGENT**

(75) Inventor: **Matthew W. Davis**, Erwinna, PA (US)

(73) Assignee: **Mutual Pharmaceutical Company, Inc.**, Philadelphia, PA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/688,038**

(22) Filed: **Jan. 15, 2010**

(65) **Prior Publication Data**

US 2010/0179169 A1      Jul. 15, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 12/372,046, filed on Feb. 17, 2009.

(60) Provisional application No. 61/152,067, filed on Feb. 12, 2009, provisional application No. 61/138,141, filed on Jan. 14, 2009.

(51) **Int. Cl.**

| | |
|---|---|
| *A01N 37/18* | (2006.01) |
| *A01N 43/50* | (2006.01) |
| *A61K 31/16* | (2006.01) |
| *A61K 31/497* | (2006.01) |
| *A61K 31/415* | (2006.01) |
| *C07C 233/00* | (2006.01) |
| *C07C 235/00* | (2006.01) |
| *C07C 237/00* | (2006.01) |
| *C07C 239/00* | (2006.01) |
| *C07C 211/00* | (2006.01) |
| *C07C 205/00* | (2006.01) |
| *C07C 207/00* | (2006.01) |

(52) **U.S. Cl.** ........ 514/629; 564/123; 564/308; 564/427; 568/306; 514/254.07; 514/254.1; 514/396

(58) **Field of Classification Search** .................. 514/629, 514/254.7, 254.1, 396; 564/123, 308, 427; 568/306

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,426,224 | A | 6/1995 | Lee et al. |
| 5,914,332 | A | 6/1999 | Sham et al. |
| 5,968,972 | A | 10/1999 | Broder et al. |
| 6,037,157 | A | 3/2000 | Norbeck et al. |
| 6,245,805 | B1 | 6/2001 | Broder et al. |
| 6,896,900 | B2 | 5/2005 | Gosselin et al. |
| 7,601,758 | B1 | 10/2009 | Davis |
| 7,619,004 | B1 | 11/2009 | Davis |

OTHER PUBLICATIONS

Wang et al. 2001, HMG-CoA reductase inhibitors (Statins) characterized as direct inhibitors of P-glycoprotein. Pharmaceutical Research, vol. 18. No. 6, pp. 800-806.\*

DRUGS.COM; "Drug Interactions Between Colchicine and Ketoconazole"; printed Dec. 4, 2009; 2 pages.

Horn, et al.; "Life-Threatening Colchicine Drug Interactions"; Pharmacy Times; pp. 111; (May 2006).

COLCRYS Prescribing Information, www.colcrys.com/assets/pdf/COLCRYS_Full_Prescribing_Information.pdf; 5 pages; Revised Sep. 2009.

Niel, et al.; "Colchicine Today"; Joint Bone Spine; 73; pp. 672-678; (2006).

Perez-Ruiz, et al.; "Optimisation of the Treatment of Acute Gout"; BioDrugs; 13; pp. 415-423; (2000).

Terkeltaub, Robert A.; "Gout"; The New England Journal of Medicine; 349; pp. 1647-1655; (2003).

Terkeltaub, Robert A.; "Colchicine Update: 2008"; Semin. Arthritis Rheum. 38:411-419; (2009) (e publ. Oct. 29, 2008).

Terkeltaub, et al. (a); "Comparison of Low-Dose vs High-Dose Oral Colchicine Regimens in Patients with Gout Flares"; Presentation at the American College of Rheumatology Scientific Meeting: San Francisco, CA, 23 pages; Oct. 26, (2008).

Terkeltaub, et al. (b); "The Clinical Relevance of P-gp and CYP 3A4 on Colchicine Metabolism and Elimination"; Presentation at the American College of Rheumatology Scientific Meeting; San Francisco; CA; 19 pages; Oct. 26; (2008).

Ben-Chetrit and Levy; "Colchicine: 1998 Update"; Semin. Arthritis Rheum.; 28:48-59; (1998).

Leikin and Paloucek (eds.); "Colchicine"; Poisoning and Toxicology Handbook; 4th ed.; pp. 216-217; (CRC Press); (2008).

Ketoconazole Tablets UPS, Prescribing Information, Apotex, Inc.; 8 pages; Revised Jul. 2004.

Colchicine-Probenecid; http://www.healthgrades.com/drug-ratings/drug/sideeffects/2207/colchecine-probenecid; 2 pages; printed Dec. 2, 2009.

U.S. Appl. No. 12/372,046, NonFinal Office Action dated May 18, 2009, 9 pages.

U.S. Appl. No. 12/372,046, NonFinal Office Action dated Jul. 14, 1009, 10 pages.

U.S. Appl. No. 12/372,046, Final Office Action dated Sep. 11, 2009, 24 pages.

Herrewege, et al.; "A Dual Chamber Model of Female Cervical Mucosa for the Study of HIV Transmission and for the Evaluation of Candidate HIV Microbicides"; Antiviral Research; 74; 111-124; (2007).

Hsu, et al; "Ritonavir; Clinical Pharmacokinetics and Interactions with Other Anti-HIV Agents"; Clinical Pharmacokinet; 35; pp. 275-291; (1998).

Krishnan et al; "Gout in Ambulatory Care Settings in the United States"; Journal of Rheumatology; 35; pp. 498-501; (2008).

(Continued)

*Primary Examiner* — Sreeni Padmanabhan

*Assistant Examiner* — Kara R McMillian

(74) *Attorney, Agent, or Firm* — Cantor Colburn LLP

(57)      **ABSTRACT**

Methods for concomitant administration of colchicine together with one or more second active agents, e.g., ketoconazole and ritonavir, are disclosed. Such methods reduce the dangers commonly associated with such concomitant administration and provide additional benefits. Methods of notifying health care practitioners and patients regarding appropriate dosing for concomitant administration of colchicine together with second active agents are also provided.

**8 Claims, 5 Drawing Sheets**

**US 7,964,648 B2**

Page 2

OTHER PUBLICATIONS

Van Der Velden, et al; "Colchicine-Induced Neuromyopathy In A Patient With Chronic Renal Failure: The Role Of Clarithromycin"; Netherlands, The Journal Of Medicine; 66; pp. 204-206; (2008).

Zhou, et al; "Clinical Outcomes and Management of Mechanism-Based Inhibition of Cytochrome P450 3A4"; Therapeutics and Clinical Risk Management; 1; pp. 3-13; (2005).

U.S. Appl. No. 12/372,046. NonFinal Office Action dated Jan. 26, 2010, 30 pages.

Creighton, et al.; "Is Ritonavir Boosting Associated with Gout?"; Royal Society of Medicine Services, London, U.K.; 16; pp. 362-364; (2005).

Lacy et al., Lexi-Comp's Clinical Reference Library, Drug Information Handbook, 7th Ed , 1999-2000, pp. 108-109 and 292-293

Drugs.com,"Colchicine Dosage" (available online http://www.drugs.com/dosage/colchicine.html); 6 pages; accessed Sep. 20, 2010.

Rx-s.net/weblog/more/colchicine-indications-and-dosage/; "Colchicine Indications and Dosage"; 5 pages; last revised Aug. 2, 2005.

Ogbru, Omudhome (www.medicinenet.com/colchicine/article.htm; 2 pages; (2008).

Rango; "Management of Gout With Colchicine", http://www.theberries.ca/Archives/colchicine.html; 4 pages; available on line as of Jul. 5, 2003).

* cited by examiner



FIG. 1



FIG. 2

A340



FIG. 3



FIG. 4



FIG. 5

US 7,964,648 B2

1

# METHODS FOR CONCOMITANT ADMINISTRATION OF COLCHICINE AND A SECOND ACTIVE AGENT

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a Continuation of U.S. patent application. Ser. No. 12/372,046, filed Feb. 17, 2009, which is a Nonprovisional of U.S. Provisional Application Ser. No. 61/138,141 filed Dec. 17, 2008 and 61/152,067 filed Feb. 12, 2009, all of which are hereby incorporated by reference in their entirety.

## FIELD OF THE DISCLOSURE

This disclosure relates to methods allowing for the co-administration of colchicine together with one or more second active agents for therapeutic purposes with improved safety compared to prior methods of administration.

## BACKGROUND

Colchicine, chemical name (−)-N-[(7S, 12aS)-1,2,3,10-tetramethoxy-9-oxo-5,6,7,9-tetrahydrobenzo[a]heptalen-7-yl]-acetamide, is an alkaloid found in extracts of *Colchicum autumnale, Gloriosa superba,* and other plants. It is a microtubule-disrupting agent used in the treatment of gout and other conditions that may be treated, relieved or prevented with anti-inflammatory treatment. Colchicine impairs the motility of granulocytes and can prevent the inflammatory phenomena that initiate an attack (or flare) of gout. Colchicine also inhibits mitosis, resulting in effects in cells with high turnover rates such as those in the gastrointestinal tract and bone marrow. The primary adverse side effects of colchicine therapy include gastrointestinal upset such as diarrhea and nausea.

Colchicine has a narrow therapeutic index. The margin between an effective dose and a toxic dose of colchicine is much narrower than that of many other widely used drugs. Consequently, actions that result in increased colchicine levels in patients receiving colchicine therapy are particularly dangerous. Co-administration of colchicine to patients along with certain other drugs can have the effect of increasing colchicine levels. Such drug-drug interactions with colchicine have been reported to result in serious morbid complications and, in some cases, death.

Colchicine is rapidly absorbed from the gastrointestinal tract. Peak concentrations occur in 0.5 to 2 hours. The drug and its metabolites are distributed in leukocytes, kidneys, liver, spleen and the intestinal tract. Colchicine is metabolized in the liver and excreted primarily in the feces with 10 to 20% eliminated unchanged in the urine.

Gout (or gouty arthritis) is a disease caused by a build up of uric acid in the joints. Such a build up is typically due to an overproduction of uric acid, or to a reduced ability of the kidney to excrete uric acid. Gout is characterized by excruciating, sudden, unexpected, burning pain, as well as by swelling, redness, warmness, and stiffness in the affected joint. Low-grade fever may also be present. A gout flare is a sudden attack of pain in affected joints, especially in the lower extremities, and most commonly in the big toe. In afflicted individuals, the frequency of gout flares typically increases over time. In this manner, gout progresses from acute gout to chronic gout, which involves repeated episodes of joint pain.

Colchicine can reduce pain in attacks of acute gout flares and also can be used beneficially for treating adults for pro-

2

phylaxis of gout flares. Although its exact mode of action in the relief of gout is not completely understood, colchicine is known to decrease the inflammatory response to urate crystal deposition by inhibiting migration of leukocytes, to interfere with urate deposition by decreasing lactic acid production by leukocytes, to interfere with kinin formation and to diminish phagocytosis and subsequent inflammatory responses.

Cytochrome p450 (CYP) enzymes are agents of drug metabolism that are found in the liver, the gastrointestinal tract and other locations in the body. CYP enzymes occur in a variety of closely related proteins referred to as isozymes and different CYP isozymes may preferentially metabolize different drugs. The 3A family of CYP isozymes, particularly CYP3A4, is also known to be involved in many clinically significant drug-drug interactions, including those involving colchicine and second active agents. While drugs are often targets of CYP-mediated metabolism, some may also alter the expression and activity of such enzymes, thus impacting the metabolism of other drugs. The biotransformation of colchicine in human liver microsomes involves formation of 3-demethylcolchicine and 2-demethylcolchicine. As shown by experiments using antibodies against CYP3A4 and experiments using chemical inhibition of CYP3A4, this transformation is correlated with (and thus apparently mediated by) CYP3A4 activity.

P-glycoprotein (P-gp) is an ATP-dependent cell surface transporter molecule that acts as an ATPase efflux pump for multiple cytotoxic agents, including colchicine. P-gp actively pumps certain compounds, including drugs such as colchicine, out of cells. P-gp is encoded by the Adenosine triphosphate-binding cassette subfamily B member 1 (ABCB1) gene, also referred to as the multiple drug resistance 1 gene (MDR1).

Since colchicine acts intracellularly, the combined effects of CYP3A4 inhibition and P-gp inhibition by second active agents that also interact with CYP3A4 and P-gp can cause colchicine toxicity in patients taking what would be a safe dose of colchicine in the absence of concomitant second agent administration. Various studies of adverse reactions from exposure to multiple drugs have found that 6.5-23% of the adverse reactions result from drug-drug interactions. Unfortunately, each year a number of deaths occur as the direct result of patients adding a concomitant prescription pharmaceutical product to their existing medication regimen.

There accordingly remains a need for improved methods for administering colchicine to individuals who are concomitantly being treated with second active agents so as to reduce the possibility of colchicine toxicity while maintaining the sometimes life-saving advantages of being able to administer the two (or more) agents concomitantly. The present disclosure addresses this need and provides further advantages.

## SUMMARY

In one embodiment, a method of treating an individual in need of treatment with colchicine comprises concomitantly administering to the individual colchicine and another drug, for example, ketoconazole or ritonavir or cyclosporine, wherein the colchicine is administered as a dosing regimen with a starting colchicine dose of no more than about 0.6 mg colchicine, followed by either: no additional colchicine doses within about 12, 24, 48, or 72 hours, or at least one additional colchicine dose within about 12 hours and no more frequently than once every hour wherein each additional colchicine dose is no greater than about 0.6 mg. According to another embodiment, the other drug is, for example, verapamil or diltiazem, and the starting colchicine dose during coadministration with

3

the other drug is no more than about 1.2 mg colchicine, followed by either: no additional colchicine doses within about 12, 24, 48, or 72 hours, or at least one additional colchicine dose within about 12 hours.

In another aspect, a method of using colchicine comprises increasing the blood plasma levels of colchicine in a individual being administered doses of about 0.6 mg or less of colchicine to treat a colchicine-treatable condition, said method comprising the concomitant dosing of the individual with a sufficient amount of ketoconazole to increase the $C_{max}$ of colchicine by about 90%, or to increase the $AUC_{0-t}$ of colchicine in the individual by about 190%, or to increase the $AUC_{0-inf}$ of colchicine in the individual by about 205%, or to decrease the clearance of colchicine by about 70%, compared to the $C_{max}$, $AUC_{0-t}$, $AUC_{0-inf}$, or clearance in a matched individual not administered concomitant ketoconazole.

In yet another aspect, a method of using colchicine comprises increasing the blood plasma levels of colchicine in an individual being administered doses of about 0.6 mg or less of colchicine to treat a colchicine-treatable condition, said method comprising the concomitant dosing of the individual with a sufficient amount of ritonavir to increase the $C_{max}$ of colchicine by about 170%, or to increase the $AUC_{0-t}$ of colchicine in the individual by about 245%, or to decrease the clearance of colchicine by about 70%, compared to the $C_{max}$, $AUC_{0-t}$, or clearance in a matched individual not administered concomitant ritonavir.

In another embodiment, a method for using colchicine comprises a pharmacy receiving a prescription for colchicine for a patient who is concomitantly being treated with ketoconazole or ritonavir or verapamil, and the pharmacy dispensing colchicine in response to receipt of the prescription, wherein the dispensing is preceded by: entering, into a first computer readable storage medium in functional communication with a computer, of a unique patient identifier for said patient and at least one drug identifier for colchicine linked to the patient identifier so as to indicate that colchicine is to be administered to the patient, wherein the computer has been programmed to issue a drug-drug interaction alert when the at least one drug identifier for colchicine is entered linked to the patient identifier so as to indicate that colchicine is to be administered to the patient and when the patient identifier is also linked to an identifier indicating that ketoconazole or ritonavir or verapamil is being concomitantly administered to the patient, wherein, upon entry of the at least one drug identifier for colchicine linked to the patient identifier, a drug-drug interaction alert is issued to one or more of a pharmacy technician, a pharmacist, or a pharmacy customer obtaining the colchicine, said alert indicating that that ketoconazole or ritonavir is being concomitantly administered to the patient and that prior to the colchicine being dispensed, the colchicine dosing regimen must be reviewed and, if necessary adjusted, so that when the colchicine is delivered to the pharmacy customer obtaining the colchicine it is delivered along with instructions for the colchicine to be taken in accordance with a dosing regimen of no more than about 0.6 mg colchicine, followed by either: no additional colchicine doses within about 12, 24, 48, or 72 hours, or at least one additional colchicine dose within about 12 hours and no more frequently than once every hour wherein each additional colchicine dose is no greater than about 0.6 mg.

A method of treating a patient with colchicine comprises administering an adjusted daily dosage amount of colchicine to the patient who is receiving concomitant administration of ritonavir, wherein the adjusted daily dosage amount of colchicine is about 25% to 50% of an intended daily dosage amount of colchicine, and wherein the intended daily dosage amount

4

of colchicine is a dose suitable for the patient if the patient were not receiving concomitant ritonavir.

A method of treating a patient with colchicine comprises administering an adjusted daily dosage amount of colchicine to the patient who is receiving concomitant administration of ketoconazole, wherein the adjusted daily dosage amount of colchicine is about 25% to 50% of an intended daily dosage amount of colchicine, and wherein the intended daily dosage amount of colchicine is a daily dosage amount suitable for the patient if the patient were not receiving concomitant ketoconazole.

A method of treating an individual in need of treatment for gout flares, comprises concomitantly administering colchicine and azithromycin, and carefully monitoring the individual for potential toxicity. The method further comprises adjusting the dose of colchicine or azithromycin as necessary to avoid adverse side effects.

A method of treating an individual with colchicine comprises concomitantly administering colchicine and verapamil, and carefully monitoring the individual for signs and symptoms of adverse side effects. The method further comprises administering an adjusted daily dosage amount of colchicine to the patient who is receiving concomitant administration of verapamil, wherein the adjusted daily dosage amount of colchicine is about 50% to 75% of an intended daily dosage amount of colchicine, and wherein the intended daily dosage amount of colchicine is a daily dosage amount suitable for a patient if the patient were not receiving concomitant verapamil.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows mean colchicine plasma concentrations following administration of single and multiple oral doses of colchicine 0.6 mg in healthy adults, N=13, Y axis=colchicine concentration, ng/mL, X axis=time in hours, ◆=day 1, ■=day 25. See Example 1.

FIG. 2 shows a pharmacokinetic profile comparison of single-dose colchicine (0.6 mg, alone) and single-dose colchicine (0.6 mg) co-administered with steady-state clarithromycin in healthy adults, Y axis=colchicine concentration, ng/mL, X axis=time in hours, N=23, ●=colchicine alone, ◆=colchicine plus clarithromycin. See Example 2.

FIG. 3 shows a pharmacokinetic profile comparison of single-dose colchicine (0.6 mg, alone) and single-dose colchicine (0.6 mg) co-administered with steady-state clarithromycin and steady-state cyclosporine in healthy adults, Y axis=colchicine concentration, ng/mL, X axis=time in hours, N=18, ▲=colchicine alone, ●=colchicine plus clarithromycin, ■=colchicine plus cyclosporine.

FIG. 4 shows a pharmacokinetic profile comparison of single-dose colchicine (0.6 mg, alone) and single-dose colchicine (0.6 mg) co-administered with steady-state ketoconazole and steady-state ritonavir in healthy adults. Y axis=colchicine concentration, ng/mL, X axis=time in hours, N=18, ▲=colchicine alone, ●=colchicine plus ketoconazole, ■=colchicine plus ritonavir.

FIG. 5 shows a pharmacokinetic profile comparison of single-dose colchicine (0.6 mg, alone) and single-dose colchicine (0.6 mg) co-administered with steady-state azithromycin and steady-state diltiazem in healthy adults. Y axis=colchicine concentration, ng/mL, X axis=time in hours, N=18, ▲=colchicine alone, ●=colchicine plus azithromycin, ■=colchicine plus diltiazem.

US 7,964,648 B2

5

These and other embodiments, advantages and features of the present invention become clear when detailed description is provided in subsequent sections.

DETAILED DESCRIPTION

Disclosed herein are methods for safely administering colchicine concomitantly with a second active agent, wherein the second active agent is a CYP3A4 inhibitor, a P-gp inhibitor, or both. Exemplary second active agents that are CYP3A4 and P-gp inhibitors are azithromycin, ketoconazole, ritonavir, diltiazem, verapamil and cyclosporine. It has now been discovered that certain reduced or limited colchicine dosage amounts, when administered with concomitantly administered recommended dosage amounts of second active agents that are CYP3A4 inhibitors, P-gp inhibitors, or both, achieve plasma colchicine levels that are therapeutically effective, but are not significantly higher, and therefore not significantly more toxic, than plasma levels achieved by administration of manufacturers' recommended colchicine dosages in the absence of concomitant administration with the second active agent. Thus, colchicine and second active agents that are CYP3A4 inhibitors, P-gp inhibitors, or both, can be administered concomitantly with improved safety when colchicine is administered as disclosed herein.

Without being held to theory, it has been hypothesized by the inventors herein that P-gp inhibition is more important in the elimination of colchicine than CYP3A4 inhibition. The CYP3A4 and P-gp inhibition potential of clarithromycin, azithromycin, ketoconazole, ritonavir, diltiazem and cyclosporine are given in Table 1. Based on their level of P-gp inhibition, it was predicted that clarithromycin and cyclosporine will increase colchicine concentrations more than ketoconazole or ritonavir, which will increase colchicine levels more than verapamil, azithromycin or diltiazem. The results presented herein confirm this hypothesis.

TABLE 1

CYP3A4 and P-gp inhibition potential of second active agents

| Drug | CYP3A Inhibition potential | P-gp Inhibition potential |
|---|---|---|
| Clarithromycin | +++++ | +++++ |
| Cyclosporine | +++++ | +++++ |
| Ketoconazole | +++++ | +++ |
| Ritonavir | +++++ | +++ |
| Verapamil | ++ | ++ |
| Diltiazem | + | + |
| Azithromycin | + | + |

Ritonavir (Norvir®, Abbott Laboratories) is an inhibitor of Human Immunodeficiency Virus (HIV) protease and is approved for the treatment of HIV-infection when used as part of a highly active antiretroviral therapy (HAART) regimen at the recommended dose of 600 mg twice daily. Although a very potent and effective protease inhibitor at the recommended dose, ritonavir is not well tolerated by HIV-infected patients at the approved dose and therefore, is generally not used clinically as a sole, therapeutic protease inhibitor within a HAART regimen. Rather, ritonavir is used more often as a pharmacokinetic enhancer or 'boosting agent' when combined with other approved protease inhibitors that are CYP3A4 and P-gp substrates and also have inherent bioavailability issues, such as poor bioavailability due to first pass effect. Improving the pharmacokinetic disposition of other protease inhibitors is possible due to the potent CYP3A4 and P-gp inhibitory activity ritonavir possesses. Sub-therapeutic ritonavir doses are used to achieve pharmacokinetic enhance-

6

ment of the co-administered protease inhibitors; typically 100 mg of ritonavir administered twice daily is the ritonavir dose used in combination with the primary protease inhibitor. This low-dose ritonavir regimen boosts the bioavailability of the second protease inhibitor without contributing significantly to the adverse event profile of the HAART regimen.

Cyclosporine (Neoral®, Novartis Pharmaceuticals Corporation) is the active principle in Neoral® an oral formulation that immediately forms a microemulsion in an aqueous environment. Cyclosporine is indicated for kidney, liver, and heart transplantation; rheumatoid arthritis and psoriasis. Cyclosporine is extensively metabolized by the CYP3A4 enzyme system in the liver, and to a lesser degree in the gastrointestinal tract, and the kidney. The metabolism of cyclosporine can be altered by the co-administration of a variety of agents.

Ketoconazole is a synthetic broad-spectrum antifungal agent available in scored white tablets, each containing 200 mg ketoconazole base for oral administration. Ketoconazole tablets are indicated for the treatment of the following systemic fungal infections: candidiasis, chronic mucocutaneous candidiasis, oral thrush, candiduria, blastomycosis, coccidioidomycosis, histoplasmosis, chromomycosis, and paracoccidioidomycosis. Ketoconazole is a potent inhibitor of the CYP3A4 enzyme system. Co-administration of ketoconazole and drugs primarily metabolized by the CYP3A4 enzyme may result in increased plasma concentrations of the drugs that could increase or prolong both therapeutic and adverse side effects.

Azithromycin is a macrolide antibiotic indicated for the treatment of patients with mild to moderate infections caused by susceptible strains of the designated microorganisms in specific conditions. Azithromycin remains the sole agent developed and marketed within the azalide macrolide subclass. Due to this dibasic structure, azithromycin has demonstrated unique pharmacological properties that differ significantly from those of classic macrolide agents. Azithromycin's pharmacokinetics are characterized by low concentrations in serum, secondary to rapid and significant uptake by fibroblasts and acute reactant cells such as polymorphonuclear leukocytes (PMNs), monocytes, and lymphocytes. Azithromycin is a weak to moderate CYP3A4 inhibitor.

Diltiazem (Cardizem® CD, Biovail Pharmaceuticals, Inc. [Biovail]) is an extended-release (ER) calcium ion influx inhibitor available in blue capsules, each containing 240 mg diltiazem hydrochloride for oral administration. Diltiazem ER capsules are indicated for the treatment of hypertension and the management of chronic stable angina and angina due to coronary artery spasm. Diltiazem is a CYP3A4 and P-gp inhibitor.

Verapamil HCl ER (Mylan Pharmaceuticals, Inc.) is a calcium ion influx inhibitor available in a pale green, capsule shaped, film-coated tablets, each containing 240 mg verapamil hydrochloride for oral administration. Verapamil HCl ER tablets are indicated for the management of hypertension. Verapamil HCl ER is a potent CYP3A4 and P-gp inhibitor.

In one embodiment, colchicine is administered to an individual suffering from a condition treatable with colchicine, and the concomitant second active agent (e.g., ketoconazole, ritonavir, cyclosporine, verapamil, or diltiazem or any other CYP3A4 or P-gp inhibitor) is administered concurrently while the colchicine administration is reduced, or the individual has recently completed a dosing regimen of the second active agent, in which case the colchicine administration may still be reduced for a period of time.

In one embodiment, disclosed herein is a method of administering colchicine and a second active agent (e.g., ketocona-

A346

US 7,964,648 B2

7

zole, ritonavir, or cyclosporine) wherein an individual is administered the colchicine according to a colchicine dosing regimen of a single starting colchicine dose of no more than about 0.6 mg colchicine, followed by either no additional colchicine doses within about 12, 24, 48, or 72 hours, or followed by at least one additional colchicine dose within 12 hours and no more frequently than once every hour (e.g., every 3, 4, 6, 8, or 12 hours). In this embodiment, each additional colchicine dose is specifically no greater than about 0.3 mg and the individual is an adult individual or a pediatric individual. Specifically, the starting colchicine dose is about 0.6 mg or about 0.3 mg, and each additional colchicine dose is about 0.3 mg. In one embodiment, when additional doses are administered, only two, three, or four additional colchicine doses are administered within about 24 hours. Specifically, the individual is an adult individual and the starting colchicine dose is about 0.6 mg, and each additional colchicine dose, if any, is about 0.3 mg. In one embodiment, only three additional colchicine doses are administered within about 24 hours.

In one embodiment, disclosed herein is a method of administering colchicine and a second active agent (e.g., verapamil or diltiazem) wherein an individual is administered the colchicine according to a colchicine dosing regimen of a single starting colchicine dose of no more than about 1.2 mg colchicine, followed by either no additional colchicine doses within about 12, 24, 48, or 72 hours, or followed by at least one additional colchicine dose within 12 hours and no more frequently than once every hour (e.g., every 3, 4, 6, 8, or 12 hours). In this embodiment, each additional colchicine dose is specifically no greater than about 0.3 mg or 0.6mg and the individual is an adult individual or a pediatric individual. Specifically, the starting colchicine dose is about 0.6mg or 1.2 mg, and each additional colchicine dose is about 0.3 mg or 0.6mg. In one embodiment, when additional doses are administered, only two, three, or four additional colchicine doses are administered within about 24 hours. Specifically, the individual is an adult individual and the starting colchicine dose is about 1.2 mg, and each additional colchicine dose, if any, is about 0.3 mg or 0.6 mg. In one embodiment, only three additional colchicine doses are administered within about 24 hours.

In one embodiment, the second active agent is ketoconazole or ritonavir. In one embodiment, the ketoconazole is administered to the individual at a dosage of about 200 mg daily and the colchicine dosing regimen is one about 0.6 mg colchicine dose to start, followed by 0, 1, 2, 3, or 4 additional colchicine doses of about 0.6 mg every 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, or 12 hours (e.g., every 2, 3, 4, 5, or 6 hours) after the preceding colchicine dose. In another embodiment, the ritonavir is administered to the individual at a dosage of about 200 to 1200 mg daily (e.g., in 2×100 mg doses or 2×600 mg doses) and the colchicine dosing regimen is one about 0.6 mg colchicine dose to start, followed by 0, 1, 2, 3, or 4 additional colchicine doses of about 0.6 mg every 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, or 12 hours (e.g., every 2, 3, 4, 5, or 6 hours) after the preceding colchicine dose. In an exemplary regimen for treatment of acute gout flares, ingestion of colchicine is continued until a total of no more than about 1.2, 1.4, 1.6, 1.8, 2, or 2.4 mg of colchicine has been ingested, after which ingestion of colchicine is stopped until a subsequent acute gout flare occurs. More preferably, the colchicine is administered as a dosage form of 0.6 mg (e.g., one 0.6 mg colchicine tablet), or 0.3 mg (e.g., one half of a 0.6 mg tablet) of colchicine and administration of the dosage form is not repeated within a period of at least about two days, preferably at least about three days.

8

In one embodiment, the second active agent (e.g., ketoconazole or ritonavir or cyclosporine) is administered to the individual before the colchicine is administered to the individual, and wherein the administration of second active agent is terminated no more than about fourteen days prior to the initiation of colchicine administration. For example, the method comprises administering colchicine to an individual also taking a second active agent (e.g., ketoconazole or ritonavir or cyclosporine), or having completed treatment with the second active agent within the prior 14 days, the individual being administered a single dose of about 0.6 mg or about 0.3 mg of colchicine to treat a gout flare, which administration is not repeated within any 3-day period. According to this embodiment if the second active agent is instead verapamil or diltiazem, if the second active agent is terminated no more than about fourteen days prior to the initiation of the colchicine administration to treat a gout flare, the single dose of colchicine is about 1.2mg not to be repeated within a 3-day period.

In another aspect, herein disclosed is a method for increasing the blood plasma levels of colchicine in an individual to whom colchicine is being administered to treat or prevent a colchicine-responsive condition. This method comprises the concomitant dosing of the individual with a sufficient amount of ketoconazole to increase the $C_{max}$ of colchicine by about 90%, or to increase the $AUC_{0-t}$ of colchicine in the individual by about 190%, or to increase the $AUC_{0-inf}$ of colchicine in the individual by about 205%, or to decrease the clearance of colchicine by about 70%, compared to the $C_{max}$, $AUC_{0-t}$, or clearance in the same or a matched individual when not being administered a concomitant ketoconazole. In a specific embodiment, the individual is being administered no more than hourly doses of about 0.6 mg of colchicine or less, and the amount of ketoconazole is about 200 mg. In one embodiment, the single dose is one 0.6 mg colchicine tablet.

In yet another aspect, herein disclosed is a method for increasing the blood plasma levels of colchicine in an individual to whom colchicine is being administered to treat or prevent a colchicine-responsive condition. This method comprises the concomitant dosing of the individual with a sufficient amount of ritonavir to increase the $C_{max}$ of colchicine by about 170%, or to increase the $AUC_{0-t}$ of colchicine in the individual by about 245%, or to decrease the clearance of colchicine by about 70%, compared to the $C_{max}$, $AUC_{0-t}$, or clearance in the same or a matched individual when not being administered concomitant ritonavir. In a specific embodiment, the individual is being administered no more than hourly doses of about 0.6 mg of colchicine or less, and the amount of ritonavir is about 200 to about 1200 mg. In one embodiment, the single dose is one 0.6 mg colchicine tablet.

In one embodiment, a method of treating a patient with colchicine comprises administering an adjusted daily dosage amount of colchicine to the patient who is receiving concomitant administration of ritonavir, wherein the adjusted daily dosage amount of colchicine is 25% to 50% of an intended daily dosage amount of colchicine, and wherein the intended daily dosage amount of colchicine is a daily dosage amount suitable for the patient if the patient were not receiving concomitant ritonavir. Treating is, for example, to prevent gout flares, to treat acute gout, or to treat familial Mediterranean fever. When the colchicine is administered to prevent gout flares, the adjusted daily dosage amount of colchicine may reduced from a 0.6 mg twice daily intended dose to a 0.6 mg once daily adjusted dose. Alternatively, when the colchicine is administered to prevent gout flares, wherein the adjusted daily dosage amount of colchicine is reduced from a 0.6 mg once daily intended dose to a 0.3 mg once daily adjusted dose.

US 7,964,648 B2

9

In one embodiment, when treating is for acute gout, the intended daily dosage amount is 1.8 to 2.4 mg, and the maximum adjusted daily dosage amount is 0.6 mg, not to be repeated within 3 days. In another embodiment, treating is for acute gout, the intended daily dosage amount is 2.4 to 4.8 mg and the maximum adjusted daily dosage amount is 0.6 to 1.2 mg, not to be repeated within 3 days. In yet another embodiment, treating is for familial Mediterranean fever and the daily dosage amount 1.2 to 2.4 mg for adults, and the maximum adjusted daily dosage amount is 0.6 mg, given, for example, in two 0.3 mg doses. In another embodiment, treating is for familial Mediterranean fever and the intended daily dosage amount is 0.9 to 1.8 mg for children 6-12 years or 4-6 years, and the maximum adjusted daily dosage amount is 0.6 mg, given, for example, in two 0.3 mg doses. The concomitantly administered dose of ritonavir is, for example, 200 mg per day. In one embodiment, the ritonavir is administered to the patient before the colchicine is administered to the patient, and wherein the administration of ritonavir is terminated no more than about fourteen days prior to the initiation of colchicine administration. The method optionally further comprises carefully monitoring the individual for potential toxicity. Any 0.3 mg dose contemplated in this method can be a single 0.3 mg dosage form or one-half a 0.6 mg dosage form, e.g. one-half a 0.6 mg colchicine tablet.

A method of treating a patient with colchicine comprises administering an adjusted daily dosage amount of colchicine to the patient who is receiving concomitant administration of ketoconazole, wherein the adjusted daily dosage amount of colchicine is 25% to 50% of an intended daily dosage amount of colchicine, and wherein the intended daily dosage amount of colchicine is a daily dosage amount suitable for the patient if the patient were not receiving concomitant ketoconazole. Treating is, for example, to prevent gout flares, to treat acute gout, or to treat familial Mediterranean fever. When the colchicine is administered to prevent gout flares, the adjusted daily dosage amount of colchicine may reduced from a 0.6 mg twice daily intended dose to a 0.6 mg once daily adjusted dose. Alternatively, when the colchicine is administered to prevent gout flares, wherein the adjusted daily dosage amount of colchicine is reduced from a 0.6 mg once daily intended dose to a 0.3 mg once daily adjusted dose. In one embodiment, when treating is for acute gout, the intended daily dosage amount is 1.8 to 2.4 mg, and the maximum adjusted daily dosage amount is 0.6 mg, not to be repeated within 3 days. In another embodiment, treating is for acute gout, the intended daily dosage amount is 2.4 to 4.8 mg and the maximum adjusted daily dosage amount is 0.6 to 1.2 mg, not to be repeated within 3 days. In yet another embodiment, treating is for familial Mediterranean fever and the daily dosage amount 1.2 to 2.4 mg for adults, and the maximum adjusted daily dosage amount is 0.6 mg, given, for example, in two 0.3 mg doses. In another embodiment, treating is for familial Mediterranean fever and the intended daily dosage amount is 0.9 to 1.8 mg for children 6-12 years or 4-6 years, and the maximum adjusted daily dosage amount is 0.6 mg, given, for example, in two 0.3 mg doses. The concomitantly administered dose of ketoconazole is, for example, 250 mg per day. In one embodiment, the ketoconazole is administered to the patient before the colchicine is administered to the patient, and wherein the administration of ketoconazole is terminated no more than about fourteen days prior to the initiation of colchicine administration. The method optionally further comprises carefully monitoring the individual for potential toxicity. Any 0.3 mg dose contemplated in this method can be a single 0.3 mg dosage form or one-half a 0.6 mg dosage form, e.g. one-half a 0.6 mg colchicine tablet.

10

A method of treating a patient with colchicine comprises administering an adjusted daily dosage amount of colchicine to the patient who is receiving concomitant administration of cyclosporine, wherein the adjusted daily dosage amount of colchicine is 25% to 50% of an intended daily dosage amount of colchicine, and wherein the intended daily dosage amount of colchicine is a daily dosage amount suitable for the patient if the patient were not receiving concomitant cyclosporine. Treating is, for example, to prevent gout flares, to treat acute gout, or to treat familial Mediterranean fever. When the colchicine is administered to prevent gout flares, the adjusted daily dosage amount of colchicine may reduced from a 0.6 mg twice daily intended dose to a 0.3 mg once daily adjusted dose. Alternatively, when the colchicine is administered to prevent gout flares, wherein the adjusted daily dosage amount of colchicine is reduced from a 0.6 mg once daily intended dose to a 0.3 mg once every other day adjusted dose. In one embodiment, when treating is for acute gout, the intended daily dosage amount is 1.8 to 2.4 mg, and the maximum adjusted daily dosage amount is 0.6 mg, not to be repeated within 3 days. In another embodiment, treating is for acute gout, the intended daily dosage amount is 2.4 to 4.8 mg and the maximum adjusted daily dosage amount is 0.6 to 1.2 mg, not to be repeated within 3 days. In yet another embodiment, treating is for familial Mediterranean fever and the daily dosage amount 1.2 to 2.4 mg for adults, and the maximum adjusted daily dosage amount is 0.6 mg, given, for example, in two 0.3 mg doses. In another embodiment, treating is for familial Mediterranean fever and the intended daily dosage amount is 0.9 to 1.8 mg for children 6-12 years or 4-6 years, and the maximum adjusted daily dosage amount is 0.6 mg, given, for example, in two 0.3 mg doses. The concomitantly administered dose of cyclosporine can be various dosage strengths administered per day, and can be administered as an oral preparation, topically, or intravenously. In one embodiment, the cyclosporine is administered to the patient before the colchicine is administered to the patient, and wherein the administration of cyclosporine is terminated no more than about fourteen days prior to the initiation of colchicine administration. The method optionally further comprises carefully monitoring the individual for potential toxicity. Any 0.3 mg dose contemplated in this method can be a single 0.3 mg dosage form or one-half a 0.6 mg dosage form, e.g. one-half a 0.6 mg colchicine tablet.

In another embodiment, colchicine is concomitantly administered with azithromycin. Concomitant administration of azithromycin with colchicine increases exposure to colchicine approximately 46% and thus has the potential to produce colchicine toxicity. During concomitant use of azithromycin and colchicine, the physician should carefully monitor individuals for any signs or symptoms of colchicine toxicity. Additionally, dosing adjustments to either the colchicine and/or the azithromycin may be necessary to avoid adverse side effects.

A method of treating a patient with colchicine comprises administering an adjusted daily dosage amount of colchicine to the patient who is receiving concomitant administration of verapamil, wherein the adjusted daily dosage amount of colchicine is 50% to 75% of an intended daily dosage amount of colchicine, and wherein the intended daily dosage amount of colchicine is a daily dosage amount suitable for the patient if the patient were not receiving concomitant verapamil. Treating is, for example, to prevent gout flares, to treat acute gout, or to treat familial Mediterranean fever. When the colchicine is administered to prevent gout flares, the adjusted daily dosage amount of colchicine may reduced from a 0.6 mg twice daily intended dose to a 0.3 mg once daily adjusted

US 7,964,648 B2

| 11 | 12 |

dose. In one embodiment, when treating is for acute gout, the intended daily dosage amount is 1.8 to 2.4 mg, and the maximum adjusted daily dosage amount is 1.2 mg. In another embodiment, treating is for acute gout, the intended daily dosage amount is 2.4 to 4.8 mg and the maximum adjusted daily dosage amount is about one-third the intended daily dosage amount. In yet another embodiment, treating is for familial Mediterranean fever and the daily dosage amount 1.2 to 2.4 mg for adults, and the maximum adjusted daily dosage amount is 1.2 mg, given, for example, in two 0.6 mg doses. In one embodiment, the verapamil is administered to the patient

**Acute Gout**

Acute gout, or gout flares, can be treated according to the following treatment schedule. This table indicates the original, or intended, dose, i.e., the dose of colchicine recommended absent concomitant administration of the drugs listed below. This table also presents the dose adjustment of the present invention, or the recommended colchicine dose to be administered when the strong and moderate CYP3A4 and P-gp inhibitors are administered concomitantly with colchicine when the patient is being treated for acute gout, or an acute gout flare.

| | Colchicine Dose Recommendation | |
|---|---|---|
| Drug | Original Intended Dose (Total Dose) | Dose Adjustment |
| Strong CYP3A4 Inhibitors | Regimen Reduced by Two Thirds | |
| Erythromycin Ketoconazole Ritonavir | 1.2 mg (2 tablets) at the first sign of the flare followed by 0.6 mg (1 tablet) one hour later. Dose to be repeated no earlier than 3 days. | 0.6 mg (1 tablet) × 1 dose. Dose to be repeated no earlier than 3 days. |
| Moderate CYP3A4 Inhibitors | Regimen Reduced by One Third | |
| Diltiazem Verapamil | 1.2 mg (2 tablets) at the first sign of the flare followed by 0.6 mg (1 tablet) one hour later. Dose to be repeated no earlier than 3 days. | 1.2 mg (2 tablets) × 1 dose. Dose to be repeated no earlier than 3 days. |
| Strong P-gp Inhibitors | Regimen Reduced by Two Thirds | |
| Cyclosporine | 1.2 mg (2 tablets) at the first sign of the flare followed by 0.6 mg (1 tablet) one hour later. Dose to be repeated no earlier than 3 days. | 0.6 mg (1 tablet) × 1 dose. Dose to be repeated no earlier than 3 days. |

before the colchicine is administered to the patient, and wherein the administration of verapamil is terminated no more than about fourteen days prior to the initiation of colchicine administration. The method optionally further comprises carefully monitoring the individual for potential toxicity. Any 0.3 mg dose contemplated in this method can be a single 0.3 mg dosage form or one-half a 0.6 mg dosage form, e.g. one-half a 0.6 mg colchicine tablet.

Disclosed herein are specific dosage reductions of colchicine that improve safety when colchicine is co-administered with certain active agents. The dose of colchicine recommended for administration without co-administration of certain other active agents, such as CYP3A4 or P-gp inhibitors, is referred to as an intended daily dosage amount. The reduced or modified daily dosage amount determined from the experiments presented herein is referred to as an adjusted daily dosage amount. An adjusted daily dosage amount is thus a daily dosage amount that can be safely co-administered with a second active agent as disclosed herein. A dose adjustment is thus a dose of colchicine and does not include cessation of colchicine, that is, a dose of 0 mg of colchicine.

In these and other embodiments, the colchicine-responsive condition is gout (e.g., a gout flare in a chronic gout sufferer), familial Mediterranean fever (FMF), thrombocytopenic purpura, pericarditis, scleroderma, or Behçet's disease. In some embodiments, the treatment with colchicine is either palliative or prophylactic. The gout may be acute gout, e.g. a gout flare, or chronic gout.

**Chronic Gout**

For chronic gout, an original intended daily dosage amount is 1.2 mg or 6 mg. Alternatively, an intended daily dosage amount of chronic gout can be as much as 2.4 mg per day. The daily dosage amount for chronic gout can be administered at one time or dosed at intervals throughout the day, e.g. twice daily, three times daily, or four times daily.

Chronic gout, with and without a concomitant dose of another drug, can be treated according to the following treatment schedule:

Colchicine Dose Adjustment for Co-administration with Interacting Drugs If No Alternative Available

| | Colchicine Dose Recommendation | |
|---|---|---|
| Drug | Original Intended Dose | Dose Adjustment |
| Clarithromycin | 0.6 mg twice daily | 0.3 mg once daily |
| | 0.6 mg once daily | 0.3 mg once every other day |
| Cyclosporine | 0.6 mg twice daily | 0.3 mg once daily |
| | 0.6 mg once daily | 0.3 mg once every other day |
| Erythromycin | 0.6 mg twice daily | 0.3 mg once daily |
| | 0.6 mg once daily | 0.3 mg once every other day |
| Ritonavir | 0.6 mg twice daily | 0.6 mg once daily |
| | 0.6 mg once daily | 0.3 mg once daily |

**Familial Mediterranean Fever**

Familial Mediterranean Fever (FMF) can be treated according to the following intended daily dosing schedule:

US 7,964,648 B2

13

| | Daily dosage amount | |
|---|---|---|
| Age | Usual | Maximum |
| Adults and children >12 years | 1.2 mg | 2.4 mg |
| Children >6 to 12 years | 0.9 mg | 1.8 mg |
| Children 4 to 6 years | 0.3 mg | 1.8 mg |

When colchicine is given to patients with FMF concomitantly with other drugs, the adjusted (reduced) dosage amount of colchicine, according to this embodiment, is provided in the table below:

| Concomitant Drug Class or Food | Noted or Anticipated Outcome | Clinical Comment |
|---|---|---|
| Strong CYP3A4 Inhibitors: atazanavir, clarithromycin, indinavir, itraconazole, ketoconazole, nefazodone, nelfinavir, ritonavir, saquinavir, telithromycin | Significant increase in colchicine plasma levels[1]; fatal colchicine toxicity has been reported with clarithromycin, a strong CYP3A4 inhibitor. Similarly, significant increase in colchicine plasma levels is anticipated with other strong CYP3A4 inhibitors. | Use colchicine with caution at reduced maximum dose of 0.3 mg twice daily with increased monitoring for adverse effects. In patients with renal or hepatic impairment, use of colchicine in conjunction with these drugs is contraindicated. |
| Moderate CYP3A4 inhibitors: amprenavir, aprepitant, diltiazem, erythromycin, fluconazole, fosamprenavir, grapefruit juice, verapamil | Significant increase in colchicine plasma concentration is anticipated. Neuromuscular toxicity has been reported with diltiazem and verapamil interactions. | Use colchicine with caution at reduced maximum dose of 0.6 mg twice daily with increased monitoring for adverse effects. In patients with renal or hepatic impairment, use a maximum dose of 0.3 mg twice daily. |
| Strong P-gp Inhibitors e.g. Cyclosporine, ranolazine. | Significant increase in colchicine plasma levels[1]; fatal colchicine toxicity has been reported with cyclosporine, a strong P-gp inhibitor. Similarly, significant increase in colchicine plasma levels is anticipated with other strong P-gp inhibitors. | Use colchicine with caution at reduced maximum dose of 0.3 mg twice daily with increased monitoring for adverse effects. In patients with renal or hepatic impairment, use of colchicine in conjunction with these drugs is contraindicated. |

Pharmacy management systems are computer-based systems that are widely used by commercial pharmacies to manage prescriptions and to provide pharmacy and medical personnel with warnings and guidance regarding drugs being administered to individuals. Such systems typically provide alerts warning either or both of health care providers and patients when a drug that may be harmful to the particular patient is prescribed. For example, such systems can provide alerts warning that a patient has an allergy to a prescribed drug, or is receiving concomitant administration of a drug that can have a dangerous interaction with a prescribed drug. U.S. Pat. Nos. 5,758,095, 5,833,599, 5,845,255, 6,014,631, 6,067,524, 6,112,182, 6,317,719, 6,356,873, and 7,072,840, each of which is incorporated herein by reference, disclose various pharmacy management systems and aspects thereof. Many pharmacy management systems are now commercially available, e.g., CENTRICITY Pharmacy from BDM Information Systems Ltd., General Electric Healthcare, Waukesha, Wis., Rx30 Pharmacy Systems from Transaction Data Systems, Inc., Ocoee, Fla., SPEED SCRIPT from Digital Simplistics,

14

Inc., Lenexa, Ky., and various pharmacy management systems from OPUS-ISM, Hauppauge, N.Y.

In another aspect, herein disclosed are methods for using colchicine which methods involve the use of pharmacy management systems.

In one aspect, one such method comprises a pharmacy receiving a prescription for colchicine for a patient who is suffering from gout (e.g., acute gout flares or chronic gout) and who is concomitantly being treated with a second active agent (e.g., ketoconazole or ritonavir) that is an inhibitor of CYP3A and P-glycoprotein, followed by the pharmacy dispensing colchicine in response to receipt of the prescription, wherein the dispensing is preceded by entry into a first computer readable storage medium, in functional communication with a computer, of a unique patient identifier for said patient and at least one drug identifier for colchicine linked to the patient identifier so as to indicate that colchicine is to be administered to the patient. The computer is programmed to issue a drug-drug interaction alert when the at least one drug identifier for colchicine is entered linked to the patient identifier so as to indicate that colchicine is to be administered to the patient and when the patient identifier is also linked to an identifier indicating that a second active agent (e.g., ketoconazole or ritonavir) that is an inhibitor of CYP3A4 or P-glycoprotein is being concomitantly administered to the patient. Upon entry of the at least one drug identifier for colchicine linked to the patient identifier, a drug-drug interaction alert is issued to one or more of a pharmacy technician, a pharmacist, or a pharmacy customer obtaining the colchicine, said alert indicating that a second active agent (e.g., ketoconazole or ritonavir) is being concomitantly administered to the patient and that prior to the colchicine being dispensed, the colchicine dosing regimen must be reviewed and, if necessary adjusted, so that when the colchicine is delivered to the phar-

US 7,964,648 B2

15

macy customer obtaining the colchicine it is delivered along with instructions for the colchicine to be taken in accordance with a dosing regimen of no more than one about 0.6 mg colchicine dose to start (e.g., following the onset of the acute gout attack or the first sign of a gout flare) followed by either: no additional colchicine doses within about 12, 24, 48, or 72 hours, or at least one additional colchicine dose within about 12 hours and no more frequently than once every hour and wherein each additional colchicine dose is no greater than about 0.6 mg, and wherein the patient ingests the colchicine as instructed.

The drug-drug interaction alert is preferably issued as one or both of a written warning on a display screen of the pharmacy management computer system, and a printed warning. The printed warning may be attached to or packaged with the dispensed prescription.

In one aspect, the identifier indicating that ketoconazole is being concomitantly administered to the patient is an identifier indicating that the second active agent is ketoconazole and is linked to at least one further identifier indicating that the ketoconazole is prescribed so that 200 mg of ketoconazole is to be ingested by the patient daily, in which case the dosing regimen for colchicine is preferably one about 0.6 mg colchicine dose to start, optionally followed by additional colchicine doses, e.g., 0, 1, 2, 3, or 4 additional colchicine doses within 24 hours of about 0.3 mg ingested every 1, 2, 3, 4, 5, 6, 7, 8, 9 10, 11, or 12 hours (e.g., every 2, 3, 4, 5, or 6 hours) after the preceding colchicine dose. In another embodiment, the identifier indicating that ketoconazole is being concomitantly administered to the patient is an identifier indicating that the second active agent is ketoconazole is linked to at least one further identifier, entered into a second computer readable storage medium in functional communication with a computer, the second storage medium being the same as or different from the first storage medium, and the further identifier indicating that the ketoconazole is prescribed so that about 200 mg of ketoconazole is to be ingested by the patient daily, in which case the colchicine dosing regimen is one about 0.6 mg colchicine dose to start, followed by an about 0.3 mg colchicine dose ingested every 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, or 12 hours (e.g., every six to eight hours) after the preceding colchicine dose. In one embodiment, the dosing regimen calls for the about 0.3 mg colchicine dose every six to eight hours. In another embodiment, the dosing regimen calls for one dose of the colchicine every eight to twelve hours.

In yet another preferred aspect, the identifier indicating that ketoconazole is being concomitantly administered to the patient is an identifier indicating that the second active agent is ketoconazole and is linked to at least one further identifier, entered into a second computer readable storage medium in functional communication with a computer, the second storage medium being the same as or different from the first storage medium, and the further identifier indicating that the ketoconazole is prescribed so that about 200 mg of ketoconazole is to be ingested by the patient daily and the dosing regimen is one about 0.3 mg colchicine dose to start, followed by an about 0.3 mg colchicine dose ingested every 2, 3, 4, 5, 6, 7, or 8 hours (e.g., every eight to twelve hours) after the preceding colchicine dose.

A preferred dosing regimen calls for ingestion of colchicine to be continued until a total of no more than 1.2 mg or 2.4 mg of colchicine has been ingested, after which ingestion of colchicine is to be stopped, e.g., for at least 2, 3, 4, 5, 6, or 7 days, or until a subsequent acute gout flare, or the first sign of a subsequent gout flare, occurs.

16

In another aspect, the identifier indicating that ritonavir is being concomitantly administered to the patient is an identifier indicating that the second active agent is ritonavir and is linked to at least one further identifier indicating that the ritonavir is prescribed so that 200 or 1200 mg of ritonavir is to be ingested by the patient daily, in which case the dosing regimen for colchicine is preferably one about 0.6 mg colchicine dose to start, optionally followed by additional colchicine doses, e.g., 0, 1, 2, 3, or 4 additional colchicine doses within 24 hours of about 0.3 mg ingested every 1, 2, 3, 4, 5, 6, 7, 8, 9 10, 11, or 12 hours (e.g., every 2, 3, 4, 5, or 6 hours) after the preceding colchicine dose. In another embodiment, the identifier indicating that ritonavir is being concomitantly administered to the patient is an identifier indicating that the second active agent is ritonavir is linked to at least one further identifier, entered into a second computer readable storage medium in functional communication with a computer, the second storage medium being the same as or different from the first storage medium, and the further identifier indicating that the ritonavir is prescribed so that about 1200 mg of ritonavir is to be ingested by the patient daily, in which case the colchicine dosing regimen is one about 0.6 mg colchicine dose to start, followed by an about 0.3 mg colchicine dose ingested every 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, or 12 hours (e.g., every six to eight hours) after the preceding colchicine dose. In one embodiment, the dosing regimen calls for the about 0.3 mg colchicine dose every six to eight hours. In another embodiment, the dosing regimen calls for one dose of the colchicine every eight to twelve hours.

In yet another aspect, the identifier indicating that ritonavir is being concomitantly administered to the patient is an identifier indicating that the second active agent is ritonavir and is linked to at least one further identifier, entered into a second computer readable storage medium in functional communication with a computer, the second storage medium being the same as or different from the first storage medium, and the further identifier indicating that the ritonavir is prescribed so that about 1200 mg of ritonavir is to be ingested by the patient daily and the dosing regimen is one about 0.3 mg colchicine dose to start, followed by an about 0.3 mg colchicine dose ingested every 2, 3, 4, 5, 6, 7, or 8 hours (e.g., every eight to twelve hours) after the preceding colchicine dose.

Also disclosed herein is a dosage adjustment method for administering colchicine to a patient to treat a medical condition, the patient concomitantly treated with a second active agent. The second active agent may be, for example, ritonavir, ketoconazole, cyclosporine, verapamil, or diltiazem. The method comprises determining a first colchicine dosing regimen (the colchicine dosing regimen suitable for administration in the absence of co-administration with a second active agent, which dosing regimen may consist of one or more doses of colchicine); and determining a second active agent dosing regimen; and administering the second active agent to the patient at the second active agent dosing regimen while concomitantly administering colchicine to the patient according to a second colchicine dosing regimen, which may consist of one or more reduced colchicine doses. The second colchicine dosing regimen is a fraction of the first colchicine dosing regimen, where the fraction is obtained by administering reduced colchicine doses or by reducing the frequency of colchicine doses, and wherein the fraction is less than or equal to about $\frac{2}{3}$ or less than or equal to about $\frac{1}{2}$ or less than or equal to about $\frac{1}{3}$.

According to this embodiment, upon the administering the second active agent to the patient at the second active agent dosing regimen while concomitantly administering colchicine to the patient at the second colchicine dosing regimen,

A351

US 7,964,648 B2

17                                                18

the therapeutic circulating level of colchicine is achieved in the patient. Preferably, the fraction is selected from $\frac{1}{12}$, $\frac{1}{6}$, $\frac{1}{4}$, $\frac{1}{3}$, $\frac{5}{12}$, and $\frac{1}{2}$, more preferably, the fraction is $\frac{1}{3}$ or $\frac{1}{2}$. In one embodiment, if the second colchicine dosing regimen comprises a "first" colchicine dose, and one or more "subsequent" colchicine doses, each subsequent colchicine dose may be the same as the first dose, or a fraction of the first dose. The fraction is selected from about $\frac{1}{12}$, about $\frac{1}{6}$, about $\frac{1}{4}$, about $\frac{1}{3}$, about $\frac{5}{12}$, about $\frac{1}{2}$, and about $\frac{7}{12}$, e.g., about $\frac{1}{2}$ or about $\frac{2}{3}$. In one example, the second colchicine dosing regimen is once-a-day, twice-a-day, three-times-a-day or four-times-a-day. In a variation of this example, the initial treatment day in, a second colchicine dosing regimen that lasts for more than one day, has one more dose administered than are administered each subsequent day.

Preferably the second active agent is selected from ketoconazole, cyclosporine, ritonavir, verapamil, or diltiazem. The specific conditions are selected from gout, FMF, thrombocytopenic purpura, and Behçet's disease. In one embodiment, the gout is an acute gout flare and the colchicine treatment schedule is an acute treatment schedule adapted for treatment of acute gout flares, or the gout is chronic gout, and the colchicine treatment schedule is a chronic treatment schedule adapted for prophylaxis, or prevention, of flares. In another embodiment, the fraction of colchicine administered to the patient concomitantly with a second active agent that is a CYP3A4 or P-gp inhibitor is $\frac{1}{3}$ or $\frac{1}{2}$ the original intended amount of colchicine and treatment with colchicine is initiated subsequent to or at the same time as initiation of treatment with the second active agent.

Colchicine is one of the most widely used drugs for treating familial Mediterranean fever (FMF). It has been reported that 5-10% of FMF patients do not show a beneficial response to colchicine administration. A polymorphism in the ABCB1 gene, the "ABCB1 3435 C to T polymorphism" has been reported to correlate with this lack of response to colchicine treatment, with patients with the homozygous TT genotype exhibiting the most pronounced "non-responder" phenotypes.

Accordingly, in another aspect, provided herein is a method for treating a patient suffering from FMF, which patient is a colchicine non-responder. Preferably, the patient is homozygous for the TT genotype of the ABCB1 3435 C to T polymorphism. The method entails the concomitant administration of a P-gp inhibitor and colchicine to the patient. Exemplary P-gp inhibitors include ketoconazole and ritonavir. Preferred dosages of the P-gp inhibitor for this purpose correspond to those called for in the prescribing information for the drug in question. For ketoconazole, an exemplary dosage is 200 mg per day. For ritonavir, an exemplary dosage is 200 or 1200 mg per day. Specific colchicine dosing regimens for this purpose are the same as used for treatment of FMF in responders, though the doses of colchicine administered may be increased as tolerated, e.g., up to two to three times the typical doses.

The following examples further illustrate aspects of this disclosure but should not be construed as in any way limiting its scope. In particular, the conditions are merely exemplary and can be readily varied by one of ordinary skill in the art.

EXAMPLES

Example 1

Pharmacokinetic Study in Healthy Adults of Single vs. Multiple Oral Doses of Colchicine Tablets

This study was a single-center, open-label, single-sequence, two-period study to evaluate the pharmacokinetic profile of colchicine following single and multiple oral doses of colchicine tablets, 0.6 mg, in healthy volunteers.

In Period 1, study subjects received a 0.6-mg dose of colchicine after an overnight fast of at least 10 hours. In Period 2, subjects received a 0.6 mg dose of colchicine in the morning and the evening (approximately 12 hours later) for 10 days (steady state regimen). Subjects received a light breakfast served 60 minutes following dose administration in the morning and the evening dose was administered 90 minutes after an evening meal on Days 15 through 24 only. On Day 25, the colchicine dose was administered after an overnight fast of at least 10 hours and lunch was served 4 hours post-dose. Study periods were separated by a 14-day washout. Following the single dose and the last dose of the multiple dose regimen (beginning on the mornings of Day 1 and Day 25, respectively), blood samples were collected (6 mL each) from each subject within 1 hour prior to dosing and after dose administration at study hours 0.5, 1, 1.5, 2, 3, 4, 6, 8, 10, 12, and 24 (while confined) and 36, 48, 72, and 96 (on an outpatient basis). Plasma concentrations of colchicine and its metabolites were determined using validated LC/MS-MS methods.

Thirteen healthy, non-smoking subjects with a mean age of 25.5 years (range 19 to 38 years) and within 15% of ideal body weight were enrolled in this study. All subjects completed both dosing periods according to protocol.

After a single dose, plasma concentrations are no longer quantifiable 24 hours post-dose in all but 1 subject. After the last dose of the steady state regimen, concentrations remained quantifiable for 48 to 72 hours. Review of individual subject data shows that no subject experienced a secondary colchicine peak, either following a single dose or upon multiple dosing.

All 2-O-demethylcolchicine (2-DMC) concentrations were below the level of quantitation (LOQ, 0.2 ng/mL) and only one sample from 1 subject (of 13 subjects) had a detectable 3-O-demethylcolchiine (3-DMC) concentration, which was near the level of quantitation. Therefore, metabolites are not discussed further.

In healthy adults, colchicine appears to be readily absorbed when given orally, reaching a mean maximum plasma concentration of 2.5 ng/mL in 1.5 hours after a single dose. The drug is distributed widely, with an apparent volume of distribution of 540 L, greatly exceeding total body water. The elimination half-life as calculated following a single oral dose is approximately 5 hours. Levels were not detectable by 24 hours post-dose and this is therefore not an accurate estimate. Pharmacokinetic parameter values are summarized in the table below.

Review of trough plasma concentrations indicates that steady state was attained by approximately the eighth day of dosing for most subjects. Colchicine may have a diurnal variation reflected in the observed Cmin concentrations at steady state. Cmin concentrations prior to the morning dose are approximately 12% higher than the Cmin concentrations prior to the evening dose (Day 23 and Day 24). The mean Cmin concentration observed on Day 25 was 0.907 ng/ml..

Colchicine accumulated following administration of multiple doses to an extent greater than expected. Exposure was nearly two-fold higher (approximately 1.7 based on AUC [Day 25 $AUC_{0-\tau}$/Day 1 $AUC_{0-\infty}$] and approximately 1.5 based on Cmax [Day 25 $C_{max}$/Day 1 $C_{max}$]). This observation could be attributable to an underestimation of AUC∞ following a single dose. With the higher plasma levels that occur with repeated dosing, a longer terminal elimination half life is apparent, 26.6 hours. Pharmacokinetic parameter values are summarized in Tables 3-5.

A352

US 7,964,648 B2

**19**

**20**

TABLE 3

Colchicine Pharmacokinetic Parameter Values Following Administration
of A Single Oral Dose of Colchicine 0.6 mg in Healthy Adults (N = 13)

| | MEAN | STDEV | % CV | MEDIAN | MIN | MAX |
|---|---|---|---|---|---|---|
| $AUC_{0-t}$ (pg-hr/mL) | 10494.66 | 3544.08 | 33.77 | 10560.90 | 4812.88 | 18091.85 |
| $AUC_{0-inf}$ (pg-hr/mL) | 12268.18 | 4422.08 | 36.05 | 11451.45 | 7252.66 | 23801.68 |
| $C_{max}$ (pg/mL) | 2450.15 | 702.11 | 28.66 | 2480.00 | 1584.00 | 3977.00 |
| $T_{max}$ (hr) | 1.50 | 0.54 | 36.00 | 1.50 | 1.00 | 3.00 |
| $K_{el}$ (1/hr) | 0.1829 | 0.0592 | 32.38 | 0.1992 | 0.0359 | 0.2443 |
| $T_{1/2}$ (hr) | 4.95 | 4.43 | 89.54 | 3.48 | 2.84 | 19.29 |

TABLE 4

Colchicine Pharmacokinetic Parameter Values Following Administration of Multiple
(b.i.d.) Oral Doses of Colchicine 0.6 mg in Healthy Adults (N = 13)

| | MEAN | STDEV | % CV | MEDIAN | MIN | MAX |
|---|---|---|---|---|---|---|
| $AUC_{0-t}$ (pg-hr/mL) | 43576.96 | 9333.26 | 21.42 | 41925.10 | 29328.78 | 58265.35 |
| $AUC_{0-\tau}$ (pg-hr/mL) | 20366.61 | 3322.12 | 16.31 | 20423.08 | 13719.18 | 25495.25 |
| $AUC_{0-inf}$ (pg-hr/mL) | 54198.77 | 9214.54 | 17.00 | 54113.43 | 37599.76 | 67944.65 |
| $C_{max}$ (pg/mL) | 3553.15 | 843.45 | 23.74 | 3734.00 | 1977.00 | 4957.00 |
| $C_{min}$ (pg/mL) | 906.51 | 152.19 | 16.79 | 903.50 | 636.23 | 1149.67 |
| $C_{ave}$ (pg/mL) | 1697.22 | 276.84 | 16.31 | 1701.92 | 1143.26 | 2124.60 |
| $T_{max}$ (hr) | 1.31 | 0.60 | 45.61 | 1.00 | 0.50 | 3.00 |
| $K_{el}$ (1/hr) | 0.0267 | 0.0044 | 16.34 | 0.0261 | 0.0206 | 0.0333 |
| $T_{1/2}$ (hr) | 26.60 | 4.33 | 16.26 | 26.51 | 20.82 | 33.65 |

TABLE 5

Mean (% CV) Colchicine Pharmacokinetic Parameter
Values Following Administration of Single and Multiple
(b.i.d.) Oral Doses of Colchicine 0.6 mg in Healthy Adults

| | Vd/F (L) | CL/F (L/hr) |
|---|---|---|
| Colchicine 0.6-mg Single Dose (N = 13) | | |
| Day 1 | 341 (54.4) | 54.1 (31.0) |
| Colchicine 0.6 mg b.i.d. × 10 days | | |
| Day 25 | 1150 (18.73) | 30.3 (19.0) |

CL = Dose/AUC$_{0-t}$ (Calculated from mean values)
Vd = CL/Ke (Calculated from mean values)

In tables, the parameter CL/F denotes the apparent total body clearance after administration, calculated as Total Dose/Total AUC0-$_{\tau au}$; and V$_d$/F denotes the apparent total volume of distribution after administration, calculated as Total Dose/(Total AUC$_\infty$×K$_{el}$). FIG. 1 shows mean colchicine plasma concentrations following administration of single and multiple oral doses of colchicine 0.6 mg in healthy adults.

Example 2

Clinical Drug-Drug Interaction Study of Colchicine and Clarithromycin

A single-center, open-label, one sequence, two-period study was carried out in 23 healthy subjects. On Day 1, a single 0.6-mg dose of colchicine was administered. After completing a 21-day washout period, all subjects received 250 mg of clarithromycin administered twice daily for 7 days (Days 22 through 29), a sufficient dose and duration to inhibit CYP3A4 and Pgp. On the final day (Day 29), a single dose of colchicine was co-administered with the clarithromycin dose. When combined with steady-state clarithromycin, there is a significant increase in exposure to colchicine as compared to when colchicine is given alone: the mean $C_{max}$ and AUC$_{0-t}$ concentrations increased 167% and 250%, respectively. In addition, co-administration of clarithromycin and colchicine resulted in an increase of 233% in the plasma elimination half-life (t/2) of colchicine and a 75% decrease in apparent clearance (CL/F). A summary of the mean (% CV) colchicine pharmacokinetic parameters for Day 1 (colchicine administered alone) and Day 29 (colchicine co-administered with steady-state clarithromycin) are given in the table below and illustrated in Table 5.

US 7,964,648 B2

| 21 | 22 |

**TABLE 6**

Comparison of Single-Dose Colchicine (0.6 mg, Alone) and
Single-Dose Colchicine (0.6 mg) Co-Administered with
Steady-State Clarithromycin in Healthy Adults

| | Arithmetic Mean (% CV) | |
| Parameter (units) | Colchicine (N = 23) | Colchicine + Clarithromycin (N = 23) |
|---|---|---|
| $AUC_{0-t}$ (ng · hr/mL) | 12.37 (37.64) | 41.95 (23.31) |
| $AUC_{0-inf}$ (ng · hr/mL) | 15.53 (49.6) | 52.62 (22.84) |
| $C_{max}$ (ng/mL) | 2.84 (30.97) | 8.44 (17.63) |
| $T_{max}$ (hr)* | 1.50 (0.50-2.00) | 1.00 (0.50-2.00) |
| CL/F (L/hr) | 46.8 (43.68) | 12.0 (23.75) |

FIG. 2 shows a pharmacokinetic profile comparison of single-dose colchicine (0.6 mg, alone) and single-dose colchicine (0.6 mg) co-administered with steady-state clarithromycin in healthy adults. Based on the foregoing data, it is concluded that the dose of colchicine co-administered with clarithromycin should be reduced by ⅔.

Example 3

Clinical Drug-Drug Interaction Study of Colchicine and Cyclosporine

This study was an open-label, non-randomized, single-center, one-sequence, two-period drug interaction study conducted in healthy male and female volunteers. Twenty-four (24) non-smoking, non-obese adult volunteers were enrolled. All subjects were dosed and studied as a single cohort, with each subject receiving the same treatment in a non-randomized fashion.

A single dose of colchicine, 0.6 mg, was administered alone on Day 1, and then co-administered with cyclosporine on Day 15. Cyclosporine was administered as a single-dose (1×100 mg capsule) on the morning of Day 15. A 14 day washout period was completed after the first colchicine dose on Day 1 and prior to the co-administration of colchicine and cyclosporine doses on Days 15.

Serial blood samples were collected by individual venipuncture up to 96 hours following drug administration on Day 1 and Day 15. Blood samples for determination of colchicine plasma concentrations were obtained at time zero (pre-dose) and after dose administration at 0.5, 1.0, 1.5, 2, 3, 4, 5, 6, 8, 12, and 24 hours post-dose on a confined basis. Subjects were then return to the clinic on a non-confined basis for continued blood sampling collection at 36, 48, 72, and 96 hours post-dose administration on Days 2-5 (Period 1) and Days 16-19 (Period 2). Cyclosporine plasma concentrations were not measured.

**TABLE 7**

Comparison of Single-Dose Colchicine (0.6 mg, Alone) and
Single-Dose Colchicine (0.6 mg) Co-Administered with
Steady-State Cyclosporine in Healthy Adults

| | Arithmetic Mean (% CV) | |
| Parameter (units) | Colchicine (N = 23) | Colchicine + Cyclosporine (N = 23) |
|---|---|---|
| $AUC_{0-t}$ (ng · hr/mL) | 12.55 | 39.83 |
| $AUC_{0-inf}$ (ng · hr/mL) | 15.00 | 47.31 |
| $C_{max}$ (ng/mL) | 2.72 | 8.82 |

**TABLE 7-continued**

Comparison of Single-Dose Colchicine (0.6 mg, Alone) and
Single-Dose Colchicine (0.6 mg) Co-Administered with
Steady-State Cyclosporine in Healthy Adults

| | Arithmetic Mean (% CV) | |
| Parameter (units) | Colchicine (N = 23) | Colchicine + Cyclosporine (N = 23) |
|---|---|---|
| $T_{max}$ (hr)* | 1.15 | 1.13 |
| CL/F (L/hr) | 48.24 | 13.42 |

FIG. 3 shows a pharmacokinetic profile comparison of single-dose colchicine (0.6 mg, alone) and single-dose colchicine (0.6 mg) co-administered with steady-state clarithromycin and steady-state cyclosporine in healthy adults. Based on the foregoing data, the dose of colchicine co-administered with cyclosporine should be reduced by approximately ½ to ¾.

Example 4

Clinical Drug-Drug Interaction Study of Colchicine and Ritonavir

An open-label, non-randomized, single-center, one-sequence, two-period drug interaction study was conducted in healthy male and female volunteers; there will be a 14-day washout between the two periods. Twenty-four (24) non-smoking non-obese adult volunteers were enrolled. All subjects were dosed and studied as a single cohort, with each subject receiving the same treatment in a non-randomized fashion.

All subjects received a single 0.6-mg dose of colchicine on Day 1 administered under standard fasting conditions, followed by a 14-day washout period completed on an outpatient basis. At discharge on Day 2, study subjects were instructed to return to the clinical site on the mornings and evenings of Days 15 through 18 to receive two daily dosage amounts of ritonavir (1×100 mg ritonavir capsule twice daily (every 12 hours) on Days 15-18) in a 'directly-observed' fashion; after taking the first dose of ritonavir, subjects remained in the clinic for observation for 1 hour post-dose administration on Day 15. On the evening of Day 18, study participants remained at the clinic for their final study confinement period. In the morning on Day 19, study subjects received a single 0.6 mg colchicine dose with a single 100 mg ritonavir dose and study subjects received the final 100 mg ritonavir dose 12 hours later in the evening on Day 19 under standard fasting conditions.

Serial blood samples were collected by individual venipuncture up to 96 hours following drug administration on Day 1 and Day 19. Blood samples for determination of colchicine plasma concentrations were obtained at time zero (pre-dose) and after dose administration at 0.5, 1.0, 1.5, 2, 3, 4, 5, 6, 8, 12, and 24 hours post-dose on an inpatient basis. Subjects returned to the clinic on an outpatient basis for continued blood sampling collection at 36, 48, 72, and 96 hours post-dose administration. Ritonavir plasma concentrations were not measured.

US 7,964,648 B2

**23**

TABLE 8

Comparison of Single-Dose Colchicine (0.6 mg, Alone) and
Single-Dose Colchicine (0.6 mg) Co-Administered with
Steady-State Ritonavir in Healthy Adults: In-transformed data

|  | Colchicine Alone | Colchicine + Ritonavir | % Ratio |
|---|---|---|---|
| $C_{max}$ (pg/mL), geometric mean | 1798.37 | 4835.39 | 268.88 |
| $AUC_{0-t}$ (pg · h/mL), geometric mean | 7642.71 | 27795.08 | 363.65 |
| $AUC_{\infty}$ (pg · h/mL), geometric mean | 9551.74 | 33771.36 | 353.56 |

TABLE 9

Comparison of Single-Dose Colchicine (0.6 mg, Alone) and
Single-Dose Colchicine (0.6 mg) Co-Administered with
Steady-State Ritonavir in Healthy Adults

|  | Arithmetic Mean (% CV) Median (Range) for $T_{max}$ | |
|---|---|---|
| Parameter (units) | Colchicine + Ritonavir (N = 18) | Colchicine Alone (N = 18) |
| $AUC_{0-t}$ (ng · hr/mL) | 29.05 (30.76) | 8.41 (47.46) |
| $AUC_{0-\infty}$ (ng · hr/mL) | 35.28 (29.79) | 10.41 (45.48) |
| $C_{max}$ (ng/mL) | 4.99 (25.18) | 1.87 (28.19) |
| $T_{max}$ (hr) | 1.5 (1-1.5) | 1 (0.5-1.5) |
| CL/F (L/hr) | 18.59 (31.58) | 67.93 (39.47) |

Following exposure to 100 mg b.i.d. ×5 days, there was a significant increase in exposure to a single 0.6-mg colchicine (approximately 245%). Mean peak colchicine concentration increased by approximately 170%. Total apparent oral clearance was decreased by 70% with co-administration. $T_{max}$ is not affected. Elimination half-life could not be estimated accurately as plasma concentrations were not quantifiable after 24 hours.

FIG. 4 shows a pharmacokinetic profile comparison of single-dose colchicine (0.6 mg, alone) and single-dose colchicine (0.6 mg) co-administered with steady-state ritonavir and steady-state ketoconazole in healthy adults. Based on the foregoing data, the dose of colchicine co-administered with ritonavir should be reduced by approximately ½.

Example 5

Clinical Drug-Drug Interaction Study of Colchicine and Ketoconazole

This study was an open-label, non-randomized, single-center, one-sequence, two-period drug interaction study conducted in healthy male and female volunteers; there will be a 14-day washout between the two periods. Twenty-four (24) non-smoking, non-obese adult volunteers were enrolled.

A single dose of colchicine, 0.6 mg, was administered alone on Day 1, and then co-administered with ketoconazole on Day 19 (AM dose). Ketoconazole was administered for 5 consecutive days [200 mg twice daily (every 12 hours)] beginning on the morning of Day 15, with the last 200 mg ketoconazole dose administered on the evening on Day 19. Total study participation, exclusive of up to 28 days of screening, was approximately 24 days, during which subjects will be confined on two occasions for a total confinement of approximately 3 days.

**24**

Serial blood samples were collected by individual venipuncture up to 96 hours following drug administration on Day 1 and Day 19. Blood samples for determination of colchicine plasma concentrations were obtained at time zero (pre-dose) and after dose administration at 0.5, 1.0, 1.5, 2, 3, 4, 5, 6, 8, 12, and 24 hours post-dose on an inpatient basis. Subjects then returnee to the clinic on an outpatient basis for continued blood sampling collection at 36, 48, 72, and 96 hours postdose administration. Ketoconazole plasma concentrations were not measured.

TABLE 10

Comparison of Single-Dose Colchicine (0.6 mg, Alone)
and Single-Dose Colchicine (0.6 mg) Co-Administered
with Steady-State Ketoconazole in Healthy Adults:
In-transformed data

|  | Colchicine Alone | Colchicine + Ketoconazole | % Ratio |
|---|---|---|---|
| $C_{max}$ (pg/mL), geometric mean | 2598.28 | 5078.50 | 195.46 |
| $AUC_{0-t}$ (pg · h/mL), geometric mean | 11087.99 | 33223.80 | 299.64 |
| $AUC_{\infty}$ (pg · h/mL), geometric mean | 13185.92 | 42143.00 | 319.61 |

TABLE 11

Comparison of Single-Dose Colchicine (0.6 mg, Alone) and
Single-Dose Colchicine (0.6 mg) Co-Administered with
Steady-State Ketoconazole in Healthy Adults

|  | Arithmetic Mean (% CV) | |
|---|---|---|
| Parameter (units) | Colchicine (N = 23) | Colchicine + Ketoconazole (N = 23) |
| $AUC_{0-t}$ (ng · hr/mL) | 11988.61 | 34382.82 |
| $AUC_{0-inf}$ (pg · h/mL) | 14314.09 | 43688.90 |
| $C_{max}$ (pg/mL) | 2779.08 | 5266.92 |
| $T_{max}$ (hr)* | 1.00 | 1.02 |
| CL/F (L/hr) | 49301.09 | 14797.94 |

*Median (Range) for $T_{max}$

Following administration of ketoconazole 200 mg b.i.d. ×5 days, there was a significant increase in exposure to a single oral dose of colchicine 0.6 mg ($C_{max}$ and $AUC_{0-t}$ increased by 90% and 190%, respectively, and $AUC_{\infty}$ increased by about 205%). Total apparent oral clearance decreased by 70% with co-administration. Elimination half-life could not be estimated accurately as plasma concentrations were not quantifiable after 24 hours.

FIG. 4 shows a pharmacokinetic profile comparison of single-dose colchicine (0.6 mg, alone) and single-dose colchicine (0.6 mg) co-administered with steady-state ritonavir and steady-state ketoconazole in healthy adults. Based on the foregoing data, the dose of colchicine co-administered with ketoconazole should be reduced by approximately ½.

Example 6

Clinical Drug-Drug Interaction Study of Colchicine and Azithromycin

This study was an open-label, non-randomized, single-center, one-sequence, two-period drug interaction study conducted in healthy male and female volunteers; there was a

US 7,964,648 B2

25 26

14-day washout between the two periods. Twenty-four (24) non-smoking adult volunteers were enrolled. All subjects were dosed and studied as a single cohort, with each subject receiving the same treatment in a non-randomized fashion.

A single dose of colchicine, 0.6 mg, was administered alone on Day 1, and then co-administered with the azithromycin on Day 19. Azithromycin was administered for 5 consecutive days (2×250 mg once daily [Day 15 only] and then 1×250 mg once daily Days 16-19) beginning on the morning of Day 15, with the last 250 mg azithromycin dose administered on the morning on Day 19. Total study participation, exclusive of up to 28 days of screening, was approximately 24 days, during which subjects were confined on two occasions for a total confinement of approximately 3 days.

Serial blood samples were collected by individual venipuncture up to 96 hours following drug administration on Day 1 and Day 19. Blood samples for determination of colchicine plasma concentrations were obtained at time zero (pre-dose) and after dose administration at 0.5, 1.0, 1.5, 2, 3, 4, 5, 6, 8, 12, and 24 hours post-dose on an inpatient basis. Subjects returned to the clinic on an outpatient basis for continued blood sampling collection at 36, 48, 72, and 96 hours post-dose administration. Azithromycin plasma concentrations were not measured.

TABLE 12

Comparison of Single-Dose Colchicine (0.6 mg, Alone) and
Single-Dose Colchicine (0.6 mg) Co-Administered with
Steady-State Azithromycin in Healthy Adults

| | Colchicine Alone | Colchicine + Azithromycin | % Ratio |
|---|---|---|---|
| $C_{max}$ (pg/mL), geometric mean | 2535.94 | 2856.22 | 112.63 |
| $AUC_{0-t}$ (pg · hr/mL), geometric mean | 10971.51 | 16090.52 | 146.66 |
| $AUC_\infty$ (pg · hr/mL), geometric mean | 12931.80 | 18312.83 | 141.61 |

TABLE 13

Comparison of Single-Dose Colchicine (0.6 mg, Alone) and
Single-Dose Colchicine (0.6 mg) Co-Administered with
Steady-State Azithromycin in Healthy Adults

| | Arithmetic Mean (% CV) Median (Range) for $T_{max}$ | |
|---|---|---|
| Parameter (units) | Colchicine + Azithromycin (N = 21) | Colchicine Alone (N = 21) |
| $AUC_{0-t}$ (ng · hr/mL) | 17.16 (37.78) | 11.98 (45.81) |
| $AUC_{0-\infty}$ (ng · hr/mL) | 19.61 (39.15) | 14.13 (46.73) |
| $C_{max}$ (ng/mL) | 3.05 (39.54) | 2.74 (41.52) |
| $T_{max}$ (hr) | 1.5 (0.5-3) | 1.0 (0.5-3) |
| $t_{1/2}$ (hr) | 6.71 (68.34)[†] | 6.07 (66.15)[§] |
| CL/F (L/hr) | 35.01 (37.26) | 50.24 (40.31) |

Following administration of azithromycin 500 mg on Day 1 followed by 250 mg×4 days, exposure to colchicine is increased (approximately 46% for $AUC_{0-t}$ and approximately 40% for $AUC_{0-\infty}$). Mean peak colchicine concentration increased by approximately 12% and total apparent oral clearance decreased approximately 30% with co-administration. $T_{max}$ was not affected.

FIG. 5 shows a pharmacokinetic profile comparison of single-dose colchicine (0.6 mg, alone) and single-dose colchicine (0.6 mg) co-administered with steady-state azithromycin and steady-state diltiazem in healthy adults.

Example 7

Clinical Drug-Drug Interaction study of Colchicine and Diltiazem

This study was an open-label, non-randomized, single-center, one-sequence, two-period drug interaction study conducted in healthy male and female volunteers. Twenty-four (24) non-smoking, non-obese adult volunteers were enrolled. All subjects were dosed and studied as a single cohort, with each subject receiving the same treatment in a non-randomized fashion.

As single dose of colchicine, 0.6 mg, was administered alone on Day 1, and then co-administered with diltiazem ER on Day 21. Diltiazem ER was administered for 7 consecutive days (1×240 mg capsule once daily on Days 15-21) beginning on the morning of Day 15, with the last 240 mg diltiazem ER dose administered on the morning on Day 21. A 14-day washout period was completed after the first colchicine dose on Day 1 and prior to the administration of the first diltiazem ER dose on Day 15.

Serial blood samples were collected by individual venipuncture up to 96 hours following drug administration on Day 1 and Day 21. Blood samples for determination of colchicine plasma concentrations were obtained at time zero (pre-dose) and after dose administration at 0.5, 1.0, 1.5, 2, 3, 4, 5, 6, 8, 12, and 24 hours post-dose on an inpatient basis. Subjects returned to the clinic on an outpatient basis for continued blood sampling collection at 36, 48, 72, and 96 hours post-dose administration. Diltiazem plasma concentrations were not measured.

TABLE 14

Comparison of Single-Dose Colchicine (0.6 mg, Alone) and
Single-Dose Colchicine (0.6 mg) Co-Administered with
Steady-State Diltiazem in Healthy Adults

| | Colchicine Alone | Colchicine + Diltiazem | % Ratio |
|---|---|---|---|
| $C_{max}$ (pg/mL), geometric mean | 2006.42 | 2583.22 | 128.75 |
| $AUC_{0-t}$ (pg · h/mL), geometric mean | 9154.55 | 15740.37 | 171.94 |
| $AUC_\infty$ (pg · h/mL), geometric mean | 11022.30 | 19902.98 | 180.57 |

TABLE 15

Comparison of Single-Dose Colchicine (0.6 mg, Alone) and
Single-Dose Colchicine (0.6 mg) Co-Administered with
Steady-State Diltiazem in Healthy Adults

| | Arithmetic Mean (% CV) Median (Range) for $T_{max}$ | |
|---|---|---|
| Parameter (units) | Colchicine + Diltiazem (N = 20) | Colchicine Alone (N = 20) |
| $AUC_{0-t}$ (ng · hr/mL) | 17.73 | 10.04 |
| $AUC_{0-\infty}$ (ng · hr/mL) | 22.49 | 12.03 |
| $C_{max}$ (ng/mL) | 2.80 | 2.17 |
| $T_{max}$ (hr) | 1.48 | 1.15 |
| $t_{1/2}$ (hr) | 12.50 | 5.51 |
| CL/F (L/hr) | 463.49 | 395.83 |

27

FIG. **5** shows a pharmacokinetic profile comparison of single-dose colchicine (0.6 mg, alone) and single-dose colchicine (0.6 mg) co-administered with steady-state azithromycin and steady-state diltiazem in healthy adults.

### Example 8

### Clinical Drug-Drug Interaction Study of Colchicine and Verapamil

This study was an open-label, non-randomized, single-center, one-sequence, two-period drug interaction study conducted in healthy male and female volunteers. Twenty-four (24) non-smoking, non-obese adult volunteers were enrolled. All subjects were dosed and studied as a single cohort, with each subject receiving the same treatment in a non-randomized fashion.

A single dose of colchicine, 0.6 mg, was administered alone on Day 1, and then co-administered with verapamil HCl ER on Day 19. Verapamil HCl ER was administered for 5 consecutive days ($1 \times 240$ mg tablet once daily on Days 15-19) beginning on the morning of Day 15, with the last 240 mg verapamil HCl ER dose administered on the morning on Day 19. A 14-day washout period was completed after the first colchicine dose on Day 1 and prior to the administration of the first verapamil HCL ER dose on Day 15.

Serial blood samples were collected by individual venipuncture up to 96 hours following drug administration on Day 1 and Day 19. Blood samples for determination of colchicine plasma concentrations were obtained at time zero (pre-dose) and after dose administration at 0.5, 1.0, 1.5, 2, 3, 4, 5, 6, 8, 12, and 24 hours post-dose on a confined basis. Subjects returned to the clinic on a non-confined basis for continued blood sampling collection at 36, 48, 72, and 96 hours post-dose administration on Days 2-5 (Period 1) and Days 20-23 (Period 2). Verapamil plasma concentrations were not measured.

#### TABLE 16

Comparison of Single-Dose Colchicine (0.6 mg, Alone) and Single-Dose Colchicine (0.6 mg) Co-Administered with Steady-State Verapamil in Healthy Adults

| | Colchicine Alone | Colchicine + Verapamil | % Ratio |
|---|---|---|---|
| $C_{max}$ (pg/mL), geometric mean | 2768.77 | 3639.68 | 131.45 |
| $AUC_{0-t}$ (pg · h/mL), geometric mean | 12256.40 | 23889.21 | 194.94 |
| $AUC_{\infty}$ (pg · h/mL), geometric mean | 14415.79 | 29556.75 | 205.03 |

#### TABLE 17

Comparison of Single-Dose Colchicine (0.6 mg, Alone) and Single-Dose Colchicine (0.6 mg) Co-Administered with Steady-State Verapamil in Healthy Adults

| Parameter (units) | Arithmetic Mean (% CV) Median (Range) for $T_{max}$ | |
|---|---|---|
| | Colchicine + Verapamil (N = 24) | Colchicine Alone (N = 24) |
| $AUC_{0-t}$ (ng · hr/mL) | 24.64 | 13.09 |
| $AUC_{0-\infty}$ (ng · hr/mL) | 30.59 | 15.37 |
| $C_{max}$ (ng/mL) | 3.85 | 2.97 |
| $T_{max}$ (hr) | 1.15 | 1.22 |

28

#### TABLE 17-continued

Comparison of Single-Dose Colchicine (0.6 mg, Alone) and Single-Dose Colchicine (0.6 mg) Co-Administered with Steady-State Verapamil in Healthy Adults

| Parameter (units) | Arithmetic Mean (% CV) Median (Range) for $T_{max}$ | |
|---|---|---|
| | Colchicine + Verapamil (N = 24) | Colchicine Alone (N = 24) |
| $t_{1/2}$ (hr) | 17.17 | 6.24 |
| CL/F (L/hr) | 21.01 | 43.93 |

Recitation of ranges of values herein are merely intended to serve as a shorthand method of referring individually to each separate value falling within the range, unless otherwise indicated herein, and each separate value is incorporated into the specification as if it were individually recited herein. The endpoints of all ranges directed to the same component or property are inclusive and independently combinable.

All methods described herein can be performed in a suitable order unless otherwise indicated or clearly contradicted by context. The use of any and all examples, or exemplary language (e.g., "such as") herein is intended to better illuminate the disclosure and is non-limiting unless otherwise specified. No language in the specification should be construed as indicating that any non-claimed element as essential to the practice of the claimed embodiments. Unless defined otherwise, technical and scientific terms used herein have the same meaning as is commonly understood by one of skill in the art to which this disclosure belongs. The terms wt %, weight percent, percent by weight, etc. are equivalent and interchangeable.

In the specification and claims that follow, references will be made to a number of terms which shall be defined to have the following meaning.

The terms "a" and "an" do not denote a limitation of quantity, but rather denote the presence of at least one of the referenced item. The term "or" means "and/or". The terms "comprising", "having", "including", and "containing" are to be construed as open-ended terms (i.e., meaning "including, but not limited to").

"Concomitant" and "concomitantly" as used herein refer to the administration of at least two drugs to a patient either simultaneously or within a time period during which the effects of the first administered drug are still operative in the patient. Thus, if the first drug is, e.g., clarithromycin and the second drug is colchicine, the concomitant administration of the second drug can occur as much as one to two weeks, preferably within one to seven days, after the administration of the first drug. This is because clarithromycin can exert a long-lasting inhibition of CYP3A isozymes so that CYP3A activity in the patient may not return to pre-clarithromycin-administration levels for as much as two weeks after the cessation of clarithromycin administration. If colchicine is the first drug, administration of a second drug would be concomitant if done within 1 to 2 days, preferably 12 to 24 hours.

A "dose" means the measured quantity of a drug to be taken at one time by a patient.

A "dosage amount" means an amount of a drug suitable to be taken during a fixed period, usually during one day (i.e. daily). A "daily dosage amount" is the total dosage amount taken in one day, that is, a 24 hour period.

"Dosing regimen" means the dose of a drug taken at a first time by a patient and the interval (time or symptomatic) and

US 7,964,648 B2

29

dosage amounts at which any subsequent doses of the drug are taken by the patient. Each dose may be of the same or different.

A "patient" means a human or non-human animal in need of medical treatment. Medical treatment can include treatment of an existing condition, such as a disease or disorder, prophylactic or preventative treatment, or diagnostic treatment. In preferred embodiments the patient is human.

"Providing" means giving, administering, selling, distributing, transferring (for profit or not), manufacturing, compounding, or dispensing.

"Risk" means the probability or chance of adverse reaction, injury, or other undesirable outcome arising from a medical treatment. An "acceptable risk" means a measure of the risk of harm, injury, or disease arising from a medical treatment that will be tolerated by an individual or group. Whether a risk is "acceptable" will depend upon the advantages that the individual or group perceives to be obtainable in return for taking the risk, whether they accept whatever scientific and other advice is offered about the magnitude of the risk, and numerous other factors, both political and social. An "acceptable risk" of an adverse reaction means that an individual or a group in society is willing to take or be subjected to the risk that the adverse reaction might occur since the adverse reaction is one whose probability of occurrence is small, or whose consequences are so slight, or the benefits (perceived or real) of the active agent are so great. An "unacceptable risk" of an adverse reaction means that an individual or a group in society is unwilling to take or be subjected to the risk that the adverse reaction might occur upon weighing the probability of occurrence of the adverse reaction, the consequences of the adverse reaction, and the benefits (perceived or real) of the active agent. "At risk" means in a state or condition marked by a high level of risk or susceptibility.

Pharmacokinetic parameters referred to herein describe the in vivo characteristics of drug (or a metabolite or a surrogate marker for the drug) over time. These include plasma concentration (C), as well as $C_{max}$, $C_0$, $C_{24}$, $T_{max}$, and AUC. "$C_{max}$" is the measured plasma concentration of the active agent at the point of maximum, or peak, concentration. "$C_{min}$" is the measured plasma concentration of the active agent at the point of minimum concentration. "$C_0$" is the measured plasma concentration of the active agent at about n hours after administration. "$C_{24}$" is the measured plasma concentration of the active agent at about 24 hours after administration. The term "$T_{max}$" refers to the time from drug administration until $C_{max}$ is reached. "AUC" is the area under the curve of a graph of the measured plasma concentration of an active agent vs. time, measured from one time point to another time point. For example $AUC_{0-t}$ is the area under the curve of plasma concentration versus time from time 0 to time t, where time 0 is the time of initial administration of the drug. Time t can be the last time point with measurable plasma concentration for an individual formulation. The $AUC_{0-\infty}$, $AUC_\infty$ or $AUC_{0-inf}$ is the calculated area under the curve of plasma concentration versus time from time 0 to time infinity. In steady-state studies, $AUC_{0-\tau}$ is the area under the curve of plasma concentration over the dosing interval (i.e., from time 0 to time τ (tau), where tau is the length of the dosing interval. Other pharmacokinetic parameters are the parameter $K_e$ or $K_{el}$ the terminal elimination rate constant calculated from a semi-log plot of the plasma concentration versus time curve; $t_{1/2}$ the terminal elimination half-life, calculated as $0.693/K_{el}$. CL/F denotes the apparent total body clearance after administration, calculated as Total Dose/Total $AUC_\infty$; and $V_{area}/F$ denotes the apparent total volume of distribution after administration, calculated as Total Dose/(Total $AUC_\infty \times K_{el}$).

30

"Side effect" means a secondary effect resulting from taking a drug. The secondary effect can be a negative (unfavorable) effect (i.e., an adverse side effect) or a positive (favorable) effect.

The most frequently reported adverse side effects to colchicine therapy are gastrointestinal, specifically abdominal pain with cramps, diarrhea, nausea, and vomiting. Less frequently or rarely reported adverse side effects associated with colchicine therapy include anorexia, agranulocytosis, allergic dermatitis, allergic reactions, alopecia, angioedema, aplastic anemia, bone marrow depression, myopathy, neuropathy, skin rash, thrombocytopenic disorder, and urticaria.

Whether a patient experiences an adverse side effect can be determined by obtaining information from the patient regarding onset of certain symptoms which may be indicative of the adverse side effect, results of diagnostic tests indicative of the adverse side effect, and the like.

Embodiments are described herein, including the best modes known to the inventors. Variations of such embodiments will become apparent to those of ordinary skill in the art upon reading the foregoing description. The skilled artisan is expected to employ such variations as appropriate, and the disclosed methods are expected to be practiced otherwise than as specifically described herein. Accordingly, all modifications and equivalents of the subject matter recited in the claims appended hereto are included to the extent permitted by applicable law. Moreover, any combination of the above-described elements in all possible variations thereof is encompassed unless otherwise indicated herein or otherwise clearly contradicted by context.

What is claimed is:

1. A method of treating a patient with colchicine, comprising

orally administering an adjusted daily dosage amount of colchicine to the patient who is receiving concomitant administration of ketoconazole,

wherein the adjusted daily dosage amount of colchicine is 25% to 50% of an intended daily dosage amount of colchicine, and

wherein the intended daily dosage amount of colchicine is a dosage amount suitable for the patient if the patient were not receiving concomitant ketoconazole.

2. The method of claim 1, wherein the treating is for the prophylaxis of gout flares, and wherein the intended daily dosage amount of colchicine suitable for the patient if the patient were not receiving concomitant ketoconazole is 0.6 mg twice daily or 0.6 mg once daily.

3. The method of claim 1, wherein the treating is for acute gout flares, and wherein the intended daily dosage amount of colchicine suitable for the patient if the patient were not receiving concomitant ketoconazole is 1.2 mg at the first sign of flare, followed by 0.6 mg one hour later, dose to be repeated no earlier than 3 days.

4. The method of claim 1, wherein the treating is for familial Mediterranean fever

wherein the adjusted daily dosage amount of colchicine is a maximum colchicine dosage amount of 0.6 mg of colchicine per day which is a reduction from the intended daily dosage amount of colchicine in the absence of concomitant ketoconazole wherein the intended daily dosage amount is a maximum daily dosage amount as follows:

A358

US 7,964,648 B2

31

| | Daily dosage amount | |
|---|---|---|
| Age | Usual | Maximum |
| Adults and children >12 years | 1.2 mg | 2.4 mg |
| Children >6 to 12 years | 0.9 mg | 1.8 mg |
| Children 4 to 6 years | 0.3 mg | 1.8 mg. |

**5**. The method of claim **2**, wherein the adjusted daily dosage amount of colchicine is 25% of a 0.6 mg twice daily intended dose.

32

**6**. The method of claim **2**, wherein the adjusted daily dosage amount of colchicine is 25% of a 0.6 mg once daily intended dose.

**7**. The method of claim **1**, wherein the concomitantly administered dose of ketoconazole is 200 mg twice per day.

**8**. The method of claim **3**, wherein the adjusted daily dosage amount is about 50% of the intended daily dosage amount.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.         : 7,964,648 B2                                    Page 1 of 5
APPLICATION NO.   : 12/688038
DATED               : June 21, 2011
INVENTOR(S)        : Matthew W. Davis

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:
Item (56), under "OTHER PUBLICATIONS", in column 2, line 5, delete "COLCYRS" and insert -- COLCRYS --, therefor.

On page 2, under "OTHER PUBLICATIONS", in column 2, line 3, delete "Drugs.com;"Colchicine" and insert -- Drugs.com; "Colchicine --, therefor.

In column 1, line 11, delete "Dec. 17, 2008" and insert -- January 14, 2009 --, therefor.

In column 2, lines 20-21, delete "3-demethylchochicine" and insert -- 3-demethylcolchicine --, therefor.

In column 3, line 6, delete "in a" and insert -- in an --, therefor.

In column 3, line 49, delete "that that" and insert -- that --, therefor.

In column 4, line 38, delete "■" and insert -- □ --, therefor.

In column 4, line 44, delete "●" and insert -- ○ --, therefor.

In column 4, line 51, delete "▲" and insert -- Δ --, therefor.

In column 4, line 51, delete "●" and insert -- ○ --, therefor.

In column 4, line 52, delete "■" and insert -- □ --, therefor.

In column 4, line 58, delete "▲" and insert -- Δ --, therefor.

In column 4, line 58, delete "●" and insert -- ○ --, therefor.

Signed and Sealed this
Twentieth Day of November, 2012

David J. Kappos
Director of the United States Patent and Trademark Office

A360

In column 4, line 59, delete "■" and insert -- □ --, therefor.

In column 4, line 66, delete "▲" and insert -- Δ --, therefor.

In column 4, line 66, delete "●" and insert -- ○ --, therefor.

In column 4, line 67, delete "■" and insert -- □ --, therefor.

In column 5, line 64, after "effect" insert -- . --.

In column 6, line 52, delete "in a" and insert -- in --, therefor.

In column 7, line 31, delete "0.6mg" and insert -- 0.6 mg --, therefor.

In column 7, line 33, delete "0.6mg" and insert -- 0.6 mg --, therefor.

In column 7, line 35, delete "0.6mg" and insert -- 0.6 mg --, therefor.

In column 8, line 62, after "may" insert -- be --.

In column 8, line 65, delete "wherein the" and insert -- the --, therefor.

In column 9, line 9, after "amount" insert -- is --.

In column 9, line 37, after "may" insert -- be --.

In column 9, line 40, delete "wherein the" and insert -- the --, therefor.

In column 9, line 50, after "amount" insert -- is --.

In column 10, line 12, after "may" insert -- be --.

In column 10, line 15, delete "wherein the" and insert -- the --, therefor.

In column 10, line 26, after "amount" insert -- is --.

In column 10, line 66, after "may" insert -- be --.

In column 11, line 8, after "amount" insert -- is --.

In column 12, line 42, delete "amount of" and insert -- amount for --, therefor.

In column 12, line 49, before "Colchicine" insert -- Table 2 --.

In column 13, line 20, delete "levels¹" and insert -- levels --, therefor.

CERTIFICATE OF CORRECTION (continued)                                      Page 3 of 5
U.S. Pat. No. 7,964,648 B2

In column 13, line 37, delete "levels[1]" and insert -- levels --, therefor.

In column 13, line 62, after "thereof" insert -- . --.

In column 15, line 28, delete "9" and insert -- 9, --, therefor.

In column 16, line 11, delete "9" and insert -- 9, --, therefor.

In column 16, line 64, delete "the administering" and insert -- administering --, therefor.

In column 18, line 27, delete "are" and insert -- were --, therefor.

In column 18, line 37, delete "3-O-demethylcolchciine" and insert -- 3-O-demethylcolchicine --, therefor.

In column 18, line 53, delete "Cmin" and insert -- $C_{min}$ --, therefor.

In column 18, line 54, delete "Cmin" and insert -- $C_{min}$ --, therefor.

In column 18, line 55, delete "Cmin" and insert -- $C_{min}$ --, therefor.

In column 18, line 57, delete "Cmin" and insert -- $C_{min}$ --, therefor.

In column 18, line 62, delete "Cmax" and insert -- $C_{max}$ --, therefor.

In column 18, line 63, delete "AUC∞" and insert -- $AUC_{\infty}$ --, therefor.

In column 19, line 9, delete "Cmax" and insert -- $C_{max}$ --, therefor.

In column 19, line 11, delete "Tmax" and insert -- $T_{max}$ --, therefor.

In column 19, line 49, delete "Vd/F" and insert -- $V_d/F$ --, therefor.

In column 19, line 59, delete "Vd = CL/Ke" and insert -- $V_d = CL/K_e$ --, therefor.

In column 19, line 63, delete "AUC0-$_{tau}$;" and insert -- $AUC_{0-tau}$; --, therefor.

In column 20, line 54, delete "Pgp." and insert -- P-gp. --, therefor.

In column 20, line 62, delete "(t1/2)" and insert -- $(t_{1/2})$ --, therefor.

In column 20, lines 66-67, after "below" delete "and illustrated in Table 5".

In column 21, line 13, after "$T_{max}$ (hr)" delete "*".

CERTIFICATE OF CORRECTION (continued)                                    Page 4 of 5
U.S. Pat. No. 7,964,648 B2

In column 21, lines 48-49, delete "were then return" and insert -- then returned --, therefor.

In column 21, line 60, after "Arithmetic Mean" delete "(% CV)".

In column 22, line 6, after "Arithmetic Mean" delete "(% CV)".

In column 22, line 12, after "$T_{max}$ (hr)" delete "*".

In column 22, line 33, delete "will be" and insert -- was --, therefor.

In column 22, line 35, after "smoking" insert -- , --.

In column 23, line 4, delete "Ritonovir" and insert -- Ritonavir --, therefor.

In column 23, line 4, delete "In" and insert -- ln --, therefor.

In column 23, line 7, delete "Ritonovir" and insert -- Ritonavir --, therefor.

In column 23, line 55, delete "will be" and insert -- was --, therefor.

In column 23, lines 65-66, delete "will be" and insert -- were --, therefor.

In column 24, line 7, delete "returnee" and insert -- returned --, therefor.

In column 24, line 33, after "Arithmetic Mean" delete "(% CV)".

In column 24, line 42, after "*Median", delete "(Range)".

In column 25, line 56, delete "(68.34)$^1$" and insert -- (68.34) --, therefor.

In column 25, line 56, delete "(66.15)$^1$" and insert -- (66.15) --, therefor.

In column 26, line 16, delete "As" and insert -- A --, therefor.

In column 26, line 56, after "Arithmetic Mean" delete "(% CV)".

In column 26, line 58, after "Median", delete "(Range)".

In column 27, line 58, after "Arithmetic Mean" delete "(% CV)".

In column 27, line 60, after "Median", delete "(Range)".

In column 28, line 7, after "Arithmetic Mean" delete "(% CV)".

**CERTIFICATE OF CORRECTION (continued)**
**U.S. Pat. No. 7,964,648 B2**

In column 28, line 8, after "Median", delete "(Range)".

In column 29, line 61, delete "$K_d$" and insert -- $K_{el}$ --, therefor.



US008440722B2

(12) **United States Patent**
Davis

(10) Patent No.: **US 8,440,722 B2**
(45) Date of Patent: **\*May 14, 2013**

(54) **METHODS FOR CONCOMITANT ADMINISTRATION OF COLCHICINE AND A SECOND ACTIVE AGENT**

(75) Inventor: **Matthew W. Davis**, Erwinna, PA (US)

(73) Assignee: **Takeda Pharmaceuticals U.S.A., Inc.**, Deerfield, IL (US)

(\*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/454,255**

(22) Filed: **Apr. 24, 2012**

(65) **Prior Publication Data**

US 2012/0208891 A1    Aug. 16, 2012

**Related U.S. Application Data**

(60) Division of application No. 13/184,704, filed on Jul. 18, 2011, which is a continuation of application No. 12/909,171, filed on Oct. 21, 2010, now abandoned, which is a continuation of application No. 12/372,046, filed on Feb. 17, 2009, now Pat. No. 7,820,681.

(60) Provisional application No. 61/138,141, filed on Jan. 14, 2009, provisional application No. 61/152,067, filed on Feb. 12, 2009.

(51) **Int. Cl.**
| | |
|---|---|
| *A01N 37/18* | (2006.01) |
| *A61K 31/16* | (2006.01) |
| *C07C 233/00* | (2006.01) |
| *C07C 235/00* | (2006.01) |
| *C07C 237/00* | (2006.01) |
| *C07C 239/00* | (2006.01) |
| *C07C 211/00* | (2006.01) |
| *C07C 205/00* | (2006.01) |
| *C07C 207/00* | (2006.01) |

(52) **U.S. Cl.**
USPC ........... **514/629**; 564/123; 564/308; 564/427; 568/306

(58) **Field of Classification Search** ... 514/629; 564/123, 564/308, 427; 568/306
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,426,224 | A | 6/1995 | Lee et al. |
| 5,914,332 | A | 6/1999 | Sham et al. |
| 5,968,972 | A | 10/1999 | Broder et al. |
| 6,037,157 | A | 3/2000 | Norbeck et al. |
| 6,245,805 | B1 | 6/2001 | Broder et al. |
| 6,896,900 | B2 | 5/2005 | Gosselin et al. |
| 7,601,758 | B1 | 10/2009 | Davis |
| 7,619,004 | B1 | 11/2009 | Davis |
| 7,820,681 | B1 | 10/2010 | Davis |
| 7,906,519 | B2 | 3/2011 | Davis |
| 7,915,269 | B2 | 3/2011 | Davis |

| | | | | |
|---|---|---|---|---|
| 7,935,731 | B2 | 5/2011 | Davis | |
| 7,964,647 | B2 * | 6/2011 | Davis | 514/629 |
| 7,964,648 | B2 * | 6/2011 | Davis | 514/629 |
| 7,981,938 | B2 * | 7/2011 | Davis | 514/629 |
| 8,093,296 | B2 * | 1/2012 | Davis | 514/629 |
| 8,093,297 | B2 * | 1/2012 | Davis | 514/629 |
| 8,093,298 | B2 * | 1/2012 | Davis | 514/629 |
| 8,097,655 | B2 * | 1/2012 | Davis | 514/629 |
| 2002/0037843 | A1 | 3/2002 | Reiner et al. | |
| 2011/0039940 | A1 | 2/2011 | Davis | |

OTHER PUBLICATIONS

Troger et al. 2005, "Tetraparesis associated with colchicine is probably due to inhibition by verapamil of the P-glycoprotein efflux pump in the blood-brain barrier;" BMJ, vol. 331, p. 613.*
U.S. Appl. No. 13/175,062, filed Jul. 2011, Davis, Matthew W.*
U.S. Appl. No. 13/451,328, filed Apr. 2012, Davis, Matthew W.*
U.S. Appl. No. 13/452,277, filed Apr. 2012, Davis, Matthew W.*
Akdag et al., "Acute Colchicine Intoxication During Clarithromycin Administration in Patients With Chronic Renal Failure"; J. Nephrol; 19; pp. 515-517; (2006).
Ben-Chetrit; Colchicine: 1998 Update; Seminars in Arthritis and Rheumatism; 28; pp. 48-59; (1998).
Bhat, et al ; "Colchicine Revisited"; (2009) p. 766-773.
Prescription Drug Ratings, "Colchicine-Probenecid"; http://www. healthgrades.com/drug-ratings/drug/sideeffects/2207/Colchicine-Probenecid; printed Dec. 2, 2009; 2 pages.
COLCYRS—Prescribing Information, www.colcrys.com/assets/ pdf/COLCRYS-Full-Prescribing_Information.pdf; 5 pages; Revised Sep. 2009.
Drugs.com; "Colchicine Dosage"; (available online) http://ww. drugs.com/dosage/colchicine.html) accessed Sep. 20, 2010.
Horn, et al.; "Life-threatening Colchicine Drug Interactions"; Pharmacy Times; p. 111; (2006).
Krishnan et al.; "Gout in Ambulatory Care Settings in the United States"; Journal of Rheumatology; 35; pp. 498-501; (2008).
Lacy et al.; Lexi-Comp's Clinical Reference Library, Drug Information Handbook, 7th Ed., pp. 108-109 and 292-293; (1999-2000).
Leikin etc al ; "Colchicine"; Poisoning and Toxicology Handbook, Fourth Edition; p. 216; (2007).
Niel et al.; Colchicine Today; Joint Bone Spine; 73; pp. 672-678; (2006).
Ogbru, Omudhome (www.medicinenet.com/colchicine/article.htm; 2 pages; (2008).
Ogihara et. al.; "What Kinds of Substrates Show P-Glycoprotein-Dependent Intestinal Absorption? Comparison of Verapamil with Vinblastine"; Drug Metab. Pharmacokinet; 21(3);—238-244; (2006).
Perez-Ruiz, et al.; "Optimisation of the Treatment of Acute Gout"; BioDrugs; 13; pp. 415-423; (2000).
Rango; "Management of Goup with Colchicine"; http://www.theberries.ca/Archives/colchicine.html; 4 pages; available on line as of Jul. 5, 2003).

(Continued)

*Primary Examiner* — Kara R McMillian
(74) *Attorney, Agent, or Firm* — Cantor Colburn LLP

(57) **ABSTRACT**

Methods for concomitant administration of colchicine together with one or more second active agents, e.g., verapamil, are disclosed. Such methods reduce the dangers commonly associated with such concomitant administration and provide additional benefits. Methods of notifying health care practitioners and patients regarding appropriate dosing for concomitant administration of colchicine together with second active agents are also provided.

**2 Claims, 5 Drawing Sheets**

US 8,440,722 B2

Page 2

OTHER PUBLICATIONS

Rollot, et al.; "Acute Colchicine Intoxication During Clarithromycin Administration"; The Annals of Pharmacotherapy; 38; pp. 2074-2077; (2004).

Rx-s.net/weblog/more/colchicine-indications-and-dosage/; "Colchicine Indications and Dosage"; 5 pages; last revised Aug. 2, 2005.

Terkeltaub, Robert A.; "Gout"; The New England Journal of Medicine; 349; pp. 1647-1655; (2003).

Terkeltaub, et al.; "Comparison of Low-Dose vs High-Dose Oral Colchicine Regimens in Patients with Gout Flares"; Presentation at the American College of Rheumatology Scientific Meeting; San Francisco, CA; Oct. 24-29, 2008.

Terkeltaub, et al.; "The Clinical Relevance of P-gp and CYP 3A4 on Colchicine Metabolism and Elimination"; Presentation at the American College of Rheumatology Scientific Meeting; San Francisco, CA; Oct. 24-29, 2008b.

Terkeltaub, Robert A.; "Colchicine Update: 2008"; Seminars in Arthritis and Rheumatism; VA Medical Center, University of California San Diego; 38(6); pp. 411-419; (2009).

Van Der Velden, et al.; "Colchicine-Induced Neuromyopathy in a Patient with Chronic Renal Failure: The Role of Clarithromycin"; Netherlands Journal of Medicine; 66; pp. 204-206; (2008).

Drugs.com "drug interactions between ketoconazole and colchicine"; www.drugs.com/drug-interactions/colchicine-with-ketoconazole-1412-0-728-0.html printed Dec. 4, 2009 2 pages.

"Guidance for Industry—In Vivo Drug Metabolism/Drug Interaction Studies—Study Design, Data Analysis, and Recommendations for Dosing and Labeling"; 19 pages; USDA; Nov. 1999.

"Guidance for Industry: Drug Interaction Studies—Study Design, Data Analysis, and Implications for Dosing and Labeling"; U.S. Department of Health and Human Services Food and Drug Administration; pp. 1-55; September 2006, http://www.fda.gov/cber/guidelines.htm.

"Risk of Drug Interactions Involving Herbal and Citrus Products"; Health Canada International Symposium on Drug, Food and Natural Health Product Interactions; Gatineau, Quebec, 61 pages; powerpoint presentation; Feb. 9, 2006.

Sabouraud, et al.; "Pharmacokinetics of Colchicine: A Review of Experimental and Clinical Data"; 2 Gastroenterol (Suppl. 1); 30; pp. 35-39p (1992).

Nuki, G., "Colchicine: Its Mechanism of Action and Efficacy in Crystal-Induced Inflammation"; Curr Rheumatol Rep.; 10(3); pp. 218-227; (2008).

Cerquaglia, et al. "Pharmacological and Clinical Basis of Treatment of Familial Mediterranean Fever (FMF) with Colchicine or Analogues: An Update"; Current Drug Targets—Inflammation & Allergy; 4; pp. 117-124; (2005).

Prescriber Update; Vo. 26(2); Dec. 2005; Medsafe; New Zealand Medicines and Medical Devices Safety Authority; www.medsafe.govt.nz; 23 pages; see pp. 26-27.

Achtert et al., Pharmacokinetics/bioavailability of colchicine in healthy male volunteers, Eur. J. Drug Metab. Pharmacokinet. 1989, 14(4): 317-322.

Ahern et al., "Does Colchicine Work? The results of the first controlled study in acute gout"; Aust NZ J Med 1987; 17: 301-304.

Dahan et al., "Grapefruit Juice and its Constituents Augment Colchicine Intestinal Absorption: Potential Hazardous Interaction and the Role of P-Glycoprotein", Pharm Res. 2009; 26(4); 883-92; Epub Dec. 2, 2008.

FDA News Release; "FDA Takes Action to Stop the Marketing of Unapproved Injectable Drugs Containing Colchicine"; http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/2008/ucm116853.htm; 2 pages; printed Oct. 22, 2012.

Goldbart, et al.; Near Fatal Acute Colchicine Intoxication in a Child. A Case Report; Eur J Pediatr; 159; pp. 895-897; (2000).

Hung et al.; "Fatal Interaction Between Clarithromycin and Colchicine in Patients with Renal Insufficiency: A Retrospective Study"; Clinical Infectious Diseases; 41; pp. 291-300; (2005).

Huang, S.M.; "Risk of Drug Interactions Involving Herbal and Citrus Products"; Health Canada International Symposium on Drug, Food and Natural Health Product Interactions; Gatineau, Quebec, 61 pages; powerpoint presentation; Feb. 9, 2006.

* cited by examiner



FIG. 1



FIG. 2

A402



FIG. 3



FIG. 4



FIG. 5

US 8,440,722 B2

1

# METHODS FOR CONCOMITANT ADMINISTRATION OF COLCHICINE AND A SECOND ACTIVE AGENT

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a Divisional of U.S. application Ser. No. 13/184,704 filed on Jul. 18, 2011, which is a Continuation U.S. application Ser. No. 12/909,171, filed Oct. 21, 2010, which is a continuation of U.S. application Ser. No. 12/372, 046, filed Feb. 17, 2009, now U.S. Pat. No. 7,820,681, issued Oct. 26, 2010, which claims priority from U.S. Provisional Application Ser. Nos. 61/138,141 filed Dec. 17, 2008 and 61/152,067 filed Feb. 12, 2009, all of which are hereby incorporated by reference in their entirety.

## FIELD OF THE DISCLOSURE

This disclosure relates to methods allowing for the co-administration of colchicine together with one or more second active agents for therapeutic purposes with improved safety compared to prior methods of administration.

## BACKGROUND

Colchicine, chemical name (−)-N-[(7S,12aS)-1,2,3,10-tetramethoxy-9-oxo-5,6,7,9-tetrahydrobenzo[a]heptalen-7-yl]-acetamide, is an alkaloid found in extracts of *Colchicum autumnale, Gloriosa superba,* and other plants. It is a microtubule-disrupting agent used in the treatment of gout and other conditions that may be treated, relieved or prevented with anti-inflammatory treatment. Colchicine impairs the motility of granulocytes and can prevent the inflammatory phenomena that initiate an attack (or flare) of gout. Colchicine also inhibits mitosis, resulting in effects in cells with high turnover rates such as those in the gastrointestinal tract and bone marrow. The primary adverse side effects of colchicine therapy include gastrointestinal upset such as diarrhea and nausea.

Colchicine has a narrow therapeutic index. The margin between an effective dose and a toxic dose of colchicine is much narrower than that of many other widely used drugs. Consequently, actions that result in increased colchicine levels in patients receiving colchicine therapy are particularly dangerous. Co-administration of colchicine to patients along with certain other drugs can have the effect of increasing colchicine levels. Such drug-drug interactions with colchicine have been reported to result in serious morbid complications and, in some cases, death.

Colchicine is rapidly absorbed from the gastrointestinal tract. Peak concentrations occur in 0.5 to 2 hours. The drug and its metabolites are distributed in leukocytes, kidneys, liver, spleen and the intestinal tract. Colchicine is metabolized in the liver and excreted primarily in the feces with 10 to 20% eliminated unchanged in the urine.

Gout (or gouty arthritis) is a disease caused by a build up of uric acid in the joints. Such a build up is typically due to an overproduction of uric acid, or to a reduced ability of the kidney to excrete uric acid. Gout is characterized by excruciating, sudden, unexpected, burning pain, as well as by swelling, redness, warmness, and stiffness in the affected joint. Low-grade fever may also be present. A gout flare is a sudden attack of pain in affected joints, especially in the lower extremities, and most commonly in the big toe. In afflicted individuals, the frequency of gout flares typically increases

2

over time. In this manner, gout progresses from acute gout to chronic gout, which involves repeated episodes of joint pain.

Colchicine can reduce pain in attacks of acute gout flares and also can be used beneficially for treating adults for prophylaxis of gout flares. Although its exact mode of action in the relief of gout is not completely understood, colchicine is known to decrease the inflammatory response to urate crystal deposition by inhibiting migration of leukocytes, to interfere with urate deposition by decreasing lactic acid production by leukocytes, to interfere with kinin formation and to diminish phagocytosis and subsequent inflammatory responses.

Cytochrome p450 (CYP) enzymes are agents of drug metabolism that are found in the liver, the gastrointestinal tract and other locations in the body. CYP enzymes occur in a variety of closely related proteins referred to as isozymes and different CYP isozymes may preferentially metabolize different drugs. The 3A family of CYP isozymes, particularly CYP3A4, is also known to be involved in many clinically significant drug-drug interactions, including those involving colchicine and second active agents. While drugs are often targets of CYP-mediated metabolism, some may also alter the expression and activity of such enzymes, thus impacting the metabolism of other drugs. The biotransformation of colchicine in human liver microsomes involves formation of 3-demethylcolchicine and 2-demethylcolchicine. As shown by experiments using antibodies against CYP3A4 and experiments using chemical inhibition of CYP3A4, this transformation is correlated with (and thus apparently mediated by) CYP3A4 activity.

P-glycoprotein (P-gp) is an ATP-dependent cell surface transporter molecule that acts as an ATPase efflux pump for multiple cytotoxic agents, including colchicine. P-gp actively pumps certain compounds, including drugs such as colchicine, out of cells. P-gp is encoded by the Adenosine triphosphate-binding cassette subfamily B member 1 (ABCB1) gene, also referred to as the multiple drug resistance 1 gene (MDR1).

Since colchicine acts intracellularly, the combined effects of CYP3A4 inhibition and P-gp inhibition by second active agents that also interact with CYP3A4 and P-gp can cause colchicine toxicity in patients taking what would be a safe dose of colchicine in the absence of concomitant second agent administration. Various studies of adverse reactions from exposure to multiple drugs have found that 6.5-23% of the adverse reactions result from drug-drug interactions. Unfortunately, each year a number of deaths occur as the direct result of patients adding a concomitant prescription pharmaceutical product to their existing medication regimen.

There accordingly remains a need for improved methods for administering colchicine to individuals who are concomitantly being treated with second active agents so as to reduce the possibility of colchicine toxicity while maintaining the sometimes life-saving advantages of being able to administer the two (or more) agents concomitantly. The present disclosure addresses this need and provides further advantages.

## SUMMARY

In one embodiment, a method of treating an individual in need of treatment with colchicine comprises concomitantly administering to the individual colchicine and another drug, for example, ketoconazole or ritonavir or cyclosporine, wherein the colchicine is administered as a dosing regimen with a starting colchicine dose of no more than about 0.6 mg colchicine, followed by either: no additional colchicine doses within about 12, 24, 48, or 72 hours, or at least one additional colchicine dose within about 12 hours and no more frequently

US 8,440,722 B2

3

than once every hour wherein each additional colchicine dose is no greater than about 0.6 mg. According to another embodiment, the other drug is, for example, verapamil or diltiazem, and the starting colchicine dose during coadministration with the other drug is no more than about 1.2 mg colchicine, followed by either: no additional colchicine doses within about 12, 24, 48, or 72 hours, or at least one additional colchicine dose within about 12 hours.

In another aspect, a method of using colchicine comprises increasing the blood plasma levels of colchicine in an individual being administered doses of about 0.6 mg or less of colchicine to treat a colchicine-treatable condition, said method comprising the concomitant dosing of the individual with a sufficient amount of ketoconazole to increase the $C_{max}$ of colchicine by about 90%, or to increase the $AUC_{0-t}$ of colchicine in the individual by about 190%, or to increase the $AUC_{0-inf}$ of colchicine in the individual by about 205%, or to decrease the clearance of colchicine by about 70%, compared to the $C_{max}$, $AUC_{0-t}$, $AUC_{0-inf}$, or clearance in a matched individual not administered concomitant ketoconazole.

In yet another aspect, a method of using colchicine comprises increasing the blood plasma levels of colchicine in an individual being administered doses of about 0.6 mg or less of colchicine to treat a colchicine-treatable condition, said method comprising the concomitant dosing of the individual with a sufficient amount of ritonavir to increase the $C_{max}$ of colchicine by about 170%, or to increase the $AUC_{0-t}$ of colchicine in the individual by about 245%, or to decrease the clearance of colchicine by about 70%, compared to the $C_{max}$, $AUC_{0-t}$, or clearance in a matched individual not administered concomitant ritonavir.

In another embodiment, a method for using colchicine comprises a pharmacy receiving a prescription for colchicine for a patient who is concomitantly being treated with ketoconazole or ritonavir or verapamil, and the pharmacy dispensing colchicine in response to receipt of the prescription, wherein the dispensing is preceded by: entering, into a first computer readable storage medium in functional communication with a computer, of a unique patient identifier for said patient and at least one drug identifier for colchicine linked to the patient identifier so as to indicate that colchicine is to be administered to the patient, wherein the computer has been programmed to issue a drug-drug interaction alert when the at least one drug identifier for colchicine is entered linked to the patient identifier so as to indicate that colchicine is to be administered to the patient and when the patient identifier is also linked to an identifier indicating that ketoconazole or ritonavir or verapamil is being concomitantly administered to the patient, wherein, upon entry of the at least one drug identifier for colchicine linked to the patient identifier, a drug-drug interaction alert is issued to one or more of a pharmacy technician, a pharmacist, or a pharmacy customer obtaining the colchicine, said alert indicating that that ketoconazole or ritonavir is being concomitantly administered to the patient and that prior to the colchicine being dispensed, the colchicine dosing regimen must be reviewed and, if necessary adjusted, so that when the colchicine is delivered to the pharmacy customer obtaining the colchicine it is delivered along with instructions for the colchicine to be taken in accordance with a dosing regimen of no more than about 0.6 mg colchicine, followed by either: no additional colchicine doses within about 12, 24, 48, or 72 hours, or at least one additional colchicine dose within about 12 hours and no more frequently than once every hour wherein each additional colchicine dose is no greater than about 0.6 mg.

A method of treating a patient with colchicine comprises administering an adjusted daily dosage amount of colchicine

4

to the patient who is receiving concomitant administration of ritonavir, wherein the adjusted daily dosage amount of colchicine is about 25% to 50% of an intended daily dosage amount of colchicine, and wherein the intended daily dosage amount of colchicine is a dose suitable for the patient if the patient were not receiving concomitant ritonavir.

A method of treating a patient with colchicine comprises administering an adjusted daily dosage amount of colchicine to the patient who is receiving concomitant administration of ketoconazole, wherein the adjusted daily dosage amount of colchicine is about 25% to 50% of an intended daily dosage amount of colchicine, and wherein the intended daily dosage amount of colchicine is a daily dosage amount suitable for the patient if the patient were not receiving concomitant ketoconazole.

A method of treating an individual in need of treatment for gout flares, comprises concomitantly administering colchicine and azithromycin, and carefully monitoring the individual for potential toxicity. The method further comprises adjusting the dose of colchicine or azithromycin as necessary to avoid adverse side effects.

A method of treating an individual with colchicine comprises concomitantly administering colchicine and verapamil, and carefully monitoring the individual for signs and symptoms of adverse side effects. The method further comprises administering an adjusted daily dosage amount of colchicine to the patient who is receiving concomitant administration of verapamil, wherein the adjusted daily dosage amount of colchicine is about 50% to 75% of an intended daily dosage amount of colchicine, and wherein the intended daily dosage amount of colchicine is a daily dosage amount suitable for a patient if the patient were not receiving concomitant verapamil.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows mean colchicine plasma concentrations following administration of single and multiple oral doses of colchicine 0.6 mg in healthy adults, N=13, Y axis=colchicine concentration, ng/mL, X axis=time in hours, ◆=day 1, □=day 25. See Example 1.

FIG. 2 shows a pharmacokinetic profile comparison of single-dose colchicine (0.6 mg, alone) and single-dose colchicine (0.6 mg) co-administered with steady-state clarithromycin in healthy adults, Y axis=colchicine concentration, ng/mL, X axis=time in hours, N=23, ●=colchicine alone, ◆=colchicine plus clarithromycin. See Example 2.

FIG. 3 shows a pharmacokinetic profile comparison of single-dose colchicine (0.6 mg, alone) and single-dose colchicine (0.6 mg) co-administered with steady-state clarithromycin and steady-state cyclosporine in healthy adults, Y axis=colchicine concentration, ng/mL, X axis=time in hours, N=18, ▲=colchicine alone, ●=colchicine plus clarithromycin, ■=colchicine plus cyclosporine.

FIG. 4 shows a pharmacokinetic profile comparison of single-dose colchicine (0.6 mg, alone) and single-dose colchicine (0.6 mg) co-administered with steady-state ketoconazole and steady-state ritonavir in healthy adults. Y axis=colchicine concentration, ng/mL, X axis=time in hours, N=18, ▲=colchicine alone, ●=colchicine plus ketoconazole, ■=colchicine plus ritonavir.

FIG. 5 shows a pharmacokinetic profile comparison of single-dose colchicine (0.6 mg, alone) and single-dose colchicine (0.6 mg) co-administered with steady-state azithromycin and steady-state diltiazem in healthy adults. Y

US 8,440,722 B2

5
6

axis=colchicine concentration, ng/mL, X axis=time in hours, N=18, ▲=colchicine alone, ●=colchicine plus azithromycin, ■=colchicine plus diltiazem.

These and other embodiments, advantages and features of the present invention become clear when detailed description is provided in subsequent sections.

## DETAILED DESCRIPTION

Disclosed herein are methods for safely administering colchicine concomitantly with a second active agent, wherein the second active agent is a CYP3A4 inhibitor, a P-gp inhibitor, or both. Exemplary second active agents that are CYP3A4 and P-gp inhibitors are azithromycin, ketoconazole, ritonavir, diltiazem, verapamil and cyclosporine. It has now been discovered that certain reduced or limited colchicine dosage amounts, when administered with concomitantly administered recommended dosage amounts of second active agents that are CYP3A4 inhibitors, P-gp inhibitors, or both, achieve plasma colchicine levels that are therapeutically effective, but are not significantly higher, and therefore not significantly more toxic, than plasma levels achieved by administration of manufacturers' recommended colchicine dosages in the absence of concomitant administration with the second active agent. Thus, colchicine and second active agents that are CYP3A4 inhibitors, P-gp inhibitors, or both, can be administered concomitantly with improved safety when colchicine is administered as disclosed herein.

Without being held to theory, it has been hypothesized by the inventors herein that P-gp inhibition is more important to the elimination of colchicine than CYP3A4 inhibition. The CYP3A4 and P-gp inhibition potential of clarithromycin, azithromycin, ketoconazole, ritonavir, diltiazem and cyclosporine are given in Table 1. Based on their level of P-gp inhibition, it was predicted that clarithromycin and cyclosporine will increase colchicine concentrations more than ketoconazole or ritonavir, which will increase colchicine levels more than verapamil, azithromycin or diltiazem. The results presented herein confirm this hypothesis.

TABLE 1

| Drug | CYP3A Inhibition potential | P-gp Inhibition potential |
|---|---|---|
| CYP3A4 and P-gp inhibition potential of second active agents | | |
| Clarithromycin | +++++ | +++++ |
| Cyclosporine | +++++ | +++++ |
| Ketoconazole | +++++ | +++ |
| Ritonavir | +++++ | +++ |
| Verapamil | ++ | ++ |
| Diltiazem | + | + |
| Azithromycin | + | + |

Ritonavir (Norvir®, Abbott Laboratories) is an inhibitor of Human Immunodeficiency Virus (HIV) protease and is approved for the treatment of HIV-infection when used as part of a highly active antiretroviral therapy (HAART) regimen at the recommended dose of 600 mg twice daily. Although a very potent and effective protease inhibitor at the recommended dose, ritonavir is not well tolerated by HIV-infected patients at the approved dose and therefore, is generally not used clinically as a sole, therapeutic protease inhibitor within a HAART regimen. Rather, ritonavir is used more often as a pharmacokinetic enhancer or 'boosting agent' when combined with other approved protease inhibitors that are CYP3A4 and P-gp substrates and also have inherent bioavailability issues, such as poor bioavailability due to first pass effect. Improving the pharmacokinetic disposition of other protease inhibitors is possible due to the potent CYP3A4 and P-gp inhibitory activity ritonavir possesses. Sub-therapeutic ritonavir doses are used to achieve pharmacokinetic enhancement of the co-administered protease inhibitors; typically 100 mg of ritonavir administered twice daily is the ritonavir dose used in combination with the primary protease inhibitor. This low-dose ritonavir regimen boosts the bioavailability of the second protease inhibitor without contributing significantly to the adverse event profile of the HAART regimen.

Cyclosporine (Neoral®, Novartis Pharmaceuticals Corporation) is the active principle in Neoral® an oral formulation that immediately forms a microemulsion in an aqueous environment. Cyclosporine is indicated for kidney, liver, and heart transplantation; rheumatoid arthritis and psoriasis. Cyclosporine is extensively metabolized by the CYP3A4 enzyme system in the liver, and to a lesser degree in the gastrointestinal tract, and the kidney. The metabolism of cyclosporine can be altered by the co-administration of a variety of agents.

Ketoconazole is a synthetic broad-spectrum antifungal agent available in scored white tablets, each containing 200 mg ketoconazole base for oral administration. Ketoconazole tablets are indicated for the treatment of the following systemic fungal infections: candidiasis, chronic mucocutaneous candidiasis, oral thrush, candiduria, blastomycosis, coccidioidomycosis, histoplasmosis, chromomycosis, and paracoccidioidomycosis. Ketoconazole is a potent inhibitor of the CYP3A4 enzyme system. Co-administration of ketoconazole and drugs primarily metabolized by the CYP3A4 enzyme may result in increased plasma concentrations of the drugs that could increase or prolong both therapeutic and adverse side effects.

Azithromycin is a macrolide antibiotic indicated for the treatment of patients with mild to moderate infections caused by susceptible strains of the designated microorganisms in specific conditions. Azithromycin remains the sole agent developed and marketed within the azalide macrolide subclass. Due to its dibasic structure, azithromycin has demonstrated unique pharmacokinetic properties that differ significantly from those of classic macrolide agents. Azithromycin's pharmacokinetics are characterized by low concentrations in serum, secondary to rapid and significant uptake by fibroblasts and acute reactant cells such as polymorphonuclear leukocytes (PMNs), monocytes, and lymphocytes. Azithromycin is a weak to moderate CYP3A4 inhibitor.

Diltiazem (Cardizem® CD, Biovail Pharmaceuticals, Inc. [Biovail]) is an extended-release (ER) calcium ion influx inhibitor available in blue capsules, each containing 240 mg diltiazem hydrochloride for oral administration. Diltiazem ER capsules are indicated for the treatment of hypertension and the management of chronic stable angina and angina due to coronary artery spasm. Diltiazem is a CYP3A4 and P-gp inhibitor.

Verapamil HCl ER (Mylan Pharmaceuticals, Inc.) is a calcium ion influx inhibitor available in a pale green, capsule shaped, film-coated tablets, each containing 240 mg verapamil hydrochloride for oral administration. Verapamil HCl ER tablets are indicated for the management of hypertension. Verapamil HCl ER is a potent CYP3A4 and P-gp inhibitor.

In one embodiment, colchicine is administered to an individual suffering from a condition treatable with colchicine, and the concomitant second active agent (e.g., ketoconazole, ritonavir, cyclosporine, verapamil, or diltiazem or any other CYP3A4 or P-gp inhibitor) is administered concurrently while the colchicine administration is reduced, or the individual has recently completed a dosing regimen of the second

US 8,440,722 B2

7
8

active agent, in which case the colchicine administration may still be reduced for a period of time.

In one embodiment, disclosed herein is a method of administering colchicine and a second active agent (e.g., ketoconazole, ritonavir, or cyclosporine) wherein an individual is administered the colchicine according to a colchicine dosing regimen of a single starting colchicine dose of no more than about 0.6 mg colchicine, followed by either no additional colchicine doses within about 12, 24, 48, or 72 hours, or followed by at least one additional colchicine dose within 12 hours and no more frequently than once every hour (e.g., every 3, 4, 6, 8, or 12 hours). In this embodiment, each additional colchicine dose is specifically no greater than about 0.3 mg and the individual is an adult individual or a pediatric individual. Specifically, the starting colchicine dose is about 0.6 mg or about 0.3 mg, and each additional colchicine dose is about 0.3 mg. In one embodiment, when additional doses are administered, only two, three, or four additional colchicine doses are administered within about 24 hours. Specifically, the individual is an adult individual and the starting colchicine dose is about 0.6 mg, and each additional colchicine dose, if any, is about 0.3 mg. In one embodiment, only three additional colchicine doses are administered within about 24 hours.

In one embodiment, disclosed herein is a method of administering colchicine and a second active agent (e.g., verapamil or diltiazem) wherein an individual is administered the colchicine according to a colchicine dosing regimen of a single starting colchicine dose of no more than about 1.2 mg colchicine, followed by either no additional colchicine doses within about 12, 24, 48, or 72 hours, or followed by at least one additional colchicine dose within 12 hours and no more frequently than once every hour (e.g., every 3, 4, 6, 8, or 12 hours). In this embodiment, each additional colchicine dose is specifically no greater than about 0.3 mg or 0.6 mg and the individual is an adult individual or a pediatric individual. Specifically, the starting colchicine dose is about 0.6 mg or 1.2 mg, and each additional colchicine dose is about 0.3 mg or 0.6 mg. In one embodiment, when additional doses are administered, only two, three, or four additional colchicine doses are administered within about 24 hours. Specifically, the individual is an adult individual and the starting colchicine dose is about 1.2 mg, and each additional colchicine dose, if any, is about 0.3 mg or 0.6 mg. In one embodiment, only three additional colchicine doses are administered within about 24 hours.

In one embodiment, the second active agent is ketoconazole or ritonavir. In one embodiment, the ketoconazole is administered to the individual at a dosage of about 200 mg daily and the colchicine dosing regimen is one about 0.6 mg colchicine dose to start, followed by 0, 1, 2, 3, or 4 additional colchicine doses of about 0.6 mg every 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, or 12 hours (e.g., every 2, 3, 4, 5, or 6 hours) after the preceding colchicine dose. In another embodiment, the ritonavir is administered to the individual at a dosage of about 200 to 1200 mg daily (e.g., in 2×100 mg doses or 2×600 mg doses) and the colchicine dosing regimen is one about 0.6 mg colchicine dose to start, followed by 0, 1, 2, 3, or 4 additional colchicine doses of about 0.6 mg every 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, or 12 hours (e.g., every 2, 3, 4, 5, or 6 hours) after the preceding colchicine dose. In an exemplary regimen for treatment of acute gout flares, ingestion of colchicine is continued until a total of no more than about 1.2, 1.4, 1.6, 1.8, 2, or 2.4 mg of colchicine has been ingested, after which ingestion of colchicine is stopped until a subsequent acute gout flare occurs. More preferably, the colchicine is administered as a dosage form of 0.6 mg (e.g., one 0.6 mg colchicine tablet), or

0.3 mg (e.g., one half of a 0.6 mg tablet) of colchicine and administration of the dosage form is not repeated within a period of at least about two days, preferably at least about three days.

In one embodiment, the second active agent (e.g., ketoconazole or ritonavir or cyclosporine) is administered to the individual before the colchicine is administered to the individual, and wherein the administration of second active agent is terminated no more than about fourteen days prior to the initiation of colchicine administration. For example, the method comprises administering colchicine to an individual also taking a second active agent (e.g., ketoconazole or ritonavir or cyclosporine), or having completed treatment with the second active agent within the prior 14 days, the individual being administered a single dose of about 0.6 mg or about 0.3 mg of colchicine to treat a gout flare, which administration is not repeated within any 3-day period. According to this embodiment if the second active agent is instead verapamil or diltiazem, if the second active agent is terminated no more than about fourteen days prior to the initiation of the colchicine administration to treat a gout flare, the single dose of colchicine is about 1.2 mg not to be repeated within a 3-day period.

In another aspect, herein disclosed is a method for increasing the blood plasma levels of colchicine in an individual to whom colchicine is being administered to treat or prevent a colchicine-responsive condition. This method comprises the concomitant dosing of the individual with a sufficient amount of ketoconazole to increase the $C_{max}$ of colchicine by about 90%, or to increase the $AUC_{0-t}$ of colchicine in the individual by about 190%, or to increase the $AUC_{0-t_{inf}}$ of colchicine in the individual by about 205%, or to decrease the clearance of colchicine by about 70%, compared to the $C_{max}$, $AUC_{0-t}$, or clearance in the same or a matched individual when not being administered a concomitant ketoconazole. In a specific embodiment, the individual is being administered no more than hourly doses of about 0.6 mg of colchicine or less, and the amount of ketoconazole is about 200 mg. In one embodiment, the single dose is one 0.6 mg colchicine tablet.

In yet another aspect, herein disclosed is a method for increasing the blood plasma levels of colchicine in an individual to whom colchicine is being administered to treat or prevent a colchicine-responsive condition. This method comprises the concomitant dosing of the individual with a sufficient amount of ritonavir to increase the $C_{max}$ of colchicine by about 170%, or to increase the $AUC_{0-t}$ of colchicine in the individual by about 245%, or to decrease the clearance of colchicine by about 70%, compared to the $C_{max}$, $AUC_{0-t}$, or clearance in the same or a matched individual when not being administered concomitant ritonavir. In a specific embodiment, the individual is being administered no more than hourly doses of about 0.6 mg of colchicine or less, and the amount of ritonavir is about 200 to about 1200 mg. In one embodiment, the single dose is one 0.6 mg colchicine tablet.

In one embodiment, a method of treating a patient with colchicine comprises administering an adjusted daily dosage amount of colchicine to the patient who is receiving concomitant administration of ritonavir, wherein the adjusted daily dosage amount of colchicine is 25% to 50% of an intended daily dosage amount of colchicine, and wherein the intended daily dosage amount of colchicine is a daily dosage amount suitable for the patient if the patient were not receiving concomitant ritonavir. Treating is, for example, to prevent gout flares, to treat acute gout, or to treat familial Mediterranean fever. When the colchicine is administered to prevent gout flares, the adjusted daily dosage amount of colchicine may reduce from a 0.6 mg twice daily intended dose to a 0.6 mg

US 8,440,722 B2

9

once daily adjusted dose. Alternatively, when the colchicine is administered to prevent gout flares, wherein the adjusted daily dosage amount of colchicine is reduced from a 0.6 mg once daily intended dose to a 0.3 mg once daily adjusted dose. In one embodiment, when treating is for acute gout, the intended daily dosage amount is 1.8 to 2.4 mg, and the maximum adjusted daily dosage amount is 0.6 mg, not to be repeated within 3 days. In another embodiment, treating is for acute gout, the intended daily dosage amount is 2.4 to 4.8 mg and the maximum adjusted daily dosage amount is 0.6 to 1.2 mg, not to be repeated within 3 days. In yet another embodiment, treating is for familial Mediterranean fever and the daily dosage amount 1.2 to 2.4 mg for adults, and the maximum adjusted daily dosage amount is 0.6 mg, given, for example, in two 0.3 mg doses. In another embodiment, treating is for familial Mediterranean fever and the intended daily dosage amount is 0.9 to 1.8 mg for children 6-12 years or 4-6 years, and the maximum adjusted daily dosage amount is 0.6 mg, given, for example, in two 0.3 mg doses. The concomitantly administered dose of ritonavir is, for example, 200 mg per day. In one embodiment, the ritonavir is administered to the patient before the colchicine is administered to the patient, and wherein the administration of ritonavir is terminated no more than about fourteen days prior to the initiation of colchicine administration. The method optionally further comprises carefully monitoring the individual for potential toxicity. Any 0.3 mg dose contemplated in this method can be a single 0.3 mg dosage form or one-half a 0.6 mg dosage form, e.g. one-half a 0.6 mg colchicine tablet.

A method of treating a patient with colchicine comprises administering an adjusted daily dosage amount of colchicine to the patient who is receiving concomitant administration of ketoconazole, wherein the adjusted daily dosage amount of colchicine is 25% to 50% of an intended daily dosage amount of colchicine, and wherein the intended daily dosage amount of colchicine is a daily dosage amount suitable for the patient if the patient were not receiving concomitant ketoconazole. Treating is, for example, to prevent gout flares, to treat acute gout, or to treat familial Mediterranean fever. When the colchicine is administered to prevent gout flares, the adjusted daily dosage amount of colchicine may reduce from a 0.6 mg twice daily intended dose to a 0.6 mg once daily adjusted dose. Alternatively, when the colchicine is administered to prevent gout flares, wherein the adjusted daily dosage amount of colchicine is reduced from a 0.6 mg once daily intended dose to a 0.3 mg once daily adjusted dose. In one embodiment, when treating is for acute gout, the intended daily dosage amount is 1.8 to 2.4 mg, and the maximum adjusted daily dosage amount is 0.6 mg, not to be repeated within 3 days. In another embodiment, treating is for acute gout, the intended daily dosage amount is 2.4 to 4.8 mg and the maximum adjusted daily dosage amount is 0.6 to 1.2 mg, not to be repeated within 3 days. In yet another embodiment, treating is for familial Mediterranean fever and the daily dosage amount 1.2 to 2.4 mg for adults, and the maximum adjusted daily dosage amount is 0.6 mg, given, for example, in two 0.3 mg doses. In another embodiment, treating is for familial Mediterranean fever and the intended daily dosage amount is 0.9 to 1.8 mg for children 6-12 years or 4-6 years, and the maximum adjusted daily dosage amount is 0.6 mg, given, for example, in two 0.3 mg doses. The concomitantly administered dose of ketoconazole is, for example, 250 mg per day. In one embodiment, the ketoconazole is administered to the patient before the colchicine is administered to the patient, and wherein the

10

administration of ketoconazole is terminated no more than about fourteen days prior to the initiation of colchicine administration. The method optionally further comprises carefully monitoring the individual for potential toxicity. Any 0.3 mg dose contemplated in this method can be a single 0.3 mg dosage form or one-half a 0.6 mg dosage form, e.g. one-half a 0.6 mg colchicine tablet.

A method of treating a patient with colchicine comprises administering an adjusted daily dosage amount of colchicine to the patient who is receiving concomitant administration of cyclosporine, wherein the adjusted daily dosage amount of colchicine is 25% to 50% of an intended daily dosage amount of colchicine, and wherein the intended daily dosage amount of colchicine is a daily dosage amount suitable for the patient if the patient were not receiving concomitant cyclosporine. Treating is, for example, to prevent gout flares, to treat acute gout, or to treat familial Mediterranean fever. When the colchicine is administered to prevent gout flares, the adjusted daily dosage amount of colchicine may reduce from a 0.6 mg twice daily intended dose to a 0.3 mg once daily adjusted dose. Alternatively, when the colchicine is administered to prevent gout flares, wherein the adjusted daily dosage amount of colchicine is reduced from a 0.6 mg once daily intended dose to a 0.3 mg once every other day adjusted dose. In one embodiment, when treating is for acute gout, the intended daily dosage amount is 1.8 to 2.4 mg, and the maximum adjusted daily dosage amount is 0.6 mg, not to be repeated within 3 days. In another embodiment, treating is for acute gout, the intended daily dosage amount is 2.4 to 4.8 mg and the maximum adjusted daily dosage amount is 0.6 to 1.2 mg, not to be repeated within 3 days. In yet another embodiment, treating is for familial Mediterranean fever and the daily dosage amount 1.2 to 2.4 mg for adults, and the maximum adjusted daily dosage amount is 0.6 mg, given, for example, in two 0.3 mg doses. In another embodiment, treating is for familial Mediterranean fever and the intended daily dosage amount is 0.9 to 1.8 mg for children 6-12 years or 4-6 years, and the maximum adjusted daily dosage amount is 0.6 mg, given, for example, in two 0.3 mg doses. The concomitantly administered dose of cyclosporine can be various dosage strengths administered per day, and can be administered as an oral preparation, topically, or intravenously. In one embodiment, the cyclosporine is administered to the patient before the colchicine is administered to the patient, and wherein the administration of cyclosporine is terminated no more than about fourteen days prior to the initiation of colchicine administration. The method optionally further comprises carefully monitoring the individual for potential toxicity. Any 0.3 mg dose contemplated in this method can be a single 0.3 mg dosage form or one-half a 0.6 mg dosage form, e.g. one-half a 0.6 mg colchicine tablet.

In another embodiment, colchicine is concomitantly administered with azithromycin. Concomitant administration of azithromycin with colchicine increases exposure to colchicine approximately 46% and thus has the potential to produce colchicine toxicity. During concomitant use of azithromycin and colchicine, the physician should carefully monitor individuals for any signs or symptoms of colchicine toxicity. Additionally, dosing adjustments to either the colchicine and/or the azithromycin may be necessary to avoid adverse side effects.

A method of treating a patient with colchicine comprises administering an adjusted daily dosage amount of colchicine

US 8,440,722 B2

11

to the patient who is receiving concomitant administration of verapamil, wherein the adjusted daily dosage amount of colchicine is 50% to 75% of an intended daily dosage amount of colchicine, and wherein the intended daily dosage amount of colchicine is a daily dosage amount suitable for the patient if the patient were not receiving concomitant verapamil. Treating is, for example, to prevent gout flares, to treat acute gout, or to treat familial Mediterranean fever. When the colchicine is administered to prevent gout flares, the adjusted daily dosage amount of colchicine may reduce from a 0.6 mg twice daily intended dose to a 0.3 mg once daily adjusted dose. In one embodiment, when treating is for acute gout, the intended daily dosage amount is 1.8 to 2.4 mg, and the maximum adjusted daily dosage amount is 1.2 mg. In another embodiment, treating is for acute gout, the intended daily dosage amount is 2.4 to 4.8 mg and the maximum adjusted daily dosage amount is about one-third the intended daily dosage amount. In yet another embodiment, treating is for familial Mediterranean fever and the daily dosage amount 1.2 to 2.4 mg for adults, and the maximum adjusted daily dosage amount is 1.2 mg, given, for example, in two 0.6 mg doses. In one embodiment, the verapamil is administered to the patient before the colchicine is administered to the patient, and wherein the administration of verapamil is terminated no more than about fourteen days prior to the initiation of colchicine administration. The method optionally further comprises carefully monitoring the individual for potential toxicity. Any 0.3 mg dose contemplated in this method can be a single 0.3 mg dosage form or one-half a 0.6 mg dosage form, e.g. one-half a 0.6 mg colchicine tablet.

Disclosed herein are specific dosage reductions of colchicine that improve safety when colchicine is co-administered with certain active agents. The dose of colchicine recommended for administration without co-administration of certain other active agents, such as CYP3A4 or P-gp inhibitors, is referred to as an intended daily dosage amount. The reduced or modified daily dosage amount determined from the experiments presented herein is referred to as an adjusted daily dosage amount. An adjusted daily dosage amount is thus a daily dosage amount that can be safely co-administered with a second active agent as disclosed herein. A dose adjustment is thus a dose of colchicine and does not include cessation of colchicine, that is, a dose of 0 mg of colchicine.

In these and other embodiments, the colchicine-responsive condition is gout (e.g., a gout flare in a chronic gout sufferer), familial Mediterranean fever (FMF), thrombocytopenic purpura, pericarditis, scleroderma, or Behçet's disease. In some embodiments, the treatment with colchicine is either palliative or prophylactic. The gout may be acute gout, e.g. a gout flare, or chronic gout.

Acute Gout

Acute gout, or gout flares, can be treated according to the following treatment schedule. This table indicates the original, or intended, dose, i.e., the dose of colchicine recommended absent concomitant administration of the drugs listed below. This table also presents the dose adjustment of the present invention, or the recommended colchicine dose to be administered when the strong and moderate CYP3A4 and P-gp inhibitors are administered concomitantly with colchicine when the patient is being treated for acute gout, or an acute gout flare.

12

| | Colchicine Dose Recommendation | |
|---|---|---|
| Drug | Original Intended Dose (Total Dose) | Dose Adjustment |
| Strong CYP3A4 Inhibitors | Regimen Reduced by Two Thirds | |
| Erythromycin Ketoconazole Ritonavir | 1.2 mg (2 tablets) at the first sign of the flare followed by 0.6 mg (1 tablet) one hour later. Dose to be repeated no earlier than 3 days. | 0.6 mg (1 tablet) × 1 dose. Dose to be repeated no earlier than 3 days. |
| Moderate CYP3A4 Inhibitors | Regimen Reduced by One Third | |
| Diltiazem Verapamil | 1.2 mg (2 tablets) at the first sign of the flare followed by 0.6 mg (1 tablet) one hour later. Dose to be repeated no earlier than 3 days. | 1.2 mg (2 tablets) × 1 dose. Dose to be repeated no earlier than 3 days. |
| Strong P-gp Inhibitors | Regimen Reduced by Two Thirds | |
| Cyclosporine | 1.2 mg (2 tablets) at the first sign of the flare followed by 0.6 mg (1 tablet) one hour later. Dose to be repeated no earlier than 3 days. | 0.6 mg (1 tablet) × 1 dose. Dose to be repeated no earlier than 3 days. |

Chronic Gout

For chronic gout, an original intended daily dosage amount is 1.2 mg or 6 mg. Alternatively, an intended daily dosage amount of chronic gout can be as much as 2.4 mg per day. The daily dosage amount for chronic gout can be administered at one time or dosed at intervals throughout the day, e.g. twice daily, three times daily, or four times daily.

Chronic gout, with and without a concomitant dose of another drug, can be treated according to the following treatment schedule:

Colchicine Dose Adjustment for Co-Administration with Interacting Drugs if No Alternative Available

| | Colchicine Dose Recommendation | |
|---|---|---|
| Drug | Original Intended Dose | Dose Adjustment |
| Clarithromycin | 0.6 mg twice daily | 0.3 mg once daily |
| | 0.6 mg once daily | 0.3 mg once every other day |
| Cyclosporine | 0.6 mg twice daily | 0.3 mg once daily |
| | 0.6 mg once daily | 0.3 mg once every other day |
| Erythromycin | 0.6 mg twice daily | 0.3 mg once daily |
| | 0.6 mg once daily | 0.3 mg once every other day |
| Ritonavir | 0.6 mg twice daily | 0.3 mg once daily |
| | 0.6 mg once daily | 0.3 mg once daily |

Familial Mediterranean Fever

Familial Mediterranean Fever (FMF) can be treated according to the following intended daily dosing schedule:

| | Daily dosage amount | |
|---|---|---|
| Age | Usual | Maximum |
| Adults and children >12 years | 1.2 mg | 2.4 mg |
| Children >6 to 12 years | 0.9 mg | 1.8 mg |
| Children 4 to 6 years | 0.3 mg | 1.8 mg |

US 8,440,722 B2

13

When colchicine is given to patients with FMF concomitantly with other drugs, the adjusted (reduced) dosage amount of colchicine, according to this embodiment, is provided in the table below:

| Concomitant Drug Class or Food | Noted or Anticipated Outcome | Clinical Comment |
|---|---|---|
| Strong CYP3A4 Inhibitors: atazanavir, clarithromycin, indinavir, itraconazole, ketoconazole, nefazodone, nelfinavir, ritonavir, saquinavir, telithromycin | Significant increase in colchicine plasma levels[1]; fatal colchicine toxicity has been reported with clarithromycin, a strong CYP3A4 inhibitor. Similarly, significant increase in colchicine plasma levels is anticipated with other strong CYP3A4 inhibitors. | Use colchicine with caution at reduced maximum dose of 0.3 mg twice daily with increased monitoring for adverse effects. In patients with renal or hepatic impairment, use of colchicine in conjunction with these drugs is contraindicated. |
| Moderate CYP3A4 inhibitors: amprenavir, aprepitant, diltiazem, erythromycin, fluconazole, fosamprenavir, grapefruit juice, verapamil | Significant increase in colchicine plasma concentration is anticipated. Neuromuscular toxicity has been reported with diltiazem and verapamil interactions. | Use colchicine with caution at reduced maximum dose of 0.6 mg twice daily with increased monitoring for adverse effects. In patients with renal or hepatic impairment, use a maximum dose of 0.3 mg twice daily. |
| Strong P-gp Inhibitors e.g. Cyclosporine, ranolazine. | Significant increase in colchicine plasma levels[1]; fatal colchicine toxicity has been reported with cyclosporine, a strong P-gp inhibitor. Similarly, significant increase in colchicine plasma levels is anticipated with other strong P-gp inhibitors. | Use colchicine with caution at reduced maximum dose of 0.3 mg twice daily with increased monitoring for adverse effects. In patients with renal or hepatic impairment, use of colchicine in conjunction with these drugs is contraindicated. |

Pharmacy management systems are computer-based systems that are widely used by commercial pharmacies to manage prescriptions and to provide pharmacy and medical personnel with warnings and guidance regarding drugs being administered to individuals. Such systems typically provide alerts warning either or both of health care providers and patients when a drug that may be harmful to the particular patient is prescribed. For example, such systems can provide alerts warning that a patient has an allergy to a prescribed drug, or is receiving concomitant administration of a drug that can have a dangerous interaction with a prescribed drug. U.S. Pat. Nos. 5,758,095, 5,833,599, 5,845,255, 6,014,631, 6,067,524, 6,112,182, 6,317,719, 6,356,873, and 7,072,840, each of which is incorporated herein by reference, disclose various pharmacy management systems and aspects thereof. Many pharmacy management systems are now commercially available, e.g., CENTRICITY Pharmacy from BDM Information Systems Ltd., General Electric Healthcare, Waukesha, Wis., Rx30 Pharmacy Systems from Transaction Data Systems, Inc., Ocoee, Fla., SPEED SCRIPT from Digital Simplistics, Inc., Lenexa, Kans., and various pharmacy management systems from OPUS-ISM, Hauppauge, N.Y.

In another aspect, herein disclosed are methods for using colchicine which methods involve the use of pharmacy management systems.

In one aspect, one such method comprises a pharmacy receiving a prescription for colchicine for a patient who is suffering from gout (e.g., acute gout flares or chronic gout) and who is concomitantly being treated with a second active agent (e.g., ketoconazole or ritonavir) that is an inhibitor of

14

CYP3A and P-glycoprotein, followed by the pharmacy dispensing colchicine in response to receipt of the prescription, wherein the dispensing is preceded by entry into a first computer readable storage medium, in functional communication with a computer, of a unique patient identifier for said patient and at least one drug identifier for colchicine linked to the patient identifier so as to indicate that colchicine is to be administered to the patient. The computer is programmed to issue a drug-drug interaction alert when the at least one drug identifier for colchicine is entered linked to the patient identifier so as to indicate that colchicine is to be administered to the patient and when the patient identifier is also linked to an identifier indicating that a second active agent (e.g., ketoconazole or ritonavir) that is an inhibitor of CYP3A4 or P-glycoprotein is being concomitantly administered to the patient. Upon entry of the at least one drug identifier for colchicine linked to the patient identifier, a drug-drug interaction alert is issued to one or more of a pharmacy technician, a pharmacist, or a pharmacy customer obtaining the colchicine, said alert indicating that a second active agent (e.g., ketoconazole or ritonavir) is being concomitantly administered to the patient and that prior to the colchicine being dispensed, the colchicine dosing regimen must be reviewed and, if necessary adjusted, so that when the colchicine is delivered to the pharmacy customer obtaining the colchicine it is delivered along with instructions for the colchicine to be taken in accordance with a dosing regimen of no more than one about 0.6 mg colchicine dose to start (e.g., following the onset of the acute gout attack or the first sign of a gout flare) followed by either: no additional colchicine doses within about 12, 24, 48, or 72 hours, or at least one additional colchicine dose within about 12 hours and no more frequently than once every hour and wherein each additional colchicine dose is no greater than about 0.6 mg, and wherein the patient ingests the colchicine as instructed.

US 8,440,722 B2

15

The drug-drug interaction alert is preferably issued as one or both of a written warning on a display screen of the pharmacy management computer system, and a printed warning. The printed warning may be attached to or packaged with the dispensed prescription.

In one aspect, the identifier indicating that ketoconazole is being concomitantly administered to the patient is an identifier indicating that the second active agent is ketoconazole and is linked to at least one further identifier indicating that the ketoconazole is prescribed so that 200 mg of ketoconazole is to be ingested by the patient daily, in which case the dosing regimen for colchicine is preferably one about 0.6 mg colchicine dose to start, optionally followed by additional colchicine doses, e.g., 0, 1, 2, 3, or 4 additional colchicine doses within 24 hours of about 0.3 mg ingested every 1, 2, 3, 4, 5, 6, 7, 8, 9 10, 11, or 12 hours (e.g., every 2, 3, 4, 5, or 6 hours) after the preceding colchicine dose. In another embodiment, the identifier indicating that ketoconazole is being concomitantly administered to the patient is an identifier indicating that the second active agent is ketoconazole is linked to at least one further identifier, entered into a second computer readable storage medium in functional communication with a computer, the second storage medium being the same as or different from the first storage medium, and the further identifier indicating that the ketoconazole is prescribed so that about 200 mg of ketoconazole is to be ingested by the patient daily, in which case the colchicine dosing regimen is one about 0.6 mg colchicine dose to start, followed by an about 0.3 mg colchicine dose ingested every 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, or 12 hours (e.g., every six to eight hours) after the preceding colchicine dose. In one embodiment, the dosing regimen calls for the about 0.3 mg colchicine dose every six to eight hours. In another embodiment, the dosing regimen calls for one dose of the colchicine every eight to twelve hours.

In yet another preferred aspect, the identifier indicating that ketoconazole is being concomitantly administered to the patient is an identifier indicating that the second active agent is ketoconazole and is linked to at least one further identifier, entered into a second computer readable storage medium in functional communication with a computer, the second storage medium being the same as or different from the first storage medium, and the further identifier indicating that the ketoconazole is prescribed so that 200 mg of ketoconazole is to be ingested by the patient daily and the dosing regimen is one about 0.3 mg colchicine dose to start, followed by an about 0.3 mg colchicine dose ingested every 2, 3, 4, 5, 6, 7, or 8 hours (e.g., every eight to twelve hours) after the preceding colchicine dose.

A preferred dosing regimen calls for ingestion of colchicine to be continued until a total of no more than 1.2 mg or 2.4 mg of colchicine has been ingested, after which ingestion of colchicine is to be stopped. e.g., for at least 2, 3, 4, 5, 6, or 7 days, or until a subsequent acute gout flare, or the first sign of a subsequent gout flare, occurs.

In another aspect, the identifier indicating that ritonavir is being concomitantly administered to the patient is an identifier indicating that the second active agent is ritonavir and is linked to at least one further identifier indicating that the ritonavir is prescribed so that 200 or 1200 mg of ritonavir is to be ingested by the patient daily, in which case the dosing regimen for colchicine is preferably one about 0.6 mg colchicine dose to start, optionally followed by additional colchicine doses, e.g., 0, 1, 2, 3, or 4 additional colchicine doses

16

within 24 hours of about 0.3 mg ingested every 1, 2, 3, 4, 5, 6, 7, 8, 9 10, 11, or 12 hours (e.g., every 2, 3, 4, 5, or 6 hours) after the preceding colchicine dose. In another embodiment, the identifier indicating that ritonavir is being concomitantly administered to the patient is an identifier indicating that the second active agent is ritonavir is linked to at least one further identifier, entered into a second computer readable storage medium in functional communication with a computer, the second storage medium being the same as or different from the first storage medium, and the further identifier indicating that the ritonavir is prescribed so that about 1200 mg of ritonavir is to be ingested by the patient daily, in which case the colchicine dosing regimen is one about 0.6 mg colchicine dose to start, followed by an about 0.3 mg colchicine dose ingested every 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, or 12 hours (e.g., every six to eight hours) after the preceding colchicine dose. In one embodiment, the dosing regimen calls for the about 0.3 mg colchicine dose every six to eight hours. In another embodiment, the dosing regimen calls for one dose of the colchicine every eight to twelve hours.

In yet another aspect, the identifier indicating that ritonavir is being concomitantly administered to the patient is an identifier indicating that the second active agent is ritonavir and is linked to at least one further identifier, entered into a second computer readable storage medium in functional communication with a computer, the second storage medium being the same as or different from the first storage medium, and the further identifier indicating that the ritonavir is prescribed so that about 1200 mg of ritonavir is to be ingested by the patient daily and the dosing regimen is one about 0.3 mg colchicine dose to start, followed by an about 0.3 mg colchicine dose ingested every 2, 3, 4, 5, 6, 7, or 8 hours (e.g., every eight to twelve hours) after the preceding colchicine dose.

Also disclosed herein is a dosage adjustment method for administering colchicine to a patient to treat a medical condition, the patient concomitantly treated with a second active agent. The second active agent may be, for example, ritonavir, ketoconazole, cyclosporine, verapamil, or diltiazem. The method comprises determining a first colchicine dosing regimen (the colchicine dosing regimen suitable for administration in the absence of co-administration with a second active agent, which dosing regimen may consist of one or more doses of colchicine); and determining a second active agent dosing regimen; and administering the second active agent to the patient at the second active agent dosing regimen while concomitantly administering colchicine to the patient according to a second colchicine dosing regimen, which may consist of one or more reduced colchicine doses. The second colchicine dosing regimen is a fraction of the first colchicine dosing regimen, where the fraction is obtained by administering reduced colchicine doses or by reducing the frequency of colchicine doses, and wherein the fraction is less than or equal to about ⅔ or less than or equal to about ½ or less than or equal to about ⅓.

According to this embodiment, upon the administering the second active agent to the patient at the second active agent dosing regimen while concomitantly administering colchicine to the patient at the second colchicine dosing regimen, the therapeutic circulating level of colchicine is achieved in the patient. Preferably, the fraction is selected from ½, ⅙, ¼, ⅓, 5/12, and ½, more preferably, the fraction is ⅓ or ½. In one embodiment, if the second colchicine dosing regimen comprises a "first" colchicine dose, and one or more "subsequent" colchicine doses, each subsequent colchicine dose may be the

A413

US 8,440,722 B2

17

same as the first dose, or a fraction of the first dose. The fraction is selected from about $1/12$, about $1/8$, about $1/4$, about $1/3$, about $5/12$, about $1/2$, and about $7/12$, e.g., about $1/2$ or about $2/3$. In one example, the second colchicine dosing regimen is once-a-day, twice-a-day, three-times-a-day or four-times-a-day. In a variation of this example, the initial treatment day in, a second colchicine dosing regimen that lasts for more than one day, has one more dose administered than are administered each subsequent day.

Preferably the second active agent is selected from keto-conazole, cyclosporine, ritonavir, verapamil, or diltiazem. The specific conditions are selected from gout, FMF, thrombocytopenic purpura, and Behçet's disease. In one embodiment, the gout is an acute gout flare and the colchicine treatment schedule is an acute treatment schedule adapted for treatment of acute gout flares, or the gout is chronic gout, and the colchicine treatment schedule is a chronic treatment schedule adapted for prophylaxis, or prevention, of flares. In another embodiment, the fraction of colchicine administered to the patient concomitantly with a second active agent that is a CYP3A4 or P-gp inhibitor is $1/3$ or $1/2$ the original intended amount of colchicine and treatment with colchicine is initiated subsequent to or at the same time as initiation of treatment with the second active agent.

Colchicine is one of the most widely used drugs for treating familial Mediterranean fever (FMF). It has been reported that 5-10% of FMF patients do not show a beneficial response to colchicine administration. A polymorphism in the ABCB1 gene, the "ABCB1 3435 C to T polymorphism" has been reported to correlate with this lack of response to colchicine treatment, with patients with the homozygous TT genotype exhibiting the most pronounced "non-responder" phenotypes.

Accordingly, in another aspect, provided herein is a method for treating a patient suffering from FMF, which patient is a colchicine non-responder. Preferably, the patient is homozygous for the TT genotype of the ABCB1 3435 C to T polymorphism. The method entails the concomitant administration of a P-gp inhibitor and colchicine to the patient. Exemplary P-gp inhibitors include ketoconazole and ritonavir. Preferred dosages of the P-gp inhibitor for this purpose correspond to those called for in the prescribing information for the drug in question. For ketoconazole, an exemplary dosage is 200 mg per day. For ritonavir, an exemplary dosage is 200 or 1200 mg per day. Specific colchicine dosing regimens for this purpose are the same as used for treatment of FMF in responders, though the doses of colchicine administered may be increased as tolerated, e.g., up to two to three times the typical doses.

The following examples further illustrate aspects of this disclosure but should not be construed as in any way limiting its scope. In particular, the conditions are merely exemplary and can be readily varied by one of ordinary skill in the art.

EXAMPLES

Example 1

Pharmacokinetic Study in Healthy Adults of Single vs. Multiple Oral Doses of Colchicine Tablets

This study was a single-center, open-label, single-sequence, two-period study to evaluate the pharmacokinetic profile of colchicine following single and multiple oral doses of colchicine tablets, 0.6 mg, in healthy volunteers.

In Period 1, study subjects received a 0.6-mg dose of colchicine after an overnight fast of at least 10 hours. In

18

Period 2, subjects received a 0.6 mg dose of colchicine in the morning and the evening (approximately 12 hours later) for 10 days (steady state regimen). Subjects received a light breakfast served 60 minutes following dose administration in the morning and the evening dose was administered 90 minutes after an evening meal on Days 15 through 24 only. On Day 25, the colchicine dose was administered after an overnight fast of at least 10 hours and lunch was served 4 hours post-dose. Study periods were separated by a 14-day washout. Following the single dose and the last dose of the multiple dose regimen (beginning on the mornings of Day 1 and Day 25, respectively), blood samples were collected (6 mL each) from each subject within 1 hour prior to dosing and after dose administration at study hours 0.5, 1, 1.5, 2, 3, 4, 6, 8, 10, 12, and 24 (while confined) and 36, 48, 72, and 96 (on an outpatient basis). Plasma concentrations of colchicine and its metabolites were determined using validated LC/MS-MS methods.

Thirteen healthy, non-smoking subjects with a mean age of 25.5 years (range 19 to 38 years) and within 15% of ideal body weight were enrolled in this study. All subjects completed both dosing periods according to protocol.

After a single dose, plasma concentrations are no longer quantifiable 24 hours post-dose in all but 1 subject. After the last dose of the steady state regimen, concentrations remained quantifiable for 48 to 72 hours. Review of individual subject data shows that no subject experienced a secondary colchicine peak, either following a single dose or upon multiple dosing.

All 2-O-demethylcolchicine (2-DMC) concentrations were below the level of quantitation (LOQ, 0.2 ng/mL) and only one sample from 1 subject (of 13 subjects) had a detectable 3-O-demethylcolchicine (3-DMC) concentration, which was near the level of quantitation. Therefore, metabolites are not discussed further.

In healthy adults, colchicine appears to be readily absorbed when given orally, reaching a mean maximum plasma concentration of 2.5 ng/mL in 1.5 hours after a single dose. The drug is distributed widely, with an apparent volume of distribution of 540 L, greatly exceeding total body water. The elimination half-life is calculated following a single oral dose is approximately 5 hours. Levels were not detectable by 24 hours post-dose and this is therefore not an accurate estimate. Pharmacokinetic parameter values are summarized in the table below.

Review of trough plasma concentrations indicates that steady state was attained by approximately the eighth day of dosing for most subjects. Colchicine may have a diurnal variation reflected in the observed $C_{min}$ concentrations at steady state. $C_{min}$ concentrations prior to the morning dose are approximately 12% higher than the $C_{min}$ concentrations prior to the evening dose (Day 23 and Day 24). The mean $C_{min}$ concentration observed on Day 25 was 0.907 ng/mL.

Colchicine accumulated following administration of multiple doses to an extent greater than expected. Exposure was nearly two-fold higher (approximately 1.7 based on AUC [Day 25 $AUC_{0-\tau}$/Day 1 $AUC_{0-\infty}$] and approximately 1.5 based on Cmax [Day 25 $C_{max}$/Day 1 $C_{max}$]). This observation could be attributable to an underestimation of AUC∞ following a single dose. With the higher plasma levels that occur with repeated dosing, a longer terminal elimination half-life is apparent, 26.6 hours. Pharmacokinetic parameter values are summarized in Tables 3-5.

US 8,440,722 B2

**19**                                                                                   **20**

TABLE 3

Colchicine Pharmacokinetic Parameter Values Following Administration of
A Single Oral Dose of Colchicine 0.6 mg in Healthy Adults (N = 13)

|  | MEAN | STDEV | % CV | MEDIAN | MIN | MAX |
|---|---|---|---|---|---|---|
| $AUC_{0-t}$ (pg-hr/mL) | 10494.66 | 3544.08 | 33.77 | 10560.90 | 4812.88 | 18091.85 |
| $AUC_{0-inf}$ (pg-hr/mL) | 12268.18 | 4422.08 | 36.05 | 11451.45 | 7252.66 | 23801.68 |
| Cmax (pg/mL) | 2450.15 | 702.11 | 28.66 | 2480.00 | 1584.00 | 3977.00 |
| Tmax (hr) | 1.50 | 0.54 | 36.00 | 1.50 | 1.00 | 3.00 |
| $K_{el}$ (1/hr) | 0.1829 | 0.0592 | 32.38 | 0.1992 | 0.0359 | 0.2443 |
| $T_{1/2}$ (hr) | 4.95 | 4.43 | 89.54 | 3.48 | 2.84 | 19.29 |

TABLE 4

Colchicine Pharmacokinetic Parameter Values Following Administration of
Multiple (b.i.d.) Oral Doses of Colchicine 0.6 mg in Healthy Adults (N = 13)

|  | MEAN | STDEV | % CV | MEDIAN | MIN | MAX |
|---|---|---|---|---|---|---|
| $AUC_{0-t}$ (pg-hr/mL) | 43576.96 | 9333.26 | 21.42 | 41925.10 | 29328.78 | 58265.35 |
| $AUC_{0-\tau}$ (pg-hr/mL) | 20366.61 | 3322.12 | 16.31 | 20423.08 | 13719.18 | 25495.25 |
| $AUC_{0-inf}$ (pg-hr/mL) | 54198.77 | 9214.54 | 17.00 | 54113.43 | 37599.76 | 67944.65 |
| $C_{max}$ (pg/mL) | 3553.15 | 843.45 | 23.74 | 3734.00 | 1977.00 | 4957.00 |
| $C_{min}$ (pg/mL) | 906.51 | 152.19 | 16.79 | 903.50 | 636.23 | 1149.67 |
| $C_{ave}$ (pg/mL) | 1697.22 | 276.84 | 16.31 | 1701.92 | 1143.26 | 2124.60 |
| $T_{max}$ (hr) | 1.31 | 0.60 | 45.61 | 1.00 | 0.50 | 3.00 |
| $K_{el}$ (1/hr) | 0.0267 | 0.0044 | 16.34 | 0.0261 | 0.0206 | 0.0333 |
| $T_{1/2}$ (hr) | 26.60 | 4.33 | 16.26 | 26.51 | 20.82 | 33.65 |

TABLE 5

Mean (% CV) Colchicine Pharmacokinetic Parameter Values
Following Administration of Single and Multiple (b.i.d.)
Oral Doses of Colchicine 0.6 mg in Healthy Adults

|  | Vd/F (L) | CL/F (L/hr) |
|---|---|---|
| Colchicine 0.6-mg Single Dose (N = 13) | | |
| Day 1 | 341 (54.4) | 54.1 (31.0) |
| Colchicine 0.6 mg b.i.d. × 10 days | | |
| Day 25 | 1150 (18.73) | 30.3 (19.0) |

CL = Dose/AUC$_{0-t}$ (Calculated from mean values)
Vd = CL/Ke (Calculated from mean values)

In tables, the parameter CL/F denotes the apparent total
body clearance after administration, calculated as Total Dose/
Total AUC0-$_{Last}$; and V$_d$/F denotes the apparent total volume
of distribution after administration, calculated as Total Dose/
(Total AUC∞×K$_{el}$). FIG. **1** shows mean colchicine plasma
concentrations following administration of single and mul-
tiple oral doses of colchicine 0.6 mg in healthy adults.

Example 2

Clinical Drug-Drug Interaction Study of Colchicine
and Clarithromycin

A single-center, open-label, one sequence, two-period
study was carried out in 23 healthy subjects. On Day 1, a
single 0.6-mg dose of colchicine was administered. After
completing a 21-day washout period, all subjects received
250 mg of clarithromycin administered twice daily for 7 days

(Days 22 through 29), a sufficient dose and duration to inhibit
CYP3A4 and Pgp. On the final day (Day 29), a single dose of
colchicine was co-administered with the clarithromycin dose.
When combined with steady-state clarithromycin, there is a
significant increase in exposure to colchicine as compared to
when colchicine is given alone: the mean C$_{max}$ and AUC$_{0-t}$
concentrations increased 167% and 250%, respectively. In
addition, co-administration of clarithromycin and colchicine
resulted in an increase of 233% in the plasma elimination
half-life (t½) of colchicine and a 75% decrease in apparent
clearance (Cl /F). A summary of the mean (% CV) colchicine
pharmacokinetic parameters for Day 1 (colchicine adminis-
tered alone) and Day 29 (colchicine co-administered with
steady-state clarithromycin) are given in the table below and
illustrated in Table 5.

TABLE 6

Comparison of Single-Dose Colchicine (0.6 mg, Alone)
and Single-Dose Colchicine (0.6 mg) Co-Administered
with Steady-State Clarithromycin in Healthy Adults

|  | Arithmetic Mean (% CV) | |
|---|---|---|
| Parameter (units) | Colchicine (N = 23) | Colchicine + Clarithromycin (N = 23) |
| $AUC_{0-t}$ (ng · hr/mL) | 12.37 (37.64) | 41.95 (23.31) |
| $AUC_{0-inf}$ (ng · hr/mL) | 15.53 (49.6) | 52.62 (22.84) |
| $C_{max}$ (ng/mL) | 2.84 (30.97) | 8.44 (17.63) |
| $T_{max}$ (hr)* | 1.50 (0.50-2.00) | 1.50 (0.50-2.00) |
| CL/F (L/hr) | 46.8 (43.68) | 12.0 (23.75) |

US 8,440,722 B2

<table>
<tr><td>21</td><td>22</td></tr>
</table>

FIG. 2 shows a pharmacokinetic profile comparison of single-dose colchicine (0.6 mg, alone) and single-dose colchicine (0.6 mg) co-administered with steady-state clarithromycin in healthy adults. Based on the foregoing data, it is concluded that the dose of colchicine co-administered with clarithromycin should be reduced by ⅔.

### Example 3

#### Clinical Drug-Drug Interaction Study of Colchicine and Cyclosporine

This study was an open-label, non-randomized, single-center, one-sequence, two-period drug interaction study conducted in healthy male and female volunteers. Twenty-four (24) non-smoking, non-obese adult volunteers were enrolled. All subjects were dosed and studied as a single cohort, with each subject receiving the same treatment in a non-randomized fashion.

A single dose of colchicine, 0.6 mg, was administered alone on Day 1, and then co-administered with cyclosporine on Day 15. Cyclosporine was administered as a single-dose (1×100 mg capsule) on the morning of Day 15. A 14 day washout period was completed after the first colchicine dose on Day 1 and prior to the co-administration of colchicine and cyclosporine doses on Day 15.

Serial blood samples were collected by individual venipuncture up to 96 hours following drug administration on Day 1 and Day 15. Blood samples for determination of colchicine plasma concentrations were obtained at time zero (pre-dose) and after dose administration at 0.5, 1.0, 1.5, 2, 3, 4, 5, 6, 8, 12, and 24 hours post-dose on a confined basis. Subjects were then return to the clinic on a non-confine basis for continued blood sampling collection at 36, 48, 72, and 96 hours post-dose administration on Days 2-5 (Period 1) and Days 16-19 (Period 2). Cyclosporine plasma concentrations were not measured.

TABLE 7

Comparison of Single-Dose Colchicine (0.6 mg, Alone) and Single-Dose Colchicine (0.6 mg) Co-Administered with Steady-State Cyclosporine in Healthy Adults

| | Arithmetic Mean (% CV) | |
|---|---|---|
| Parameter (units) | Colchicine (N = 23) | Colchicine + Cyclosporine (N = 23) |
| AUC$_{0-t}$(ng · hr/mL) | 12.55 | 39.83 |
| AUC$_{0-inf}$(ng · hr/mL) | 15.00 | 47.31 |
| C$_{max}$ (ng/mL) | 2.72 | 8.82 |
| T$_{max}$ (hr)* | 1.15 | 1.13 |
| CL/F (L/hr) | 48.24 | 13.42 |

FIG. 3 shows a pharmacokinetic profile comparison of single-dose colchicine (0.6 mg, alone) and single-dose colchicine (0.6 mg) co-administered with steady-state clarithromycin and steady-state cyclosporine in healthy adults. Based on the foregoing data, the dose of colchicine co-administered with cyclosporine should be reduced by approximately ½ to ¾.

### Example 4

#### Clinical Drug-Drug Interaction Study of Colchicine and Ritonavir

An open-label, non-randomized, single-center, one-sequence, two-period drug interaction study was conducted in healthy male and female volunteers; there will be a 14-day washout between the two periods. Twenty-four (24) non-smoking, non-obese adult volunteers were enrolled. All subjects were dosed and studied as a single cohort, with each subject receiving the same treatment in a non-randomized fashion.

All subjects received a single 0.6-mg dose of colchicine on Day 1 administered under standard fasting conditions, followed by a 14-day washout period completed on an outpatient basis. At discharge on Day 2, study subjects were instructed to return to the clinical site on the mornings and evenings of Days 15 through 18 to receive two daily dosage amounts of ritonavir (1×100 mg ritonavir capsule twice daily (every 12 hours) on Days 15-18) in a 'directly-observed' fashion; after taking the first dose of ritonavir, subjects remained in the clinic for observation for 1 hour post-dose administration on Day 15. On the evening of Day 18, study participants remained at the clinic for their final study confinement period. In the morning on Day 19, study subjects received a single 0.6 mg colchicine dose with a single 100 mg ritonavir dose and study subjects received the final 100 mg ritonavir dose 12 hours later in the evening on Day 19 under standard fasting conditions.

Serial blood samples were collected by individual venipuncture up to 96 hours following drug administration on Day 1 and Day 19. Blood samples for determination of colchicine plasma concentrations were obtained at time zero (pre-dose) and after dose administration at 0.5, 1.0, 1.5, 2, 3, 4, 5, 6, 8, 12, and 24 hours post-dose on an inpatient basis. Subjects returned to the clinic on an outpatient basis for continued blood sampling collection at 36, 48, 72, and 96 hours post-dose administration. Ritonavir plasma concentrations were not measured.

TABLE 8

Comparison of Single-Dose Colchicine (0.6 mg, Alone) and Single-Dose Colchicine (0.6 mg) Co-Administered with Steady-State Ritonavir in Healthy Adults: ln-transformed data

| | Colchicine Alone | Colchicine + Ritonavir | % Ratio |
|---|---|---|---|
| C$_{max}$ (pg/mL), geometric mean | 1798.37 | 4835.39 | 268.88 |
| AUC$_{0-t}$ (pg · h/mL), geometric mean | 7642.71 | 27793.08 | 363.65 |
| AUC$_{∞}$ (pg · h/mL), geometric mean | 9551.74 | 33771.36 | 353.56 |

TABLE 9

Comparison of Single-Dose Colchicine (0.6 mg, Alone) and Single-Dose Colchicine (0.6 mg) Co-Administered with Steady-State Ritonavir in Healthy Adults

| | Arithmetic Mean (% CV) Median (Range) for T$_{max}$ | |
|---|---|---|
| Parameter (units) | Colchicine + Ritonavir (N = 18) | Colchicine Alone (N = 18) |
| AUC$_{0-t}$ (ng · hr/mL) | 29.05 (30.76) | 8.41 (47.46) |
| AUC$_{0-∞}$ (ng · hr/mL) | 35.28 (29.79) | 10.41 (45.48) |
| C$_{max}$ (ng/mL) | 4.99 (25.18) | 1.87 (28.19) |
| T$_{max}$ (hr) | 1.5 (1-1.5) | 1 (0.5-1.5) |
| CL/F (L/hr) | 18.59 (31.58) | 67.93 (39.47) |

Following exposure to 100 mg b.i.d.×5 days, there was a significant increase in exposure to a single 0.6-mg colchicine

US 8,440,722 B2

23

(approximately 245%). Mean peak colchicine concentration increased by approximately 170%. Total apparent oral clearance was decreased by 70% with co-administration. $T_{max}$ is not affected. Elimination half-life could not be estimated accurately as plasma concentrations were not quantifiable after 24 hours.

FIG. 4 shows a pharmacokinetic profile comparison of single-dose colchicine (0.6 mg, alone) and single-dose colchicine (0.6 mg) co-administered with steady-state ritonavir and steady-state ketoconazole in healthy adults. Based on the foregoing data, the dose of colchicine co-administered with ritonavir should be reduced by approximately ½.

Example 5

Clinical Drug-Drug Interaction Study of Colchicine and Ketoconazole

This study was an open-label, non-randomized, single-center, one-sequence, two-period drug interaction study conducted in healthy male and female volunteers; there will be a 14-day washout between the two periods. Twenty-four (24) non-smoking, non-obese adult volunteers were enrolled.

A single dose of colchicine, 0.6 mg, was administered alone on Day 1, and then co-administered with ketoconazole on Day 19 (AM dose). Ketoconazole was administered for 5 consecutive days [200 mg twice daily (every 12 hours)] beginning on the morning of Day 15, with the last 200 mg ketoconazole dose administered on the evening of Day 19. Total study participation, exclusive of up to 28 days of screening, was approximately 24 days, during which subjects will be confined on two occasions for a total confinement of approximately 3 days.

Serial blood samples were collected by individual venipuncture up to 96 hours following drug administration on Day 1 and Day 19. Blood samples for determination of colchicine plasma concentrations were obtained at time zero (pre-dose) and after dose administration at 0.5, 1.0, 1.5, 2, 3, 4, 5, 6, 8, 12, and 24 hours post-dose on an inpatient basis. Subjects returned to the clinic on an outpatient basis for continued blood sampling collection at 36, 48, 72, and 96 hours post-dose administration. Ketoconazole plasma concentrations were not measured.

TABLE 10

Comparison of Single-Dose Colchicine (0.6 mg, Alone) and Single-Dose Colchicine (0.6 mg) Co-Administered with Steady-State Ketoconazole in Healthy Adults: ln-transformed data

| | Colchicine Alone | Colchicine + Ketoconazole | % Ratio |
|---|---|---|---|
| $C_{max}$ (pg/mL), geometric mean | 2598.28 | 5078.50 | 195.46 |
| $AUC_{0-t}$ (pg · h/mL), geometric mean | 11087.99 | 33223.80 | 299.64 |
| $AUC_{\infty}$ (pg · h/mL), geometric mean | 13185.92 | 42143.00 | 319.61 |

24

TABLE 11

Comparison of Single-Dose Colchicine (0.6 mg, Alone) and Single-Dose Colchicine (0.6 mg) Co-Administered with Steady-State Ketoconazole in Healthy Adults

| Parameter (units) | Arithmetic Mean (% CV) | |
|---|---|---|
| | Colchicine (N = 23) | Colchicine + Ketoconazole (N = 23) |
| $AUC_{0-t}$ (pg · hr/mL) | 11988.61 | 34382.82 |
| $AUC_{0-inf}$ (pg · hr/mL) | 14314.09 | 43688.90 |
| $C_{max}$ (pg/mL) | 2779.08 | 5266.92 |
| $T_{max}$ (hr)* | 1.00 | 1.02 |
| CL/F (L/hr) | 49301.09 | 14797.94 |

*Median (Range) for $T_{max}$

Following administration of ketoconazole 200 mg b.i.d.×5 days, there was a significant increase in exposure to a single oral dose of colchicine 0.6 mg ($C_{max}$ and $AUC_{0-t}$ increased by 90% and 190%, respectively, and $AUC_{0-\infty}$ increased by about 205%). Total apparent oral clearance decreased by 70% with co-administration. Elimination half-life could not be estimated accurately as plasma concentrations were not quantifiable after 24 hours.

FIG. 4 shows a pharmacokinetic profile comparison of single-dose colchicine (0.6 mg, alone) and single-dose colchicine (0.6 mg) co-administered with steady-state ritonavir and steady-state ketoconazole in healthy adults. Based on the foregoing data, the dose of colchicine co-administered with ketoconazole should be reduced by approximately ½.

Example 6

Clinical Drug-Drug Interaction Study of Colchicine and Azithromycin

This study was an open-label, non-randomized, single-center, one-sequence, two-period drug interaction study conducted in healthy male and female volunteers; there was a 14-day washout between the two periods. Twenty-four (24) non-smoking, non-obese adult volunteers were enrolled. All subjects were dosed and studied as a single cohort, with each subject receiving the same treatment in a non-randomized fashion.

A single dose of colchicine, 0.6 mg, was administered alone on Day 1, and then co-administered with the azithromycin on Day 19. Azithromycin was administered for 5 consecutive days (2×250 mg once daily [Day 15 only] and then 1×250 mg once daily Days 16-19) beginning on the morning of Day 15, with the last 250 mg azithromycin dose administered on the morning of Day 19. Total study participation, exclusive of up to 28 days of screening, was approximately 24 days, during which subjects were confined on two occasions for a total confinement of approximately 3 days.

Serial blood samples were collected by individual venipuncture up to 96 hours following drug administration on Day 1 and Day 19. Blood samples for determination of colchicine plasma concentrations were obtained at time zero (pre-dose) and after dose administration at 0.5, 1.0, 1.5, 2, 3, 4, 5, 6, 8, 12, and 24 hours post-dose on an inpatient basis. Subjects returned to the clinic on an outpatient basis for continued blood sampling collection at 36, 48, 72, and 96 hours post-dose administration. Azithromycin plasma concentrations were not measured.

**25**

TABLE 12

Comparison of Single-Dose Colchicine (0.6 mg, Alone)
and Single-Dose Colchicine (0.6 mg) Co-Administered
with Steady-State Azithromycin in Healthy Adults

| | Colchicine Alone | Colchicine + Azithromycin | % Ratio |
|---|---|---|---|
| $C_{max}$ (pg/mL), geometric mean | 2535.94 | 2856.22 | 112.63 |
| $AUC_{0-t}$ (pg · h/mL), geometric mean | 10971.51 | 16090.52 | 146.66 |
| $AUC_{\infty}$ (pg · h/mL), geometric mean | 12931.80 | 18312.83 | 141.61 |

TABLE 13

Comparison of Single-Dose Colchicine (0.6 mg, Alone)
and Single-Dose Colchicine (0.6 mg) Co-Administered
with Steady-State Azithromycin in Healthy Adults

| | Arithmetic Mean (% CV) Median (Range) for $T_{max}$ | |
|---|---|---|
| Parameter (units) | Colchicine + Azithromycin (N = 21) | Colchicine Alone (N = 21) |
| $AUC_{0-t}$ (ng · hr/mL) | 17.16 (37.78) | 11.98 (45.81) |
| $AUC_{0-\infty}$ (ng · hr/mL) | 19.61 (39.15) | 14.13 (46.73) |
| $C_{max}$ (ng/mL) | 3.05 (39.54) | 2.74 (41.52) |
| $T_{max}$ (hr) | 1.5 (0.5-3) | 1.0 (0.5-3) |
| $t_{1/2}$ (hr) | 6.71 (68.24)§ | 6.07 (66.15)§ |
| CL/F (L/hr) | 35.01 (37.26) | 50.24 (40.31) |

Following administration of azithromycin 500 mg on Day 1 followed by 250 mg×4 days, exposure to colchicine is increased (approximately 46% for $AUC_{\infty}$ and approximately 40% for $AUC_{0-\infty}$). Mean peak colchicine concentration increased by approximately 12% and total apparent oral clearance decreased approximately 30% with co-administration. $T_{max}$ was not affected.

FIG. 5 shows a pharmacokinetic profile comparison of single-dose colchicine (0.6 mg, alone) and single-dose colchicine (0.6 mg) co-administered with steady-state azithromycin and steady-state diltiazem in healthy adults.

Example 7

Clinical Drug-Drug Interaction Study of Colchicine and Diltiazem

This study was an open-label, non-randomized, single-center, one-sequence, two-period drug interaction study conducted in healthy male and female volunteers. Twenty-four (24) non-smoking, non-obese adult volunteers were enrolled. All subjects were dosed and studied as a single cohort, with each subject receiving the same treatment in a non-randomized fashion.

As single dose of colchicine, 0.6 mg, was administered alone on Day 1, and then co-administered with diltiazem ER on Day 21. Diltiazem ER was administered for 7 consecutive days (1×240 mg capsule once daily on Days 15-21) beginning on the morning of Day 15, with the last 240 mg diltiazem ER dose administered on the morning on Day 21. A 14-day washout period was completed after the first colchicine dose on Day 1 and prior to the administration of the first diltiazem ER dose on Day 15.

Serial blood samples were collected by individual venipuncture up to 96 hours following drug administration on Day

**26**

1 and Day 21. Blood samples for determination of colchicine plasma concentrations were obtained at time zero (pre-dose) and after dose administration at 0.5, 1.0, 1.5, 2, 3, 4, 5, 6, 8, 12, and 24 hours post-dose on an inpatient basis. Subjects returned to the clinic on an outpatient basis for continued blood sampling collection at 36, 48, 72, and 96 hours post-dose administration. Diltiazem plasma concentrations were not measured.

TABLE 14

Comparison of Single-Dose Colchicine (0.6 mg, Alone)
and Single-Dose Colchicine (0.6 mg) Co-Administered
with Steady-State Diltiazem in Healthy Adults

| | Colchicine Alone | Colchicine + Diltiazem | % Ratio |
|---|---|---|---|
| $C_{max}$ (pg/mL), geometric mean | 2006.42 | 2583.22 | 128.75 |
| $AUC_{0-t}$ (pg · h/mL), geometric mean | 9154.55 | 15740.37 | 171.94 |
| $AUC_{\infty}$ (pg · h/mL), geometric mean | 11022.30 | 19902.98 | 180.57 |

TABLE 15

Comparison of Single-Dose Colchicine (0.6 mg, Alone)
and Single-Dose Colchicine (0.6 mg) Co-Administered
with Steady-State Diltiazem in Healthy Adults

| | Arithmetic Mean (% CV) Median (Range) for $T_{max}$ | |
|---|---|---|
| Parameter (units) | Colchicine + Diltiazem (N = 20) | Colchicine Alone (N = 20) |
| $AUC_{0-t}$ (ng · hr/mL) | 17.73 | 10.04 |
| $AUC_{0-\infty}$ (ng · hr/mL) | 22.49 | 12.03 |
| $C_{max}$ (ng/mL) | 2.80 | 2.17 |
| $T_{max}$ (hr) | 1.48 | 1.15 |
| $t_{1/2}$ (hr) | 12.50 | 5.51 |
| CL/F (L/hr) | 463.49 | 395.83 |

FIG. 5 shows a pharmacokinetic profile comparison of single-dose colchicine (0.6 mg, alone) and single-dose colchicine (0.6 mg) co-administered with steady-state azithromycin and steady-state diltiazem in healthy adults.

Example 8

Clinical Drug-Drug Interaction Study of Colchicine and Verapamil

This study was an open-label, non-randomized, single-center, one-sequence, two-period drug interaction study conducted in healthy male and female volunteers. Twenty-four (24) non-smoking, non-obese adult volunteers were enrolled. All subjects were dosed and studied as a single cohort, with each subject receiving the same treatment in a non-randomized fashion.

A single dose of colchicine, 0.6 mg, was administered alone on Day 1, and then co-administered with verapamil HCl ER on Day 19. Verapamil HCl ER was administered for 5 consecutive days (1×240 mg tablet once daily on Days 15-19) beginning on the morning of Day 15, with the last 240 mg verapamil HCl ER dose administered on the morning on Day 19. A 14-day washout period was completed after the first colchicine dose on Day 1 and prior to the administration of the first verapamil HCL ER dose on Day 15.

US 8,440,722 B2

27

Serial blood samples were collected by individual venipuncture up to 96 hours following drug administration on Day 1 and Day 19. Blood samples for determination of colchicine plasma concentrations were obtained at time zero (pre-dose) and after dose administration at 0.5, 1.0, 1.5, 2, 3, 4, 5, 6, 8, 12, and 24 hours post-dose on a confined basis. Subjects returned to the clinic on a non-confined basis for continued blood sampling collection at 36, 48, 72, and 96 hours post-dose administration on Days 2-5 (Period 1) and Days 20-23 (Period 2). Verapamil plasma concentrations were not measured.

TABLE 16

Comparison of Single-Dose Colchicine (0.6 mg, Alone)
and Single-Dose Colchicine (0.6 mg) Co-Administered
with Steady-State Verapamil in Healthy Adults

| | Colchicine Alone | Colchicine + Verapamil | % Ratio |
|---|---|---|---|
| $C_{max}$ (pg/mL), geometric mean | 2768.77 | 3639.68 | 131.45 |
| $AUC_{0-t}$ (pg · h/mL), geometric mean | 12256.40 | 23889.21 | 194.94 |
| $AUC_\infty$ (pg · h/mL), geometric mean | 14415.79 | 29556.75 | 205.03 |

TABLE 17

Comparison of Single-Dose Colchicine (0.6 mg, Alone)
and Single-Dose Colchicine (0.6 mg) Co-Administered
with Steady-State Verapamil in Healthy Adults

| | Arithmetic Mean (% CV) Median (Range) for $T_{max}$ | |
|---|---|---|
| Parameter (units) | Colchicine + Verapamil (N = 24) | Colchicine Alone (N = 24) |
| $AUC_{0-t}$ (ng · hr/mL) | 24.64 | 13.09 |
| $AUC_{0-\infty}$ (ng · hr/mL) | 30.59 | 15.37 |
| $C_{max}$ (ng/mL) | 3.85 | 2.97 |
| $T_{max}$ (hr) | 1.15 | 1.22 |
| $t_{1/2}$ (hr) | 17.17 | 6.24 |
| CL/F (L/hr) | 21.01 | 43.93 |

Recitation of ranges of values herein are merely intended to serve as a shorthand method of referring individually to each separate value falling within the range, unless otherwise indicated herein, and each separate value is incorporated into the specification as if it were individually recited herein. The endpoints of all ranges directed to the same component or property are inclusive and independently combinable.

All methods described herein can be performed in a suitable order unless otherwise indicated or clearly contradicted by context. The use of any and all examples, or exemplary language (e.g., "such as") herein is intended to better illuminate the disclosure and is non-limiting unless otherwise specified. No language in the specification should be construed as indicating that any non-claimed element as essential to the practice of the claimed embodiments. Unless defined otherwise, technical and scientific terms used herein have the same meaning as is commonly understood by one of skill in the art to which this disclosure belongs. The terms wt %, weight percent, percent by weight, etc. are equivalent and interchangeable.

In the specification and claims that follow, references will be made to a number of terms which shall be defined to have the following meaning.

28

The terms "a" and "an" do not denote a limitation of quantity, but rather denote the presence of at least one of the referenced item. The term "or" means "and/or." The terms "comprising", "having", "including", and "containing" are to be construed as open-ended terms (i.e., meaning "including, but not limited to").

"Concomitant" and "concomitantly" as used herein refer to the administration of at least two drugs to a patient either simultaneously or within a time period during which the effects of the first administered drug are still operative in the patient. Thus, if the first drug is, e.g., clarithromycin and the second drug is colchicine, the concomitant administration of the second drug can occur as much as one to two weeks, preferably within one to seven days, after the administration of the first drug. This is because clarithromycin can exert a long-lasting inhibition of CYP3A isozymes so that CYP3A activity in the patient may not return to pre-clarithromycin-administration levels for as much as two weeks after the cessation of clarithromycin administration. If colchicine is the first drug, administration of a second drug would be concomitant if done within 1 to 2 days, preferably 12 to 24 hours.

A "dose" means the measured quantity of a drug to be taken at one time by a patient.

A "dosage amount" means an amount of a drug suitable to be taken during a fixed period, usually during one day (i.e. daily). A "daily dosage amount" is the total dosage amount taken in one day, that is, a 24 hour period.

"Dosing regimen" means the dose of a drug taken at a first time by a patient and the interval (time or symptomatic) and dosage amounts at which any subsequent doses of the drug are taken by the patient. Each dose may be of the same or different.

A "patient" means a human or non-human animal in need of medical treatment. Medical treatment can include treatment of an existing condition, such as a disease or disorder, prophylactic or preventative treatment, or diagnostic treatment. In preferred embodiments the patient is human.

"Providing" means giving, administering, selling, distributing, transferring (for profit or not), manufacturing, compounding, or dispensing.

"Risk" means the probability or chance of adverse reaction, injury, or other undesirable outcome arising from a medical treatment. An "acceptable risk" means a measure of the risk of harm, injury, or disease arising from a medical treatment that will be tolerated by an individual or group. Whether a risk is "acceptable" will depend upon the advantages that the individual or group perceives to be obtainable in return for taking the risk, whether they accept whatever scientific and other advice is offered about the magnitude of the risk, and numerous other factors, both political and social. An "acceptable risk" of an adverse reaction means that an individual or a group in society is willing to take or be subjected to the risk that the adverse reaction might occur since the adverse reaction is one whose probability of occurrence is small, or whose consequences are so slight, or the benefits (perceived or real) of the active agent are so great. An "unacceptable risk" of an adverse reaction means that an individual or a group in society is unwilling to take or be subjected to the risk that the adverse reaction might occur upon weighing the probability of occurrence of the adverse reaction, the consequences of the adverse reaction, and the benefits (perceived or real) of the active agent. "At risk" means in a state or condition marked by a high level of risk or susceptibility.

Pharmacokinetic parameters referred to herein describe the in vivo characteristics of drug (or a metabolite or a surrogate marker for the drug) over time. These include plasma con-

US 8,440,722 B2

29

centration (C), as well as $C_{max}$, $C_n$, $C_{24}$, $T_{max}$, and AUC. "$C_{max}$" is the measured plasma concentration of the active agent at the point of maximum, or peak, concentration. "$C_{min}$" is the measured plasma concentration of the active agent at the point of minimum concentration. "$C_n$" is the measured plasma concentration of the active agent at about n hours after administration. "$C_{24}$" is the measured plasma concentration of the active agent at about 24 hours after administration. The term "$T_{max}$" refers to the time from drug administration until $C_{max}$ is reached. "AUC" is the area under the curve of a graph of the measured plasma concentration of an active agent vs. time, measured from one time point to another time point. For example $AUC_{0-t}$ is the area under the curve of plasma concentration versus time from time 0 to time t, where time 0 is the time of initial administration of the drug. Time t can be the last time point with measurable plasma concentration for an individual formulation. The $AUC_{0-\infty}$, $AUC_{\infty}$ or $AUC_{0-inf}$ is the calculated area under the curve of plasma concentration versus time from time 0 to time infinity. In steady-state studies, $AUC_{0-\tau}$ is the area under the curve of plasma concentration over the dosing interval (i.e., from time 0 to time $\tau$ (tau), where tau is the length of the dosing interval. Other pharmacokinetic parameters are the parameter $K_e$ or $K_{el}$, the terminal elimination rate constant calculated from a semi-log plot of the plasma concentration versus time curve; $t_{1/2}$ the terminal elimination half-life, calculated as $0.693/K_{el}$. CL/F denotes the apparent total body clearance after administration, calculated as Total Dose/Total $AUC_{\infty}$; and $V_{area}/F$ denotes the apparent total volume of distribution after administration, calculated as Total Dose/(Total $AUC_{\infty} \times K_{el}$).

"Side effect" means a secondary effect resulting from taking a drug. The secondary effect can be negative (unfavorable) effect (i.e., an adverse side effect) or a positive (favorable) effect.

The most frequently reported adverse side effects to colchicine therapy are gastrointestinal, specifically abdominal pain with cramps, diarrhea, nausea, and vomiting. Less frequently or rarely reported adverse side effects associated with colchicine therapy include anorexia, agranulocytosis, allergic dermatitis, allergic reactions, alopecia, angioedema, aplastic

30

anemia, bone marrow depression, myopathy, neuropathy, skin rash, thrombocytopenic disorder, and urticaria.

Whether a patient experiences an adverse side effect can be determined by obtaining information from the patient regarding onset of certain symptoms which may be indicative of the adverse side effect, results of diagnostic tests indicative of the adverse side effect, and the like.

Embodiments are described herein, including the best modes known to the inventors. Variations of such embodiments will become apparent to those of ordinary skill in the art upon reading the foregoing description. The skilled artisan is expected to employ such variations as appropriate, and the disclosed methods are expected to be practiced otherwise than as specifically described herein. Accordingly, all modifications and equivalents of the subject matter recited in the claims appended hereto are included to the extent permitted by applicable law. Moreover, any combination of the above-described elements in all possible variations thereof is encompassed unless otherwise indicated herein or otherwise clearly contradicted by context.

What is claimed is:

1. A method of treating a patient in need of treatment for prophylaxis of gout flares with colchicine, comprising
orally administering an adjusted daily dosage amount of colchicine to the patient who is receiving concomitant administration of verapamil,
wherein the adjusted daily dosage amount of colchicine is 50% to 75% of an intended daily dosage amount of colchicine,
wherein the intended daily dosage amount of colchicine is a dosage amount suitable for the patient if the patient were not receiving concomitant verapamil, wherein the intended daily dosage amount of colchicine suitable for the patient if the patient were not receiving concomitant verapamil is 0.6 mg twice daily or 0.6 mg once daily, and wherein the concomitantly administered dose of verapamil is 240 mg per day.

2. The method of claim 1, wherein the adjusted daily dosage amount is 50% of the intended daily dosage amount.

* * * * *

US007964647B2

(12) **United States Patent**       (10) **Patent No.:**     **US 7,964,647 B2**
Davis                              (45) **Date of Patent:**    **\*Jun. 21, 2011**

(54) **COLCHICINE COMPOSITIONS AND METHODS**

(75) Inventor: **Matthew W. Davis**, Erwinna, PA (US)

(73) Assignee: **Mutual Pharmaceutical Company, Inc.**, Philadelphia, PA (US)

( \* ) Notice:   Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/407,980**

(22) Filed:   **Mar. 20, 2009**

(65)            **Prior Publication Data**

US 2009/0170952 A1    Jul. 2, 2009

**Related U.S. Application Data**

(63) Continuation of application No. 12/246,034, filed on Oct. 6, 2008.

(60) Provisional application No. 60/977,796, filed on Oct. 5, 2007, provisional application No. 61/090,965, filed on Aug. 22, 2008.

(51) **Int. Cl.**
*A01N 37/18*     (2006.01)
*A61K 31/16*     (2006.01)
*C07C 233/00*    (2006.01)
*C07C 235/00*    (2006.01)
*C07C 237/00*    (2006.01)
*C07C 239/00*    (2006.01)
*C07C 211/00*    (2006.01)
*C07C 205/00*    (2006.01)
*C07C 207/00*    (2006.01)

(52) **U.S. Cl.** ........ **514/629**; 564/123; 564/308; 564/427; 568/306

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56)              **References Cited**

U.S. PATENT DOCUMENTS

7,601,758 B1 \* 10/2009 Davis ........................... 514/629
7,619,004 B1 \* 11/2009 Davis ........................... 514/629
2005/0220877 A1\* 10/2005 Patel et al. ................... 424/472

FOREIGN PATENT DOCUMENTS

WO      9215291 A2    9/1992

OTHER PUBLICATIONS

Leikin et al. Poisoning and toxicology handbook. Aug. 2007, p. 216.\*
Bodoki et al. Fast determination of colchicine by TLC-densitometry from pharmaceuticals and vegetal extracts. Journal of Pharmaceutical and Biomedical Analysis, 37, 2005: 971-977.\*
http://www.medsafe.govt.nz/Profs/PUArticles/colchicinetoxicity. htm.\*
Bombuwala et al. Colchitaxel, a coupled compound made from microtubule inhibitors colchicine and paclitaxel. Beilstein Journal of Organic Chemistry, 2006, 2:13.\*

Leikin et al. Poisoning and toxicology handbook. Aug. 2007, pp. 216-217.\*
Wang et al. HMG-CoA reductase inhibitors (statins) characterized as direct inhibitors of P-glycoprotein. Pharmaceutical Research, vol. 18, No. 6. pp. 800-806.\*
Horn et al., 2006. Pharmacy Times, pp. 111.\*
Wang et al. HMG-CoA reductase inhibitors (statins) characterized as direct inhibitors of P-glycoprotein. Pharmaceutical Research, vol. 18, No. 6, pp. 800-806, 2001.\*
Jordan et al. "British Society for Rheumatology and British Health Professionals in Rheumatology Guideline for the Management of Gout (Full Guidelines)", Rheumatology, 2007, pp. 1-17, Online Supplement to Jordan et al. 2007 "British Society for Rheumatology and British Health Professionals in Rheumatology Guideline for the Management of Gout (Executive Summary)", Rheumatology (Oxford). Aug. 2007;46(8):1372-4. Epub May 23, 2007.
Zhang et al., "EULAR evidence based recommendations for gout. Part II: Management. Report of a task force of the EULAR Standing Committee For International Clinical Studies Including Therapeutics (ESCISIT)", Ann Rheum Dis 2006, 65: 1312-1324.
Ahern et al., "Does Colchicine Work? The results of the first controlled study in acute gout" Aust NZ J Med 1987; 17: 301-304.
Borstad, et al. "Colchicine for prophylaxis of acute flares when initiating allopurinol for chronic gouty arthritis" J Rheumatol 2004; 31:2429-32.
Morris, et al. "Lesson of the week—Colchicine in acute gout" BMJ 2003; 327:1275-6.
Paulus, et al. "Prophylactic colchicine therapy of intercritical gout. A placebo-controlled study of probenecid-treated patients" Arthritis Rheum 1974, 17(5): 609-14.
Yurdakul et al. "A double-blind trial of colchicine in Behcet's syndrome" Arthritis Rheum. 2001, 44(11): 2686-2692.
Schlesinger et al. "Colchicine for acute gout". Cochrane Database of Systematic Reviews, Issue 4, Oct. 18, 2006, pp. 1-18.
Ferron et al. "Oral absorption characteristics and pharmacokinetics of colchicine in healthy volunteers after single and multiple doses" J. Clin. Pharmacol. 1996, 36: 874-883.
Girre et al. "Model-Independent Pharmacokinetics of Colchicine after Oral Administration to Healthy Volunteers" Fundam. Clin. Pharmacol. 1989, 3:537-543.
Achtert et al. "Pharmacokinetics/bioavailability of colchicine in healthy male volunteers" Eur. J. Drug Metab. Pharmacokinet. 1989, 14(4). 317-322.
Halkin et al. "Colchicine kinetics in patients with familial Mediterranean fever" Clin. Pharmacol. Ther. 1980, 28(1): 82-87.
Jiang et al. "Rapid and sensitive liquid chromatography-tandem mass spectrometry method for the quantitation of colchicine in human plasma" J. Chromatogr. B 2007, 850:564-568.
Korner & Kohn, "Development and optimization of a stability indicating method on a monolithic reversed-phase column for Colchicum dry extract" J. Chromatogr. A 2005, 1089:148-157.

(Continued)

*Primary Examiner* — Brandon J Fetterolf
*Assistant Examiner* — Anna Pagonakis
(74) *Attorney, Agent, or Firm* — Cantor Colburn LLP

(57)              **ABSTRACT**

Stable ultrapure colchicine compositions comprising ultrapure colchicine and a pharmaceutically acceptable excipient are described. The compositions can be tablets. Methods for preparing such compositions and methods of use are also disclosed. Methods of treating gout flares with colchicine compositions are also disclosed.

**1 Claim, 1 Drawing Sheet**

**US 7,964,647 B2**

Page 2

OTHER PUBLICATIONS

Probenecid and Colchicine Tablets USP, Mar. 2006, Watson Laboratories product label.

Colchicine Tablets USP, 0.6 mg, Vison Pharma LLC product label, Oct. 2006.

CColchicine Tablets USP, Vintage Pharmaceuticals LLC (Qualitest) product label, Apr. 2005.

Colchicine Tablets USP, 0.6 mg, Akyma Pharmaceuticals LLC product label, Jan. 2005.

Colchicine Tablets USP, Feb. 2003, West-ward Pharmaceutical Corp. product label.

Terkeltaub "Gout" N Engl J Med 2003, 349: 1647-55.

Bombuwala, K. et al., Colchitaxel, a coupled compound made from microtubule inhibitors colchicine and paclitaxel, Beilstein J. Org. Chem. 2006, 2:13, pp. 1-9.

"Colchicine Hydrate Product Data Sheet," Tocris Bioscience, (2009).

"Dose" definition, Merriam Webster Online Medical Dictionary, downloaded from http://www.merriam-webster.com/medical/dose on Nov. 3, 2009.

Colchicine product data sheet, EMD Chemicals, Inc., downloaded from the internet on Oct. 5, 2009 from http://www.emdchemicals.com/life-science-research/colchicine-colchicum-autumnale/EMD_BIO-234115/p_Z_ab.           s1L_9oAAAEWhmEfVhTm?WFSimpleSearch_NameOrID=colchicine&BackButtonText=search+results.

* cited by examiner

**FIGURE 1**



US 7,964,647 B2

1

# COLCHICINE COMPOSITIONS AND METHODS

## CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. application Ser. No. 12/246,034, filed Oct. 6, 2008, which claims the benefit of U.S. Provisional Application Ser. No. 60/977,796 filed Oct. 5, 2007 and U.S. Provisional Application Ser. No. 61/090,965 filed Aug. 22, 2008, each of which is hereby incorporated by reference in its entirety.

## BACKGROUND

This application relates to colchicine compositions for therapeutic purposes, specifically ultrapure colchicine, and methods of making and using the colchicine compositions.

Colchicine, chemical name (−)-N-[(7S,12aS)-1,2,3,10-tetramethoxy-9-oxo-5,6,7,9-tetrahydrobenzo[a]heptalen-7-yl]-acetamide, is a pale yellow powder soluble in water in 1:25 dilution.

Colchicine is an alkaloid found in extracts of certain plants such as *Colchicum autumnale* and *Gloriosa superba*. Colchicine arrests cell division in animals and plants. It has adversely affected spermatogenesis in humans and in some animal species under certain conditions.

Gout (or gouty arthritis) is a disease caused by a build up of uric acid due to an overproduction of uric acid or a reduced ability of the kidney to get rid of uric acid. It is more common in males, postmenopausal women, and people with high blood pressure. Heavy alcohol use, diabetes, obesity, sickle cell anemia, and kidney disease also increase the risk. The condition may also develop in people who take drugs that interfere with uric acid excretion.

In gout, monosodium urate or uric acid crystals are deposited on the articular cartilage of joints, tendons and surrounding tissues due to elevated concentrations of uric acid in the blood stream. This provokes an inflammatory reaction of these tissues. Gout is characterized by excruciating, sudden, unexpected, burning pain, as well as swelling, redness, warmness, and stiffness in the affected joint. Low-grade fever may also be present. The patient usually suffers from two sources of pain. The crystals inside the joint cause intense pain whenever the affected area is moved. The inflammation of the tissues around the joint also causes the skin to be swollen, tender and sore if it is even slightly touched. For example, a blanket or even the lightest sheet draping over the affected area could cause extreme pain.

Acute gouty arthritis (alternatively referred to as a gout flare or a gout attack) is a sudden attack of pain in affected joints, especially in the feet and legs. Chronic gout involves repeated attacks of joint pain.

In acute gouty arthritis, symptoms develop suddenly and usually involve only one or a few joints. The big toe, knee, or ankle joints are most often affected. The pain frequently starts during the night and is often described as throbbing, crushing, or excruciating. The joint appears infected with signs of warmth, redness, and tenderness. The attacks of painful joints may go away in several days, but may return from time to time. Subsequent attacks usually last longer. Some people may progress to chronic gout (chronic gouty arthritis), while others may have no further attacks.

If several attacks of gout occur each year, it can lead to joint deformity and limited motion in joints. Uric acid deposits, called tophi, develop in cartilage tissue, tendons, and soft tissues. These tophi usually develop only after a patient has

2

suffered from the disease for many years. Deposits also can occur in the kidneys, leading to chronic kidney failure.

Colchicine can be used for treating adults with acute gouty arthritis and pain in attacks of acute gouty arthritis, and also can be used beneficially for treating adults with chronic gout for prophylaxis of acute gout flares. Although its exact mode of action in the relief of gout is not completely understood, colchicine is known to decrease the inflammatory response to urate crystal deposition by inhibiting migration of leukocytes, to interfere with urate deposition by decreasing lactic acid production by leukocytes, to interfere with kinin formation and to diminish phagocytosis and the subsequent anti-inflammatory response. The anti-inflammatory effect of colchicine is relatively selective for acute gouty arthritis. However, other types of arthritis occasionally respond. It is neither an analgesic nor a uricosuric and will not prevent progression to chronic gouty arthritis. It does have a prophylactic, suppressive effect that helps to reduce the incidence of acute attacks and to relieve the residual pain and mild discomfort that patients with gout occasionally experience. In some instances, non-steroidal anti-inflammatory drugs (NSAIDs) may also be prescribed to relieve pain and inflammation in acute gouty arthritis attacks. Strong painkillers, such as codeine, or corticosteroids may also be prescribed to relieve the pain.

Colchicine is rapidly absorbed from the gastrointestinal tract. Peak concentrations occur in 0.5 to 2 hours. The drug and its metabolites are distributed in leukocytes, kidneys, liver, spleen and the intestinal tract. Colchicine is metabolized in the liver and excreted primarily in the feces with 10 to 20% eliminated unchanged in the urine.

There remains a need for pure forms of colchicine having low levels of impurities for pharmaceutical use to minimize the potential for side effects in patients taking colchicine pharmaceutical products and to minimize the need for costly toxicity testing required for approval of pharmaceutical products comprising conventional colchicine having high levels of individual or total impurities. In particular, there is a need for stable compositions comprising ultrapure colchicine.

## SUMMARY

Disclosed herein are colchicine compositions.

In one embodiment, the colchicine composition comprises ultrapure colchicine, wherein the ultrapure colchicine comprises no more than about 3.0% total impurities, specifically no more than about 2.0% total impurities, and a pharmaceutically acceptable excipient.

In another embodiment, the colchicine composition comprises ultrapure colchicine, wherein the ultrapure colchicine comprises no more than about 3.0% total impurities, specifically no more than about 2.0% total impurities, a filler, a binder, and a disintegrant.

In yet another embodiment, the colchicine composition comprises about 0.6 mg A colchicine, about 12 to about 16 mg pregelatinized starch, about 20 to about 24 mg microcrystalline cellulose, about 3.9 to about 4.7 mg sodium starch glycolate, about 0.5 to about 0.7 mg magnesium stearate, and an amount of lactose monohydrate such that the colchicine dosage form has a total weight of about 100 mg.

In an embodiment, the colchicine composition comprises colchicine; and a pharmaceutically acceptable excipient; wherein the colchicine composition comprises no more than about 3.5% total impurities and no more than 0.42% N-deacetyl-N-formyl colchicine.

In an embodiment, the colchicine composition comprises colchicine; and a pharmaceutically acceptable excipient,

US 7,964,647 B2

3

wherein the colchicine composition has 0.6 mgA colchicine, wherein a single dose of the 0.6 mgA colchicine composition has enhanced bioavailability as compared to a single dose of a pharmaceutical product comprising 0.5 mg colchicine after potency correction for colchicine.

In an embodiment, the colchicine composition comprises colchicine; and a pharmaceutically acceptable excipient, wherein the colchicine composition has equivalent bioavailability when administered in a fed or a fasted state.

In an embodiment, the colchicine composition comprises colchicine; and a pharmaceutically acceptable excipient, wherein administration of a single dose of the colchicine composition to a human provides a Cmax between about 1.3 ng/mL and about 4.0 ng/mL, an $AUC_{0-t}$ between about 4.4 ng-hr/mL and about 30.8 ng-hr/mL, or an $AUC_{0-INF}$ between about 6.7 ng-hr/mL and about 27.8 ng-hr/mL.

Methods of making the colchicine compositions are also disclosed herein.

In an embodiment, the method comprises wet granulating ultrapure colchicine, wherein the ultrapure colchicine comprises no more than about 3.0% of total impurities, with a pharmaceutically acceptable excipient to obtain wet granules, and mixing the granules with a disintegrant to obtain the composition.

In yet another embodiment, the method comprises wet granulating colchicine with a pharmaceutically acceptable excipient to obtain wet granules; drying the wet granules to obtain dried granules; milling the dried granules to obtain milled granules; mixing the milled granules with a disintegrant to obtain the composition; mixing the composition with a lubricant to obtain a tableting blend; and compressing the tableting blend to obtain a colchicine tablet.

Also disclosed herein are methods of making ultrapure colchicine.

In an embodiment, the method comprises subjecting colchicine comprising more than about 3.0% total impurities to column chromatography to obtain a colchicine concentrate, distilling the colchicine concentrate to obtain a colchicine distillate, and crystallizing ultrapure colchicine from the colchicine distillate: wherein the ultrapure colchicine comprises no more than about 3.0% total impurities.

In another embodiment, the method comprises subjecting colchicine comprising more than about 3.0% total impurities to neutral alumina column chromatography to obtain a colchicine concentrate; distilling the colchicine concentrate with ethyl acetate to obtain a colchicine distillate; and crystallizing ultrapure colchicine from the colchicine distillate in ethyl acetate; wherein the ultrapure colchicine comprises no more than about 3.0% total impurities.

In still another embodiment, the method comprises subjecting colchicine comprising more than about 3.0% total impurities to neutral alumina column chromatography to obtain a colchicine concentrate; distilling the colchicine concentrate with ethyl acetate to obtain a colchicine distillate; crystallizing a purified colchicine from the colchicine distillate in ethyl acetate; washing the purified colchicine with ethyl acetate to obtain a washed purified colchicine; and drying the washed purified colchicine to obtain ultrapure colchicine, wherein the ultrapure colchicine comprises no more than about 3.0% total impurities.

Also disclosed are methods of treating a patient with the colchicine compositions.

In an embodiment, the method comprises administering a dosing regimen to a patient having an acute gouty arthritis attack, wherein the dosing regimen consists of two colchicine dosage forms at the onset of the acute gouty arthritis attack,

4

followed by one colchicine dosage form in about one hour, wherein a colchicine dosage form comprises about 0.6 mgA colchicine.

In an embodiment, the method comprises administering less than about 2 mg of colchicine to a patient over a period of about one hour, wherein the patient is experiencing an acute gouty arthritis attack.

In an embodiment, the method comprises administering to a human experiencing an acute gouty arthritis attack a colchicine composition, wherein the composition is effective to provide a colchicine plasma concentration profile having an area under the plasma colchicine concentration curve from time 0 to infinity ($AUC_{0-INF}$) of about 34.2 ng-hr/mL to about 74.1 ng-hr/mL, an area under the plasma colchicine concentration curve from time 0 to time t ($AUC_{0-t}$) of about 28.8 ng-hr/mL to about 58.9 ng-hr/mL, or a maximum plasma colchicine concentration (Cmax) of about 3.2 ng/mL to about 11.4 ng/mL for a maximum total dose of about 1.8 mg colchicine.

In an embodiment, the method comprises administering a dosing regimen to a patient having an acute gouty arthritis attack, wherein the dosing regimen consists of two colchicine dosage forms at the onset of the acute gouty arthritis attack, followed by one colchicine dosage form in about one hour, wherein a colchicine dosage form comprises about 0.6 mgA colchicine, wherein the dosing regimen is effective to provide an area under the plasma colchicine concentration curve from time 0 to infinity ($AUC_{0-t}$INF) of about 34.2 ng-hr/mL to about 74.1 ng-hr/mL, an area under the plasma colchicine concentration curve from time 0 to time t ($AUC_{0-t}$) of about 28.8 ng-hr/mL to about 58.9 ng-hr/mL, or a maximum plasma colchicine concentration (Cmax) of about 3.2 ng/mL to about 11.4 ng/mL.

In an embodiment, the method comprises administering a dosing regimen to a patient having an acute gouty arthritis attack, wherein the dosing regimen consists of two colchicine dosage forms at the onset of the acute gouty arthritis attack, followed by one colchicine dosage form in about one hour, wherein a colchicine dosage form comprises about 0.6 mgA colchicine, wherein the dosing regimen is effective to provide a colchicine plasma concentration profile which has a maximum plasma colchicine concentration (Cmax) which is at least 80% of plasma Cmax provided by a dosing regimen of two dosage forms, followed by one dosage form about every hour later for 6 hours.

In an embodiment, the method comprises administering a dosing regimen to a patient having an acute gouty arthritis attack, wherein the dosing regimen consists of two colchicine dosage forms at the onset of the acute gouty arthritis attack, followed by one colchicine dosage form in about one hour, wherein a colchicine dosage form comprises about 0.6 mgA colchicine, wherein the odds of a patient being a responder to the dosing regimen are not statistically different from the odds of being a responder to a second dosing regimen consisting of two colchicine dosage forms at the onset of the acute gouty arthritis attack, followed by one colchicine dosage form every hour for 6 hours, wherein a responder is a patient obtaining a ≧50% improvement in pain at 24 hours after the first dose, without taking an additional active agent for reducing pain of the acute gouty arthritis attack.

In an embodiment, the method comprises administering a dosing regimen to a patient having an acute gouty arthritis attack, wherein the dosing regimen consists of two colchicine dosage forms at the onset of the acute gouty arthritis attack, followed by one colchicine dosage form in about one hour, wherein a colchicine dosage form comprises about 0.6 mgA colchicine, wherein in a randomized, placebo-controlled

A426

5

6

study of the dosing regimen in patients with an acute gouty arthritis attack, the fraction of patients that experienced a given % improvement in pain at 24 hrs after first dose is shown in FIG. 1.

These and other embodiments, advantages and features of the present invention become clear when detailed description and examples are provided in subsequent sections.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows the fraction of all patients improved at 24 hrs post-first dose of colchicine, regardless of pain rescue, as a function of the percent improvement in pain determined in the study of Example 3.

DETAILED DESCRIPTION

Disclosed herein are compositions comprising ultrapure colchicine and a pharmaceutically acceptable excipient. Herein, "ultrapure colchicine" means colchicine comprising no more than about 3.0% of total impurities, measured chromatographically as described below, specifically the ultra pure colchicine comprises no more than about 2.0% of total impurities, more specifically no more than about 1.0% of total impurities, or even more specifically no more than about 0.5% of total impurities. In some embodiments, the ultrapure colchicine comprises no more than about 0.10% of N-deacetyl-N-formyl colchicine, measured chromatographically. In some embodiments, the ultrapure colchicine is purified from a botanical source. Methods of making ultrapure colchicine and the compositions comprising the ultrapure colchicine, methods of treating various conditions using the compositions. Dosing regimens are also disclosed.

Not wishing to be bound by theory, it is postulated that the properties of colchicine as an antimitotic agent (e.g. its tubulin binding properties) or its effects on Pgp transporter properties provide the therapeutic effects of colchicine described herein. The methods described herein therefore also contemplate the use of an antimitotic agent with at least one pharmaceutically acceptable excipient. An antimitotic agent can be a drug that prevents or inhibits mitotis, or cell division.

In the specification and claims that follow, references will be made to a number of terms which shall be defined to have the following meaning.

The terms "a" and "an" do not denote a limitation of quantity, but rather denote the presence of at least one of the referenced item. The term "or" means "and/or". The terms "comprising", "having", "including", and "containing" are to be construed as open-ended terms (i.e., meaning "including, but not limited to") unless otherwise noted.

An "active agent" means a compound (including for example, colchicine), element, or mixture that when administered to a patient, alone or in combination with another compound, element, or mixture, confers, directly or indirectly, a physiological effect on the patient. The indirect physiological effect may occur via a metabolite or other indirect mechanism. When the active agent is a compound, then salts, solvates (including hydrates), and co-crystals of the free compound or salt, crystalline forms, non-crystalline forms, and any polymorphs of the compound are contemplated herein. Compounds may contain one or more asymmetric elements such as stereogenic centers, stereogenic axes and the like, e.g., asymmetric carbon atoms, so that the compounds can exist in different stereoisomeric forms. These compounds can be, for example, racemates or optically active forms. For compounds with two or more asymmetric elements, these compounds can additionally be mixtures of diastereomers. For compounds having asymmetric centers, all optical isomers in pure form and mixtures thereof are encompassed. In addition, compounds with carbon-carbon double bonds may occur in Z- and E-forms, with all isomeric forms of the compounds. In these situations, the single enantiomers, i.e., optically active forms can be obtained by asymmetric synthesis, synthesis from optically pure precursors, or by resolution of the racemates. Resolution of the racemates can also be accomplished, for example, by conventional methods such as crystallization in the presence of a resolving agent, or chromatography, using, for example, a chiral HPLC column. All forms are contemplated herein regardless of the methods used to obtain them.

"Bioavailability" means the extent or rate at which an active agent is absorbed into a living system or is made available at the site of physiological activity. For active agents that are intended to be absorbed into the bloodstream, bioavailability data for a given formulation may provide an estimate of the relative fraction of the administered dose that is absorbed into the systemic circulation. "Bioavailability" can be characterized by one or more pharmacokinetic parameters.

"Bioequivalence" or "equivalent bioavailability" means the absence of a significant difference in the rate or extent to which the active agent in pharmaceutical equivalents or pharmaceutical alternatives is absorbed into a living system or is made available at the site of physiological activity or the absence of a significant difference in the rate or extent to which the active agent in a pharmaceutical composition is absorbed into a living system or is made available at the site of physiological activity when administered by two different methods (e.g., dosing under non-fasted versus fasted conditions). Bioequivalence can be determined by comparing in vitro dissolution testing data for two dosage forms or two dosing conditions or by comparing pharmacokinetic parameters for two dosage forms or two dosing conditions.

In some embodiments, two products (e.g. an inventive composition and COL-PROBENECID®) or two methods (e.g., dosing under fed (non-fasted) versus fasted conditions) are bioequivalent if the ratio of the geometric mean of logarithmic transformed $AUC_{0-\infty}$, $AUC_{1-t}$, or $C_{max}$ for the two products or two methods is about 0.80 to about 1.25; specifically if the 90% Confidence Interval (CI) limit for the ratio of the geometric mean of logarithmic transformed $AUC_{0-\infty}$, $AUC_{0-t}$ or $C_{max}$ for the two products or two methods is about 0.80 to about 1.25; more specifically if the ratios of the geometric mean of logarithmic transformed $AUC_{0-\infty}$, $AUC_{0-t}$ and $C_{max}$ for the two products or two methods are about 0.80 to about 1.25; yet more specifically if the 90% Confidence Interval (CI) limits for the ratios of the geometric mean of logarithmic transformed $AUC_{0-\infty}$, $AUC_{0-t}$ and $C_{max}$ for the two products or two methods are about 0.80 to about 1.25.

"Colchicine therapy" refers to medical treatment of a symptom, disorder, or condition by administration of colchicine. Colchicine therapy can be considered optimal when effective plasma levels are reached when required. In addition, peak plasma values ($C_{max}$) should be as low as possible so as to reduce the incidence and severity of possible side effects.

"Conventional colchicine" means colchicine comprising more than 3% but no more than about 5.0% total impurities, measured chromatographically as described below, and comprising more than about 0.010% of N-deacetyl-N-formyl colchicine.

A "dosage form" means a unit of administration of an active agent. Examples of dosage forms include tablets, cap-

7

sules, injections, suspensions, liquids, emulsions, creams, ointments, suppositories, inhalable forms, transdermal forms, and the like.

"Dosing regimen" means the dose of an active agent taken at a first time by a patient and the interval (time or symptomatic) at which any subsequent doses of the active agent are taken by the patient. The additional doses of the active agent can be different from the dose taken at the first time.

A "dose" means the measured quantity of an active agent to be taken at one time by a patient.

"Efficacy" means the ability of an active agent administered to a patient to produce a therapeutic effect in the patient.

As used herein, the term "mgA" refers to milligrams of the active colchicine, or the free base of colchicine, after compensating for the potency of the batch of colchicine (i.e., after compensating for impurities, including solvents, and salts in the colchicine). For example, 0.612 mg of an ultrapure colchicine free base having a total impurity of 2 wt % (thus a purity of 98 wt %) contains 0.6 mgA (0.612 mg×0.98=0.6 mgA) of colchicine.

An "oral dosage form" means a unit dosage form for oral administration.

A "patient" means a human or non-human animal in need of medical treatment. Medical treatment can include treatment of an existing condition, such as a disease or disorder, prophylactic or preventative treatment, or diagnostic treatment. In some embodiments the patient is a human patient.

"Pharmaceutically acceptable" means that which is generally safe, non-toxic and neither biologically nor otherwise undesirable and includes that which is acceptable for veterinary use as well as human pharmaceutical use.

"Pharmaceutically acceptable salts" includes derivatives of colchicine, wherein the colchicine is modified by making acid or base addition salts thereof, and further refers to pharmaceutically acceptable solvates, including hydrates, and co-crystals of such compounds and such salts. Examples of pharmaceutically acceptable salts include, but are not limited to, mineral or organic acid addition salts of basic residues such as amines; alkali or organic addition salts of acidic residues; and the like, and combinations comprising one or more of the foregoing salts. The pharmaceutically acceptable salts include non-toxic salts and the quaternary ammonium salts of the colchicine. For example, non-toxic acid salts include those derived from inorganic acids such as hydrochloric, hydrobromic, sulfuric, sulfamic, phosphoric, nitric and the like; other acceptable inorganic salts include metal salts such as sodium salt, potassium salt, cesium salt, and the like; and alkaline earth metal salts, such as calcium salt, magnesium salt, and the like, and combinations comprising one or more of the foregoing salts. Pharmaceutically acceptable organic salts includes salts prepared from organic acids such as acetic, propionic, succinic, glycolic, stearic, lactic, malic, tartaric, citric, ascorbic, pamoic, maleic, hydroxymaleic, phenylacetic, glutamic, benzoic, salicylic, mesylic, esylic, besylic, sulfanilic, 2-acetoxybenzoic, fumaric, toluenesulfonic, methanesulfonic, ethane disulfonic, oxalic, isethionic, HOOC—(CH₂)$_n$—COOH where n is 0-4, and the like; organic amine salts such as triethylamine salt, pyridine salt, picoline salt, ethanolamine salt, triethanolamine salt, dicyclohexylamine salt, N,N'-dibenzylethylenediamine salt, and the like; and amino acid salts such as arginate, asparginate, glutamate, and the like; and combinations comprising one or more of the foregoing salts; organic amine salts such as triethylamine salt, pyridine salt, picoline salt, ethanolamine salt, triethanolamine salt, dicyclohexylamine salt, N,N' dibenzylethylenediamine salt, and the like; and amino acid salts such as arginate, asparginate, glutamate, and the like;

8

and combinations comprising one or more of the foregoing salts. All forms of such derivatives of colchicine are contemplated herein, including all crystalline, amorphous, and polymorph forms. Specific colchicine salts include colchicine hydrochloride, colchicine dihydrochloride, and co-crystals, hydrates or solvates thereof.

"Pharmacokinetic parameters" describe the in vivo characteristics of an active agent (or a metabolite or a surrogate marker for the active agent) over time, such as plasma concentration (C), $C_{max}$, $C_n$, $C_{24}$, $T_{max}$, and AUC. "$C_{max}$" is the measured plasma concentration of the active agent at the point of maximum, or peak, concentration. "$C_{min}$" is the measured plasma concentration of the active agent at the point of minimum concentration. "$C_n$" is the measured plasma concentration of the active agent at about n hours after administration. "$C_{24}$" is the measured plasma concentration of the active agent at about 24 hours after administration. The term "$T_{max}$" refers to the time at which the measured plasma concentration of the active agent is the highest after administration of the active agent. "AUC" is the area under the curve of a graph of the measured plasma concentration of an active agent vs. time, measured from one time point to another time point. For example $AUC_{0-t}$ is the area under the curve of plasma concentration versus time from time 0 to time t, where t can be the last time point with measurable plasma concentration for an individual formulation. The $AUC_{0-∞}$ or $AUC_{0-INF}$ is the calculated area under the curve of plasma concentration versus time from time 0 to time infinity. In steady-state studies, $AUC_{0-τ}$ is the area under the curve of plasma concentration over the dosing interval (i.e., from time 0 to time τ (tau), where tau is the length of the dosing interval. Other pharmacokinetic parameters are the parameter $K_e$ or $K_{el}$, the terminal elimination rate constant calculated from a semi-log plot of the plasma concentration versus time curve; $t_{1/2}$ the terminal elimination half-life, calculated as $0.693/K_{el}$; CL/F denotes the apparent total body clearance after administration, calculated as Total Dose/Total $AUC_∞$; and $V_{area}/F$ denotes the apparent total volume of distribution after administration, calculated as Total Dose/(Total $AUC_∞×K_{el}$).

"Adverse event" means any untoward medical occurrence in a patient administered an active agent and which does not necessarily have to have a causal relationship with this treatment. An adverse event (AE) can therefore be any unfavorable and unintended sign (including an abnormal laboratory finding, for example), symptom, or disease temporally associated with the use of the active agent, whether or not considered related to the active agent.

"Side effect" means a secondary effect resulting from taking an active agent. The secondary effect can be a negative (unfavorable) effect (i.e., an adverse side effect) or a positive (favorable) effect.

The most frequently reported adverse side effects to colchicine therapy are gastrointestinal, specifically diarrhea; abdominal pain with cramps; nausea; and vomiting. Less frequently or rarely reported adverse side effects associated with colchicine therapy include anorexia, agranulocytosis, allergic dermatitis, allergic reactions, alopecia, angioedema, aplastic anemia, bone marrow depression, myopathy, neuropathy, skin rash, thrombocytopenic disorder, and urticaria.

Determining that a patient experiences an adverse side effect can be performed by obtaining information from the patient regarding onset of certain symptoms which may be indicative of the adverse side effect, results of diagnostic tests indicative of the adverse side effect, and the like.

Ultrapure colchicine comprising low levels of individual impurities or total impurities is highly desirable as compared to conventionally available forms of colchicine. Currently,

A428

US 7,964,647 B2

<table>
<tr><td>9</td><td>10</td></tr>
</table>

commercially available forms of colchicine often comprise high levels of impurities. Depending on the source or the preparation process, colchicine may comprise some or all of the common impurities shown in Table 1.

TABLE 1

| Common Impurities | Chemical name | Other common name |
|---|---|---|
| Impurity A | N-[(7S,12aS)-1,2,3,10-tetramethoxy-9-oxo-5,6,7,9-tetrahydrobenzo[a]heptalen-7-yl]formamide | N-deacetyl-N-formyl colchicine |
| Impurity B | (−)-N-[(7S,12aR)-1,2,3,10-tetramethoxy-9-oxo-5,6,7,9-tetrahydrobenzo[a]heptalen-7-yl]-acetamide | Conformational isomer |
| Impurity C | N-[(7S,7bR,10aS)-1,2,3,9-tetramethoxy-8-oxo-5,6,7,7b,8,10a-hexahydro-benzo[a]cyclopenta[3,4]cyclobuta[1,2-c]cyclohepten-7-yl]-acetamide | β-Lumicolchicine |
| Impurity D | N-[(7S,12aS)-3-(β-D-glucopyranosyloxy)-1,2,10-trimethoxy-9-oxo-5,6,7,9-tetrahydro-benzo[a]heptalen-7-yl]-acetamide | Colchicoside |
| Impurity E | N-[(7S,12aS)-3-hydroxy-1,2,10-trimethoxy-9-oxo-5,6,7,9-tetrahydrobenzo[a]heptalen-7-yl]-acetamide | 3-O-demethyl colchicine |
| Impurity F | N-[(7S,12aS)-10-hydroxy-1,2,3-trimethoxy-9-oxo-5,6,7,9-tetrahydrobenzo[a]heptalen-7-yl]acetamide | Colchiceine |

In addition to the common impurities listed above, colchicine may also comprise N-[(7S,12aS)-2-hydroxy-1,3,10-trimethoxy-9-oxo-5,6,7,9-tetrahydrobenzo[a]heptalen-7-yl]-acetamide ("2-O-demethyl colchicine") impurity. Some analytical methods cannot differentiate 2-O-demethyl colchicine from 3-O-demethyl colchicine.

In addition to the common impurities listed above, colchicine may also comprise other structurally unidentified impurities. In fact, conventional forms of colchicine may comprise as much as 5% of total impurities, determined chromatographically as described below. Such high levels of impurities in conventional colchicine pose several problems. The impurities may cause side effects in patients taking dosage forms comprising conventional colchicine. For example, N-deacetyl-N-formyl-colchicine (Impurity A, also known as Gloriosine) is tumorigenic and has been studied as an anti-cancer agent. Therefore reduction in the level of N-deacetyl-N-formyl colchicine found in convention colchicine is highly desirable. Additionally, high levels of impurities can also pose a regulatory challenge for pharmaceutical companies using conventional colchicine in products. For a pharmaceutical product comprising an active agent, the United States Food and Drug Administration (FDA) requires "qualification" or toxicity information for any impurity that is greater than the International Conference on Harmonization (ICH) qualification threshold of 0.15% per individual impurity in the active agent substance or 1.0% in the dosage form. Thus, there is a regulatory benefit for a pharmaceutical company to market pharmaceutical products comprising active agents comprising low levels of individual impurities or total impurities in the active agent substance as well as in the dosage form. As a result, for a pharmaceutical composition comprising colchicine, it is in the best interest of both the pharmaceutical company and the patient that impurities be minimized, if possible, in the colchicine and in colchicine compositions or dosage forms.

The ultrapure colchicine disclosed herein comprises no more than (NMT) about 3.0%; specifically NMT about 2.0%, or more specifically, NMT about 1.0%, or even more specifically NMT about 0.5% of total impurities. In one embodiment, "total impurities" includes the common impurities,

Impurities A through F, as well as all structurally unidentified impurities eluting within 1.5 times the retention time of colchicine using an HPLC method as described in more detail below. In another embodiment, other HPLC and HPLC methods, for example, as described in more detail below, can be used to quantify the level of total impurities.

The ultrapure colchicine may also comprise low levels of individual impurities. In one embodiment, the ultrapure colchicine comprises NMT about 2.0%, specifically NMT about 1.5%; more specifically NMT about 1.0%; or yet more specifically, NMT about 0.5%, or even more specifically, NMT about 0.15%, or still more specifically, NMT about 0.10%, of any individual impurity. The impurity can be Impurity A, Impurity B, Impurity C, Impurity D, Impurity E, Impurity F, or an unidentified impurity.

In an embodiment, the ultrapure colchicine comprises no more than (NMT) about 3.0% total impurities and NMT about 0.10% N-deacetyl-N-formyl colchicine.

In another embodiment, the ultrapure colchicine comprises NMT about 3.0% total impurities; NMT about 0.1% per individual impurity of Impurity A, Impurity C, Impurity D, and Impurity E; NMT about 0.15% Impurity F; and NMT about 2.0% of Impurity B.

Not wishing to be bound by theory, it is postulated that the conformational isomer, Impurity B, is in equilibrium with the active colchicine such that even after purification of the colchicine to about 0.5% Impurity B, the purified colchicine re-equilibrates to a level of Impurity B around about 1% to about 1.3%.

The level of an individual impurity or of total impurities in colchicine may be determined by any suitable analytical method known in the art. In one embodiment, the impurity levels are determined using a high performance liquid chromatography (HPLC) assay, for example, the HPLC method described in the Colchicine Official Monograph USP30/NF25, herein fully incorporated by reference.

Exemplary conditions for HPLC or ultra performance liquid chromatography (HPLC) assays that can be used for the impurity analysis of colchicine or of a colchicine pharmaceutical product are listed in Table 2.

TABLE 2

| Exemplary HPLC Conditions For Colchicine Purity Analysis | | | |
|---|---|---|---|
| | USP30/NF25 Colchicine Official Monograph Method | HPLC Method | UPLC Method |
| Mobile phase | 0.5 Molar KH₂PO₄ in Methanol:Water (65:45, v:v), pH adjusted to 5.5 with H₃PO₄ | pH 7.2 10 mM Phosphate Buffer:methanol (MeOH) Gradient | pH 4.5 Ammonium Acetate Buffer:MeOH Gradient |
| Column | Octylsilyl silica gel, | Zorbax SBC(18) | Acquity GEH C18 |
| | 4.6 mm × 25 cm, 5 micron | 4.6 × 250 mm | 2.1 × 100 mm, 1.7 um |
| Flow rate | 1.0 mL/min | 1.0 mL/min | 0.25 mL/min |
| Column Temp | Ambient | Ambient | 30 C. +/− 2 C. |
| Detection | 254 nanometers (nm) | 246 nm | 246 nm |
| Injection volume | 20 microliters (uL) | 75 uL | 7 uL |
| Sample Conc. | 0.006 mg/mL | 0.120 mg/ml | 0.012 mg/ml |
| Run time | 15 minutes (min) | 46 min | 25 min |

US 7,964,647 B2

**11**

When using one of the above HPLC conditions in Table 2 for colchicine purity analysis, the relative retention time (RRT) of an impurity can be calculated by the following formula:

RRT of an impurity=RT of the impurity/RT of colchicine,

where RT stands for retention time of the impurity or the colchicine at the particular conditions used in the assay.

In one embodiment, using the HPLC method in Table 2, the retention time (RT) of colchicine is about 7 minutes and the relative retention times (RRTs) of the common impurities eluting within 1.5 times the retention time for colchicine are listed in Table 2A:

TABLE 2A

| Relative Retention Times (RRTs) of the Common Impurities | |
| --- | --- |
| Impurity ID | RRT |
| N-deacetyl-N-formyl colchicine - Impurity A | 0.94 |
| Conformational isomer - Impurity B | 0.8 |
| β-Lumicolchicine - Impurity C | 1.2 |
| Colchicoside - Impurity D | 0.4 |
| 3-O-demethyl colchicine - Impurity E | 0.7 |

In one embodiment, the percent of a particular impurity is calculated by dividing the response (peak area) of the impurity peak by the sum of all responses (total peak area of all peaks, including the colchicine peak and all common and unidentified impurity peaks) eluting within 1.5 times the retention time for colchicine in the HPLC assay and multiplying the result by 100%.

In one embodiment, the level (%) of total impurities is calculated by dividing the sum of responses of any peaks other than that due to colchicine eluting within 1.5 times the retention time for colchicine by the sum of all responses eluting in the HPLC assay and multiplying the result by 100%.

An additional HPLC method for determining the level of impurities other than Impurity F in colchicine or in colchicine pharmaceutical products has been developed and validated for use as an alternative to the methods in Table 2 above. The method is shown in Table 3A below.

TABLE 3A

| Quantitative HPLC Method for determining all impurities other than impurity F in colchicine and colchicine pharmaceutical products. | |
| --- | --- |
| | Quantitative HPLC Method for colchicine and colchicine products. |
| Mobile phase | pH 4.5 Ammonium Acetate Buffer: methanol Gradient |
| Column | Waters XBridge C18, 250 mm × 4.6 mm, 5 μm particle size |
| Flow rate | 0.9 mL/min |
| Column Temp | 10 ± 3.5 C. (for column)/10 ± 2 C. (for sample) |
| Detection | 246 nm |
| Injection volume | 75 μL |
| Sample Conc. | 0.16 mg/ml |
| Run time | 60 min |

In the quantitative HPLC method of Table 3A, the retention time (RT) of colchicine is about 24 minutes and the relative retention times (RRTs) of the common impurities for colchicine are listed in Table 3B:

**12**

TABLE 3B

| Relative Retention Times (RRTs) of the Common Impurities | |
| --- | --- |
| Impurity ID | RRT |
| N-deacetyl-N-formyl colchicine - Impurity A | 0.93 |
| Conformational isomer - Impurity B | 0.82 |
| β-Lumicolchicine - Impurity C | 1.76 |
| Colchicoside - Impurity D | 0.18 |
| 3-O-demethyl colchicine - Impurity E | 0.52 |
| 2-O-demethyl colchicine | 0.54 |
| Gamma-Lumicolchicine | 1.37 |

The percentage of individual impurities in the sample solution is calculated as follows:

$$\% \text{ Impurity} = \frac{r_i}{r_s} \times \frac{W_i(\text{mg})}{100 \text{ mL}} \times \frac{6.0 \text{ mL}}{100 \text{ mL}} \times$$
$$\frac{2.0 \text{ mL}}{100 \text{ mL}} \times P \times \left( \frac{100 - \% \ RS_u - \% \ W_u}{100} \right) \times$$
$$\frac{200 \text{ mL}}{SW(\text{mg}) \times \left( \frac{100 - \% \ RS_u - \% \ W_u}{100} \right)} \times \frac{100\%}{RRF}$$

Where:

$r_s$=The area response of the Colchicine peak in the Working Standard Solution.

$r_i$=The area response of the impurity peak in the Sample Solution

P=% Purity of the Colchicine Reference Standard divided by 100%.

SW=Weight of Sample taken for Sample Preparation

$W_s$=Weight of Colchicine in the Stock Standard Solution

RRF=Relative Response Factor for specified and unspecified impurities, 1.0

% $RS_{s/u}$=Percent of Residual Solvents in the Colchicine Standard/Sample

% $W_{s/u}$=% Water in the Colchicine Standard/Sample

To date, the impurity colchiceine (Impurity F or 10-O-Demethyl Colchicine "10-DMC") has been typically analyzed by a qualitative calorimetric test described in the Colchicine Official Monograph USP30/NF25 using ferric chloride solution, rather than chromatographically. The standard for acceptable levels of Impurity F has been absence of production of a definite green color in a solution of colchicine.

However, a chromatographic method has been developed for the determination of Impurity F (Colchiceine or 10-O-Demethyl Colchicine "10-DMC"). The chromatographic conditions are as follows:

TABLE 3C

| HPLC parameters for Colchiceine determination | |
| --- | --- |
| HPLC System: | HPLC equipped with a pump, auto sampler, variable wavelength detector and a suitable data acquisition system. |
| Column: | Phenomenex Gemini C18 150 mm × 4.6 mm 5 μm, 110 Å |
| Detection: | 245 nm |
| Flow Rate: | About 1.5 mL/min |
| Injection Volume: | 50 μL |
| Temperature: | Column: 10° C. ± 3.5° C. Sampler: 5° C. ± 2° C. |
| Needle Rinse Setting: | Double |
| Needle Wash: | Water/Acetonitrile (50:50) |
| Digital Filter Response: | 1.0 |

US 7,964,647 B2

**13**

TABLE 3C-continued

| HPLC parameters for Colchicine determination | |
|---|---|
| Sampling Rate: | 5.0 |
| Resolution: | 1.2 |
| Mobile Phase: | pH 4.5 Buffer Solution:Acetonitrile (75:25) |
| Run Time: | About 7 minutes for Standard |
| | About 20 minutes for first Blank and Samples |

The LQL level for 10-DMC in this method is 0.776304 μg/mL. The amount of 10-DMC expressed in percent of Colchicine is calculated as follows:

$$\% \text{ Purity} = \frac{r_i}{r_s} \times \frac{W_s(\text{mg}) \times P}{400 \text{ mL}} \times \left(\frac{100 - \% \ RS_s - \% \ W_s}{100}\right) \times$$

$$\frac{3.0 \text{ mL}}{100 \text{ mL}} \times \frac{50 \text{ mL}}{W_u(\text{mg}) \times \left(\frac{100 - \% \ RS_u - \% \ W_u}{100}\right)} \times \frac{100\%}{RRF}$$

Where:

$r_i$=The peak area response of 10-DMC in the Sample Solution

$r_s$=The peak area response of Colchicine in the Working Standard Solution

$W_s$=The weight of Colchicine in the Stock Standard Preparation

$W_u$=The weight of Colchicine in the Sample Preparation

P=Standard purity factor expressed as labeled (% Purity/100)

% $RS_{s/u}$=Percent of Residual Solvents in the Colchicine Standard/Sample

% $W_{s/u}$=% Water in the Colchicine Standard/Sample

RRF=Relative response factor for 10-DMC=0.88

Ultrapure colchicine may be obtained by various purification methods starting from colchicine-containing botanical extracts, conventional colchicine, or other partially-purified forms of colchicine. In some embodiments, the colchicine is purified from a botanical source. The botanical source can be any capable of providing colchicine, conventional or ultrapure, in quantities suitable for commercial pharmaceutical product manufacture

The literature from 1884-1997 on methods of isolation and purification of colchicine from various botanic sources, including for example *C. autumnale* corms or leaves and species of *Gloriosa* has been reviewed. (Kiselev & Yavich, 1991, "METHODS OF ISOLATING ALKALOIDS OF THE COLCHICINE SERIES"; Plenum Publishing Co., English translation of article from Khimiya Prirodnykh Soedinenii, No. 5, pp. 592-600, September-October, 1990.). Kiseleve & Yavich also review reports in the literature of impurities detected in colchicine stored for various times, as follows. In an article published in 1944 it was reported that chromatography of colchicine corresponding to the requirements of the USP of that time showed the presence of 5% of impurities and various amount of individual impurities. An article published in 1952 reported that colchicine meeting the requirements of the USP contained about 4% of 3-demethylcolchicine. A 1953 article reported 1.5% of N-formyldeacetylcolchicine isolated and the presence of other accompanying alkaloids in a pharmacopeial sample of colchicine. An investigation of a commercial sample by high-resolution liquid chromatography, published in 1986, reported finding 93.4% of colchicine, 2.9% of N-formyldeactylcholchicine, 1.8% of 17-hydroxy-colchicine, and 0.84% of an unknown substance.

**14**

Walaszik et al. describes a process of incorporating carbon 14 into *C. autumnale* plants and isolating radioactive colchicine from the radioactive plants (See Walaszik et al., Science (1952) 116:225-227). However, the level of impurities in the isolated radioactive colchicine is not disclosed.

The purification methods disclosed herein produce ultra-pure colchicine comprising very low levels of total impurities or individual impurities. In one embodiment, ultrapure colchicine may be obtained from conventional colchicine obtained commercially or produced using solvent extraction of appropriate botanic material as described in more detail below.

In one embodiment, conventional colchicine may be obtained by isolating colchicine from a colchicine chloroform extract. The extract is washed with a mixture of purified water, sodium hydroxide solution, sodium chloride solution and acetic acid. The washed extract is filtered and the resulting concentrate is distilled in two steps, first using methanol, and second using ethyl acetate. The resulting distillate is crystallized. Ethyl acetate can be used to isolate and wash the crystallized colchicine, which is then dried to yield conventional colchicine. The conventional colchicine comprises more than about 3.0% but no more than 5% total impurities. The conventional colchicine may be used directly in a colchicine composition comprising a pharmaceutically acceptable excipient. It may also be used for further purification to obtain ultrapure forms of colchicine.

In one embodiment of a method of making ultrapure colchicine, the conventional colchicine may be subjected to column chromatography to obtain a purified colchicine concentrate, distilling the purified colchicine concentrate to obtain a colchicine distillate, and crystallizing ultrapure colchicine from the colchicine distillate. The method can further comprise washing the crystallized ultrapure colchicine with a solvent and drying. The ultrapure colchicine comprises no more than about 3.0% of total impurities.

In one embodiment, the column chromatography is carried out using methylene chloride as solvent on a column of neutral alumina. Other solvents or chromatographic media may be used, provided that impurities are removed from the conventional colchicine to the desired level. In another embodiment, distillation of the purified colchicine concentrate is carried out using ethyl acetate. Other organic solvents can be used, provided that impurities are removed from the purified colchicine concentrate. In yet another embodiment, the solvent used to wash the crystallized ultrapure colchicine is ethyl acetate.

In another embodiment, a method of making ultrapure colchicine comprises subjecting colchicine comprising more than about 3.0% total impurities to neutral alumina column chromatography to obtain a colchicine concentrate; distilling the colchicine concentrate with ethyl acetate to obtain a colchicine distillate; crystallizing a purified colchicine from the colchicine distillate in ethyl acetate; washing the purified colchicine with ethyl acetate to obtain a washed purified colchicine; and drying the washed purified colchicine to obtain ultrapure colchicine, wherein the ultrapure colchicine comprises no more than about 3.0% total impurities.

In one embodiment, the ultrapure colchicine obtained in any of the above methods comprises no more than about 2.0% total impurities. In another embodiment, the ultrapure colchicine comprises no more than about 1.5% total impurities. In another embodiment, the ultrapure colchicine comprises no more than about 1.0% total impurities. In another embodiment, the ultrapure colchicine comprises no more than about 0.5% total impurities. In yet another embodiment, the ultrapure colchicine comprises no more than about 0.5% per indi-

15

vidual impurity of Impurity A, Impurity B, Impurity C, Impurity D, Impurity E, or Impurity F. In still another embodiment, the ultrapure colchicine comprises no more than about 0.15% per individual impurity of Impurity A, Impurity C, Impurity D, Impurity E, or Impurity F. In another embodiment, the ultrapure colchicine comprises no more than about 1.0% of total unidentified impurities. In yet another embodiment, the ultrapure colchicine comprises no more than about 0.5% of total unidentified impurities. In yet another embodiment, the ultrapure colchicine comprises no more than 1.0% of Impurity B, and no more than 0.1% per individual impurity of any of Impurity A, Impurity C, Impurity D, Impurity E, and Impurity F.

The above methods of making ultrapure colchicine are only examples of suitable methods for its preparation.

The colchicine compositions disclosed herein comprise colchicine and a pharmaceutically acceptable excipient. In one embodiment, the colchicine composition comprises 0.1 wt % to 10 wt % colchicine, specifically 0.1 wt % to 5 wt % colchicine. In one embodiment, the colchicine in the colchicine compositions is ultrapure colchicine. The compositions comprising ultrapure colchicine are stable and provide enhanced safety to patients taking the compositions because the patients are ingesting fewer impurities. In particular, the colchicine compositions contain substantially lower levels of the tumorigenic compound N-deacetyl-N-formyl colchicine.

The pharmaceutically acceptable excipient in the colchicine composition may be a filler (or diluent), a binder, a disintegrant, a lubricant, or a combination comprising two or more of the foregoing excipients.

In one embodiment, the pharmaceutically acceptable excipient comprises a filler. Exemplary fillers may be one or more compounds which are capable of providing compactability and good flow. Exemplary fillers include microcrystalline cellulose, starch, lactose, sucrose, glucose, mannitol, maltodextrin, sorbitol, dextrose, silicic acid, dibasic calcium phosphate, or a combination comprising at least one of the foregoing fillers. Exemplary lactose forms include lactose monohydrate, NF (Fast Flo), lactose spray-dried monohydrate, and lactose anhydrous. Exemplary microcrystalline cellulose (MCC) include, for example, AVICEL® PH101 and AVICEL® PH102, which are commercially available from FMC Biopolymer, Philadelphia, Pa. Exemplary dibasic calcium phosphates include dihydrated and anhydrous dibasic calcium phosphates. In one embodiment, the filler is a combination of microcrystalline cellulose and lactose monohydrate, NF (fast flo).

When present, the amount of the filler in the composition may be about 10 wt % to about 99 wt %, or more specifically, about 30 wt % to about 90 wt %, or even more specifically, about 50 wt % to about 90 wt %, or still more specifically, about 70 wt % to about 85 wt %, based on the total weight of the composition. In one embodiment, the total amount of the filler is about 82 wt %, based on the total weight of the composition

In one embodiment, the pharmaceutically acceptable excipient comprises a binder. Binders may be used to impart cohesive qualities to a formulation, for example, a tablet formulation, and thus ensure that the tablet remains intact after compaction. Exemplary binders include starches (for example, Starch 1500® or pregelatinized starch), alginates, gelatin, carboxymethylcellulose, sugars (for example, sucrose, glucose, dextrose, and maltodextrin), polyethylene glycol, waxes, natural and synthetic gums, polyvinylpyrrolidone, and cellulosic polymers (for example, microcrystalline cellulose, hydroxypropyl cellulose, hydroxypropyl methylcellulose, methyl cellulose, and hydroxyethyl cellulose) and

16

combinations comprising one or more of the foregoing binders. In one embodiment, the binder is starch, or more specifically, pregelatinized starch.

When present, the amount of the binder may be about 10 wt % to about 99 wt %, or more specifically, about 10 wt % to about 50 wt %, or even more specifically, about 10 wt % to about 20 wt %, based on the total weight of the composition. In one embodiment, the amount of the binder is about 14 wt %, based on the total weight of the composition.

In another embodiment, the pharmaceutically acceptable excipient comprises a disintegrant. Disintegrants are used to facilitate disintegration or "breakup" of a composition, for example, a tablet, after administration. Exemplary disintegrants include sodium starch glycolate, sodium crosscarmelose (cross-linked carboxy methyl cellulose), crosslinked polyvinylpyrrolidone (PVP-XL), anhydrous calcium hydrogen phosphate, agar-agar, potato or tapioca starch, alginic acid, or a combination comprising one or more of the foregoing disintegrants.

When present, the disintegrant may be present in an amount of about 0.1 to 30 wt %, or more specifically, about 1 to 20 wt %, or even more specifically, about 1 to 10 wt %, based on the total weight of the composition. In one embodiment, the amount of the disintegrant is about 4.5 wt %, based on the total weight of the composition.

In another embodiment, the pharmaceutically acceptable excipient comprises a lubricant. Generally, a lubricant is added just before tableting, and is mixed with the rest of the composition for a minimum period of time to obtain good dispersal. Exemplary lubricants include magnesium stearate, calcium stearate, zinc stearate, stearic acid, talc, glyceryl behenate, polyethylene glycol, polyethylene glycol, polyethylene oxide, sodium lauryl sulfate, magnesium lauryl sulfate, sodium oleate, sodium stearyl fumarate, DL-leucine, colloidal silica, or a combination comprising one or more of the foregoing lubricants. In one embodiment, the lubricant is magnesium stearate, calcium stearate, or zinc stearate.

When present, the lubricant may be present in an amount of about 0.01 wt % to about 10 wt %, or more specifically, about 0.1 wt % to about 5 wt %, or even more specifically, about 0.1 wt % to about 1 wt %, based on the total weight of the composition. In one embodiment, the amount of the lubricant is about 0.6 wt %, based on the total weight of the composition.

If desired, the composition may optionally comprise small amounts of nontoxic auxiliary substances such as wetting or emulsifying agents, or pH buffering agents, for example, sodium acetate, sorbitan monolaurate, triethanolamine sodium acetate, triethanolamine oleate, sodium lauryl sulfate, dioctyl sodium sulfosuccinate, and polyoxyethylene sorbitan fatty acid esters.

In one embodiment, a composition comprises an ultrapure colchicine, wherein the ultrapure colchicine comprises no more than 3.0% of total impurities, a filler, a binder, and a disintegrant.

In another embodiment, a colchicine composition comprises about 0.6 mgA colchicine; about 14 mg pregelatinized starch; about 22 mg microcrystalline cellulose; about 4.3 mg sodium starch glycolate; about 0.6 mg magnesium stearate; and an amount of lactose monohydrate such that the colchicine composition has a total weight of about 100 mg. In one embodiment, the colchicine in the colchicine composition is ultrapure colchicine.

In an embodiment, a colchicine composition comprises colchicine; and a pharmaceutically acceptable excipient; wherein the colchicine composition comprises no more than about 3.5% total impurities, specifically no more than about

US 7,964,647 B2

17                                                                18

3.0% total impurities, more specifically no more than about 2.0% total impurities, or yet more specifically no more than about 1.0% total impurities. In some of these embodiments, specific limitations on the levels of individual impurities are also met by the colchicine composition. In addition to containing no more than a particular maximum level of total impurities, the colchicine composition can comprise not more than about 0.42% Impurity A, Impurity C, Impurity D, Impurity E, or Impurity F, and not more than about 2.0% Impurity B; specifically not more than about 0.2% Impurity A, Impurity C, Impurity D, Impurity E, or Impurity F, and not more than about 1.5% Impurity B; and more specifically not more than about 0.15% Impurity A, Impurity C, Impurity D, Impurity E, or Impurity F, and not more than about 1.1% Impurity B. In one embodiment the colchicine composition comprises no more than 3.5% total impurities, no more than 0.42% Impurity A, and no more than 2.0% Impurity B. The pharmaceutically acceptable excipient can be one or more discussed previously herein.

In one embodiment, a colchicine composition comprises colchicine and a pharmaceutically acceptable excipient; wherein the colchicine composition comprises no more than about 3.5% total impurities. In some embodiments, the colchicine composition comprises ultrapure colchicine and total impurities in the ultrapure colchicine comprise no more than about 3.0%, or specifically no more than about 2.0%, or more specifically no more than about 1.5%, or yet more specifically, no more than about 1.0%. In addition to containing no more than a particular maximum level of total impurities, the ultrapure colchicine in the colchicine composition can comprise not more than about 0.15% Impurity A, Impurity C, Impurity D, Impurity E, or Impurity F, and not more than about 2.0% Impurity B; specifically not more than about 0.10% Impurity A, Impurity C, Impurity D, or Impurity E; not more than about 0.15% Impurity F, and not more than about 1.5% Impurity B. In one embodiment the colchicine composition comprises ultrapure colchicine comprising no more than 0.10% Impurity A, no more than about 0.15% Impurity F, and no more than 2.0% Impurity B. The pharmaceutically acceptable excipient can be one or more discussed previously herein.

In one embodiment, a colchicine composition comprises colchicine; a filler; a binder; and a disintegrant; wherein the colchicine composition comprises no more than about 3.5% total impurities. In some embodiments, the colchicine composition comprises ultrapure colchicine and total impurities in the composition comprise no more than about 3.5%, or specifically no more than about 3.0%, more specifically no more than about 2.0%, or yet more specifically, no more than about 1.0%; with individual impurity levels of not more than about 0.42% for Impurity A, Impurity C, Impurity D, Impurity E, or Impurity F, and not more than about 2.0% for Impurity B. or specifically with individual impurity levels of not more than about 0.10% for Impurity A, Impurity C, Impurity D, Impurity E, or Impurity F, and not more than about 2.0% for Impurity B.

In one embodiment, the percent total impurities in the composition is determined in an HPLC assay as described in Colchicine Official Monograph USP30/NF25 as 100% times a sum of responses of any peaks other than that due to colchicine, eluting within 1.5 times the retention time for colchicine, relative to a sum of responses of all peaks eluting within 1.5 times the retention time for colchicine and the percent of an individual impurity in the composition is determined in an HPLC assay as described in Colchicine Official Monograph USP30/NF25 as 100% times the responses of the impurity peak relative to a sum of responses of all peaks eluting within 1.5 times the retention time for colchicine.

In yet another embodiment, the percent total and/or individual impurities in the composition is determined in an HPLC assay or HPLC assay in accordance with the methods described in Table 2 or Table 3A or 3C.

In one embodiment, any of the colchicine compositions described above is in the form of a tablet. As used herein, the term "tablet" means a compressed pharmaceutical dosage form of any shape or size. The tablets described herein may be obtained from the compositions comprising colchicine and a pharmaceutically acceptable excipient. Any of the colchicine compositions can be in the form of any other dosage form known in the art, specifically, any oral dosage form, for example a capsule.

Either wet or dry granulation of a colchicine composition may be used prior to compressing the composition into tablets, or direct compression can be used.

In one embodiment, wet granulation is used to prepare wet granules comprising colchicine. A granulating liquid is used in wet granulation process. Both aqueous and non-aqueous liquids may be used as the granulating liquid. In one embodiment, the granulating liquid is an aqueous liquid, or more specifically, de-ionized water. In an embodiment, the colchicine is ultrapure colchicine.

The amount of the granulating liquid used may depend on many factors, for example, the type of the granulating liquid, the amount of the granulating liquid used, whether a hygroscopic excipient is used, the nature of the active agent, and the active agent loading. In one embodiment, the amount of the granulating liquid is in the range of about 5 wt % to about 50 wt %, or more specifically, about 10 wt % to about 40 wt %, based on the dry weight of the granulating particles prior to wet granulation.

Wet granulation time is generally about 5 to 60 minutes. In one embodiment, the colchicine particles and suitable excipients are mixed with the granulating liquid for a period of about 5 to about 45 minutes, or more specifically, about 5 to about 35 minutes. For a small scale, the mixing time is about 1 to about 20 minutes, or more specifically, 3 to 10 minutes. Wet granulation is generally performed at temperatures between about 20° C. to about 35° C., or more specifically, at room temperature (about 25° C.).

Any equipment may be used to contact the granulating liquid with the colchicine and the excipients as long as uniform distribution of the granulating liquid is achieved. For example, small-scale production can be achieved by mixing and wetting the ultrapure colchicine and the excipients in mortars or stainless steel bowls, while for larger quantities, V-blenders with intensifier bars, planetary mixers, rotary granulators, high shear granulators, and fluid-bed granulation equipment may be used. In one embodiment, the granulator is a high shear granulator.

In one embodiment, a method of making a colchicine composition comprises wet granulating colchicine with a pharmaceutically acceptable excipient to obtain wet granules, and mixing the granules with a second excipient to obtain a colchicine composition. In one embodiment, the pharmaceutically acceptable excipient comprises a mixture of a filler and a binder. In another embodiment, the mixture of the filler and the binder comprises pregelatinized starch, lactose monohydrate, and microcrystalline cellulose. In another embodiment, de-ionized water is used as the granulating liquid. In some embodiments, the colchicine is ultrapure colchicine. In an embodiment, the second excipient mixed with the granules is a disintegrant. The colchicine compositions can contain about

US 7,964,647 B2

**19**

0.1 wt % to about 10 wt %, or more specifically, about 0.1 wt % to about 1 wt %, of colchicine, based on the total weight of the colchicine composition.

In an embodiment, the method of making a composition comprises wet granulating colchicine with a pharmaceutically acceptable excipient to obtain wet granules, and mixing the granules with a disintegrant to obtain a colchicine composition. In some embodiments, the method further comprises drying the mixture. In another embodiment, the wet granules are dried to obtain dried granules; and then the dried granules are mixed with a disintegrant to obtain the composition. In another embodiment, the dried granules can be milled to obtain milled granules before mixing the milled dried granules with the disintegrant. In one embodiment, greater than 50% of the milled granules pass through a 45 micron sieve or mesh screen. The method can further comprise mixing the colchicine composition with a lubricant to obtain a tableting blend or compressing the tableting blend to obtain a tablet. The method can further comprise coating the tablet.

In one embodiment, a method of making a colchicine composition comprises wet granulating ultrapure colchicine with a pharmaceutically acceptable excipient to obtain wet granules; drying the wet granules to obtain dried granules; milling the dried granules to obtain milled granules; and mixing the milled granules with a disintegrant to obtain the composition. The ultrapure colchicine can comprise no more than about 3.0% total impurities, with no more than about 0.10% Impurity A, no more than about 0.15% Impurity F, and no more than about 2.0% Impurity B.

In another embodiment, a method of making a colchicine tablet comprises wet granulating colchicine with a pharmaceutically acceptable excipient to obtain wet granules; drying the wet granules to obtain dried granules; milling the dried granules to obtain milled granules; mixing the milled granules with a disintegrant to obtain the composition; mixing the composition with a lubricant to obtain a tableting blend; and compressing the tableting blend to obtain a colchicine tablet.

In some embodiments, the wet granules are dried to obtain dried granules before mixing with a second excipient, for example a disintegrant. Wet granules can be dried by any suitable means to remove the granulating liquid and to form dried granules containing colchicine and the pharmaceutically acceptable excipient. The conditions and duration of drying depend on factors such as the liquid used and the weight of the granulating particles. Examples of suitable drying methods include, but are not limited to, tray drying, forced air drying, microwave drying, vacuum drying and fluid bed drying.

The extent of drying may be determined by visual observation and manual manipulation, as is common in the art. The extent of drying may also be determined by sieve analysis, moisture measurements, such as loss on drying (LOD) or other suitable methods. In one embodiment, wet granules are dried until the granules lose less than 5 weight percent (wt %), or more specifically, 3 wt % upon drying at 105° C. based on the total weight of the dried granules prior to drying (or LOD of less than 3 wt %).

After drying, dried granules may be mixed directly with an excipient, for example, a filler, a binder, a disintegrant, or a lubricant, for further processing. Alternatively, dried granules may optionally be subjected to additional processing steps prior to mixing with the excipient. For example, dried granules may be sized to reduce particle size prior to mixing with an excipient. Exemplary sizing operations include milling or sieving. Any suitable equipment for reducing the particle size may be used in the present invention. In one embodiment, the

**20**

dried granules are milled to obtain milled granules so that at least 50% of the milled granules pass through a 45 micron mesh screen.

Suitable excipients may be added extragranularly and mixed with the granules to form colchicine compositions. As used herein, the term "extragranular" or "extragranularly" means that the referenced material, for example, a suitable excipient, is added or has been added as a dry component after wet granulation. In one embodiment, a disintegrant and a lubricant, in that sequence, are added extragranularly to the granules and mixed to form a blend. The blend may be encapsulated directly into capsule shells, for example, hard gelatin shells, to form capsule formulations. Alternatively, the blend may be compressed into tablets. In some embodiments, the granules are dried granules or milled, dried granules. In some embodiments, the colchicine is ultrapure colchicine.

Mixing can be carried out for a sufficient time to produce homogeneous mixtures or blends. Mixing may be accomplished by blending, stirring, shaking, tumbling, rolling, or by any other method to achieve a homogeneous blend. In some embodiments, the components to be mixed are combined under low shear conditions in a suitable apparatus, such as a V-blender, tote blender, double cone blender or any other apparatus capable of functioning under low shear conditions.

The homogenous mixtures or blends are then compressed using any method suitable in the industry.

The colchicine tablets prepared from the above described methods exhibit acceptable physical characteristics including good friability and hardness. The colchicine tablets disclosed herein have friability in the range of about 0% to 3%, specifically about 0 to 1%, more specifically 0% to 0.5%

The colchicine tablet can be coated. Coating the tablet may be performed by any known process. A coating for the colchicine tablet disclosed herein can be any suitable coating, such as, for example, a functional or a non-functional coating, or multiple functional or non-functional coatings. By "functional coating" is meant to include a coating that modifies the release properties of the total formulation, for example, a sustained-release coating. By "non-functional coating" is meant to include a coating that is not a functional coating, for example, a cosmetic coating. A non-functional coating can have some impact on the release of the active agent due to the initial dissolution, hydration, perforation of the coating, etc., but would not be considered to be a significant deviation from the non-coated composition.

In one embodiment, the tablet is coated with a non-functional coating. The coating can be a white or colored OPADRY® or OPADRY® II (both available from Colorcon, West Point, Pa.), optionally with additional ingredients such as carnauba wax, plasticizers, opacifiers, colorants, and antioxidants. In one embodiment, the coating comprises OPADRY® II and carnauba wax.

In an embodiment, a colchicine composition comprises about 0.6 mgA colchicine; about 12 to about 16 mg pregelatinized starch; about 20 to about 24 mg microcrystalline cellulose; about 3.9 to about 4.7 mg sodium starch glycolate; about 0.5 to about 0.7 mg magnesium stearate; and an amount of lactose monohydrate such that the colchicine dosage form has a total weight of about 100 mg. In some embodiments the colchicine composition comprises about 0.6 mgA colchicine, about 14 mg pregelatinized starch, about 22 mg microcrystalline cellulose, about 4.3 mg sodium starch glycolate, about 0.6 mg magnesium stearate, and an amount of lactose monohydrate such that the colchicine dosage form has a total weight of about 100 mg. The colchicine composition can be in the form of a tablet. In some embodiments the tableted

US 7,964,647 B2

21

composition further comprises a coating comprising Opadry® II and carnauba wax. In an embodiment, the colchicine is ultrapure colchicine.

In one embodiment, a colchicine composition comprising ultrapure colchicine is formulated into an immediate-release formulation. By "immediate-release" is meant a conventional or non-modified release in which greater than or equal to about 75% of the active agent is released within two hours of administration, specifically within one hour of administration.

Active agent release from a pharmaceutical formulation can be analyzed in various ways. One exemplary test is in vitro dissolution. A dissolution profile is a plot of the cumulative amount of active agent released from a formulation as a function of time. A dissolution profile can be measured utilizing the Drug Release Test <724>, which incorporates standard test USP 26 (Test <711>). A profile is characterized by the test conditions selected such as, for example, apparatus type, shaft speed, temperature, volume, and pH of the dissolution medium. More than one dissolution profile may be measured. For example, a first dissolution profile can be measured at a pH level approximating that of the stomach, and a second dissolution profile can be measured at a pH level approximating that of one point in the intestine or several pH levels approximating multiple points in the intestine.

In one embodiment, the immediate-release colchicine composition exhibits a dissolution profile such that at ten minutes after combining the composition with 500 ml of purified water at 37° C.±0.5° C. according to USP 28<711> Apparatus 1 (basket), 100 rpm speed, about 90 to about 100 wt. % of the total amount of active agent is released; specifically at 30 minutes after combining the composition with the dissolution medium, about 95 to about 100 wt. % of the total amount of colchicine is released; and more specifically at one hour after combining the composition with the dissolution medium, about 98 to about 100 wt. % of the total amount of colchicine is released.

Potency, or the amount of active colchicine present in a batch of colchicine, can be determined as described in Colchicine Official Monograph USP 30/NF 25 by comparing an assay sample to a colchicine reference standard (e.g., USP Colchicine RS) sample in the chromatographic assay described in Colchicine Official Monograph USP30/NF25 The quantity of active colchicine in the assay sample, in mg, of $C_{22}H_{25}NO_6$ is calculated by the formula: 10C $(r_x/r_S)$, in which C is the concentration, in μg per mL, of the colchicine reference standard sample; and $r_U$ and $r_S$ are the colchicine peak responses obtained from the assay sample and the colchicine reference standard sample, respectively.

In another embodiment, potency of a batch of colchicine can be determined using the HPLC Potency assay described in the table below by comparing an assay sample to a colchicine reference standard.

| HPLC Potency Assay B | |
| --- | --- |
| Mobile phase | 50 mM Potassium Phosphate Buffer:methanol (45:55), pH 5.5 ± 0.05 |
| Column | Phenomenex Luna C8(2), 4.6 mm × 25 cm, 5 μm |
| Flow rate | 1.0 ml/min |
| Column Temperature | Ambient |
| Detection | 254 nm |
| Injection volume | 20 uL |
| Sample Conc. | 0.120 mg/ml |
| Run time | 15 min |

22

The quantity, in percentage, of $C_{22}H_{25}NO_6$ (active colchicine), on an anhydrous, solvent free basis, in the colchicine assay sample is calculated by the formula:

$$\% \text{ Purity} = \frac{r_u}{r_s} \times \frac{W_s(\text{mg}) \times P \times \left( \frac{100 - M_s - S_s}{100} \right)}{500 \text{ ml}} \times$$

$$\frac{PV(\text{ml})}{VF(\text{ml})} \times \frac{VF_1(\text{ml})}{SW(\text{mg}) \times \left( \frac{100 - M_a - S_a}{100} \right)} \times \frac{VF_2(\text{ml})}{PV_1(\text{ml})} \times 100$$

Where:

$r_u$=The peak area of colchicine in the working sample solution

$r_s$=The peak area of colchicine in the working standard solution

$W_s$=The weight of colchicine in the standard preparation

P=Standard purity factor expressed as labeled % Purity

$M_s$=Moisture factor in standard expressed as % Moisture

$S_s$=Solvent factor in standard expressed as % Solvent

PV=Pipet volume used for the working standard solution

VF=Volumetric flask used for the working standard solution

SW=Sample weight in the stock sample solution

$VF_1$=Volumentric flask used for the stock sample solution

$M_a$=Moisture factor in sample expressed as % Moisture

$S_a$=Solvent factor in sample expressed as % Solvent

$VF_2$=Volumentric flask used for the working sample solution

$PV_1$=Pipet volume used for the working sample solution.

Alternatively, potency of a batch of colchicine can be determined by comparing an assay sample to a colchicine reference standard in yet another HPLC assay as follows:

| HPLC Potency Assay C | |
| --- | --- |
| HPLC System: | HPLC equipped with a pump, autosampler, variable wavelength detector and a suitable data acquisition system |
| Column Information: | Phenomenex Gemini C18 150 × 4.6 mm 5 μm 110 Å |
| Detection: | 245 nm |
| Flow Rate: | 1.5 mL/minute |
| Injection Volume: | 20 μL |
| Column Temperature: | 30° C. ± 3° C. |
| Needle Rinse Setting: | Double |
| Sampling Rate: | 2.0 |
| Resolution: | 1.2 |
| Filter Response: | 1.0 |
| Digital Filter: | Enabled |
| Needle Wash/Seal Wash: | Methanol:Water (50:50) |
| Run Time: | About 15 minutes |
| Mobile Phase: | pH 6.0 Buffer Solution (50 mM of Potassium phosphate and 4 mM of EDTA):Methanol (60:40) |
| Diluent: | Water:Methanol (75:25) |

The percent purity of Colchicine ($C_{22}H_{25}NO_6$), on an anhydrous, solvent-free basis, is calculated as follows:

$$\% \text{ Assay} = \frac{r_u}{r_s} \times \frac{W_s(\text{mg}) \times P}{50 \text{ mL}} \times \left( \frac{100 - \% RS_s - \% W_s}{100} \right) \times$$

US 7,964,647 B2

23

-continued

$$\frac{5.0 \text{ mL}}{100 \text{ mL}} \times \frac{800 \text{ mL}}{W_u(\text{mg}) \times \left(\frac{100 - \% \ RS_u - \% \ W_u}{100}\right)} \times 100\%$$

Where:

$r_u$=The peak area response of Colchicine in the Sample Solution.

$r_s$=The peak area response of Colchicine in the Working Standard Solution.

$W_s$=The weight of Colchicine in the Stock Standard Preparation.

$W_u$=The weight of Colchicine in the Sample Preparation.

P=Standard purity factor expressed as labeled (% Purity/100).

% $RS_{s/u}$=Percent of Residual Solvents in the Colchicine Standard/Sample.

% $W_{s/u}$=% Water in the Colchicine Standard/Sample.

Disclosed herein are also methods of treatment and dosing regimens.

The compositions comprising ultrapure colchicine disclosed herein may be used to treat or prevent a patient's condition such as acute gouty arthritis, chronic gouty arthritis, acute pericarditis, asthma, Behçet's disease, cancer, chronic gout (prophylaxis), pseudogout cystic disease comprising polycystic kidney disease or cystic fibrosis, demyelinating disease of central or peripheral origin, Dupuytren's contracture, Familial Mediterranean fever, glaucoma, idiopathic pulmonary fibrosis, idiopathic thrombocytopenic purpura, inflammatory disorder comprising rheumatoid arthritis, lentiviral infection, multiple sclerosis, postpericardiotomy syndrome, primary amyloidosis, primary biliary cirrhosis, proliferative vitreoretinopathy, pyoderma gangrenosum, recurrent pericarditis, or a condition in need of enhanced bone formation or bone mineral density.

The traditional dose of colchicine used to treat or prevent an attack of acute gouty arthritis has been about 1.0 to about 1.2 mgA of colchicine, for example, two tablets each comprising about 0.6 mgA colchicine. This dose may be followed by one unit of the composition every hour, or two units every two hours, until pain is relieved or until diarrhea ensues ("diarrheal dose"). After the initial dose, it is sometimes sufficient to take about 0.6 mgA colchicine every two or three hours. The dosing should be stopped if there is gastrointestinal discomfort or diarrhea. (Opiates may be needed to control diarrhea.) In subsequent attacks, the patient should be able to judge his medication requirement accurately enough to stop short of his diarrheal dose. The total amount of colchicine needed to control pain and inflammation during an attack has been believed to be in the range from about 4 mgA to about 8 mgA. An interval of three days between colchicine courses is advised in order to minimize the possibility of cumulative toxicity.

In one embodiment, a method of treating acute gouty arthritis comprises administering two colchicine dosage forms each comprising about 0.6 mgA colchicine at the onset of the acute gout attack, followed by one dosage form every hour for m hours, wherein the value of m is 1 to 8. In one embodiment, the value of m is 1 to 6. In another embodiment, the value of m is 1 (total of 3 tablets). In another embodiment, the value of m is 6 (total of 8 tablets). The colchicine in the dosage form can be ultrapure colchicine. The dosage form can be any oral dosage form, specifically a tablet.

In another embodiment, a method of treating Familial Mediterranean Fever comprises administering ½ dosage form to four dosage forms daily, each dosage form comprising about 0.6 mgA colchicine (total of about 0.3 to about 2.4 mgA colchicine daily). In another embodiment, a method of prophylactically treating chronic gout comprises administering one-half dosage form, one dosage form, two dosage forms, or three dosage forms, each dosage form comprising about 0.6 mgA of colchicine, daily. In another embodiment, a method of treating Behçet's disease comprises administering one dosage form comprising about 0.6 mgA of colchicine twice daily (total of 2 dosage forms). The colchicine in the dosage form can be ultrapure colchicine. The dosage form can be any oral dosage form, specifically a tablet.

In one embodiment, a method of treating patients with some but not all of the symptoms of acute gout, chronic gout (prophylaxis), or pseudogout, where the patients are not clinically or informally diagnosed with one of these diseases, comprises administering one or more of the dosage forms comprising about 0.6 mgA of colchicine. The colchicine in the dosage form can be ultrapure colchicine.

The invention should not be considered limited to these particular conditions for combining the components and it will be understood, based on this disclosure that the advantageous properties can be achieved through other conditions provided the components retain their basic properties and substantial homogeneity of the blended formulation components of the formulation is otherwise achieved without any significant segregation.

The following examples further illustrate the invention but should not be construed as in any way limiting its scope. In particular, the processing conditions are merely exemplary and can be readily varied by one of ordinary skill in the art.

EXAMPLES

Example 1

Exemplary Ultrapure Colchicine

As discussed above, ultrapure colchicine with reduced levels of individual and total impurities was desired by the inventors for formulation into a new dosage form in order to minimize potential adverse reactions from the impurities in patients taking the dosage form and to reduce the expense of qualification testing during the approval process for marketing the new dosage form. Batches of conventional colchicine were previously obtained from Sanmar Specialty Chemicals Limited (Berigari, India). Conventional colchicine can be further purified to form ultrapure colchicine meeting the following impurity specifications:

TABLE 4

Purity Specifications for an exemplary batch of Ultrapure Colchicine

| Impurity, Common name | Impurity | NMT % |
|---|---|---|
| N-deacetyl-N-formyl colchicine | A | 0.10 |
| Conformational isomer | B | 1.0 |
| β-Lumicolchicine | C | 0.10 |
| Colchicoside | D | 0.10 |
| 3-O-demethyl colchicine | E | 0.10 |
| Total Impurities | | 2.0 |

Ultrapure colchicine was prepared to meet the purity specifications in Table 4 as described below.

First, conventional colchicine was obtained from a colchicine chloroform extract. The extract was washed with a mixture of purified water, sodium hydroxide solution, sodium chloride solution and acetic acid. The washed extract was

A436

US 7,964,647 B2

25

26

filtered and the resulting concentrate was distilled in two steps, first using methanol, and second using ethyl acetate. The resulting distillate was crystallized. Ethyl acetate was used to isolate and wash the crystallized colchicine, which was then dried, resulting in the conventional colchicine. This process is also referred to herein as the "old process".

Second, the conventional colchicine was then subjected to column chromatography on neutral alumina using methylene chloride as solvent. The resulting concentrate was distilled using ethyl acetate, crystallized, isolated and washed using ethyl acetate, and dried, resulting in ultrapure colchicine. This method of generating conventional colchicine, followed by the additional chromatography purification step is also referred to herein as the "new process".

The impurity levels of the lot of ultrapure colchicine and two lots of conventional colchicine were analyzed using the USP30/NF25 Colchicine Official Monograph HPLC method ("USP method") described in Table 2 above. The impurity levels are shown in Table 5.

TABLE 5

| Colchicine Lot | Impurity Level, % | | | |
| | N-Deacetyl-N-formyl colchicine - Impurity A | Conformational Isomer - Impurity B | Total Unidentified Impurities | Total Impurities |
|---|---|---|---|---|
| Ultrapure (RD0600164) | ND* | 0.5 | ND* | 0.5 |
| Conventional-1 (RD060075) | 2.1 | 0.6 | ND* | 2.7 |
| Conventional 2 (RD060085) | 2.2 | 0.6 | ND* | 2.8 |

*ND—None detected.

Table 5 shows that ultrapure colchicine has fewer impurities than each of the conventional colchicine lots. Total impurities of the Ultrapure Lot using the USP method were about 0.5%. On the other hand, total impurities of conventional Lots #1 and 2 were about 2.7% and 2.6%, respectively.

Determined impurity levels may differ depending on the test method used. Table 5B contrasts the determined levels of the conformational isomer, Impurity A (N-deacetyl-N-formyl colchicine), and total impurities for the three colchicine lots using the three methods described in Table 2. The three methods show a maximum absolute variability in the percent determined of 0.8% for N-deacetyl-N-formyl colchicine, of 0.5% for conformational isomer, and 0.7% for total impurities.

Regardless of the testing method used for measuring these impurity levels, the impurity levels for ultrapure colchicine manufactured using the new process remains below the specifications set forth in Table 4.

The ultrapure colchicine of the present invention was prepared to meet the organic volatile impurity specifications ("residual solvents") in Table 6 as described below. The residual solvents are determined using USP <467> test method. In addition to the known and existing solvents, specifications were also set for residual solvent peaks that were seen in HPLC assay testing as described in Tables 2, 3A, or 3C, which solvents are not expected or previously existing for the residual solvent test methods for colchicine or were not identifiable.

TABLE 6

| Specifications for Organic Volatile Impurities | |
| Organic volatile | NMT |
|---|---|
| Chloroform | 100 ppm |
| Methanol | 3000 ppm |
| Methylene Chloride | 600 ppm |
| Ethanol | 5000 ppm |
| Ethyl Acetate | 6.0% |
| Ethyl Propionate | 5000 ppm |
| Propyl Acetate | 5000 ppm |
| Others | 500 ppm each |

Example 2

Stable Tablets Comprising Ultrapure Colchicine

Stable colchicine compositions comprising the ultrapure colchicine described in Example 1 were manufactured using the following process. Ultrapure colchicine as described in Example 1 was dissolved in purified water. Pregelatinized starch (Starch® 1500), lactose monohydrate, NF (Fast Flo), and microcrystalline cellulose, NF (Avicel PH101) were placed in a 150-liter high shear granulator and mixed. The aqueous ultrapure colchicine solution was added to the granulator while mixing. The wet granules were dried in an oven at 50° C. until the loss on drying of the material was less than 3 wt %. The dried granules were milled through a Fitzmill equipped with a 1A screen.

The milled granules were charged into a 5 cubic foot Gemco Double Cone Blender and blended with screened sodium starch glycolate, NF (GLYCOLYS®). Then,

TABLE 5B

| Levels of impurities in colchicine lots determined using methods of Table 2. | | | | | | | | | | |
| Lot name (Lot #) | Purification Process | Conformational Isomer | | | N-deacetyl-N-formyl colchicine | | | Total Impurities | | |
| | | UPLC Method | HPLC Method | USP Method | UPLC Method | HPLC Method | USP Method | UPLC Method | HPLC Method | USP Method |
|---|---|---|---|---|---|---|---|---|---|---|
| Conventional-1 (RD060055) | Old | 0.9 | 0.8 | 0.6 | 3.0 | 2.5 | 2.2 | | 3.5 | 2.8 |
| Conventional 2 (RD060075) | Old | 0.9 | 0.8 | 0.6 | 2.7 | 2.3 | 2.1 | | 3.2 | 2.7 |
| Ultrapure (RD0600164) | New | 0.9 | 1.0 | 0.5 | ND* | ND | ND | | 1.1 | 0.5 |

*ND, none detected.

US 7,964,647 B2

27

screened magnesium stearate, NF was added to the blender. Blending was continued and a final tableting blend was made. This final tableting blend was compressed into core tablets. These core tablets were film-coated with OPADRY®II purple and carnauba wax. The composition of the ultrapure colchicine tablets is shown in Table 7.

TABLE 7

| Ingredient | Amount Per Tablet, mg |
|---|---|
| Ultrapure Colchicine | 0.6[1] |
| Pregelatinized starch, NF (Starch 1500) | 14.0 |
| Lactose Monohydrate, NF (Fast Flo) | Varies[2] |
| Microcrystalline Cellulose, NF (Avicel PH101) | 21.6 |
| Sodium Starch Glycolate, NF (GLYCOLYS) | 4.3 |
| Magnesium Stearate, NF | 0.6 |
| Total core tablet | 100 |

28

TABLE 7-continued

| Ingredient | Amount Per Tablet, mg |
|---|---|
| OPADRY II Purple (#40L10039) | 4.0 |
| Carnauba Wax | 0.01 |

[1]Colchicine amount is shown in units of mgA, adjusted for purity of the lot of colchicine.
[2]Amount adjusted, depending on the actual amount of the colchicine lot added, to maintain an overall core tablet weight of 100 mg.

As a comparison, the lot of conventional colchicine designated in Example 1 as "conventional-2" was substituted in place of ultrapure colchicine in the same tablet formulation shown in Table 7. The same process of making the tablets as described above was used.

The impurities in the tablet comprising the ultrapure colchicine and that comprising the conventional colchicine were analyzed using the HPLC method described in Table 2 above. The impurity levels of both colchicine tablets are shown in Table 8.

TABLE 8

| | | | Impurity Content, % | | | |
|---|---|---|---|---|---|---|
| Colchicine Product Lot | Colchicine Lot | Process | N-Deacetyl-N-formyl colchicine (Impurity A) | Conformation Isomer (Impurity B) | Total Unknown Impurities | Total Impurities |
| A | Ultrapure | New | ND* | 1.1 | 0.1 | 1.2 |
| B | Conventional-2 | Old | 2.3 | 1.2 | ND* | 3.6 |

*ND    None detected.

It can be seen from Table 8 that the tablet comprising the ultrapure colchicine has less total impurities than that comprising the conventional colchicine.

The colchicine composition comprising ultrapure colchicine at 6 month stability time points under conditions of 25° C./60% relative humidity and 40° C./60% relative humidity exhibits impurity content ranges of Not Detected to about 0.1% for Impurity A, less than about 1.0% for total unknown impurities compared to a colchicine composition comprising conventional colchicine which exhibits impurity content of greater than about 1.5 for Impurity A and greater than about 2.0% for total unknown impurities when tested under the same conditions.

Table 9 below provides data on impurity levels and stability of impurity levels of colchicine composition batches manufactured using ultrapure and conventional colchicine, and impurity levels for two lots of commercially available COL-PROBENECID® tablets (Watson Laboratories), an FDA-approved combination dosage form comprising colchicine and probenecid.

TABLE 9

| Material | Lot | Colchicine purification Process | Conditions of Stability Study | Conformational Isomer UPLC Method | Conformational Isomer HPLC Method | N-Deacetyl peak UPLC Method | N-Deacetyl peak HPLC Method |
|---|---|---|---|---|---|---|---|
| COL-PROBENECID ® (Probenecid/ Colchicine) Tablets† | L6C0395 | N/A | N/A | 0.8 | — | 2.2 | — |
| | L6M1440 | N/A | N/A | 0.8 | | 2.5 | |
| Colchicine Product Lot | B | Old process | room temp, at release | 0.9 | 1.2 | 2.8 | 2.3 |
| | | | 12 mo 25 C./60% RH | 0.9 | 0.9 | 2.7 | 2.6 |
| | A | New process | room temp, at release | 1.0 | 1.2 | ND | ND |
| | | | 6 mo 25 C./60% RH | 1.0 | 0.8 | ND | ND |
| | | | 6 mo 40 C./75% RH | 1.0 | 1.1 | ND | ND |
| | C | New process | room temp, at release | 1.0 | 1.1 | ND | ND |
| | | | 6 mo 25 C./60% RH | 0.9 | 0.9 | ND | ND |
| | | | 6 mo 40 C./75% RH | 1.0 | 1.1 | ND | ND |

A438

US 7,964,647 B2

**29** **30**

TABLE 9-continued

| Material | Lot | Colchicine purification Process | Conditions of Stability Study | Conformational Isomer | | N-Deacetyl peak | |
|---|---|---|---|---|---|---|---|
| | | | | UPLC Method | HPLC Method | UPLC Method | HPLC Method |
| | D | New process | room temp, at release | 1.0 | 1.1 | ND | ND |
| | | | 6 mo 25 C./60% RH | 1.0 | 1.0 | ND | ND |
| | | | 6 mo 40 C./75% RH | 0.9 | 1.1 | ND | ND |

—, not analyzed;
†Commercially available;
N/A, not applicable;
ND, none detected.

For comparison, several lots of an FDA-approved colchicine-probenecid combination dosage form and various unapproved commercial colchicine dosage forms were tested for levels of impurities using the HPLC method of Table 2. Results are shown in the tables below.

Impurities in FDA-Approved Colchicine/Probenecid Combination Product

| | Watson Laboratories Colchicine/Probenecid Tablets | | | |
|---|---|---|---|---|
| Impurity | L7G1085 | L7G1085 | L7G1087 | L7E0808 |
| Conformational Isomer | 1.0% | 1.0% | 0.8% | 1.0% |
| N-deacetyl-N-formyl colchicine | 2.0% | 2.0% | 1.5% | 2.0% |
| Largest Unknown | 0.1% | 0.1% | 0.1% | 0.1% |
| Total Impurities | 3.1% | 3.1% | 2.4% | 3.2% |

Summary of Impurities in Marketed Colchicine Products with Batches of colchicine tablets using ultrapure colchicine

| Impurity | Marketed Colchicine Products | | Product Lots with Ultrapure Colchicine |
|---|---|---|---|
| | Minimum | Maximum | Maximum |
| Conformational Isomer | 0.8% | 1.1% | 1.1% |
| N-deacetyl-N-formyl colchicine | 1.3% | 2.7% | ND |
| Largest Unknown | 0.1% | 1.7% | 0.3% |
| Total Impurities | 2.4% | 5.3% | 1.4% |

ND = none detected

The total impurities found in ultrapure colchicine and colchicine products comprising ultrapure colchicine are significantly lower compared to the approved and unapproved, marketed colchicine products. In addition, the maximum total impurities value observed by testing **14** approved or unapproved marketed products was 5.3%; while the maximum

Impurities in Unapproved Colchicine Products

| | West-Ward | | | Vision | | |
|---|---|---|---|---|---|---|
| Impurity | 62303A* | 63842A | 63843A | C07003 | C07049 | C07058 |
| Exp Date | January-2009 | May-2011 | May-2011 | January-2009 | August-2009 | September-2009 |
| Conformational Isomer | 1.1/0.9% | 0.9% | 0.9% | 1.1/0.8% | 0.9% | 0.9% |
| N-deacetyl-N-formyl colchicine | 2.5/2.6% | 2.0% | 1.8% | 1.3/1.3% | 2.7% | 2.6% |
| Largest Unknown | 1.7/1.6% | 0.5% | 0.3% | 0.1/0.1% | 0.1% | 0.3% |
| Total Impurities | 5.3/5.3% | 3.5% | 3.1% | 2.5/2.3% | 3.8% | 4.0% |

| | Qualitest | | | Akyma |
|---|---|---|---|---|
| Impurity | T105G07A | T107G07A | T108G07A | 3A5246004* |
| Exp Date | July-2010 | July-2010 | August-2010 | January-2008 |
| Conformational Isomer | 1.0% | 0.9% | 0.9% | 1.1/0.9% |
| N-deacetyl-N-formyl colchicine | %1.4 | 1.3% | 1.3% | 1.4/1.5% |
| Largest Unknown | 0.3% | 0.2% | 0.2% | 0.2/0.1% |
| Total Impurities | 2.7% | 2.7% | 2.6% | 2.9/2.5% |

*Values from two separate analyses reported

A439

US 7,964,647 B2

31

value seen to date in inventive ultrapure colchicine product batches was 1.4%. This represents a 75% reduction in total impurities.

Of particular significance, the level of the known impurity, N-deacetyl-N-formyl-colchicine (Impurity A, also known as Gloriosine) has been reduced from levels exceeding 2% to levels to undetectable levels that comply with the ICH Q3A (R2) qualification threshold of 0.15% for an active agent. Gloriosine is tumorigenic and has been studied as an anti-cancer agent. Purification of conventional colchicine to obtain ultrapure colchicine has effectively reduced all individual impurity levels in the colchicine to substantially reduce exposure of patients to this tumorigenic impurity.

Example 3

Therapeutic Effects of Ultrapure Colchicine Formulation

The therapeutic effect of the ultrapure colchicine formulation containing 0.6 mg A of colchicine obtained in Example 2 is evaluated in a clinical study that is a multicenter, randomized, double-blind, placebo-controlled, parallel group, 1-week, dose comparison study designed to evaluate the efficacy of ultrapure colchicine in treating an acute gout attack (acute gouty arthritic attack) in patients with acute gout. A sufficient number of patients are screened to enroll and randomize 300 patients (100 patients per treatment group) who meet the criteria of the American College of Rheumatology (ACR) for acute arthritis of gout. The primary objective of the study is to demonstrate the efficacy of colchicine in an acute gout attack (gouty flare) based on pain reduction after 24 hours as a measure of response. Secondary objectives of the study are to compare low-dose and standard-dose dosing regimens of colchicine with respect to pain, time to response and complete pain relief, interference with sleep, and signs and symptoms of inflammation and to determine the safety of colchicine when administered in the two different dosing regimens.

Description of Study

The study will consist of three distinct phases and the number of visits to the study clinic will vary depending on conditions experienced by an individual patient's acute gout flare experienced in the study as described below. The Pre-Flare Phase will consist of up to two visits to the study clinic (with additional interim visits for clinical laboratory testing every 3 months until acute gout flare onset): Visit 1 (Screening) and Visit 2 (Randomization). The Flare Phase will not include a visit to the study clinic. The Post-Flare Phase will consist of up to three visits to the study clinic: Visit 3 (as soon as possible [ASAP] up to 48 hours post-flare onset; if a patient cannot complete Visit 3 in the first 48 hours post-flare onset, Visit 3 will be waived and the patient should return to the clinic for Visit 4), Visit 4 (>48 to 96 hours post-flare onset in patients who took at least one dose of study drug and in patients who did not qualify for treatment with study drug during the Flare Phase but did not complete Visit 3), and Visit 5 (7 days post-flare onset to be conducted in patients who took at least one dose of study drug and whose acute gout flare was still ongoing at Visit 4). For those patients in whom the acute gout flare is not resolved at Visit 5 (based on the judgment of the Investigator) or in whom there is an unresolved AE or clinically significant treatment-emergent laboratory abnormality, there will be one additional follow-up visit 14 days post-flare onset (Visit 6).

When a patient develops an acute gout flare, the patient will call the trained personnel at the Gout Flare Call Center (avail-

32

able 24 hours/day throughout the duration of the study). The patient will be queried regarding any changes in his/her medical health and concomitant medication use since the time of randomization. In order to establish if the patient's acute gout flare will be eligible for treatment with study drug, a standardized questionnaire will be used to document that the patient has all of the following signs/symptoms of the affected joint(s): swelling, erythema, marked tenderness, and pain. In addition, a patient must have at least one of the following: rapid onset of maximum pain within the prior 4 to 12 hours, decreased range of motion in the joint, warmth, or other symptom similar to a prior gout flare. Patients will be asked to rate the pain severity for each joint affected by the acute gout flare by using a study diary. Patients must have at least one joint affected by an acute gout flare with a pain assessment of ≧4 on the PI-NRS at the onset of the acute gout flare during the Flare Phase prior to taking study drug. If signs and symptoms of an acute gout flare are confirmed and the gout flare is considered eligible for treatment with study drug, the patient will also be instructed to begin taking study drug and to continue completing the patient diary. Patients will be instructed to stop taking study drug and to call the investigational site if at any time they experience a severe gastrointestinal event while taking study drug. The Gout Flare Call Center will call the patient in 24 hours from the onset of the acute gout flare to ensure that the patient has completed the patient diary, including assessments for pain at 24 hours.

In the event that the Gout Flare Call Center determines that the patient does not qualify for treatment with study drug, the patient may be asked to call back in 1 hour for re-assessment. Patients who do not qualify for treatment with study drug may seek alternative therapy without prejudice to further study participation should another acute gout flare occur.

The Gout Flare Call Center will contact patients on a monthly basis beginning 1 month after randomization to study drug. These contacts will continue until the patient has an acute gout flare or study completion, whichever occurs first. The purpose of these contacts is to re-educate patients about study participation.

Post-Flare Phase:

Visit 3: After developing an acute gout flare, whether eligible for treatment with study drug or not, all patients will return to the clinic as soon as possible after acute gout flare onset for clinical assessments. If a patient cannot complete Visit 3 in the first 48 hours post-flare onset, Visit 3 will be waived and the patient should return to the clinic for Visit 4. For patients whose acute gout flare was deemed eligible for treatment with study drug and at least one dose of study drug was taken, Investigators will examine the patient and complete clinical assessments, patient diaries will be collected, the patient will be queried for concomitant medication use and Adverse Events (AEs), and the study drug blister pack will be collected. For patients whose acute gout flare was deemed not eligible for treatment with study drug by the Gout Flare Call Center, continued eligibility for the study will be confirmed by the Investigator based on review of the inclusion and exclusion criteria as well as the responses to the standardized questionnaire and examination of the patient. Patient diaries will be collected and patients will be queried for concomitant medication use and AEs.

Visit 4: The second Post-Flare Phase visit is to be conducted >48 to 96 hours following acute gout flare onset. It will take place in patients who took at least one dose of study drug and also in those patients who did not qualify for treatment with study drug during the Flare Phase but did not complete Visit 3. For patients whose acute gout flare was deemed eligible for treatment with study drug and at least one dose of

A440

33

study drug was taken, Investigators will examine the patient and complete clinical assessments, patient diaries will be collected, patients will be queried for concomitant medication use and AEs, and the study drug blister pack will be collected (if not previously collected). Patients who took at least one dose of study drug and whose acute gout flare is still ongoing at Visit 4 will return to the clinic for a final visit (Visit 5) 7 days post-flare onset; however, if their acute gout flare is resolved at Visit 4, final study assessments, including collection of samples for laboratory safety and a complete physical examination, will be performed at Visit 4. For patients whose acute gout flare was deemed not eligible for treatment with study drug by the Gout Flare Call Center who did not have a Visit 3, continued eligibility for the study will be confirmed by the Investigator based on review of the inclusion and exclusion criteria as well as the responses to the standardized questionnaire and examination of the patient. Patient diaries will be collected and patients will be queried for concomitant medication use and AEs.

Visit 5/Early Termination: The final visit for the study will take place 7 days after the acute gout flare onset in patients who took at least one dose of study drug and whose acute gout flare was still ongoing at Visit 4. Patients will be examined and clinical assessments will be made. A complete physical examination will be conducted. Samples for clinical laboratory testing will be collected. Patient diaries will be collected and patients will be queried for concomitant medication use and AEs. The study drug blister pack will be collected (if not previously collected).

Visit 6/Follow-up: For those patients in whom the acute gout flare is not resolved at Visit 5 (based on the judgment of the Investigator) or in whom there is an unresolved AE or clinically significant treatment-emergent laboratory abnormality, there will be one additional follow-up visit 14 days post-flare onset (Visit 6).

For inclusion in the study, a patient must be 18 years of age or older, must present with a confirmed diagnosis of gout consistent with the criteria of the ACR, and must have experienced $\geqq 2$ acute gouty arthritic attacks in the 12 months prior to randomization. Patients on urate-lowering therapy must be on a stable dose and schedule with no changes in therapy for 4 weeks prior to randomization and expected to remain on a stable regimen during study participation.

Patients with acute polyarticular gout (>4 joints); taking colchicine routinely; with a known hypersensitivity to colchicine; with a history of myocardial infarction, unstable angina, cerebrovascular events, or coronary artery bypass grafting; with active myeloid leukemia, obstructive gastrointestinal cancer, or metastatic cancer; with chronic renal dysfunction, with chronic hepatic dysfunction are excluded from the study. Patients using systemic corticosteroid, cyclosporine, adalimumab, etanercept, infliximab, anakinra, abatacept, mycophenolate, azathioprine, or chronic use of non-steroidal anti-inflammatory drugs (NSAIDs), acetaminophen, tramadol, and other analgesics such as opiates at screening are also be excluded.

The three treatment groups in this study are two ultrapure colchicine tablets (1.2 mgA) administered at the onset of an acute gout attack followed by one tablet (0.6 mgA) after one hour and one placebo tablet every hour thereafter for 5 hours (the "low" dose regimen); two ultrapure colchicine tablets (1.2 mgA) administered at the onset of an acute gout attack followed by one tablet (0.6 mgA) every hour for six (6) hours (the "standard" dose regimen); or two placebo tablets at the onset of an acute gout attack followed by one placebo capsule every hour thereafter for 6 hours (the "placebo" regimen).

34

Efficacy assessment will be made based on patient and Investigator inputs. Patients will record pain severity and sleep interference on a study diary. The severity of pain for each joint affected by the acute gouty arthritic attack will be rated on an 11-point pain intensity numerical rating scale (PI-NRS) that ranges from 0 ("no pain") to 10 ("worst possible pain"). Recordings are to be made prior to each dose of study drug, i.e., pre-treatment with study drug and for the first 8 hours following start of treatment, and every 8 hours thereafter (while awake) until symptoms disappear or 72 hours have passed since the first dose of study drug was taken, whichever occurs first. The patient's pain assessment of each affected joint as reported by the patient at pre-treatment with study drug and at 24 hours post-start of study drug will be documented by a central Study Center to be used in the event the patient fails to provide data on his/her study diary for either of these two key time points. In the morning upon awakening, the patient is to rate sleep interference due to the acute gout flare in the study diary on an 11-point scale that ranges from 0 ("pain did not interfere with sleep") to 10 ("pain completely interfered; patient was unable to sleep"). Investigators will provide clinical assessments in the clinic at all Post-Flare Phase study visits, and at medically necessary intervening visits. For these assessments, each of the patient's joints affected by the acute gouty arthritic attack will be examined and signs and symptoms of inflammation will be rated (erythema [absent, present, or not assessable], swelling [0, "none" to 3, "severe"], and tenderness to touch [0, "none" to 3, "severe"]). At the final clinic visit, the Investigator will also provide a global assessment of response to treatment ranging from 0 ("excellent") to 4 ("none").

The primary efficacy variable is response to treatment in the target joint, based on patient self-assessment of pain at 24 hours post-dose. The target joint is identified during data analysis as that joint affected by the acute gout flare with the highest baseline pain score on the patient diary. Ties among maximum joint scores for an individual are resolved by random selection. A responder is one who provides both a pre-treatment and valid 24-hour pain score and achieves a $\geqq 50\%$ reduction in pain score at the 24-hour post-dose assessment relative to the pre-treatment score and does not use rescue medication. Patients who use rescue medication, discontinue prior to the 24-hour post-dose assessment, or do not achieve a $\geqq 50\%$ reduction in pain score at the 24 hour post-dose assessment relative to the pre-treatment score are deemed non-responders.

The secondary efficacy variables are assessments of magnitude of pain reduction, time to response, time to complete pain relief, and interference with sleep as recorded on patient diaries by the patient. Signs and symptoms of inflammation per Investigator's clinical assessments of the target joint are evaluated. Time to drop out (use of rescue medications) is also evaluated. Investigator global assessment of response to treatment is assessed.

The primary efficacy analysis will be based on an Intent-to-Treat (ITT) population, defined as all patients who were randomized, contacted the Gout Flare Call Center, took at least one dose of study drug, and had one subsequent contact. The Per Protocol (PP) population is defined as the subset of the ITT population confirmed by the Investigator as continuing to meet all major inclusion and exclusion criteria and initiating treatment within 12 hours of the onset of the acute gout flare. Analyses will also be made on an Evaluable patient population with an Evaluable patient defined as one who, in addition to being included in the PP population, completed the randomized treatment course. The ITT population will be used for the evaluation of safety.

US 7,964,647 B2

**35**

Statistical tests for efficacy analysis are two-tailed with an alpha significance level of 0.05.

For primary efficacy analysis, the number of responders in the standard-dose colchicine group and the placebo group, as defined for the primary efficacy variable, will be compared using the Mantel-Haenszel chi-square test stratified on study site. The comparison of the standard-dose colchicine and placebo groups of the ITT population is the primary comparison of interest. The sensitivity to alternate definitions of response (based both on magnitude of reduction from baseline as well as time point) will be evaluated as secondary endpoints. As additional sensitivity analyses, these tests will also be repeated for the PP and Evaluable populations if the sample sizes differ from the overall ITT population by more than 10%.

For secondary efficacy analysis, the number of responders in the low-dose colchicine group will be compared to placebo and also to standard-dose colchicine using the Mantel-Haenszel chi-square test stratified on study site. Change in pain intensity, interference with sleep, time to 50% reduction in pain, and time to complete pain relief will be analyzed as continuous variables using analysis of covariance with study site, treatment group, and site by treatment interaction as independent variables for change in pain intensity and interference with sleep, with baseline score as a covariate. For the Investigator's clinical assessment of inflammation (erythema, swelling, and tenderness to touch) and Investiga-

**36**

will be conducted at the final clinic visit (Visit 4 or Visit 5). Vital signs and body weight will be measured at each Post Flare visit (Visit 3 and 4 or 5). For those patients in whom there is an unresolved AE or clinically significant treatment emergent laboratory abnormality, there will be one additional follow up visit 14 days post flare onset (Visit 6).

Safety analysis will be performed by coding adverse events using a standard medical dictionary and the incidence summarized by treatment group; tabulations will be prepared of all AEs as well as by relationship and by severity. Adverse events resulting in termination and events meeting regulatory criteria for seriousness will also be tabulated separately. Descriptive statistics (mean, median, standard deviation, and range) of clinical laboratory testing results and vital sign measurements will be generated for each treatment group and change from the most recent value prior to onset of the acute gout flare calculated; no inferential testing will be performed. Treatment emergent abnormalities on physical examination will be tabulated and listed by treatment group. By patient listings of all safety data and concomitant medication use will be generated.

Study Results

The following data were obtained in general accordance with the above protocol.

Out of 813 patients screened, 575 were randomized to treatment with 185 patients having a gouty flare and receiving study drug. The intent-to-treat population consisted of 184 patients (52 received standard dose, 74 received low dose and 58 received placebo).

| Number of Responders Based on Target Joint Pain Score at 24 Hours Post First Dose | | | | | |
|---|---|---|---|---|---|
| Colchicine Dose | | Placebo | Odds Ratio (95% Confidence Intervals) | | |
| Low (N = 74) N (%) | High (N = 52) N (%) | (N = 58) N (%) | Low vs. Placebo | High vs. Placebo | High vs. Low |
| 28 (37.8) | 17 (32.7) | 9 (15.5) | 3.31 (1.41, 7.77) P = 0.0046 | 2.64 (1.06, 6.62) P = 0.0343 | 0.80 (0.38, 1.68) P = 0.5529 |

tor's global assessment of response to treatment, the treatment groups will be compared using the Mantel-Haenszel chi-square test stratified on study site.

Safety assessments will be made based on patient and Investigator inputs. Patients will be initially screened in the clinic for inclusion by review of medical history and concomitant medication use, physical examination, measurement of vital signs (oral temperature, sitting radial or brachial pulse rate, respiratory rate, and sitting blood pressure), body weight, and clinical laboratory testing (serum biochemistry, complete blood count, and urinalysis). After randomization, clinical laboratory tests, concomitant medication use, medical history and current complaints (AE) will be reviewed every 3 months until an acute gout flare occurs in order to ensure continued eligibility. Compliance with key inclusion/exclusion criteria (based on intervening medical history and concomitant medication use) will be re-confirmed by the Gout Flare Call Center prior to authorizing the start of study drug. Following the start of study drug, patients will record any severe gastrointestinal AEs on their diaries and these will be recorded in the Case Report Form (CRF) at each clinic visit. Full physical examinations and clinical laboratory testing

| Cumulative Distribution of Degree of Percent Improvement for Target Joint Pain Score at 24 Hours Post First Dose | | | |
|---|---|---|---|
| Colchicine Dose | | | |
| % Improvement | High (N = 52) | Low (N = 74) | Placebo (N = 58) |
| >=0% | 52 (100.0%) | 74 (100.0%) | 58 (100.0%) |
| >=10% | 32 (61.5%) | 47 (63.5%) | 24 (41.4%) |
| >=20% | 29 (55.8%) | 45 (60.8%) | 21 (36.2%) |
| >=30% | 21 (40.4%) | 39 (52.7%) | 17 (29.3%) |
| >=40% | 21 (40.4%) | 36 (48.6%) | 14 (24.1%) |
| >=50% | 19 (36.5%) | 30 (40.5%) | 10 (17.2%) |
| >=60% | 15 (28.8%) | 24 (32.4%) | 7 (12.1%) |
| >=70% | 10 (19.2%) | 20 (27.0%) | 4 (6.9%) |
| >=80% | 9 (17.3%) | 15 (20.3%) | 3 (5.2%) |
| >=90% | 6 (11.5%) | 9 (12.2%) | 2 (3.4%) |
| >=100% | 6 (11.5%) | 8 (10.8%) | 2 (3.4%) |

US 7,964,647 B2

37 | 38

---

Treatment Response Based on at Least a 2-Unit Reduction in Target Joint Pain Score at 24 Hours and 32 Hours Post First Dose

| | Number (%) of Responders | | | Treatment Comparisons | | |
|---|---|---|---|---|---|---|
| | Colchicine Dose | | | (Odds Ratio and 95% CI)[1] | | |
| Hours Post First Dose | High (N = 52) | Low (N = 74) | Placebo (N = 58) | High vs. Placebo | Low vs. Placebo | High vs. Low |
| 24 | 18 (34.6) | 32 (43.2) | 10 (17.2) | 2.54 (1.04, 6.18) p = 0.0368 | 3.66 (1.61, 8.32) p = 0.0015 | 0.69 (0.33, 1.45) p = 0.3298 |
| 32 | 20 (38.5) | 34 (45.9) | 10 (17.2) | 3.00 (1.24, 7.24) p = 0.0126 | 4.08 (1.80, 9.27) p = 0.0005 | 0.74 (0.36, 1.51) p = 0.4033 |

[1]The p-value is from the unstratified Pearson chi-square test.

---

Target Joint Pain at Baseline, 24 Hours and 32 Hours Post First Dose, and Change from Baseline (LOCF) - ITT Population

| | | Colchicine Dose | | | Treatment Comparisons[1] | | |
|---|---|---|---|---|---|---|---|
| Time Point | Statistic | High (N = 52) | Low (N = 74) | Placebo (N = 58) | High vs. Placebo | Low vs. Placebo | High vs. Low |
| | | 24 Hours Post First Dose | | | | | |
| Baseline | Mean (SD) | 6.9 (1.59) | 6.9 (1.72) | 6.8 (1.44) | −1.3 | −1.5 | 0.2 |
| | Median (Mix, Max) | 7.0 (4, 10) | 7.0 (4, 10) | 7.0 (4, 10) | p = 0.0145 | p = 0.0055 | p = 0.7540 |
| Change | Mean (SD) | −2.0 (2.93) | −2.2 (3.46) | −0.7 (2.77) | | | |
| | Median (Mix, Max) | −2.0 (−9, 4) | −2.0 (−9, 5) | −0.0 (−8, 4) | | | |
| | | 32 Hours Post First Dose | | | | | |
| Baseline | Mean (SD) | 6.9 (1.59) | 6.9 (1.72) | 6.8 (1.44) | −1.6 | −1.6 | 0.1 |
| | Median (Mix, Max) | 7.0 (4, 10) | 7.0 (4, 10) | 7.0 (4, 10) | p = 0.0057 | p = 0.0038 | p = 0.9238 |
| Change | Mean (SD) | −2.3 (3.05) | −2.4 (3.59) | −0.7 (2.95) | | | |
| | Median (Mix, Max) | −2.0 (−9, 3) | −2.5 (−9, 5) | 0.0 (−8, 4) | | | |

[2]Tabled values are the difference between treatment groups mean change from baseline and p-value from ANCOVA with treatment group as the independent variable and baseline score as the covariate.

---

Total Pain Relief (TOTPAR) Based on All Target Joint Pain Scores

| | | Colchicine Dose | | |
|---|---|---|---|---|
| Time Point | Statistic | High (N = 52) | Low (N = 74) | Placebo (N = 58) |
| Hour 24 | n | 51[1] | 74 | 58 |
| | Mean (SD) | 20.9 (48.42) | 30.5 (61.44) | 9.5 (45.87) |
| | Median (Mix, Max) | 11.5 (−102, 135) | 23.0 (−112, 185) | 7.3 (−90, 142) |
| Hour 32 | n | 51 | 74 | 58 |
| | Mean (SD) | 31.9 (63.83) | 45.5 (82.05) | 12.2 (59.88) |
| | Median (Mix, Max) | 27.5 (−102, 185) | 34.1 (−128, 257) | 7.3 (−114, 142) |

[1]Patient 1026-1005 did not have a diary and the 24-hour call to the Call Center was 27 hours after the initial call. As indicated in the SAP, the Call Center pain score was not eligible for substitution for the missing diary. This patient has been excluded from the TOTPAR summary.

A443

US 7,964,647 B2

| 39 | | 40 |
|---|---|---|

Number (%) of Patients Using Rescue Medication Up to and Including the 24-Hour Post First Dose Assessment

| | Colchicine Dose | | | Treatment Comparison (Odds Ratio and 95% CI) | | |
|---|---|---|---|---|---|---|
| | High (N = 52) | Low (N = 74) | Placebo (N = 58) | | | |
| | n (%) | n (%) | n (%) | High vs. Placebo | Low vs. Placebo | High vs. Low |
| | 18 (34.6) | 23 (31.1) | 29 (50.0%) | 0.53 (0.25, 1.14) p = 0.1034 | 0.45 (0.22, 0.92) p = 0.0273 | 1.17 (0.55, 2.50) p = 0.6768 |

Change from Baseline in Target Joint Pain Scores at 24 Hours Post First Dose with Interval of Time of Dose Relative to Flare Onset as Covariate (LOCF) - ITT Population

| | | Colchicine Dose | | | Treatment Comparisons[2] | | |
|---|---|---|---|---|---|---|---|
| | Statistic | High (N = 52) | Low (N = 74) | Placebo (N = 58) | High vs. Placebo | Low vs. Placebo | High vs. Low |
| | | Early Treatment Start (within 4 hours) | | | | | |
| Baseline | Mean (SD) | 6.9 (1.59) | 6.9 (1.72) | 6.8 (1.44) | −1.3 | −1.5 | 0.2 |
| | Median (Min, Max) | 7.0 (4, 10) | 7.0 (4, 10) | 7.0 (4, 10) | p = 0.0145 | p = 0.0055 | p = 0.7540 |
| Change | Mean (SD) | −2.0 (2.93) | −2.2 (3.46) | −0.7 (2.77) | | | |
| | Median (Min, Max) | −2.0 (−9, 4) | −2.0 (−9, 5) | −0.0 (−8, 4) | | | |
| | | Late Treatment Start (after 4 hours) | | | | | |
| Baseline | Mean (SD) | 6.9 (1.59) | 6.9 (1.72) | 6.8 (1.44) | −1.6 | −1.6 | 0.1 |
| | Median (Min, Max) | 7.0 (4, 10) | 7.0 (4, 10) | 7.0 (4, 10) | p = 0.0057 | p = 0.0038 | p = 0.9238 |
| Change | Mean (SD) | −2.3 (3.05) | −2.4 (3.59) | −0.7 (2.95) | | | |
| | Median (Min, Max) | −2.0 (−9, 3) | −2.5 (−9, 5) | 0.0 (−8, 4) | | | |

[1]Patient 1016-1013 was missing a flare onset time and Patients 1002-1007, 1018-1008, 1006-1013, 1009-1011, 1010-1005, 1010-1016, 1026-1002, 1026-1007, 1064-1007, and 1068-1022 appear to have taken the first dose of study medication prior to flare onset.

[2]Tabled values are the difference between treatment groups mean change from baseline and p-value from ANCOVA with treatment group as the independent variable and baseline score as the covariate.

50

Overall Summary of Treatment Emergent Adverse Events - Safety Population

| | Colchicine Dose | | |
|---|---|---|---|
| | High (N = 52) n (%) | Low (N = 74) n (%) | Placebo (N = 59) n (%) |
| Total Number of TEAEs[1] | 85 | 34 | 27 |
| Number (%) of Patients with at Least One TEAE | 40 (76.9) | 27 (36.5) | 16 (27.1) |
| Number (%) of Patients with at Least One Mild TEAE | 15 (28.8) | 19 (25.7) | 9 (15.3) |
| Number (%) of Patients with at Least One Moderate TEAE | 15 (28.8) | 8 (10.8) | 6 (10.2) |
| Number (%) of Patients with at Least One Severe TEAE | 10 (19.2) | 0 | 1 (1.7) |

55

-continued

Overall Summary of Treatment Emergent Adverse Events - Safety Population

| | Colchicine Dose | | |
|---|---|---|---|
| | High (N = 52) n (%) | Low (N = 74) n (%) | Placebo (N = 59) n (%) |
| Number (%) of Patients with a TEAE Discontinuing Study | 0 | 0 | 0 |
| Number (%) of Patients with a Treatment Emergent SAE | 0 | 0 | 0 |

[1]Patients reporting more than one adverse event are only counted once for a given event.

US 7,964,647 B2

41     42

Number (%) of Patients with at Least One Treatment-Emergent Gastrointestinal Adverse Event Recorded on the Diary or the CRF- Safety Population

| Method of Capture | Colchicine Dose | | | | Placebo (N = 59) | |
|---|---|---|---|---|---|---|
| | Standard (N = 52) | | Low (N = 74) | | | |
| | All | Severe | All | Severe | All | Severe |
| Captured on Adverse Event CRF[1] | 40 (76.9)[2] | 10 (19.2) | 19 (25.7) | 0 | 12 (20.3) | 0 |
| Captured on Patient Diary | 48 (92.3)[2] | 13 (25.0) | 32 (43.2)[3] | 3 (4.1) | 15 (25.4) | 2 (3.4) |
| Captured on Patient Diary or Adverse Event CRF | 49 (94.2)[2] | 18 (34.6) | 33 (44.6) | 3 (4.1) | 16 (27.1) | 2 (3.4) |

[1]Gastrointestinal adverse events captured on the AE CRF include the MedDRA preferred terms of "diarrhoea", "nausea", "vomiting", "abdominal pain", or "abdominal pain lower", "abdominal pain upper", "abdominal discomfort", or "dyspepsia".
[2]Statistically significantly different from placebo and from Low-dose colchicine (95% CI of odds ratio does not include "1").
[3]Statistically significantly different from placebo (95% CI of odds ratio does not include "1").

Number (%) of Patients with at Least One Severe TEAE in Any Treatment Group- Safety Population

| MedDRA System Organ Class MedDRA Preferred Term | Colchicine Dose | | | Placebo (N = 59) n (%) | Odds Ratio (95% Confidence | | |
|---|---|---|---|---|---|---|---|
| | High (N = 52) n (%) | Low (N = 74) n (%) | All Colchicine (N = 126) n (%) | | High vs. Placebo | Low vs. Placebo | High vs. Low |
| Number of Patients with at Least One Severe TEAE | 10 (19.2) | 0 | 10 (7.9) | 1 (1.7) | 13.8 (1.7, 112) | — | — |
| Gastrointestinal Disorders | 10 (19.2) | 0 | 10 (7.9) | 0 | — | — | — |
| Diarrhea | 10 (19.2) | 0 | 10 (7.9) | 0 | — | — | — |
| Melaena | 1 (1.9) | 0 | 1 (0.8) | 0 | — | — | — |
| Nausea | 1 (1.9) | 0 | 1 (0.8) | 0 | — | — | — |
| Metabolism and Nutrition Disorders | 0 | 0 | 0 | 1 (1.7) | — | — | — |
| Gout | 0 | 0 | 0 | 1 (1.7) | — | — | — |
| Musculoskeletal and Connective Tissue Disorders | 1 (1.9) | 0 | 1 (0.8) | 0 | — | — | — |
| Pain in Extremity | 1 (1.9) | 0 | 1 (0.8) | 0 | — | — | — |

Number (%) of Patients with at Least One Drug-Related Treatment Emergent Adverse Events with an Incidence of ≥2% of Patients in Any Treatment Group

| MedDRA System Organ Class MedDRA Preferred Term | Colchicine Dose | | Placebo (N = 59) n (%) | Odds Ratio (95% Confidence Intervals) | | |
|---|---|---|---|---|---|---|
| | High (N = 52) n (%) | Low (N = 74) n (%) | | High vs. Placebo | Low vs. Placebo | High vs. Low |
| Number of Patients with at Least One Drug-Related TEAE | 38 (73.1) | 21 (28.4) | 14 (23.7) | 8.7 (3.7, 20.6) | 1.3 (0.6, 2.8) | 6.9 (3.1, 15.2) |
| Gastro-intestinal Disorders | 38 (73.1) | 18 (24.3) | 11 (18.6) | 11.8 (4.8, 29.0) | 1.4 (0.6, 3.3) | 8.4 (3.8, 19.0) |
| Diarrhea | 38 (73.1) | 16 (21.6) | 8 (13.6) | 17.3 (6.6, 45.4) | 1.8 (0.7, 4.4) | 9.8 (4.3, 22.5) |
| Nausea | 7 (13.5) | 3 (4.1) | 3 (5.1) | 2.9 (0.7, 11.9) | 0.8 (0.2, 4.1) | 3.7 (0.9, 15.0) |
| Vomiting | 8 (15.4) | 0 | 0 | — | — | — |

As shown in the above tables, standard dose colchicine produced ≧50% pain reduction at 24 hrs without pain rescue in a greater proportion of patients than did placebo (32.7% vs. 15.5%, p=0.0343; odds ratio 2.64 (95% CI, 1.06, 6.62), and more gastrointestinal side effects than placebo (73.1% vs.

18.6%, odds ratio 11.8 {95% CI, 4.8, 29.0}), in particular more diarrhea than placebo (73.1% vs. 13.6%, odds ratio 17.3 {95% CI, 6.6, 45.4}). Low dose colchicine also produced ≧50% pain reduction at 24 hrs without pain rescue in a greater proportion of patients than did placebo (37.8% vs.

A445

US 7,964,647 B2

**43**

15.5%, p=0.0046; odds ratio 3.31 (95% CI, 1.41, 7.77)), and more gastrointestinal side effects than placebo (24.3% vs. 18.6%, odds ratio 1.4 {95% CI, 0.7 to 11.9}), but did not significantly differ from placebo with respect to diarrhea (21.6% vs. 13.6%, odds ratio 1.8 {95% CI, 0.7 to 4.4}). Severe diarrhea occurred in 19.2% of patients taking high-dose colchicine while not occurring in the low-dose colchicine group. Vomiting occurred in 15.4% of patients taking high-dose colchicine while not occurring in the low-dose colchicine group.

Based on the primary efficacy variable of $\geqq 50\%$ pain reduction at 24 hrs without pain rescue, the proportion of responders to the standard dose and the low dose colchicine regimens was not significantly different (p=0.5529). The odds ratio for being a responder to standard dose colchicine vs. being a responder to low dose colchicine was 0.80 (95% CI, 0.38, 1.68). The proportion of patients rescued prior to 24 hours for the standard dose, low dose and placebo were 34.6%, 28.4% and 48.3%, respectively.

FIG. 1 summarizes efficacy data from the trial. FIG. 1 shows the fraction of all patients improved at 24 hrs post-first dose, regardless of pain rescue, as a function of the percent improvement in pain for each of the three treatment methods (standard dose, low dose, placebo). For example, 49% of patients taking the low dose achieved at least 40% relief compared to 24% of the patients on placebo.

Standard dose oral colchicine was established to be effective, but burdened by significant diarrhea. In contrast, although low dose colchicine was not significantly different from standard dose colchicine in efficacy, low dose colchicine was not significantly different from placebo with respect to diarrhea. This trial provides a new evidence basis for acute gout treatment, specifically supporting the unexpected superiority of a low dose colchicine dosing regimen of 2 tablets of 0.6 mg followed in 1 hour by 1 tablet. The higher standard dose colchicine dosing regimen did not improve patient outcome, but did increase adverse events.

### Example 4

#### Pharmacokinetic Study in Healthy Adults of Single vs. Multiple Oral Doses of Colchicine Tablets

This study was a single-center, open-label, single-sequence, two-period study to evaluate the pharmacokinetic profile of colchicine following single and multiple oral doses of colchicine tablets, 0.6 mg, in healthy volunteers.

In Period 1, study subjects received a 0.6-mg dose of colchicine after an overnight fast of at least 10 hours. In Period 2, subjects received a 0.6-mg dose of colchicine in the morning and the evening (approximately 12 hours later) for 10 days (steady state regimen). Subjects received a light breakfast served 60 minutes following dose administration in the morning and the evening dose was administered 90 minutes after an evening meal on Days 15 through 24 only. On Day 25, the colchicine dose was administered after an overnight fast of at least 10 hours and lunch was served 4 hours post-dose. Study periods were separated by a 14-day washout. Following the single dose and the last dose of the multiple dose regimen (beginning on the mornings of Day 1 and Day 25, respectively), blood samples were collected (6 mL each) from each subject within 1 hour prior to dosing and after dose administration at study hours 0.5, 1, 1.5, 2, 3, 4, 6, 8, 10, 12, and 24 (while confined) and 36, 48, 72, and 96 (on an outpatient basis). Plasma concentrations of colchicine and its metabolites were determined using validated LC/MS-MS methods.

**44**

Thirteen healthy, non-smoking subjects with a mean age of 25.5 years (range 19 to 38 years) and within 15% of ideal body weight were enrolled in this study. All subjects completed both dosing periods according to protocol.

After a single dose, plasma concentrations are no longer quantifiable 24 hours post-dose in all but 1 subject. After the last dose of the steady state regimen, concentrations remained quantifiable for 48 to 72 hours. Review of individual subject data shows that no subject experienced a secondary colchicine peak, either following a single dose or upon multiple dosing.

All 2-O-demethylcolchicine (2-DMC) concentrations were below the level of quantitation (LOQ, 0.2 ng/mL) and only one sample from 1 subject (of 13 subjects) had a detectable 3-O-demethylcolchicine (3-DMC) concentration which was near the level of quantitation. Therefore, metabolites are not discussed further.

In healthy adults, colchicine appears to be readily absorbed when given orally, reaching a mean maximum plasma concentration of 2.5 ng/mL in 1.5 hours after a single dose. The drug is distributed widely, with an apparent volume of distribution of 540 L, greatly exceeding total body water. The elimination half-life as calculated following a single oral dose is approximately 5 hours. Levels were not detectable by 24 hours post-dose and this is therefore not an accurate estimate. Pharmacokinetic parameter values are summarized in the table below.

Review of trough plasma concentrations indicates that steady state was attained by approximately the eighth day of dosing for most subjects. Colchicine may have a diurnal variation reflected in the observed Cmin concentrations at steady state. Cmin concentrations prior to the morning dose are approximately 12% higher than the Cmin concentrations prior to the evening dose (Day 23 and Day 24). The mean Cmin concentration observed on Day 25 was 0.907 ng/mL.

Colchicine accumulated following administration of multiple doses to an extent greater than expected. Exposure was nearly two-fold higher (approximately 1.7 based on AUC [Day 25 $AUC_{0-\infty}$/Day 1 $AUC_{0-\infty}$] and approximately 1.5 based on $C_{max}$[Day 25 $C_{max}$/Day 1 $C_{max}$]). This observation could be attributable to an underestimation of $AUC_\infty$ following a single dose. With the higher plasma levels that occur with repeated dosing, a longer terminal elimination half life is apparent, 26.6 hours. Pharmacokinetic parameter values are summarized in the tables below.

TABLE 10

| Colchicine Pharmacokinetic Parameter Values Following Administration of A Single Oral Dose of Colchicine 0.6 mg in Healthy Adults | | | | | |
|---|---|---|---|---|---|
| | $AUC_{0-t}$ (pg·hr/mL) | $AUC_{0-inf}$ (pg·hr/mL) | $C_{max}$ (pg/mL) | $T_{max}$ (hr) | Kel (1/hr) | $T_{1/2}$ (hr) |
| N | 13 | 13 | 13 | 13 | 13 | 13 |
| MEAN | 10508.54 | 12281.90 | 2470.77 | 1.50 | 0.1829 | 4.95 |
| STDEV | 3544.82 | 4423.34 | 705.98 | 0.54 | 0.0592 | 4.43 |
| % CV | 33.73 | 36.02 | 28.61 | 36.00 | 32.39 | 89.54 |
| MEDIAN | 10560.90 | 11451.45 | 2714.00 | 1.50 | 0.1992 | 3.48 |
| MIN | 4812.88 | 7252.66 | 1584.00 | 1.00 | 0.0359 | 2.84 |
| MAX | 18128.65 | 23838.48 | 3977.00 | 3.00 | 0.2443 | 19.29 |

US 7,964,647 B2

45 46

TABLE 11

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Colchicine Pharmacokinetic Parameter Values Following Administration of Multiple (b.i.d.) Oral Doses of Colchicine 0.6 mg in Healthy Adults | | | | | | | | |
| | $AUC_{0-t}$ (pg-hr/mL) | $AUC_{0-tau}$ (pg-hr/mL) | $AUC_{0-inf}$ (pg-hr/mL) | $C_{max}$ (pg/mL) | $C_{min}$ (pg/mL) | $C_{ave}$ (pg/mL) | $T_{max}$ (hr) | Kel (1/hr) | $T_{1/2}$ (hr) |
| N | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 |
| MEAN | 43576.96 | 29056.23 | 54198.77 | 3553.15 | 906.51 | 1210.68 | 1.31 | 0.03 | 26.60 |
| STDEV | 9333.26 | 4531.30 | 9214.54 | 843.45 | 152.19 | 188.80 | 0.50 | 0.00 | 4.33 |
| % CV | 21.42 | 15.59 | 17.00 | 23.74 | 16.79 | 15.59 | 45.51 | 16.34 | 16.26 |
| MEDIAN | 41925.10 | 28452.15 | 54113.43 | 3734.00 | 903.50 | 1185.51 | 1.00 | 0.03 | 26.51 |
| MIN | 29328.78 | 20791.98 | 37599.76 | 1977.00 | 636.23 | 866.33 | 0.50 | 0.02 | 20.82 |
| MAX | 58265.35 | 36083.95 | 67944.65 | 4957.00 | 1149.67 | 1503.50 | 3.00 | 0.03 | 33.65 |

TABLE 12

| | | |
|---|---|---|
| Mean (% CV) Colchicine Pharmacokinetic Parameter Values Following Administration of Single and Multiple (b.i.d.) Oral Doses of Colchicine 0.6 mg in Healthy Adults | | |
| | Vd/F (L) | CL/F (L/hr) |
| | Colchicine 0.6-mg Single Dose (N = 13) | |
| Day 1 | 341 (54.4) | 54.1 (31.0) |
| | Colchicine 0.6 mg b.i.d. × 10 days | |
| Day 25 | 1150 (18.73) | 30.3 (19.0) |

CL = Dose/$AUC_{0-t}$ (Calculated from mean values)
Vd = CL/Ke (Calculated from mean values)

In the above table, the parameter CL/F denotes the apparent total body clearance after administration, calculated as Total Dose/Total $AUC_{0-tau}$; and $V_d$/F denotes the apparent total volume of distribution after administration, calculated as Total Dose/(Total $AUC_{\infty} \times K_{el}$).

Example 5

Pharmacokinetic Study in Healthy Adults of Low Dose Acute Gout Regimen: 1.8 mg Over 2 Hours

This study was a single-center, single-period, open-label pharmacokinetic study conducted in healthy subjects under fasting conditions. It was designed to characterize the pharmacokinetic profile of a low-dose regimen of colchicine (1.8 mg over 2 hours) used as one of the treatment arms in the randomized, controlled trial in patients with an acute gout flare discussed above.

Thirteen healthy, non-smoking subjects with a mean age of 29.3 years (range 20 to 49 years) and within 15% of ideal body weight were enrolled in this study. Subjects received 2×0.6 mg tablets initially followed by 1×0.6 mg tablet 1 hour later. Blood samples for measurement of colchicine plasma concentrations and metabolites were collected (relative to the first dose of study drug) at pre-dose; 0.5 and 1 hour post-dose (prior to second dose); and 1.5, 2, 2.5, 3, 4, 6, 8, 12, 18, 24, 36, and 48 hours post-dose. Subjects were confined until 48 hours post-dose and then returned 72 and 96 hours after the first dose for additional blood sampling on an outpatient basis. Plasma concentrations of colchicine and its metabolites were determined using validated LC/MS-MS methods.

2-DMC concentrations were below the LOQ for all subjects. Eight of 13 subjects had at least one measurable 3-DMC concentration (29 total 3-DMC measurable concentrations). 3-DMC concentrations ranged from 0.20 ng/mL (near the LOQ) to 0.45 ng/mL and were observed 1 to 4 hours post-dose. Given these low levels, metabolites are not discussed further herein.

When colchicine was administered in this low-dose regimen, concentrations increased to a maximum of 6.2 ng/mL, occurring 1.81 hours after the initial dose (0.81 hours after the second dose). Most of the subjects (10 of 13 subjects or 77%) experienced a secondary peak within 6 hours after the first of the two doses, attributed to intestinal secretion and re-absorption and/or biliary recirculation.

The terminal elimination half-life was 23.6 hours. A summary of the pharmacokinetic parameter values is provided in the table below.

TABLE 12

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| COLCHICINE PHARMACOKINETIC PARAMETER VALUES AFTER LOW-DOSE COLCHICINE (1.8 MG OVER 2 HOURS) ADMINISTRATION IN HEALTHY ADULTS | | | | | | | | |
| | $C_{max}$ (pg/mL) | $T_{max}$ (hr) | Total $AUC_{0-t}$ (pg-hr/mL) | Total $AUC_{\infty}$ (pg-hr/mL) | $K_{el}$ (1/hr) | CL/F (mL/hr) | $V_{area}$/F (L) | $t_{1/2}$ (hr) |
| N | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 |
| MEAN | 6192.77 | 1.81 | 43787.55 | 52070.06 | 0.0326 | 36950.93 | 1188.72 | 23.63 |
| STDEV | 2433.70 | 0.38 | 11437.48 | 13689.27 | 0.0100 | 9593.17 | 319.56 | 9.24 |
| % CV | 39.30 | 21.24 | 26.12 | 26.29 | 30.80 | 27.04 | 26.88 | 39.10 |
| MEDIAN | 5684.00 | 2.00 | 43942.15 | 50783.77 | 0.0322 | 35444.40 | 1149.35 | 21.56 |
| MIN | 3160.00 | 1.00 | 28821.45 | 34171.00 | 0.0141 | 24295.73 | 774.19 | 13.80 |
| MAX | 11570.00 | 2.50 | 58931.59 | 74087.08 | 0.0502 | 52676.24 | 1724.36 | 49.20 |

Example 6

Pharmacokinetic Study in Healthy Adults of a Standard-Dose Acute Gout Regimen: 4.8 mg Colchicine Over 6 Hours.

This study was a single center, randomized, double-blind, double-dummy pharmacokinetic and exploratory ECG safety study.

US 7,964,647 B2

47

With respect to the pharmacokinetic aspect of the study, on Day 1, following a minimum of 10 hours overnight fast, subjects received the appropriate randomized study drug (combination of over-encapsulated active drug or placebo capsules such that the blind was preserved). Those randomized to colchicine received 4.8 mg over 6 hours (initially 2×0.6 mg tablets followed by 1×0.6 mg tablet every hour for six additional doses). Those randomized to moxifloxacin received 1×400 mg tablet. Both dosing regimens were followed by a 4-hour post-dose fast (post-dose fast for colchicine arm started after the first dose of colchicine administered). Blood samples were obtained on Day 1 at the following time points (relative to the first dose of study drug): pre-dose and 1 (prior to second dose), 3 (prior to fourth dose), 6 (prior to final dose), 6.17, 6.33, 6.5, 6.75, 7, 7.25, 7.5, 7.75, 8, 10, 12, 23, 36, 48, 72 and 96 hours post-dose. Subjects were confined until 48 hours post-dose and then returned 72 and 96 hours after the first dose for additional blood sampling on an outpatient basis. Plasma concentrations of colchicine and its metabolites were determined using validated LC/MS-MS methods.

48

Eighteen healthy, non-smoking subjects with a mean age of 28.7 years (range 18 to 50 years) and within 15% of ideal body weight were enrolled in this study. Fifteen subjects were randomized to receive colchicine and 3 subjects were randomized to receive moxifloxacin as a positive control for QTc prolongation. All subjects completed the study according to protocol.

When colchicine was administered as the standard-dose regimen used in the treatment of patients experiencing an acute gout flare, colchicine concentrations increased to a maximum of 6.8 ng/mL (similar to the reported Cmax in the low-dose regimen) and absorbed approximately 4.5 hours after the initial dose (3.5 hours after the second dose). Most of the subjects (13 of 15 subjects receiving colchicine or 87%) experienced a secondary peak within 6 hours after a single oral dose, attributed to intestinal secretion and re-absorption and/or biliary recirculation. The terminal elimination half-life was 31.38 hours. A summary of the pharmacokinetic parameter values is provided in the table below.

TABLE 13

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| MEAN (% CV) COLCHICINE PHARMACOKINETIC PARAMETER VALUES AFTER STANDARD-DOSE COLCHICINE (4.8 MG OVER 6 HOURS) ADMINISTRATION IN HEALTHY ADULTS | | | | | | | | |
| | $C_{max}$ (ng/mL) | $T_{max}$ (hr) | Total $AUC_{0-t}$ (ng-hr/mL) | Total $AUC_\infty$ (ng-hr/mL) | $K_{el}$ ($h^{-1}$) | CL/F (mL/hr) | $V_{area}/F$ (L) | $t_{1/2}$ (hr) |
| N | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 |
| MEAN | 6.84 | 4.47 | 104.95 | 118.20 | 0.0242 | 43168.87 | 1876.09 | 31.38 |
| STDEV | 1.30 | 1.99 | 24.61 | 26.01 | 0.0088 | 12862.03 | 456.19 | 8.36 |
| % CV | 18.94 | 44.65 | 23.45 | 22.01 | 36.59 | 29.79 | 24.32 | 26.65 |
| MEDIAN | 6.69 | 3.12 | 113.12 | 126.47 | 0.0212 | 37954.71 | 1902.14 | 32.76 |
| MIN | 4.95 | 3.12 | 53.74 | 61.31 | 0.0147 | 31386.01 | 805.92 | 15.03 |
| MAX | 8.60 | 7.50 | 138.24 | 152.93 | 0.0461 | 78287.41 | 2639.21 | 47.22 |

2-DMC concentrations were below LOQ for all subjects. Fourteen of 15 subjects had at least one measurable 3-DMC concentration; the 3-DMC concentrations ranged from 0.25 ng/mL (near the LOQ) to 0.42 ng/mL and were observed 1.12 to 12.12 hours post-dose. Summary mean 3-DMC pharmacokinetic parameter values can be found in the table below. The observed mean 3-DMC Cmax, AUC$_{0-t}$, and AUC∞ concentrations were approximately 4.7%, 2%, and 4.1% of the observed mean colchicine Cmax, AUC$_{0-t}$, AUC∞ concentrations, respectively.

TABLE 14

| | | | | | | |
|---|---|---|---|---|---|---|
| Mean (% CV) 3-DMC Pharmacokinetic Parameter Values after Standard-Dose Colchicine (4.8 mg over 6 hours) Administration in Healthy Adults | | | | | | |
| | $C_{max}$ (ng/mL) N = 15 | $T_{max}$[1] (h) N = 14 | $AUC_{0-t}$ (ng · h/mL) N = 13 | $AUC_\infty$ (ng · h/mL) N = 8 | Ke ($h^{-1}$) N = 8 | $t_{1/2}$ (h) N = 8 |
| Standard Dose N = 15 | 0.32 (16.35) | 5.06 (3.12-8.12) | 2.09 (40.29) | 4.84 (42.73) | 0.1418 (60.15) | 6.93 (64.35) |

[1]$T_{max}$ reported mean (range)

US 7,964,647 B2

49

## Example 7

Food Effect Study Single Dose Vs.
COL-Probenecid® (0.5 MG Colchicine/500 MG
Probenecid)

The clinical study of this example was a randomized, single-dose, three-way crossover study testing the bioequivalence of two formulations of colchicine administered under standard fasting conditions, one the 0.6 mgA colchicine formulation of Example 2 (test product) and one a marketed combination product, 0.5 mg colchicine/500 mg probenecid tablets (COL-PROBENECID®, Watson Laboratories, Inc.) (reference product), and the effect of food on the test product by dosing following a high-fat breakfast.

Twenty-eight healthy non-smoking adult volunteers (male and female) and no alternates initiated the study. Subjects received three single doses, in a randomized sequence of three treatment periods. On each occasion, subjects received either one colchicine tablet USP, 0.6 mg (test product) given either with food or in a standard fasting condition or one colchicine 0.5 mg/probenecid 500 mg tablet (reference product) given in a standard fasting condition. Each treatment period was separated by a 14-day washout.

The two dosing conditions were (1) Standard Fasting Conditions (either colchicine tablets USP, 0.6 mg (test A) or reference product, COL-PROBENECID®): 1 tablet of test product (Test A) or reference product with 240 mL of room temperature water after an overnight fast of at least 10 hours; subjects will continue to fast for 4 hours post-dose; and (2)

50

dard meal) depending on the randomization, was allowed from 1 hour prior to dose administration until 2 hours after dosing. When fluids were restricted, they will be allowed ad libitum but will generally be controlled.

Dinner was served approximately 13.5 hours prior to dose administration. At 30 minutes before dose administration, those subjects to be dosed after eating (depending on randomization) were served the standardized, high-fat and high-calorie breakfast (FDA standard meal). All subjects fasted for at least 4 hours after dosing. Clear fluids, such as water, were allowed during fasting.

Subjects were served standardized meals and beverages, controlled by the clinic during periods of confinement. Meals were the same in content and quantity during each confinement period. No grapefruit and/or grapefruit containing products or caffeine and/or xanthine containing products were allowed during the confinement portions of the study.

During confinement, only non-strenuous activity was permitted. Following dose administration, subjects remained in a seated or upright position for at least 4 hours to ensure proper gastric emptying and subject safety.

Blood (6 mL) was collected in K2 EDTA vacutainers with samples taken within 1 hour prior to dosing (0 hour) and after dose administration at 0.5, 1, 1.5, 2, 3, 4, 6, 8, 12, and 24 hours (while confined) and 36, 48, 72, and 96 hours (on an outpatient basis). The colchicine and metabolite plasma concentrations (colchicine, 2-DMC, 3-DMC, and 10 demethylcolchicine) were measured using a validated bioanalytical method.

Pharmacokinetic results comparing the test product under fed and fasting conditions are shown below.

TABLE 15

| Pharmacokinetic results of colchicine test product under fed and fasting | | | | | |
|---|---|---|---|---|---|
| | | Ln-Transformed Data | | | |
| | Least Squares Mean | | Geometric Mean | | 90% Confidence Interval |
| PK Variable | Test B | Test A | Test B | Test A | % Ratio | (Lower Limit, Upper Limit) |
| $C_{max}$ (ng/mL) | 7.784 | 7.781 | 2402.55 | 2393.60 | 100.37 | (89.84, 112.14) |
| $AUC_{0-t}$ (ng/mL-hr) | 9.201 | 9.334 | 9906.40 | 11310.50 | 87.58 | (78.07, 98.26) |
| $AUC_{0-inf}$ (ng/mL-hr) | 9.300 | 9.468 | 10939.73 | 12939.64 | 84.54 | (76.73, 93.15) |

Geometric means are based on least squares means of ln-transformed values.

| | Non-Transformed Data | | | |
|---|---|---|---|---|
| | Least Squares Mean | | | 90% Confidence Interval |
| PK Variable | Test B | Test A | % Ratio | (Lower Limit, Upper Limit) |
| $C_{max}$ (pg/mL) | 2486.99 | 2493.15 | 99.75 | (90.43, 109.07) |
| $AUC_{0-t}$ (pg/mL-hr) | 10438.89 | 12536.56 | 83.27 | (72.79, 93.74) |
| $AUC_{0-inf}$ (pg/mL-hr) | 11345.62 | 13907.83 | 81.58 | (71.53, 91.63) |
| $T_{max}$ (hr) | 1.85 | 1.35 | 137.14 | (111.11, 163.17) |
| Kel ($hr^{-1}$) | 0.1902 | 0.1520 | 125.13 | (107.67, 142.58) |
| $T_{1/2}$ (hr) | 4.34 | 6.27 | 69.17 | (45.2, 93.14) |

High-fat Breakfast (colchicine tablets USP, 0.6 mg): 1 tablet of test product (Test B) with 240 mL of room temperature water 30 minutes after initiation of a standardized, high-fat and high-calorie breakfast (FDA standard meal) preceded by an overnight fast.

Subjects were confined for at least 15 hours prior to and until at least 24 hours after dosing each period. During each period, subjects returned on four separate occasions for outpatient blood sampling.

No fluid, except that given with drug administration and the standardized high-fat and high-calorie breakfast (FDA stan-

TABLE 16

| Descriptive statistics for Pharmacokinetic Parameters for Test Product A (0.6 mg) - Fasting conditions | | |
|---|---|---|
| | AUC0-t (pg-hr/mL) | AUC0-inf (pg-hr/mL) | Cmax (pg/mL) |
| N | 25 | 24 | 25 |
| Arithmetic Mean | 12589 | 14113 | 2503 |
| STDev | 6210.729 | 5595.398 | 722.049 |
| % CV | 48.621 | 39.648 | 28.847 |

US 7,964,647 B2

51

**TABLE 16-continued**

Descriptive statistics for Pharmacokinetic Parameters
for Test Product A (0.6 mg) - Fasting conditions

|        | AUC0-t (pg-hr/mL) | AUC0-inf (pg-hr/mL) | Cmax (pg/mL) |
|--------|-------------------|---------------------|--------------|
| Median | 11412.80          | 12756.02            | 2473.00      |
| Min    | 4430.73           | 6674.96             | 1291.00      |
| Max    | 30787.30          | 27789.51            | 3989.00      |

**TABLE 17**

Descriptive statistics for Pharmacokinetic Parameters
for Test Product A (0.6 mg) - Fed conditions

|                 | AUC0-t (pg-hr/mL) | AUC0-inf (pg-hr/mL) | Cmax (pg/mL) |
|-----------------|-------------------|---------------------|--------------|
| N               | 25                | 22                  | 25           |
| Arithmetic Mean | 10491             | 11404               | 2497         |
| STDev           | 4024.804          | 2895.681            | 695.091      |
| % CV            | 38.374            | 25.392              | 27.838       |
| Median          | 9556.25           | 10964.17            | 2293.00      |
| Min             | 6168.53           | 7128.50             | 1256.00      |
| Max             | 26031.15          | 20101.33            | 3930.00      |

Food was observed to have negligible effect on rate of absorption, as indicated by the percent ratio of ln-transformed Cmax data of 100.37, but decreased the extent of absorption by about 15%, as indicated by the percent ratio of ln-transformed AUC0-t and AUC0-inf values of 87.56 and 84.54, respectively. Under fasted and fed conditions, the mean Cmax was 2.5 ng/mL. Tmax was 1.35 hrs under fasted conditions and 1.85 hrs under fed conditions.

Pharmacokinetic results comparing the test product to the reference product are shown in the tables below. The difference in colchicine potency of the test and reference products was corrected by calculating dose-normalized values in the pharmacokinetic parameters.

52

The 0.6 mgA colchicine tablet, formulated as in Example 2, showed enhanced bioavailability over COL-PROBENECID®. The formulation disclosed herein showed a greater rate and extent of absorption than did the COL-PROBENECID®.

Recitation of ranges of values herein are merely intended to serve as a shorthand method of referring individually to each separate value falling within the range, unless otherwise indicated herein, and each separate value is incorporated into the specification as if it were individually recited herein. The endpoints of all ranges directed to the same component or property are inclusive and independently combinable.

All methods described herein can be performed in a suitable order unless otherwise indicated herein or otherwise clearly contradicted by context. The use of any and all examples, or exemplary language (e.g., "such as") provided herein, is intended merely to better illuminate the invention and does not pose a limitation on the scope of the invention unless otherwise claimed. No language in the specification should be construed as indicating any non-claimed element as essential to the practice of the invention as used herein. Unless defined otherwise, technical and scientific terms used herein have the same meaning as is commonly understood by one of skill in the art to which this invention belongs. The terms wt %, weight percent, percent by weight, etc. are equivalent and interchangeable

Embodiments of this invention are described herein, including the best mode known to the inventors for carrying out the invention. Variations of those preferred embodiments may become apparent to those of ordinary skill in the art upon reading the foregoing description. The inventors expect skilled artisans to employ such variations as appropriate, and the inventors intend for the invention to be practiced otherwise than as specifically described herein. Accordingly, this invention includes all modifications and equivalents of the subject matter recited in the claims appended hereto as permitted by applicable law. Moreover, any combination of the above-described elements in all possible variations thereof is

**TABLE 18**

Summary of Statistical Analysis Colchicine Test Product A (0.6 mg) - Fasting vs
Reference Product C (0.5 mg) - Fasting (Dose Normalized to 0.5 mg) N = 25

| | Ln-Transformed Data | | | | |
|---|---|---|---|---|---|
| | Least Squares Mean | | Geometric Mean | | 90% Confidence Interval |
| PK Variable | Test A | Reference C | Test A | Reference C | % Ratio | (Lower Limit, Upper Limit) |
| $C_{max}$ (ng/mL) | 7.598 | 7.374 | 1994.67 | 1594.51 | 125.10 | (111.97, 139.76) |
| $AUC_{0-t}$ (ng/mL-hr) | 9.151 | 8.833 | 9425.75 | 6858.61 | 137.43 | (122.5, 154.18) |
| $AUC_{0-inf}$ (ng/mL-hr) | 9.286 | 8.970 | 10783.03 | 7863.54 | 137.13 | (124.46, 151.09) |

Geometric means are based on least squares means of ln-transformed values.

| | Non-Transformed Data | | | |
|---|---|---|---|---|
| | Least Squares Mean | | 90% Confidence Interval |
| PK Variable | Test A | Reference C | % Ratio | (Lower Limit, Upper Limit) |
| $C_{max}$ (pg/mL) | 2076.08 | 1688.54 | 122.95 | (110.07, 135.83) |
| $AUC_{0-t}$ (pg/mL-hr) | 10435.91 | 8016.44 | 130.18 | (115.25, 145.11) |
| $AUC_{0-inf}$ (pg/mL-hr) | 11565.28 | 8230.68 | 140.51 | (126.04, 154.99) |
| $T_{max}$ (hr) | 1.35 | 1.34 | 100.11 | (74.05, 126.17) |
| Kel ($hr^{-1}$) | 0.1520 | 0.1970 | 77.16 | (63.69, 90.63) |
| $T_{1/2}$ (hr) | 6.27 | 3.78 | 165.89 | (126.13, 205.65) |

US 7,964,647 B2

53

encompassed by the invention unless otherwise indicated herein or otherwise clearly contradicted by context.

I claim:

1. A method of treating a patient having an acute gouty arthritis attack with colchicine consisting of

54

administering 1.2 mg oral colchicine to a human patient having an acute gouty arthritis attack at the onset of the acute gouty arthritis attack, followed by 0.6 mg oral colchicine one hour later.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,964,647 B2                                          Page 1 of 2
APPLICATION NO.     : 12/407980
DATED               : June 21, 2011
INVENTOR(S)         : Matthew W. Davis

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In column 5, line 41, delete "mitotis," and insert -- mitosis, --, therefor.

In column 10, line 4, delete "and HPLC" and insert -- and UPLC --, therefor.

In column 10, line 41, delete "(HPLC)" and insert -- (UPLC) --, therefor.

In column 12, line 42, delete "calorimetric" and insert -- colorimetric --, therefor.

In column 13, line 44, after "manufacture" insert -- . --.

In column 13, line 66, delete "N-formyldeactylcholchicine," and insert
-- N-formyldeacetylcolchicine, --, therefor.

In column 15, line 42, delete "AVICELL®" and insert -- AVICEL® --, therefor.

In column 15, line 55, after "composition" insert -- . --.

In column 15, line 61, delete "alignates," and insert -- alginates, --, therefor.

In column 16, line 14-15, delete "crosscarmellose" and insert -- croscarmellose --, therefor.

In column 18, line 5, delete "or HPLC" and insert -- or UPLC --, therefor.

In column 20, line 32, after "0.5%" insert -- . --.

In column 21, line 59, delete "methanl" and insert -- methanol --, therefor.

In column 22, line 29, delete "Volumentric" and insert -- Volumetric --, therefor.

Signed and Sealed this
Fifteenth Day of November, 2011

*David J. Kappos*

David J. Kappos
*Director of the United States Patent and Trademark Office*

**CERTIFICATE OF CORRECTION (continued)**                                    Page 2 of 2
**U.S. Pat. No. 7,964,647 B2**

In column 22, line 33, delete "Volumentric" and insert -- Volumetric --, therefor.

In column 28, line 49, delete "probenicid." and insert -- probenicid. --, therefor.

In column 37-38, line 31, delete "goup" and insert -- group --, therefor.

In column 41, line 66, delete "CT," and insert -- CI, --, therefor.

In column 44, line 16, delete "demethylcolchciine" and insert -- demethylcolchicine --, therefor.

In column 52, line 26, after "interchangeable" insert -- . --.

# United States Court of Appeals
## for the Federal Circuit

*Takeda Pharmaceuticals U.S.A. v. West-Ward Pharmaceutical,* 2015-1139, -1142

### CERTIFICATE OF SERVICE

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by MUNGER, TOLLES & OLSON LLP, attorneys for Appellant to print this document. I am an employee of Counsel Press.

On **November 24, 2014** counsel has authorized me to electronically file the foregoing **Brief for Plaintiff-Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

Charles B. Klein (principal counsel)
Steffen N. Johnson
Jovial Wong
Winston & Strawn LLP
1700 K Street, NW
Washington, DC 20006
202-282-5977
cklein@winston.com
sjohnson@winston.com
jwong@winston.com

James F. Hurst
Samuel S. Park
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601
312-558-5230
jhurst@winston.com
spark@winston.com

William M. Jay
Goodwin Procter LLP
901 New York Avenue, NW
Washington, DC 20001
202-346-4000
wjay@goodwinprocter.com

Paper copies will also be mailed to the above principal counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

November 24, 2014                                      /s/ John C. Kruesi, Jr.
                                                      John C. Kruesi, Jr.
                                                      Counsel Press

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief complies with the applicable type-volume limitations.  Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), this brief contains 13,655 words.  This certificate was prepared in reliance on the word count of the word-processing system (Microsoft Office Word 2010) used to prepare this brief.

The undersigned further certifies that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman font.


Dated:  November 24, 2014          */s/Jeffrey I. Weinberger*
                                                Jeffrey I. Weinberger
                                                *Counsel for Plaintiff-Appellant*